IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
Greenbelt Division

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | |
| v. | : | Criminal Case No. PX-20-0434 |
| | : | REDACTED VERSION |
| JEREMY SCHULMAN | : | |

### DEFENDANT JEREMY SCHULMAN'S MEMORANDUM IN SUPPORT OF MOTION TO COMPEL PRODUCTION OF EVIDENCE FROM SPECIFIED AGENCIES OF THE U.S. INTELLIGENCE COMMUNITY

Defendant Jeremy Schulman respectfully moves the Court to compel the government to seek, collect and produce certain specific documents and materials pursuant to Federal Rule of Criminal Procedure 16 and *Brady v. Maryland*, 373 U.S. 83 (1963) from five (5) named agencies of the United States Government involved in national security matters and the collection of foreign intelligence (the "Intelligence Community" or "IC").

Mr. Schulman is a practicing Maryland lawyer who has been charged with a series of felonies, based on his alleged misrepresentation of authority to act on behalf of his client – the Government of Somalia – in seeking to recover financial assets located in the United States and elsewhere. The defense has extensive and compelling reason to believe that the Intelligence Community is in possession of specific exculpatory evidence (including statements by Mr. Schulman) that will document and corroborate his lawful authority to act for the Somali government as well as acknowledgement of that authority by elements of the U.S. government.[1]

---

[1] It should be noted that on May 17, 2021, the government produced to Mr. Schulman ███████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████ Yet, one day later, in denying Mr. Schulman's request for additional records from the U.S. Department of State, the government declined, advising

By this Motion, Mr. Schulman respectfully seeks the assistance of the Court in obtaining this critical defense evidence as mandated under Fed. R. Crim. P. 16 and *Brady v. Maryland*.

**BACKGROUND**

In a series of letters beginning in December 2020, Mr. Schulman's counsel have asked the government to seek, collect and produce several specific categories of documents necessary to the preparation of Mr. Schulman's defense believed to be in the possession, custody or control of one or more of five named agencies within the Intelligence Community.[2] *See* Ex. C, December 11, 2020 Letter from Paul W. Butler, Mark J. MacDougall to the Office of the United States Attorney for the District of Maryland Requesting Discovery Pursuant to Fed. R. Crim. P. 16; *see also* Ex. D, February 23, 2021 Letter from Mark J. MacDougall to the Office of the United States Attorney for the District of Maryland Requesting Intelligence Community Discovery; *see also* Ex. E, April 2, 2021 Letter from Mark J. MacDougall to the Office of the United States Attorney for the District of Maryland Requesting Intelligence Community Discovery. The government has specifically refused to even make the inquiries necessary to determine the existence and nature of those specific categories of documents on the grounds that they are "irrelevant," beyond the scope of the government's obligations under Rule 16 and *Brady*, or both. *See* Ex. F, April 3, 2021 Letter from the U.S. Department of Justice to Defense Counsel in Response to Request for Intelligence Community Discovery, at 2. In particular, the government has refused to produce, in whole or in part:

---

that Mr. Schulman had not "provide[d] any reason to believe that the State Department possesses any exculpatory information in connection with the pending conspiracy, fraud and money laundering charges against the defendant Jeremy Schulman." Ex. B, May 18, 2021 Letter from the U.S. Department of Justice to Defense Counsel in Response to Request for U.S. Department of State Discovery, at 1.

[2] These five agencies include (1) the Central Intelligence Agency, (2) the Bureau of Intelligence and Research of the U.S. Department of State, (3) the Office of Terrorism and Financial Intelligence of the U.S. Department of the Treasury, (4) the Intelligence Branch of the Federal Bureau of Investigation and (5) the National Security Agency of the U.S. Department of Defense.

(**1**) Statements made by Mr. Schulman in the possession of the Intelligence Community (Ex. C at 2–3 and Ex. D, Req. No. 1);

(**2**) Records, files and other documents in the possession of the Intelligence Community that describe, characterize or summarize Mr. Schulman's work on behalf of the government of Somalia (Ex. C, Req. b and Ex. D, Req. No. 2);

(**3**) Records, recordings, files and other documents in the possession of the Intelligence Community arising from specifically-identified meetings between Mr. Schulman and certain high-ranking Somali officials (Ex. D, Req. No. 3);

(**4**) Records, recordings, files and other documents in the possession of the Intelligence Community arising from Mr. Schulman's work with specifically-identified Somali government officials involved in his asset-recovery efforts on behalf of the government of Somalia (Ex. D, Req. Nos. 4–6); and

(**5**) Records, files and other documents in the possession of the Intelligence Community that relate to six specifically identified individuals (*a*) with whom Mr. Schulman worked closely on asset recovery efforts (*Id*., Req. Nos. 7–8, 12) or (*b*) who possess information regarding Mr. Schulman's activities in Somalia during the relevant time period and have independent ties to the Intelligence Community likely to result in documentation of those activities (Ex. D, Req. Nos. 9–11).

In a letter dated February 23, 2021, Mr. Schulman's counsel identified, with a high level of specificity, (a) the names of fourteen foreign nationals and/or foreign government officials and (b) the dates and locations of forty meetings, communications or other encounters between Mr. Schulman and those foreign nationals and officials. *See* Ex. D at 6–9. This information necessarily includes extensive statements by Mr. Schulman that must be produced pursuant to the direct requirements of Fed. R. Crim. P. 16(a). Further, records, files and other documents directly responsive to these requests are considerably likely to be in the possession of the named agencies within the Intelligence Community and include evidence that is clearly within the scope of *Brady v. Maryland* and its progeny. Yet, as reflected in its letter dated April 3, 2021, the government has declined to make any of the requested inquiries to the named agencies within the Intelligence Communities to determine and confirm the existence, scope and nature of the requested evidence.

*See* Ex. F, April 3, 2021 Letter from the U.S. Department of Justice to Defense Counsel in Response to Request for Intelligence Community Discovery.

Mr. Schulman's counsel has substantial reason to believe that the government possesses or otherwise has ready access to evidence that is directly consistent with Mr. Schulman's requests as conveyed to the government in prior communications.

The fact that the Intelligence Community surveils the communications of foreign government officials, representatives and agents is widely known.[3] This practice is not limited to the collection of communications involving select officials, representatives and agents of foreign governments, but extends to surveillance of targeted locations and events where such individuals might gather or meet, including the United Nations Headquarters and the World Bank.[4] Collections encompass both telephone and internet-based communications and frequently include communications of U.S. persons who engage with foreign officials, representatives and agents.[5] Mr. Schulman's asset recovery work on behalf of the Government of Somalia, which included meetings with the leadership of that government, has thus placed him squarely within the net of communications that are routinely the focus of intelligence-gathering operations by agencies

---

[3] James Ball, *NSA Monitored Calls of 35 World Leaders After US Official Handed Over Contacts*, THE GUARDIAN, Oct. 25, 2013, https://www.theguardian.com/world/2013/oct/24/nsa-surveillance-world-leaders-calls ("[T]he NSA encourages senior officials in . . . the White House, State [Department] and the Pentagon, to share their 'Rolodexes' so the agency can add the phone numbers of leading foreign politicians to their surveillance systems. . . . The NSA memo . . . suggests that such surveillance was not isolated, as the agency routinely monitors the phone numbers of world leaders."); Philip Bump, *The NSA Spied on 35 World Leaders After Getting Access to Someone's Address Book*, THE ATLANTIC, October 24, 2013, https://www.theatlantic.com/politics/archive/2013/10/nsa-spied-35-world-leaders-after-getting-access-someones-address-book/309571/.

[4] Mark Hosenball, *Obama Halted NSA Spying on IMF and World Bank Headquarters*, REUTERS, October 31, 2013, https://www.reuters.com/article/us-usa-security-imf/obama-halted-nsa-spying-on-imf-and-world-bank-headquarters-idUSBRE99U1EQ20131031?feedType=RSS&feedName=topNews) ("[President] Obama . . . instructed the NSA to curtail eavesdropping on the United Nations headquarters in New York" following disclosure of internal documents confirming the practice.

[5] Privacy and Civil Liberties Oversight Board, *Report on the Surveillance Program Operated Pursuant to Section 702 of FISA* at 6–7, July 2, 2014 (*available at* https://documents.pclob.gov/prod/Documents/OversightReport/823399ae-92ea-447a-ab60-0da28b555437/702-Report-2.pdf).

4

within the Intelligence Community. Moreover, discovery produced by the government in this matter indicates ████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

███[6]

These surveillance activities are primarily directed by the National Security Agency (NSA) as part of its counterterrorism programs, but records are shared with the Central Intelligence Agency (CIA) and the Federal Bureau of Investigation (FBI), among other members of the Intelligence Community.[7] These include the Office of Terrorism and Financial Intelligence at the United States Department of the Treasury, which focuses on financial intelligence operations and international financial systems,[8] as well as the Bureau of Intelligence and Research of the U.S. Department of State (which "directs the Department's program of intelligence analysis and research, conducts liaison with the Intelligence Community, and represents the Department on

---

[6] 

[7] *Id.* at 7.

[8] *See* Statement of Carter Burwell, Counselor to the Secretary for Terrorism and Financial Intelligence at the United States Department of the Treasury, December 15, 2020 (*available at* https://www.washingtoninstitute.org/policy-analysis/evolving-national-security-threat-landscape-treasurys-expanding-toolkit) (describing the Office of Terrorism and Financial Intelligence as "among the top non-kinetic national security tools of choice for the United States government . . . to counter terrorists and their financial networks" and specifically the illicit activity of "corrupt government officials.").

committees and in interagency intelligence groups").[9] Most recently, Mr. Schulman has learned

███████████████████████████████████████████

███████████████████████████████████████████

███████

The presence and extent of international terrorist groups and activity within the borders of Somalia is a matter of significant concern to the United States. Given that circumstance, there can be no real question that the Intelligence Community has surveilled numerous Somali government officials, representatives and agents with whom Mr. Schulman worked closely – which would inevitably lead to the collection of data communications and other evidence directly involving Mr. Schulman.[10] Mr. Schulman's particular work assisting the Government of Somalia to retrieve significant financial assets located around the globe—which required correspondence with the U.S. Department of State, including a meeting at the U.S. embassy in Nairobi—only heightens the prospect of intelligence scrutiny and surveillance. In light of these circumstances, Rule 16 and *Brady* compel the government to make the specifically requested inquiries of the Intelligence Community to determine the scope and nature of this evidence and make the required production to the defense.

By separate motion, counsel respectfully seeks leave of Court to submit further information, *ex parte*, regarding the importance to Mr. Schulman's defense of the evidence sought

---

[9] "About Us," Bureau of Intelligence and Research, https://www.state.gov/about-us-bureau-of-intelligence-and-research/.

[10] *See* Michael Isikoff, *US Killing of Al-Shabaab Leader in '08 May Shine Light on NSA Surveillance Program*, NBC NEWS, Oct. 19, 2013, https://www.nbcnews.com/news/world/us-killing-al-shabaab-leader-08-may-shine-light-nsa-flna8c11424965 (explaining that court records in the criminal prosecution of a U.S. citizen with ties to Somalia "shed new light on how agency surveillance programs -- including collection of data inside the United States -- is used to support lethal U.S. counterterrorism strikes overseas"); Bump, *supra* note 3 ("[The NSA] made connections up to three relationships away from existing targets: if the NSA was watching you, they could also be watching your friends' friends' friends.").

through this Motion. The requested submission will require that counsel characterize privileged communications and attorney work product and will also disclose specific elements of trial strategy and so would be limited to *in camera* consideration by the Court.

## ARGUMENT

I. **Legal Standard**

**A. The Government Bears a Constitutional Duty to Produce Exculpatory Evidence.**

The government's disclosure of exculpatory material is inherent in the constitutional guarantee of a fair trial. *See Brady v. Maryland*, 373 U.S. 83, 87 (1963). Exculpatory evidence is any information that tends to cast doubt on the defendant's guilt with respect to any essential element in any charged count. *See United States v. Bagley*, 473 U.S. 667, 676 (1985); *Brady*, 373 U.S. at 87. Information is material if "there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *Bagley*, 473 U.S. at 682. *Brady* evidence must be disclosed regardless of whether a defendant makes a request for exculpatory evidence. *See Kyles v. Whitley*, 514 U.S. 419, 432–33 (1995); *United States v. Cheatham*, 500 F. Supp. 2d 528, 535 (W.D. Pa. 2007) ("[T]he Government has a continuing obligation to supplement the discovery it has produced under Rule 16 . . . as well as obligations pursuant to *Brady*, *Giglio*, and the Jencks Act which it may not ignore.").

The government may not simply close its eyes to information that is available to it and refuse to search for and produce *Brady* material. "It is well accepted that a prosecutor's lack of knowledge does not render information unknown for *Brady* purposes." *United States v. Hazel*, 1994 WL 642198, at *7 (4th Cir. Nov. 15, 1994) (internal citations omitted). The government's "Rule 16 obligations extend to materials in the possession of its investigative agents." *United*

*States v. Gonzales Claudio*, 806 F.2d 334, 342 (2d Cir. 1986); *see also United States v. Scruggs*, 583 F.2d 238, 242 (5th Cir. 1978).

At the pretrial stage, where "'an accused cannot possibly know, but may only suspect, that particular information exists which meets [the *Brady*] requirements, he is not required . . . to make a particular showing of the exact information sought and how it is material and favorable.'" *United States v. King*, 628 F.3d 693, 702–03 (4th Cir. 2011) (quoting *Love v. Johnson*, 57 F.3d 1305, 1313 (4th Cir. 1995)) (noting that a "defendant cannot demonstrate that suppressed evidence would have changed the trial's outcome if the Government prevents him from ever seeing that evidence"). Instead, at this stage, a defendant "need only make 'some plausible showing' that exculpatory material exists," *United States v. Abdallah*, 911 F.3d 201, 218 (4th Cir. 2018) (internal citations omitted), and "identify the requested confidential material with some degree of specificity." *United States v. Trevino*, 89 F.3d 187, 189 (4th Cir. 1996). "[D]oubtful questions" should be resolved in favor of disclosure. *Kyles*, 514 U.S. at 439 (quoting *United States v. Agurs*, 427 U.S. 97, 108 (1976)).

**B. The Government Bears a Duty to Disclose Statements of the Defendant.**

Under Rule 16(a)(1)(B) and (E), the government must produce on request of a defendant all records in its possession containing the substance of relevant oral statements regardless of intent to use those statements at trial. *See United States* v. *Hackett*, No. 11-cr-51, 2011 WL 5323506, at *8–9 (N.D. W. Va. Sept. 30, 2011), *aff'd*, 2011 WL 5244695 (N.D. W. Va. Nov. 2011) ("[A]gents' rough notes of any interview of a defendant in circumstances in which the defendant, at the time of the interview knew that the interviewer was a government agent, are required to be produced under Rule 16(a)(1)(B)(ii)") (internal quotations and citation omitted); *United States v. Fort*, 472

8

F.3d 1106, 1118 (9th Cir. 2007) ("[E]vidence became discoverable [] when . . . placed [] in the hands of the federal authorities.").

The word "any" in Rule 16(a)(1)(B)(ii) does not mean a summary of written records such as agent notes or some portion of written records. Rather, it encompasses *all* portions of *all* written records containing discoverable statements. *See United States v. Maxwell*, 285 F.3d 336, 341 (4th Cir. 2002) (interpreting statute's use of "any" to mean "all"); *Hackett*, 2011 WL 5323506, at *8– 12 (requiring disclosure of all records containing statements, including rough notes); *United States v. Lilly,* 2003 WL 168443, at *1–3 (W.D. Va. Jan. 24, 2003) (requiring disclosure of notes, holding that production only of an agent's summary report did not comply with the rule, and stating that *in camera* review is not necessary as a precondition to production in light of the rule's clear command); *accord* Webster's New Universal Unabridged Dictionary at 96 (1st ed. 2003) (defining "any" as "every; all").

II.  **The Government Should Be Compelled to Make the Necessary Inquiries and Produce the Requested Materials and all other Brady and Rule 16(a) Evidence.**

   *a. The Government's Obligations Extend to Those "Closely Connected" to the Investigative Team and Involved in Building Its Case.*

In correspondence with defense counsel, the government has conceded in theory that its obligations extend beyond the distinct members of the prosecution team to include those agencies "closely aligned with the prosecution." Ex. F at 2; *see also United States v. Umana*, No. 3:08CR134-RJC, 2010 WL 11549078, at *2 (W.D.N.C. Apr. 19, 2010). However, the government has nonetheless refused to seek substantially any information from agencies beyond the prosecution team itself. *See id.* at 3. In point of fact, "[t]he prosecution is in possession of information held by any government agency provided the prosecution has knowledge of and access

9

to the information. This is so regardless of whether the agency holding the information participated in the investigation." *United States v. W. R. Grace*, 401 F. Supp. 2d 1069, 1078 (D. Mont. 2005).

Neither the prosecution team's actual possession nor knowledge of the materials is required. "*Brady*'s commands do not stop at the prosecutor's door; the knowledge of some of those who are part of the investigative team is imputed to prosecutors regardless of prosecutors' actual awareness." *United States v. Robinson*, 627 F.3d 941, 951 (4th Cir. 2010). The government's duty to disclose information under Rule 16 and *Brady* therefore extends to "others acting on the government's behalf in the case." *Kyles*, 514 U.S. at 437. Further, Rule 16 imposes a duty on the government to produce statements that the prosecutor could have learned about by exercising due diligence. *See United States v. Santiago*, 46 F.3d 885, 894 (9th Cir. 1995) (explaining that the inquiry is "not [] whether the agency in question had participated in the investigation, but [] whether the United States Attorney had 'knowledge of and access to' the documents") (internal citations omitted).

> b. *The Government Has Implicitly Acknowledged the Relevance of Specific Discovery from the Intelligence Community.*

Moreover, there is reason to doubt the government's contention that no members of the Intelligence Community have been involved in the investigation or collection of relevant evidence involving the current proceeding against Mr. Schulman. ████████████████████
████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████[11]
████████████████████████████████████████████████████████████████

---

[11] ████████████████████████████████████████████████████████████
████

10



The government is obligated to produce the requested materials to Mr. Schulman for his defense, regardless of whether it construes members of the Intelligence Community to be part of the "prosecution team." This is consistent with the Justice Manual's instruction that a prosecutor's disclosure of exculpatory evidence should "exceed its constitutional obligations" and that prosecutors should "err on the side of disclosure in close questions of materiality." Justice Manual § 9-5.001(F).

---

[12] ▮▮▮

[13] Similarly, in its recent opposition to Mr. Schulman's Letter Motion seeking leave to file a motion compelling the production of certain *Giglio* Discovery (ECF No. 41), the Government acknowledges it "aborted" the Somali Presidential campaign of Abdiaziz Amalo by arresting him.

> *c. Mr. Schulman Has Shown that Exculpatory Information Plausibly Exists within the Requested Materials that is Relevant to the Charges against Him.*

It should be readily apparent to the government—given the nearly seven years that was evidently devoted to the investigation of this case—that the discovery believed to be in the possession of each of the five named Intelligence Community agencies is likely to contain exculpatory information, easily satisfying the requirement that such materials "bear more than some abstract logical relationship to the issues in the case." *United States v. Marshall*, 132 F.3d 63, 69 (D.C. Cir. 1998) (as amended Mar. 6, 1998) (finding violation of Rule 16(a)(1)(C) where government failed to turn over records despite repeated requests from defense) (internal citations omitted).

In particular, the categories of information requested in Mr. Schulman's letter of February 23, 2021 each bear directly on whether Mr. Schulman had authorization from the Somali government to conduct asset recovery work. *See* Ex. D. These categories specifically identify recordings, files, records, intercepts, notes and other documents that exist as a result of Mr. Schulman's in-person meetings, communications, travel and other interactions with a number of high-ranking Somali government officials, representatives and agents regarding the asset recovery work at issue in the Indictment. Moreover, given the obviously intense focus of numerous U.S. government departments and agencies on activities and conditions in and relating to Somalia, the notion that no intelligence gathering efforts or work product related in any way to Mr. Schulman's legal work is unsupportable.

Mr. Schulman is not engaged in a "fishing expedition." Mr. Schulman has held numerous in-person meetings, and regularly engaged in telephone, email and other forms of communication with Somali presidents, prime ministers, presidential advisors, ministers, ambassadors and dignitaries. These communications have taken place all over the world, often in connection with

meetings between Somali government officials, representatives and agents and members of the government as well as European allies.

By way of illustration, Mr. Schulman met with the prior Somali president, President Sheikh Sharif, on September 25, 2009 at the Waldorf Astoria Hotel in New York City, in conjunction with President Sharif's attendance at meetings at the United Nations, and with President Sharif and Finance Minister Sharif Hassan Aden at the Willard InterContinental Hotel in Washington, D.C. on September 26, 2009. Additionally, Mr. Schulman has requested IC materials that relate to a meeting he held with President Hassan Sheikh Mohamud in Washington, D.C. on January 17, 2013 at the Willard InterContinental Hotel. Mr. Schulman's meeting with President Hassan Sheikh occurred in conjunction with President Hassan Sheikh's diplomatic visit to the United States in which President Hassan Sheikh met with President Barack Obama and U.S. Secretary of State Hillary Clinton, and during which Secretary Clinton announced the formal recognition of the Government of Somalia during a joint press conference featuring President Hassan Sheikh in the Treaty Room of the U.S. Department of State.[14] Mr. Schulman has also requested IC materials related to meetings he held with President Hassan Sheikh from September 24–25, 2013 at the Hilton Manhattan East at 304 East 42nd Street (it has since been rebranded as the Westgate Grand Central Hotel), in conjunction with President Hassan Sheikh's attendance at the 68th Session of the United Nations General Assembly at the United Nations headquarters in New York, during which President Hassan Sheikh was escorted and protected by Diplomatic Security Special Agents.

Likewise, Mr. Schulman's travels to Somalia—a highly volatile nation plagued by threats of terrorism—and his work with high profile and high-ranking members of the Somali government

---

[14] Remarks of Sec. Hillary R. Clinton and Pres. Hassan Sheik Mohamud (Jan. 17, 2013), *available at* https://2009-2017.state.gov/secretary/20092013clinton/rm/2013/01/202998.htm.

have caused him to have direct interactions with current and former members of the Intelligence Community. Among other things, Mr. Schulman has reason to believe that such contacts have resulted in numerous corroborating debriefs, records, files and other documentation within the Intelligence Community regarding his work and activities on behalf of the Somali government.

### d. The Requested Evidence is Highly Relevant to Mr. Schulman's Defense.

This evidence is plainly pertinent to the charges against Mr. Schulman. The Indictment alleges that Mr. Schulman participated in a years-long scheme to defraud financial institutions holding the Government of Somalia's assets "based on fraudulent, material misrepresentations about [his] authority to act on behalf of the Somali government." Indictment, ECF No. 1, at ¶ 21. Indeed, Mr. Schulman's authority to engage with financial institutions and other entities holding the Somali government's assets is just as critical to the government's case as it is material to Mr. Schulman's defense. ███████████████████████████████████████ ███████████████████████████████████████ ███████████████████████████████████████ If any of the requested intercepts, recordings, or other materials "were to contain revelations regarding any such pivotal subject, it could 'reasonably be taken to put the whole case in such a different light as to undermine confidence" in the government's indictment.[15] *King*, 628 F.3d at 704 (internal citations omitted). Likewise, such evidence would tend to negate any *mens rea* on Mr. Schulman's part. *See United States v. Danielczyk*, No. 1:11CR85-JCC, 2013 WL 142460, at *4 (E.D. Va. Jan. 10, 2013) ("Statements and evidence that it is less likely that Defendant believed his conduct was illegal would plainly be favorable and material to his defense.").

---

[15] "[P]rosecutors generally must take a broad view of materiality and err on the side of disclosing exculpatory and impeaching evidence." Justice Manual 9-5.001(B)(1).

14

For these reasons, it is apparent that the requested categories of documents are material to Mr. Schulman's defense, relevant to the allegations in the Indictment and likely to include admissible evidence that is directly exculpatory.[16]

> e. *Mr. Schulman Has Identified the Requested Categories of Documents with Sufficient Specificity.*

Mr. Schulman's requests are of sufficient specificity to compel the government's production without supporting any rational fear that he is engaged in a fishing expedition. An accused need only "identify the requested confidential material with some degree of specificity." *Trevino*, 89 F.3d at 189. There is no requirement that a defendant request "a particular document" for production; instead, it is sufficient to make out a request for "specified categories of material." *Danielczyk*, 2013 WL 142460, at *4. In this case, Mr. Schulman's requests for IC material include the aforementioned highly specific categories of information that are likely to be in the possession of one or more of the five named IC agencies.

Mr. Schulman's requests more than satisfy this standard. The requests seek records, files and other documents related to a series of meetings between Mr. Schulman and Somali government officials, representatives and agents. During those meetings—which are identified by date, time and location—Mr. Schulman and the foreign officials discussed asset recovery efforts on behalf of the government of Somalia and/or received explicit instructions to carry out the asset recovery efforts. These meetings include multiple meetings with the President of the Transitional Federal Government of Somalia Sharif Sheikh Ahmed; his successor, the President of the Federal Republic of Somalia Hassan Sheikh Mohamud; and a number of other Somali officials and dignitaries with whom Mr. Schulman met on dozens of occasions in relation to his asset recovery work.

---

[16] The Justice Manual provides that a request to the IC "**shall** be undertaken" where "there are documents or information within the intelligence community that fall reasonably within the scope of the prosecutor's affirmative discovery obligations to the defendant." Justice Manual 9-90.210(B) (emphasis added).

Mr. Schulman has also requested files, records and other documents related to three named individuals with whom he has closely worked on asset recovery efforts: (a) Abdiaziz Hassan Amalo, (b) Musa Haji Mohamed and (c) the late Ambassador Donald Bandler. In addition, Mr. Schulman identifies three other individuals whose connections to both the Intelligence Community and to Mr. Schulman's work in Somalia lead him to believe that there are files, records and other documents that would tend to show the nature of his work and activities in the country and on its behalf: (x) Robert Kaneiss, (y) Francesca Contigulia and (z) Benjamin Stair.

There can be no defensible basis to reach any conclusion other than the requested categories of documents are sufficiently specific to compel production.

### f. Fairness Requires that the Government Produce the Requested Information Without Further Delay.

"Where, as here . . . there is an explicit request for an apparently very easy examination, and ***a non-trivial prospect that the examination might yield material exculpatory information***, we think the prosecution should make the inquiry." *United States v. Brooks*, 966 F.2d 1500, 1504 (D.C. Cir. 1992) (emphasis added). With respect to communications between Mr. Schulman and high-ranking Somali government officials regarding asset recovery efforts, there is a strong likelihood that these communications will contain exculpatory information demonstrating Mr. Schulman's authority and a decided lack of the requisite *mens rea*. Whether or not the requested evidence constitutes a prior statement of one of the government's trial witnesses under *Giglio* and the Jencks Act, evidence of relevant communications among key witnesses is plainly "material to preparing the defense" under Rule 16. *United States v. Caro*, 597 F.3d 608, 620 (4th Cir. 2010). Such evidence would unquestionably "'play an important role in uncovering admissible evidence, aiding witness preparation, corroborating testimony, or assisting impeachment or rebuttal.'" *Id*. at

621 (quoting *United States v. Lloyd*, 992 F.2d 348, 351 (D.C. Cir. 1993)); *see also United States v. Salad*, 779 F. Supp. 2d 503, 507 (E.D. Va. 2011).

The requested evidence from the Intelligence Community may also be directly exculpatory under *Brady*. The government may not withhold Rule 16 or *Brady* material on the grounds that it may also constitute Jencks Act material. Evidence that meets the constitutional threshold of "favorability" must be produced in time for the defense to make "'effective use [of it] at trial,'" notwithstanding any contrary timing provisions of the Jencks Act. *See United States v. Beckford*, 962 F. Supp. 780, 788 (E.D. Va. 1997) (quoting *United States v. Smith Grading & Paving, Inc.*, 760 F.2d 527, 531 (4th Cir. 1985)); *United States v. Scott*, No. CRIM. RDB 05-0550, 2006 WL 1238200, at *4 (D. Md. May 4, 2006) ("There is no question that the preparation of the defense in this matter would have differed significantly had the government disclosed Defendant's Letter at an earlier date."). The requested evidence is both exculpatory and "material to preparing the defense," and must be produced under both *Brady* and Rule 16.

## CONCLUSION

For the foregoing reasons, Mr. Schulman respectfully moves that the Court grant his Motion to Compel Production of Evidence from Specified Agencies of the U.S. Intelligence Community as more specifically provided in this Memorandum.

[SIGNATURE BLOCK NEXT PAGE]

Dated: June 4, 2021                    Respectfully submitted,

*/s/*_____
Mark J. MacDougall (MD Bar No. 851201)
Paul W. Butler (*Pro Hac Vice*)
Melissa D. Whitaker (*Pro Hac Vice*)
Allison S. Thornton (*Pro Hac Vice*)
*Counsel for Jeremy Wyeth Schulman*
Akin Gump Strauss Hauer & Feld LLP
2001 K Street NW
Washington, DC 20006
Telephone:  (202) 887-4000
Fax:  (202) 887-4288
E-mail:   mmacdougall@akingump.com
              pbutler@akingump.com
              mwhitaker@akingump.com
              athornton@akingump.com


*/s/*_____
Stanley Woodward (MD Bar No. 18115)
*Counsel for Jeremy Wyeth Schulman*
Brand Woodward Law
1808 Park Rd NW
Washington, DC 20010
Telephone:  202.996.7447
Fax:  202.996.0113
E-mail:   stanley@brandwoodwardlaw.com