**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | * | |
| | * | |
| **v.** | * | **CRIMINAL NO. PX-20-0434** |
| | * | |
| **JEREMY WYETH SCHULMAN,** | * | |
| | * | |
| | * | |
| **Defendant** | * | |
| | * | |

**\*\*\*\*\*\*\***

**GOVERNMENT'S OPPOSITION TO DEFENDANT JEREMY SCHULMAN'S MOTION
TO COMPEL PRODUCTION OF EVIDENCE FROM SPECIFIED AGENCIES
OF THE U.S. INTELLIGENCE COMMUNITY**

The United States of America, by and through its attorneys, submits this memorandum in opposition to Defendant Jeremy Schulman's motion to compel production of evidence from five specified agencies of the U.S. Intelligence Community (ECF 45, 46, 47). The five specified agencies were not part of the prosecution team (referred to herein as the "Government") and they played no role in the Government's investigation, and Schulman does not (and could not) show otherwise. The prosecution team also does not have any knowledge that any of the five agencies possesses any information that would be material, let alone exculpatory, in relation to the 11 conspiracy, fraud, and money laundering charges in the indictment, and again, Schulman has not shown otherwise. Schulman thus seeks precisely the type of unjustified rummaging through government files that the Fourth Circuit, and courts around the country, have consistently rejected because it would "stretch *Brady* beyond its scope and would effectively impose a duty on prosecutors to learn of any favorable evidence known by any government agent." *United States v. Taylor*, 942 F.3d 205 (4th Cir. 2019). The motion thus should be denied in its entirety.

1

## I.      Background

### a.   The Investigation and Indictment

The investigation that led to Schulman's indictment was conducted by a team comprised of prosecutors, special agents, and other personnel from the U.S. Attorney's Office for the District of Maryland, the Fraud Section of the Criminal Division, the Federal Bureau of Investigation (Baltimore Field Office) ("FBI"), and Internal Revenue Service-Criminal Investigation ("IRS-CI"). There are no other agencies or offices that were part of the prosecution team, or that conducted any investigation jointly with the prosecution.[1]

On December 2, 2020, a duly empaneled grand jury in the District of Maryland returned an indictment charging Schulman with 11 counts of conspiracy, fraud, and money laundering. ECF 1 (hereinafter, "Indictment"). The indictment alleges that from approximately July 2009 through July 2014, Schulman and his co-conspirators attempted to, and did, fraudulently obtain control over money and gold that was the property of the Central Bank of Somalia (the "Frozen Somali Assets"), and they engaged in monetary transactions with criminal proceeds.

### b.   The Government's Production of Discovery

The Government has completed eight productions of documents comprised of more than 500,000 pages of material.[2] The Government has also made available for inspection hard copy material obtained through the execution of a search warrant. The discovery includes, *inter alia*,

---

[1]      The terms "prosecution team" and "investigative team" are used interchangeably in the case law. The Government uses the term "prosecution team" here to refer to the law enforcement agents and prosecutors from the FBI (Baltimore Field Office), IRS-CI, U.S. Attorney's Office, and Fraud Section, who have contributed to the investigation and prosecution of this case.

[2]      There currently is no trial date scheduled in this case. The Government's production of discovery pursuant to Rule 16 is substantially complete. The Government's production of other materials required by the Jencks Act, *Brady*, and *Giglio* is ongoing and, consistent with the Government's practices in this district, much of it will be produced closer to trial.

the FBI memorandum describing Schulman's interview with the prosecution team, and motions, applications, affidavits, and other legal process submitted *ex parte* by the prosecution team.

In searching for records and meeting its discovery obligations, the Government has considered all the information in the possession, custody, or control of the prosecution team, and the Government obtained additional records from outside the prosecution team of which it had knowledge, including records from the National Security Division ("NSD") of the U.S. Department of Justice.[3]

### c. The Defendant Schulman's Motion

Schulman requests that the Court compel the Government to seek, collect, and produce documents and materials from five U.S. intelligence agencies: (1) the Central Intelligence Agency, (2) the Bureau of Intelligence and Research of the State Department, (3) the Office of Terrorism and Financial Intelligence of the U.S. Department of the Treasury, (4) the FBI Intelligence Branch, and (5) the National Security Agency of the U.S. Department of Defense ("NSA") (collectively, "the Five IC Agencies").   Def's Mot. 1-2.   Schulman contends that he "has substantial reason to believe" that material and/or exculpatory information is "considerably likely" to be held at the Five IC Agencies because he frequently met with Somali officials, and the U.S. intelligence community reportedly takes a general interest in the meetings of Somali officials.   Def's Mot. 3-4.   Schulman believes himself to be "squarely within the net of communications that are routinely the focus of intelligence-gathering operations."   Def's Mot. 4.

Schulman's motion followed a meet-and-confer process in which the Government agreed

---

[3]        Specifically, the Government requested and obtained records from NSD's Foreign Agent Registration Act ("FARA") Unit based on its knowledge of relevant filings with the FARA Unit, as described in the Indictment. Indictment ¶¶ 39-42.

"to exercise our discretion to make some additional inquiries outside our respective Offices based on our discussions with [defense counsel] and consistent with our responsibilities under *Brady, Giglio* and Rule 16."  *See* Def's Mot. Ex. F, Letter to Paul Butler, Esq., dated April 3, 2021.  The Government further committed to the defendant that "[w]e will appropriately advise you as to what, if anything, we obtain from those inquiries, as required within the ambit of those responsibilities." [4]   *Id.*   Additionally, the Government committed that, to the extent the Government has reviewed or had access to information from any other investigation (involving Schulman's co-conspirators or otherwise) that is required to be disclosed under Rule 16, *Brady, Giglio* or the Jencks Act, the Government will comply with those obligations.  *Id.*  The Government otherwise declined Schulman's request that the Government seek, collect, and produce material from the intelligence community.  *Id.*

## II.    Argument

Schulman's motion offers a scintillating story of high-level meetings, in fancy and dangerous places, under the constant surveillance of the U.S. intelligence apparatus.  The story, however, is utterly disconnected from the actual investigation conducted by the FBI (Baltimore Field Office), IRS-CI, and the undersigned prosecutors that led to Schulman's indictment. Schulman fails to establish that any of the Five IC Agencies were ever part of the prosecution team—and they were not.  Moreover, Schulman does not establish, and could not establish, that the Government is aware of any material or exculpatory information held by the Five IC Agencies. Schulman thus fails to show that the Government's discovery obligations under *Brady v. Maryland*, 373 U.S. 83 (1963), and its progeny or Federal Rule of Criminal Procedure 16 extend

---

[4]       Since Schulman filed this motion, the Government completed all its discretionary inquiries at certain of the Five IC Agencies and concluded none of them possess any information related to Schulman.

to any of the Five IC Agencies.   The motion should be denied for this reason alone.

The motion also should be denied for the independent reason that it fails to make the requisite plausible showing that information at the Five IC Agencies, identified with any degree of specificity, could be material or exculpatory to Schulman's defense.

### a.   Legal Standard

The Government's discovery obligations are established by case law, the Jencks Act, and Federal Rule of Criminal Procedure 16.   Under *Brady v. Maryland*, the Government is required to disclose to the defense evidence in the prosecution's possession that is both favorable to the accused and material either to guilt or to punishment. 373 U.S. at 87.   The obligation to disclose favorable evidence covers exculpatory evidence, as well as information that can be used to impeach government witnesses.   *Giglio v. United States*, 405 U.S. 150, 154 (1972).   Under Rule 16(a)(1), the government is required to disclose, upon request of the defendant, evidence that is "within the government's possession, custody, or control" and is "material to preparing the defense."   Fed. R. Crim. P. 16.

The government's obligations under *Brady* and Rule 16 extend only to information within its possession and control that is material and exculpatory to that defendant.   *Brady*, 373 U.S. at 83.   The government "has a duty to learn of any favorable evidence known to the others acting on the government's behalf in the case, including the police."   *Kyles v. Whitley*, 514 U.S. 419, 437 (1995).   Defendants cannot compel prosecutors to seek out exculpatory or impeachment evidence the government does not possess, and as the Fourth Circuit has made clear, "*Brady* requests cannot be used as discovery devices" to obtain evidence the defendant believes would be helpful. *United States v. Caro*, 597 F.3d 608 (4th Cir. 2010); *see also Weatherford v. Bursey*, 429 U.S. 545, 559 (1977) ("There is no general constitutional right to discovery in a criminal case, and

*Brady* did not create one.").   "Rule 16 applies only to materials possessed or controlled by the prosecuting United States Attorney or governmental investigatory agenc[ies] closely connected to the United States Attorney."   *United States v. Umana*, No. 3:08CR134-RJC, 2010 WL 11549078, at *2 (W.D.N.C. Apr. 19, 2010) (citing *United States v. Jordan*, 316 F.3d 1215, 1249 (11th Cir. 2003) and *United States v. Scruggs*, 583 F.2d 238, 242 (5th Cir. 1978) and holding that the Bureau of Prisons "is not an investigatory agency working in concert with the United States Attorney in this case" and thus its materials are outside the scope of Rule 16).   The Fourth Circuit has held that the prosecution is not required to disclose evidence from separate investigations by other law enforcement agencies that are not part of the prosecution team. *United States v. Taylor*, 942 F.3d 205, 225-26 (4th Cir. 2019).

> b.   *The Five IC Agencies Were Not Part of the Prosecution Team and Schulman Cannot Show Otherwise*

Schulman fails to make the requisite threshold showing that the information that he seeks is in the possession, custody, or control of the prosecution team, or any agency "closely connected" to the prosecution team.   Here, even assuming the existence of any of the information sought, it would be the Five IC Agencies, not the prosecution team, that possesses the information—as Schulman himself concedes.   Def's Mot. 1 ("The defense has extensive and compelling reason to believe that *the Intelligence Community is in possession* of specific exculpatory evidence . . .") (emphasis added).   Tellingly—despite receiving more than 500,000 pages of documents in discovery, including many affidavits and motions describing the investigation— Schulman cannot point to a single fact showing any involvement by the Five IC Agencies in the investigation or prosecution.   Def's Mot. 9-10.   Because the Five IC Agencies were not part of the prosecution team and were not acting on its behalf in this case, the Government is not obligated to search the

Five IC Agencies for material that it does not have and of which it is unaware. *Kyles*, 514 U.S. at 437; *United States v. Morris*, 80 F.3d 1151, 1168 (7th Cir. 1996) (holding that "[b]ecause none of those agencies were part of the team that investigated this case or participated in its prosecution, the district court would not impute their knowledge of potentially exculpatory information to the present prosecutors."); *Umana*, 2010 WL 11549078 at *2 (holding that the government was not obligated to produce data from the Bureau of Prisons ("BOP") because, *inter alia*, the defendant failed to show that the BOP was part of the prosecution team or that the government possessed the information).

Schulman tries to overcome this fatal flaw by contending that a single application for non-content email header information associated with a particular individual shows that the prosecution team must have consulted with the Intelligence Community.  Def's Mot. 11.  Schulman's speculative contention is misplaced: none of the Five IC Agencies were involved in submitting the application or executing the order.[5]  Moreover, the prosecution team's recourse to a judicial application here clearly reflects that the prosecution team—contrary to Schulman's theory—did *not* have access to the communications of that individual through the Intelligence Community, and thus pursued evidence in the investigation through the means typically available to the FBI and IRS-CI.  Simply put, the Five IC Agencies were not part of the prosecution team, or even connected to it in any way, and the motion should be denied for that reason alone.  *Taylor*, 942

---

[5]     Schulman states that he has not received in discovery any information obtained by the Government related to the order.   The reason for that is the Government did not obtain any responsive records.

F.3d at 225–26.

   c. *The Government Cannot Be Compelled to Produce Discovery from Agencies that Were Not Part of the Prosecution Team*

  Contrary to well-established Fourth Circuit precedent, Schulman seeks to compel the Government to produce discovery from the Five IC Agencies that were not part of the prosecution team. In *Taylor*, the Fourth Circuit recently confronted and rejected the same effort to expand the Government's obligations beyond their well-established scope. 942 F.3d at 225.

  The investigation and prosecution in *Taylor* were conducted by FBI agents and an Assistant U.S. Attorney. After the defendants were convicted, they contended that the government failed to satisfy its obligations under *Brady* and *Giglio* because it failed to disclose potential impeachment information that was held by agents from another federal agency (the Bureau of Alcohol, Tobacco, and Firearms or "ATF") working with a different AUSA. The Fourth Circuit held that imputing knowledge of the ATF agents and a different AUSA to the prosecution team would require the court "to stretch *Brady* beyond its scope and would effectively impose a duty on prosecutors to learn of any favorable evidence known by any government agent." *Taylor*, 942 F.3d at 225. The Fourth Circuit rejected such an expansion of the government's discovery obligations. *Id.*

  Similarly, in *United States v. Invidior Inc.*, the District Court for the Western District of Virginia rejected a pre-trial motion by the defendant to compel the production of discovery from various agencies that were not involved in the investigation or prosecution. No. 1:19CR00016, 2019 WL 7116364, at *1 (W.D. Va. Dec. 23, 2019). Citing *Taylor*, the district court held that the information sought by the defendants was possessed by separate agencies and agency subdivisions that were not members of the investigative or prosecution team, and thus the government could

not be compelled to produce the requested information.   *Id.* at \*3.[6]

None of the cases cited by Schulman supports compelling the Government to search the files of agencies that had no connection to the investigation, nor are they the law of the Fourth Circuit.   Def's Mot. 9-10, 16.   In *United States v. Santiago*, the Ninth Circuit held that records sought by the defendant from the BOP were in the prosecution's possession, custody, or control where (1) the BOP "actually contributed to the investigation," (2) the BOP was a part of the Department of Justice, and (3) the prosecution knew that the records at issue (prison files for inmate witnesses) existed.   46 F.3d 885, 893-94 (9th Cir. 1995).   In *United States v. Brooks*, the court of appeals held that the prosecution was required to conduct a search for exculpatory information in the files of the Metropolitan Police Department ("MPD") in connection with a prosecution of a homicide by the U.S. Attorney's Office for the District of Columbia.   966 F.2d 1500 (D.C. Cir. 1992).   The court held that the obligation arose because of "the close working relationship between the Washington metropolitan police and the U.S. Attorney for the District of Columbia . . . a relationship obviously at work in this prosecution."   *Id.*   In other words, the court held that the prosecutors' *Brady* obligation extended to the local police department in a federal homicide prosecution that had been investigated by that local police department.   In *United States v. W.R. Grace*, the district court held that information held by seven federal agencies was within the "possession and control" of the prosecution because the prosecution had sought and received information from those agencies during the investigation, but the court recognized that "a federal

---

[6]      Case law cited in the defendant's own brief stands for the same proposition.   *See* Def's Mot. 7 (citing *United States v. Gonzalez Claudio*, 806 F.2d 334, 342 (2d Cir. 1986), for the proposition that "the government's Rule 16 obligations extend to materials *in the possession of its investigative agents*" (emphasis added)); Def's Mot. 10 (citing *United States v. Robinson*, 627 F.3d 941, 951 (4th Cir. 2010), for the proposition that "*Brady's* commands do not stop at the prosecutor's door; the knowledge of some of those *who are part of the prosecution team* is imputed to prosecutors regardless of prosecutors' actual awareness" (emphasis added)).

prosecutor need not comb the files of every federal agency which might have documents." 401 F. Supp. 2d 1069, 1078-80 (D. Mont. 2005).[7]

Here, the Five IC Agencies did not conduct any of the investigation; the prosecution team did not obtain information from the Five IC Agencies during the investigation; and, as described *infra*, the prosecution team has no knowledge of any specific material or exculpatory material that these agencies might possess. Courts have consistently held that unknown records of agencies similarly distanced from the prosecution team are not within the prosecution's discovery obligations. *See, e.g., United States v. Pinto*, 905 F.2d 407 (4th Cir. 1990) (holding that the Government did not violate Rule 16 by not producing before trial records of its bail bondsman witness when the Government was not aware of the documents before trial and "it is undisputed that the government did not have actual knowledge of the existence, much less possession or control, of the documents until [the bail bondsman] appeared in court on the second day of trial"); *Morris,* 80 F.3d at 1169 (holding that there is no duty for the "prosecutor's office to learn of information possessed by other government agencies that have no involvement in the investigation or prosecution at issue."). [8] This sensible rule serves a vital interest: "the imposition of an unlimited duty on a prosecutor to inquire of other offices not working with the prosecutor's office on the case in question would inappropriately require us to adopt a monolithic view of government that would condemn the prosecution of criminal cases to a state of paralysis." *United States v.*

---

[7]    *W.R. Grace* and *Santiago* have not been followed within the Fourth Circuit and, regardless, their holdings are inapposite here.

[8]    In addition to citing readily distinguishable cases, as described above, Schulman also points to the Justice Manual in support of his motion. The Government disagrees with Schulman's interpretation of the Justice Manual's provisions regarding criminal discovery but, regardless, the Justice Manual "is not intended to, does not, and may not be relied upon to create any rights, substantive or procedural, enforceable at law by any party in any matter civil or criminal." Justice Manual, § 1-1.200.

*Avellino*, 136 F.3d 249, 255 (2nd Cir. 1998) (internal citations and quotation marks omitted); *see also Taylor,* 942 F.3d at 225.

> d.  *The Government Does Not Have Knowledge that the Five IC Agencies Possess Any Information Related to Schulman that Is Material or Exculpatory*

The Government does not have knowledge of any material or exculpatory information held by the Five IC Agencies.   Schulman does not provide facts showing otherwise.   Instead, Schulman provides a discourse on the alleged workings of the Intelligence Community and the IC's general interest in foreign government officials, and then leaps to the conclusion that the IC has "inevitably" collected "data communications and other evidence directly involving Mr. Schulman."   Schulman further states that his "particular work assisting the Government of Somalia to retrieve significant financial assets located around the globe . . . only heightens the prospect of intelligence scrutiny and surveillance."   Def's Mot. 6.   According to Schulman, "[G]iven the obviously intense focus of numerous U.S. government departments and agencies on activities and conditions in and relating to Somalia, the notion that no intelligence gathering efforts or work product related in any way to Mr. Schulman's legal work is unsupportable."   Def's Mot. 12.

But Schulman's say-so does not make it so.   Schulman offers no facts to support his rank speculation.   Nor does he even offer a compelling inference.   Terrorist groups and pirates operating in Somalia posed significant threats to the security and economic interests of the United States and its allies during the relevant period.   *See, e.g.,* Def's Mot. 6 ("The presence and extent of international terrorist groups and activity within the borders of Somalia is a matter of significant concern to the United States.").   Against this backdrop, a Bethesda lawyer and his co-conspirators involving themselves in financial matters appears unlikely to have been "squarely in the net" of

11

U.S. intelligence gathering.   Def's Mot. 4.   Nevertheless, as stated *supra*, the Government undertook discretionary inquiries for any information related to the defendant at certain of the Five IC Agencies, and none of them possessed *any* responsive records on Schulman.[9]

In *United States v. Al-Timimi*, the defendant similarly sought to compel the Government to produce Foreign Intelligence Surveillance Act ("FISA") evidence.   No. 04CR385, 2014 WL 12957760, at *1 (E.D. Va. Apr. 28, 2014).   The defendant speculated that relevant FISA material must have existed because he had been informed by the Government that he had been the subject of an intelligence investigation.   *Id.* at *5.   The court rejected the motion, holding:

> [T]he defendant's motion is poorly calibrated to uncover evidence that might establish that he never possessed the requisite intent to commit the crimes for which he was convicted.   Defendant's motion thus amounts to little more than a fishing expedition in the end.   Perhaps emboldened by recent leaks detailing the extent of previously unknown government surveillance programs, defendant's request rests heavily on plausible-sounding speculation. But that is not enough to state a viable *Brady* claim.

*Id.*   Schulman's speculation should fare no better here.

> ### e.   *Schulman's Motion Fails for the Independent Reason that It Does Not Plausibly Show that the Information Sought Could be Material or Exculpatory*

Even if Schulman could show—which he cannot—that the Government could be compelled to seek, collect, and produce documents from the Five IC Agencies, the motion would nevertheless fail for the independent reason that Schulman does not plausibly show that the information sought could be material or exculpatory.   The Fourth Circuit has held that "[i]n

---

[9]   Schulman alleges that a declassified cable from the State Department, which the Government produced in discovery, indicates that the Five IC Agencies are likely to contain exculpatory information.   Def's Mot. 1, n. 1.   That cable, however, is not exculpatory; none of the charges against Schulman implicates whether the person described in the cable and cited by Schulman was favorably inclined to Law Firm A in that period.   Regardless, the State Department cable does not relate to the Bureau of Intelligence and Research of the State Department or any of the other Five IC Agencies, and therefore is not germane to what information the Five IC Agencies might possess.

making the requisite 'plausible showing' of the existence of exculpatory information, a defendant must identify the requested confidential material with some degree of specificity." *United States v. King*, 628 F.3d 693, 704 (4th Cir. 2011). Schulman contends that the Five IC Agencies "are considerably likely" to possess information corroborating his participation in meetings with Somali officials, including former Somali President Mohamud, which could bear on Schulman's authority to engage with entities holding the Frozen Somali Assets. Def's Mot. 3, 13. Yet Schulman has not articulated any specific connection between any of these meetings and the crimes charged.

Indeed, the indictment acknowledges that the Defendant and his alleged co-conspirators had various interactions with Somali government officials and U.S. government officials. Among other things, the indictment alleges that by in or about April 2013, Schulman and his co-conspirators agreed to use Co-Conspirator 1's political connections in furtherance of the scheme; that in or about July 2013, the then-Governor of the Central Bank of Somalia executed a contract with Law Firm A, where Schulman worked; and that in September 2013, the President of Somalia provided Schulman with a letter that purported to delegate authority to him. Indictment ¶¶ 45, 46, 51-52. Information that merely corroborates that Schulman met with various Somali Government officials, even if it were to exist, would thus not be exculpatory.

Schulman's relationships with Somali officials notwithstanding, the indictment alleges that Schulman committed the following primary acts of fraud in attempting to obtain control over the Frozen Somali Assets:

- In approximately July 2009, Schulman and his co-conspirator Abdiaziz Amalo created a forged document purporting to show that Somalia's Prime Minister had "re-affirmed" that a former Central Bank Governor of Somalia ("Former Governor 1") was still the Governor (the "2009 Forged TFG PM Letter"). Schulman,

13

knowing that Former Governor 1 was not the Central Bank Governor, sent the 2009 Forged TFG PM Letter to various entities that held Somali Frozen Somali Assets and claimed that it provided him with authority over the funds.   Indictment ¶ 30.

- In approximately December 2009, Schulman and Amalo caused to be created a false English-language translation of a Somali Presidential Decree, which fraudulently inflated the authority assigned to Former Governor 1 (the "2009 Fraudulent Decree Translation").   Indictment ¶ 32.   From approximately 2010 through approximately January 2013, Schulman then attempted to gain control of the Frozen Somali Assets by sending the 2009 Fraudulent Decree Translation to various entities that held Frozen Somali Assets, including the Office of the New York State Comptroller.   Indictment ¶¶ 33, 38.

- In approximately August and September 2010, Schulman and Amalo created additional forged documents, which purported to be from the Attorney General of Somalia, in an attempt to defraud a bank in Italy, which held more than $1.5 million in Frozen Somali Assets.   Indictment ¶¶ 40-41.

- In approximately March 2013, Schulman assisted Amalo in creating a forged appointment letter, and a related power of attorney letter, that purported to show that the Somali Prime Minister had appointed an acquaintance of Amalo as the new "Director of Financial Asset Recovery and Banking Affairs" (the "2013 Forged PM Letter" and the "2013 Forged POA").   In or about April 2013, Schulman, knowing that the 2013 Forged PM Letter and the 2013 Forged POA were forgeries, sent them to various entities that held Frozen Somali Assets.   Indictment ¶¶ 43-44.

- From approximately September 2013 to June 2014, Schulman asserted to entities that held Frozen Somali Assets that he had the authority under a "25B Certification" issued by the State Department to take control of those assets.   Schulman concealed, however, that he was told by the State Department in October 2013 that, under the 25B Certification, the President of Somalia could not delegate his authority over the assets to Schulman.   Indictment ¶¶ 50-57.[10]

Schulman enumerates various meetings he had with "high profile and high-ranking members of the Somali government."   (Def's Mot. 12-14).   He does not plausibly explain, however, how any information held by the Five IC Agencies related to these meetings would be germane, much less material or exculpatory, to the above-described fraud charges.   For example, Schulman does not

---

[10]       The indictment further alleges that Schulman agreed to, and did, engage in various transactions with proceeds of the fraud scheme, and that the defendant caused Amalo to submit a fraudulent invoice to the law firm where the defendant worked to facilitate Amalo's payment from the scheme.   Indictment ¶¶ 58-67.

connect *any* of these meetings (which he attended himself) to *any* of alleged forged documents.

The cases cited by Schulman show that the Fourth Circuit's sensible materiality standard is out of reach for him.   Def's Mot. 8.   In *United States v. King*, the Fourth Circuit held that the defendant established the materiality of the information he sought with requisite specificity when seeking the grand jury transcript of a person named Bilal who figured prominently in the defendant's trial.   The defendant's trial defense was that Bilal, rather than the defendant, owned the contraband at issue; Bilal's sworn testimony plausibly could have been germane to that defense.   628 F.3d at 704.   In *United States v. Abdallah*, the Fourth Circuit held the defendant was entitled to *in camera* judicial review of potentially exculpatory information—that, unlike here, was squarely in the possession, custody, or control of the prosecution team—because the defendant sought emails of the law enforcement officers who attended the custodial interrogation connected with his arrest.   911 F.3d 201, 217-220 (4th Cir. 2018).   The defendant's confession in that interrogation "contributed to each count for which the jury convicted the defendant . . . and [thus it] was critical for Defendant's entire defense to establish that he unambiguously invoked the right to remain silent."   *Id.* at 219 (internal quotation marks and citations omitted).   The Fourth Circuit held that the defendant made the requisite plausibility showing through the inconsistencies in the suppression hearing testimony of two of the officers regarding whether the defendant invoked his right to silence during the interrogation.   *Id.*

In contrast to the defendants' narrowly tailored requests for information specifically tethered to their defenses in *Abdallah* and *King*, Schulman seeks a broad swath of records without connecting any of them specifically to the crimes charged.   *See* Def's Mot. Ex. D, 2-4 (seeking, among other things "[a]ll files, records, recordings, intercepts, other communications or statements

made *or otherwise communicated* by Mr. Schulman *to any person or entity"*) (emphasis added). The Fourth Circuit has held that where, as here, "the defendant can only speculate as to what the requested information might reveal, he cannot satisfy *Brady*'s requirement of showing that the requested evidence would be favorable to the accused." *Caro*, 597 F.3d at 608.

Schulman's request also fails to trigger the Government's *Brady* obligations to the extent he seeks information—such as information from his former associates Robert Kaneiss, Francesca Contigulia, and Benjamin Stair—that he could obtain through due diligence from other sources, to wit, his associates themselves. Def's Mot. 16. In *United States v. Wilson*, the defendant collaterally attacked his conviction for various offenses related to the sale of arms to Libya by alleging, *inter alia*, that the district court erred by not compelling the government to obtain and produce intercepted communications from the NSA. 901 F.2d 378 (4th Cir. 1990). The Fourth Circuit held that "the *Brady* rule does not apply if the evidence in question is available to the defendant from other sources." *Id.* at 380. Finding that the defendant could have obtained the information about the communications between an individual named Shirley Brill and the government from Brill herself, the court held: "Although we recognize that any statements Brill may have made suggestive of a set-up could have helped Wilson's case, we find no *Brady* violation because Wilson was free to question Brill in preparation for trial." *Id.* at 381. The same reasoning applies here: Schulman, whose counsel has stated their intention to conduct "extensive fact investigations" (ECF 34), is free to question his associates himself.

*f.   Defendant's* Ex Parte *Submission Should Be Denied*

Schulman supplemented his motion with a proposed *ex parte* submission "regarding the importance to Mr. Schulman's defense of the evidence sought through this Motion." Def's Mot. 6-7. The Government previously opposed, and the Court previously denied without prejudice,

16

the proposed *ex parte* submission.   *See* ECF 35, 40.   Schulman seeks to impose discovery obligations on the Government—and to obtain access to potentially sensitive and/or classified information from the IC—through a submission that the Government is unable to evaluate, consider, and address in response.   The Court should not have to evaluate the merits of Schulman's submission without the benefit of the full adversarial process.   Neither should the Government have to incur expanded discovery obligations, at the risk of the disclosure of sensitive or classified information, on the basis of an unchallenged and unknown *ex parte* submission.

Schulman cites no authority for such a submission.   Def's Mot. 6-7.   Nor does Schulman provide a cogent rationale in favor of it.   Rather, he relies on a paper-thin reference to concerns about disclosing his trial strategy or work product.   This argument, if accepted, could extend to any pre-trial motion sought by any litigant anywhere.   Moreover, Schulman's trial strategy simply has no bearing on whether the Government is required to search for materials from entities that are not part of the prosecution team, which is the threshold issue raised by the motion.   *See* Section II(b)-(c), *supra*.   The Government also has concerns about Schulman's assertion that the *ex parte* submission is necessary because it requires that counsel characterize "privileged communications."   Def's Mot. 7.   To the extent that Schulman is invoking advice of counsel that he received in connection with his defense, the Government has a right to be informed of that invocation so that it can address any resulting waiver accordingly.[11]

---

[11]      The Government's filter team has also withheld from the prosecution team certain material that it has determined is potentially privileged because it relates to attorney-client communications or work product that fall outside the scope of the Court's crime fraud order.   To the extent that any of Schulman's former clients have waived their assertions of attorney-client privilege, the Government has a right to be informed of those waivers as well so the filter team can release sequestered material accordingly.

### III.     Conclusion

For the foregoing reasons, the defendant Schulman's motion should be denied and the proposed *ex parte* submission should not be accepted.

Respectfully submitted,


Joseph Beemsterboer                         Jonathan F. Lenzner
Acting Chief                                      Acting United States Attorney
Fraud Section                                    District of Maryland

_____/s_____                           _____/s_____
Jason M. Manning                             David I. Salem
Amy Markopoulos                             Assistant United States Attorney
Trial Attorneys