IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
Greenbelt Division

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | |
| v. | : | **Criminal Case No. PX-20-0434** |
| | : | |
| **JEREMY SCHULMAN** | : | |

**DEFENDANT JEREMY SCHULMAN'S REPLY MEMORANDUM
IN SUPPORT OF HIS MOTION TO COMPEL PRODUCTION OF EVIDENCE FROM
SPECIFIED AGENCIES OF THE U.S. INTELLIGENCE COMMUNITY**

Defendant Jeremy Schulman, through counsel, respectfully submits this reply memorandum in support of his motion to compel production of evidence from specified agencies of the U.S. Intelligence Community (the "Intelligence Community" or "IC"), pursuant to Federal Rule of Criminal Procedure 16 and *Brady v. Maryland*, 373 U.S. 83 (1963).

The government cannot "intentionally keep[] itself ignorant" of material and exculpatory information in the government's possession or in the possession of agencies closely aligned with the prosecution team. *Hollman v. Wilson*, 158 F.3d 177, 181 (3d Cir. 1998). *See also United States v. Osario*, 929 F.2d 753, 761 (1st Cir. 1991) ("The prosecutor charged with discovery obligations cannot avoid finding out what 'the government' knows, simply by declining to make reasonable inquiry of those in a position to have relevant knowledge."); *United States v. Safavian*, 233 F.R.D. 12 (D.D.C. 2005) (requiring the government to produce materials in the possession of the General Services Administration ('GSA') when central to the government's case were allegations that the defendant violated GSA policies); *United States v. Danielczyk*, 2011 U.S. Dist. LEXIS 57151 (E.D. Va. May 26, 2011) (requiring the government to search for materials across the Department of Justice when communications within the Department of Justice bore upon the defendant's intent to commit an offense); *Carriger v. Stewart*, 132 F.3d 463, 480 (9th Cir. 1997) ("Because the

prosecution is in a unique position to obtain information known to other agents of the government, it may not be excused from disclosing what it does not know but could have learned."). "This is so regardless of whether the agency holding the information participated in the investigation." *United States v. W. R. Grace*, 401 F. Supp. 2d 1069, 1078 (D. Mont. 2005); *see also United States v. Santiago,* 46 F.3d 885, 893 (9th Cir. 1995) (finding that, as the prosecutor had knowledge of and access to the requested information, and the requirements of the Rule were otherwise met, participation in the investigation was a "sufficient, but not necessary, factor to show that the prosecution was in 'possession' of the agency's information.").[1]

The Department of Justice Manual requires, in complex cases involving "other non-criminal investigative or intelligence agencies," that prosecutors "consider whether the relationship with the other agency is close enough to make it part of the prosecution team for discovery purposes." Dep't of Justice Manual tit. 9-78 ("Justice Manual") § 9-5.002(A). Further, "[p]rosecutors are encouraged to err on the side of inclusiveness when identifying the members of the prosecution team for discovery purposes." *Id.* The government must produce the requested materials to Mr. Schulman, regardless of whether it views members of the Intelligence Community as part of the "prosecution team."

The government cannot deny that this case, as charged, is awash in actors and entities that were and are the focus of continued intense scrutiny by the U.S. Intelligence Community. From its first paragraphs, the Indictment describes as relevant to the charges against Mr. Schulman: the Government of Somalia,[2] the Transitional Federal Government of Somalia,[3] the Federal

---

[1] The government's reliance on *United States v. Taylor*, 942 F.3d 205 (4th Cir. 2019) is misplaced because, in that case, the evidence sought to be imputed upon the prosecutors was a single report generated by agents on a *separate* investigation and, at the time of trial, no prosecutor had knowledge of the investigation. *Id.* at 225–26. Additionally, unlike the material sought by Mr. Schulman, the evidence was not material. *Id.* at 226.

[2] Indictment ¶ 5.

[3] *Id.* ¶ 6.

Government of Somalia,[4] the Central Bank of Somalia,[5] Former Governors 1, 2, 3 and 4 of the Central Bank of Somalia,[6] a "currency printer that printed official currencies for central banks and monetary authorities around the world,"[7] a Central Bank governor "freezing" assets as he flees his country in the midst of a civil war[8] and the Prime Minister of the Transitional Federal Government of Somalia.[9] In asking the government to make a series of highly specific inquiries to a narrow group of agencies, Mr. Schulman seeks to obtain the kind of information that was unquestionably collected by the Intelligence Community in real time as events and discussions took place.

Moreover, the integrity of Mr. Schulman's discovery request is bolstered by the government's productions, which include a once-classified cable concerning asset recovery efforts, communications with the Office of Terrorist Financing and Financial Crimes within the Department of the Treasury, communications with the Department of State regarding the recognition of the government of Somalia and statements by Mr. Schulman's alleged co-conspirator that describe meetings at which Somali officials ratified Mr. Schulman's authority to act on behalf of the Somali government.

### I. The Government Has Knowledge that the Five IC Agencies Possess Information Related to Mr. Schulman

The government's bald assertion that it does not have knowledge of material information in the possession of the five IC agencies is insufficient to rebut Mr. Schulman's extensive factual basis to the contrary. Opp'n to Mot. to Compel at 1, 10, 11, ECF No. 49. Nor is the government's contention that these IC agents do not possess "responsive records" to the government's

---

[4] *Id.* ¶ 7.
[5] *Id.* ¶ 8.
[6] *Id.* ¶¶ 9–12.
[7] Indictment ¶ 14.
[8] *Id.* ¶ 26.
[9] *Id.* ¶ 30.

unspecified requests sufficient to show that these agencies do not possess material and exculpatory information.  *Id*. at 12.

On Tuesday, June 22, 2021, the government disclosed excerpts from law enforcement agents' notes consistent with the government's obligation under *Brady* and *Giglio*.  These disclosures – which were not made available to Mr. Schulman at the time of his original motion – make clear the exculpatory nature of the discovery sought from the IC community.  These disclosures reveal that, for four years, the government has known about the subject matter of Mr. Schulman's interactions with senior Somali officials, yet failed to make any inquiry within the IC community regarding the same.

The government cannot "engage in gamesmanship in discovery matters; to the contrary, a prosecutor may not sandbag a defendant by 'the simple expedient of leaving relevant evidence to repose in the hands of another agency while utilizing his access to it in preparing his case for trial.'" *United States v. Marshall*, 132 F.3d 63, 69 (D.C. Cir. 1998) (internal citations omitted).  In such circumstances, the evidence is "plainly within the prosecutor's Rule 16 control." *Id*.  See also *Carey v. Duckworth*, 738 F.2d 875, 878 (7th Cir. 1984) ("[A] prosecutor's office cannot get around *Brady* by keeping itself in ignorance, or compartmentalizing information about different aspects of a case.").  When the government has knowledge of *Brady* information, it is the government's responsibility to produce the information; it is not the defendant's responsibility to subpoena that information.  *See Danielczyk*, 2011 U.S. Dist. LEXIS 57151, at *9 (rejecting the government's contention that defendant should obtain *Brady* information through agency subpoenas).

It is well established that the United States government monitors communications of foreign government officials and agents.  Such surveillance is more common when foreign

4

government officials and agents are on U.S. soil.  Mr. Schulman has identified at least 40 meetings between himself and senior Somali officials, government recordings or other documentation of which will verify the authority bestowed upon Mr. Schulman by these officials.  At least a dozen of these meetings occurred on U.S. soil.  Many of these meetings occurred on the same trips during which these Somali officials met with senior officials of the United States government, including former Secretaries of State John Kerry and Hillary Clinton, former President Barack Obama and the late Senator John McCain.  Mr. Schulman also met in London with Former Assistant Secretary of State for African Affairs Johnnie Carson, President Hassan Sheikh Mohamud and Minister of Foreign Affairs and Deputy Prime Minister Fawzia Yusuf H. Adam regarding the 25B Certification.  *See* Ex. A, June 20, 2013 Email Thread Between Jeremy Schulman and Gabriel Swiney, Department of State.  Specifically, in 2009, Mr. Schulman met with President Sheikh Sharif Ahmed and Finance Minister Sharif Hassan in New York City.  President Sharif had long been a subject of U.S. Intelligence Agencies: according to publicly-available resources, in 2006, the U.S. government contemplated *assassinating* President Sharif.[10]  It is far-fetched to believe that President Sharif would later travel to the United States and meet with Secretary of State Hillary Clinton and not be monitored by the same Intelligence Agencies that, three years earlier, had been closely tracking his every move.  The government cannot make a colorable argument that Mr. Schulman's meetings with these senior Somali officials about the recovery of assets by the Somali government – given the widely suspected links between Somali officials and international terrorism and the direct implication of U.S. national security – was not monitored by these IC agencies.

---

[10] *See* Jon Lee Anderson, *The Most Failed State:  Is Somalia's New President a Viable Ally?*, THE NEW YORKER (Dec. 14, 2009), *available at* https://www.newyorker.com/magazine/2009/12/14/the-most-failed-state.  *See also* United Nations, *Assassination Attempt on President Is Attack on All Somalis, UN Says*, UN NEWS (Oct. 29, 2009), https://news.un.org/en/story/2009/10/319542-assassination-attempt-president-attack-all-somalis-un-says.

The government's assertion that Mr. Schulman's activities do not fall within these IC agencies' directive contradicts materials already produced by the government. The government's productions show that U.S. officials were aware of – and even authorized – Mr. Schulman's efforts on behalf of the government of Somalia. One obvious and well documented example is that officials within the Department of the Treasury's Office of Terrorist Financing and Financial Crimes corresponded with Department of State officials regarding the asset recovery project. *See* Ex. B, April 17, 2013 Email Thread Between Kristen Hecht, Office of Terrorist Financing and Financial Crimes, Department of State, and Department of State and Department of the Treasury Officials. The government's production also reveals the involvement of the Office of Foreign Missions within the Department of State, which works closely with law enforcement agencies. *See* Ex. C, August 1, 2013 Email Thread between Department of State Officials.

Moreover, the government's production includes a once-classified diplomatic cable addressing the asset recovery project and Mr. Schulman's contract to perform such work, which was signed by the Somali Central Bank Governor with explicit approval from the country's President. *See* Def.'s Mot., Ex. A-1, ECF No. 44-2. This cable demonstrates the U.S. Department of State's interest and the National Security Council's awareness of Mr. Schulman's work. The cable states that the asset recovery project triggered an "emergency meeting of heads of diplomatic missions or donor countries and organizations with a keen interest in Somalia," including the European Union Special Representative, United Nations officials, the World Bank Country Director and the "heads of diplomatic missions" from the United States, Norway, Sweden, the United Kingdom and others. *Id*. at 2–3. It is by no means speculative to assert that the U.S. Intelligence Community would be among the "organizations with a keen interest in Somalia," as described in this previously classified cable. Indeed, it seems that the only relevant agency ***not***

keenly interested in learning more about Mr. Schulman's authority is the Department of Justice prosecution team, which has studiously and incuriously refused to gather exculpatory evidence.

Based on materials within the government's productions and information proffered to the government, the government has knowledge that the five IC agencies possess information related to Mr. Schulman.

## II.   The Information Sought is Material and Exculpatory

The Indictment states that Mr. Schulman "fraudulently obtain[ed] control over money and gold that was the property of the Central Bank of Somalia . . . based on fraudulent, material misrepresentations *about [his] authority to act on behalf of the Somali government*." Indictment ¶ 21, ECF No. 1 (emphasis added). Yet the government now asserts that evidence of senior Somali officials verifying Mr. Schulman's authority is neither "germane, []material [n]or exculpatory, to [the government's] fraud charges." Opp'n at 14.

Mr. Schulman has demonstrated that the information possessed by the IC agencies more than "plausibly contain[s] materially favorable evidence." *United States v. Abdallah*, 911 F.3d 201, 217 (4th Cir. 2018). *Cf. United States v. King*, 628 F.3d 693 (4th Cir. 2011) (holding that there was no violation of *Brady* when the information sought was not material); *United States v. Wilson*, 901 F.2d 378, 382 (4th Cir. 1990) (same).

Beginning in 2009, Mr. Schulman met with senior Somali officials regarding his efforts to recover assets on behalf of the government of Somalia. The government seeks to significantly reformulate its own Indictment, in which it alleged Mr. Schulman lacked authority to act on behalf of the Somali government, to now argue that Mr. Schulman's authority to act on behalf of the Somali government is only relevant as it relates to allegedly forged documents. *See, e.g.*, Indictment ¶ 22; Opp'n at 13–14. The substance of Mr. Schulman's meetings with Somali officials from 2009 to 2013 – particularly, conversations regarding the asset recovery process and Mr.

7

Schulman's authority to act on behalf of the government of Somalia – is certainly exculpatory. *See Kyles v. Whitley*, 514 U.S. 419, 420 (1995) (cumulative effect of evidence relevant for *Brady* analysis). *See also* Justice Manual § 9-5.001(C)(4) ("[S]everal items together" may constitute exculpatory and impeachment information. "If this is the case, all such items must be disclosed.").

The government's June 22, 2021 production of *Giglio* statements demonstrates that conversations at these meetings were material and exculpatory. Accordingly to the *Giglio* production, Abdiaziz Hassan Amalo, Mr. Schulman's alleged co-conspirator, stated that, as early as 2009, Mr. Schulman met with President Sharif regarding the asset recovery project and President Sharif wanted Former Central Bank Governor Amalow "to be in charge of the asset recovery." *Cf.* Indictment ¶ 30. Mr. Amalo also stated that Mr. Schulman later "briefed President Moham[u]d on where he stood regarding the asset recovery and what he needed from the Somali government" at a January 2013 meeting with President Mohamud and Foreign Minister Fawzia Yusuf H. Adam. According to this same production, then, in June 2013, Mr. Schulman met with President Mohamud regarding the 25B Certification. *Cf.* Indictment at p. 15. Further, in August 2013, Mr. Schuman met with President Hassan Sheikh Mohamud and the then-Governor of the Central Bank of Somalia regarding the transfer of assets to Somalia. According to Mr. Amalo, "the President wanted [the governor] to follow the signed contract." *Cf.* Indictment ¶ 46–48.

The substance of these meetings goes straight to Mr. Schulman's *mens rea* and is inextricably intertwined with Mr. Schulman's defenses, including that he was authorized to act on behalf of the Somali government and did not knowingly participate in the forgery of any documents. In this way, Mr. Schulman's assertion that these materials are exculpatory is therefore far from speculative. *See United States v. Caro*, 597 F.3d 608, 619 (4th Cir. 2010). The

8

government cannot now re-write the Indictment and claim that meetings with senior Somali officials are not material to Mr. Schulman's defense.

In contrast to the government's claims that Mr. Schulman's request "seeks a broad swath of records" and that he "has not articulated any specific connection between any of these meetings and the crimes charged," Mr. Schulman has provided to the government highly specific document categories, along with a detailed list of dates, individuals and meetings that he knows to have involved exculpatory communications, in order to narrowly tailor his request to that evidence that would be material to his authority to recover assets. Opp'n at 13, 15. Mr. Schulman has indeed made the "'requisite plausible showing'" of the existence of exculpatory information with "'some degree of specificity.'" *King,* 628 F.3d at 703 (4th Cir. 2011) (quoting *United States v. Trevino,* 89 F.3d 187, 189 (4th Cir. 1996)). The cases that the government cites for the proposition that Mr. Schulman has not made this specificity showing are inapposite. *See, e.g.*, *United States v. Invidior Inc.,* 2019 WL 7116364, at *5 (W.D. Va. Dec. 23, 2019) (denying defendant's discovery request for information in the possession of nine agencies regarding the fraud investigation into defendant pharmaceutical company when materials was publicly available, accessible through their own contractors, or already known to the defendants); *see also United States v. Al-Timimi,* 2014 WL 12957760, at *5 (E.D. Va. Apr. 28, 2014) (denying request for information under FISA when the evidence sought was not described with "any particularity.").

**III.   An Ex Parte Submission is Fully Appropriate and Necessary**

Because Mr. Schulman should not be required "to reveal to the prosecution the theories of his defense as a prerequisite" to secure the discovery to which he is entitled, Mr. Schulman renews his request to submit an *ex parte* submission to the Court. *United States v. Poindexter*, 727 F. Supp. 1470, 1479 n.16 (D.D.C. 1989). *See also United States v. North*, 698 F. Supp. 322, 324 (D.D.C. 1988) (permitting the court to conduct an *in camera* and *ex parte* hearing to become "more

precisely informed" as to defendant's defense strategy as it related to the defendant's request for classified materials).

## CONCLUSION

For the foregoing reasons, Mr. Schulman respectfully moves that the Court grant his Motion to Compel Production of Evidence from Specified Agencies of the U.S. Intelligence Community as more specifically provided in this Memorandum.

Dated: June 24, 2021                                  Respectfully submitted,

*/s/*_____
Mark J. MacDougall (MD Bar No. 851201)
Paul W. Butler (*Pro Hac Vice*)
Melissa D. Whitaker (*Pro Hac Vice*)
Allison S. Thornton (*Pro Hac Vice*)
*Counsel for Jeremy Wyeth Schulman*
Akin Gump Strauss Hauer & Feld LLP
2001 K Street NW
Washington, DC 20006
Telephone: (202) 887-4000
Fax: (202) 887-4288
E-mail: mmacdougall@akingump.com
           pbutler@akingump.com
           mwhitaker@akingump.com
           athornton@akingump.com


*/s/*_____
Stanley Woodward (MD Bar No. 18115)
*Counsel for Jeremy Wyeth Schulman*
Brand Woodward Law
1808 Park Rd NW
Washington, DC 20010
Telephone: 202.996.7447
Fax: 202.996.0113
E-mail: stanley@brandwoodwardlaw.com