

**U.S. Department of Justice**

*United States Attorney*
*District of Maryland*
*Southern Division*

---

David I. Salem
Assistant United States Attorney
David.Salem@usdoj.gov Mailing Address:
6500 Cherrywood Lane, Suite 200
Greenbelt, MD 20770-1249 Office Location:
6406 Ivy Lane, 8ᵗʰ Floor
Greenbelt, MD 20770-1249 DIRECT: 301-344-4237
MAIN: 301-344-4433
FAX: 301-344-4516

June 22, 2021

Paul Butler, Esq.
Akin Gump Strauss Hauer & Feld LLP
c/o
Glen Kaplan
1116 Tiffany Road
Silver Spring, MD, 20904

Stanley Woodward, Esq.
Brand Woodward Law
1808 Park Road NW
Washington, DC 20010

> Re:   Discovery in the Case of
>         *United States v. Jeremy Schulman*
>         Criminal No. PX-20-0434
>         Discovery Production #8

Dear Counsel:

Pursuant to Rules 16 and 16.1 of the Federal Rules of Criminal Procedure, Local Standing Order 2020-01 (the "Standing Order"), and the Government's obligations under *Brady v. Maryland*, 373 U.S. 83 (1963), *Giglio v. United States*, 405 U.S. 150 (1972), and other authorities, and with reference to the conditions set forth in the Government's letter dated December 22, 2020, the United States is providing you its eighth discovery production.  The Government will continue to provide additional discovery on a rolling basis.  Our review of discoverable *Brady* and *Giglio* information remains ongoing.[1]

This production consists of excerpts of certain information set forth in Appendix A that was obtained through law enforcement interviews of Abdiaziz Amalo, which were later memorialized by a law enforcement agent.[2]  We are producing these excerpts to you as part of our obligation to provide

---

[1]     Please note that we reiterate our request for discovery and certain defenses, as contained in Rules 12.2, 12.3 and 16(b).  Further, it is our position that although you may have received certain non-discoverable material, this in no way obligates the United States to provide all non-discoverable material, nor does it represent the existence or non-existence of any other non-discoverable materials.

[2]     The memoranda themselves are not the statements of Mr. Amalo within the meaning of the Jencks Act.  "The Fourth Circuit consistently has held that a Government agent's notes of proffer sessions do not qualify as Jencks statements."  *United States v. Beckford*, 962 F. Supp. 780, 803 (E.D. Va. 1997) (citing cases).  Further, for the reasons set forth in our letter to the Court dated May 21, 2021, we are not producing the memoranda at this time.  (ECF 41).

*Brady* or *Giglio* information, which we are doing on an ongoing basis. We recognize that our view of what evidence may constitute *Brady* or *Giglio* information and yours may vary.  This production and letter are provided in addition to any *Brady* and *Giglio* material that has been or will be produced in other productions, regardless of whether we have specifically identified it as such. Accordingly, we urge you to thoroughly review all the material that has been or will be produced in discovery.

Please confirm receipt of these materials by email by June 28, 2021.

If you have any questions or wish to discuss any issue in further detail, please do not hesitate to contact us at the phone numbers below.

Sincerely,

DANIEL KAHN                                JONATHAN LENZNER
ACTING CHIEF, FRAUD SECTION                ACTING UNITED STATES ATTORNEY


_____/s_____                    _____/s_____
JASON M. MANNING                           DAVID I. SALEM
AMY MARKOPOULOS                            Assistant United States Attorney
Trial Attorneys                            (301) 344-4237
(202) 514-6256/616-1514                    David.Salem@usdoj.gov
Jason.Manning@usdoj.gov /
Amy.Markopoulos@usdoj.gov


Encl.

## APPENDIX A

**A law enforcement agent described portions of an interview of Abdiaziz Amalo, which was held on March 13, 2017, as follows:**

In early 2014, AMALO submitted an application which was dated December 27, 2013 in support of a loan modification. He was asked to review an email to Nationstar dated January 7, 2014 to which he attached payroll stubs reflecting income from HGS [Haden Global Services][3]. AMALO admitted that the HGS pay stubs were false. He made the pay stubs under the assumption that he was going to eventually get money from SRGPE [Shulman Rogers]. He downloaded an application to make the pay stub. However, when he was shown the metadata from the HGS pay stubs submitted to Nationstar, AMALO admitted that he used Microsoft Word to create the documents. He also admitted to using a previous UltiSat payroll stub as sample. He created the fictitious pay stubs to show Nationstar that he had a job at HGS.

AMALO was then asked to review a letter dated April 27, 2014 that he prepared and e-mailed to Nationstar. In the letter he asked the mortgage company to lower his monthly payments because he was having trouble paying. He did this because Nationstar had told him that if wanted a modification he needed to send in an appeal letter. The top of the letter reflected a fax number from Pioneer Office Suites. He stated that Pioneer Office Suites was the temporary office space he used for HGS. He was then shown copies of bank statements from Eagle Bank for the HGS account. He admitted that he had money in the HGS bank account but he also had invoices left over that he had to pay. He also admitted that if he had told Nationstar that he had over $600,000 in a bank account then they would not have approved the modification. Therefore, the information in the April 27, 2014 letter to Nationstar was false.

\*\*\*

He [AMALO] was then asked to review a credit application submitted to Nissan Motor Acceptance Corporation on April 22, 2014 for the purchase of a new vehicle. The application reflected that he worked for HGS for three years, six months earning $185,000 as President; and [Bahjo] ARMAN worked as a HR Manager for three years and two months earning $68,000. AMALO admitted that the HGS employment information for both himself and his wife was false. He put the salary down because that is what he was going to get from SRGPE. He also admitted that in late 2013 he took his family on a vacation to Disney World in Orlando, Florida while still claiming to Nationstar that he could not afford his monthly payment.

\*\*\*

[AMALO was shown tax returns that AMALO previously submitted through H&R Block.] He acknowledged that H&R Block was his tax preparer. AMALO never provided records to H&R Block and he admitted that he never filed taxes for HGS. He did not tell the H&R Block tax preparer, Laura Cook, that he owned a company. He did not submit corporate charges to the IRS for HGS. He asked Cook about corporate taxes and she told him that she did not prepare corporate tax returns. AMALO admitted that he submitted tax returns reflecting income from a taxi cab business in 2014 and 2015, but those were false. He did not drive a taxi cab in 2014 and 2015.

---

[3] Information provided in brackets in this appendix has been added for clarification purposes; it is not part of the original memoranda.

AMALO provided Cook with the income and expense numbers that she used to generate the tax return.

\* \* \*

President Sheikh Sharif wanted [Former Central Bank Governor] AMALOW to be in charge of the asset recovery. The reason they met in New York was because that was when the United Nations General Assembly ("UNGA") held their annual meeting for world leaders. All the Presidents were in New York for the UNGA. SCHULMAN also traveled to New York to meet President Sheikh Sharif.

\* \* \*

AMALO was afraid to tell his uncle that he (AMALOW) could no longer be the Governor. President Sheikh Sharif had already told AMALOW that he could not be the Governor.

\* \* \*

FARAH ABDI told him [AMALO] that someone who can speak Somali and English can tell that SCHULMAN's translated version of the decree is not correct. FARAH ABDI told him that it was okay to say their uncle is the "Director of asset recovery" because the decree could be interpreted that way. However the decree clearly does not include the language "Banking Affairs".

**A law enforcement agent described portions of an interview of Abdiaziz Amalo, which was held on March 30, 2017, as follows:**

AMALO explained that SCHULMAN told him that he (SCHULMAN) needed a letter that said that Amalow held a position in the Somali government for the Schulman Rogers law firm to agree to hold the contract. At the time, Amalow believed that he would remain the Governor of the CBS [Central Bank of Somalia] until September 2009 when he would be formally removed from the position because the incoming Governor would take office.

* * *

[AMALO reviewed a string of emails dated August 4, 2009]. Attached to [an] email was the appointment letter that AMALO previously admitted was a forgery. The string was initiated with an email from "Somalirepublic@gmail.com" and signed by "Osman". AMALO admitted that he wrote the email from "Osman" and created the fake email address. . .  AMALO was asked by SCHULMAN to create an email account for his uncle so it looked like the letter came from the government. AMALO created Somalirepublic@gmail.com and gave SCHULMAN the log-in information. He did not know if SCHULMAN ever logged into the account. The last string in the email was from AMALO to Abdi attaching the forged appointment letter.

* * *

President Sheikh Sharif and Finance Minister Hassan liked the idea of having the Shulman Rogers law firm recover the frozen assets and agreed to give Amalow some type of title upon their return to Mogadishu. Sometime later Finance Minister Hassan called AMALO and told him that they could not make Amalow the governor.

* * *

AMALO could not say for certain, but said it was possible that SCHULMAN convinced Farah that his (SCHULMAN's) version of the translation was suitable. Later AMALO told SCHULMAN that someone might notice that the translation was incorrect and could be a problem. SCHULMAN brushed AMALO aside and said he had already been through this with his brother and he did not want to go through it again.

 SCHULMAN sent some of the money (approximately half) to AMALO to an account at Bank of America identified as belonging to the "Central B of Somal". The account was opened under that name because no bank would allow AMALO to open an account under the name "Central Bank of Somalia" since he was not actually affiliated with the CBS. The banks did not recognize the government of Somalia at that time because the Transitional Federal Government of Somalia was not recognized by most international governments.

* * *

AMALO stated that he used an online company called "Small Biz" to incorporate "Central B of Somal" in Nevada. He acknowledged sending the September 29, 2009 email to Small Biz creating the corporation. He opened the shell corporation in order to facilitate opening bank accounts which would hold the recovered assets. The Bank of America account was the first one he opened. Subsequent to that he opened accounts at SunTrust Bank. Because Amalow was not

the Governor of the CBS, he could not open a bank account under the CBS's name. Therefore, AMALO selected a name which was close to "Central Bank of Somalia".

\* \* \*

[AMALO] was shown an email dated May 21, 2010 from an account identified as "Ali.Amalow@gmail.com". He admitted that he created the "Ali Amalow" email account, but claimed that Amalow and his son, Abdelhakim Abdi, also had access to the account. AMALO admitted that he wrote the email to make it seem as if Amalow wrote it and attached a copy of the account opening notification from Bank of America. He admitted that he opened the "Ali Amalow" email account while working at the Henry M. Jackson Foundation, scanned the Bank of America Account Summary Information and sent it to his own personal email. Then on July 2, 2010 he forwarded the bank information to SCHULMAN. However, AMALO was on the phone with his uncle and Abdelhakim Abdi when sent the forged email to SCHULMAN. Amalow and Abdi told him to sign into the "Ali Amalow" email account and send the bank account information to SCHULMAN. At that time, SCHULMAN did not know that AMALO sent the email to himself under the guise of Amalow. He did not tell SCHULMAN until sometime later.

\* \* \*

SCHULMAN wanted the bank account to say Central Bank of Somalia, not an abbreviated name. AMALO told him that "Central B of Somal" was the entity he created because the banks would not allow AMALO to open an account under the name of the real CBS. SCHULMAN told him that was stupid and AMALO could not open an account like this.

\* \* \*

AMALO knew that SCHULMAN would not be happy about him (AMALO) forging the letter. But SCHULMAN provided some of the language needed for the letter. AMALO initially told the interviewing agent that four or five days after he altered the letter AMALO admitted to SCHULMAN that it was a forgery. AMALO felt pressure from SCHULMAN. SCHULMAN was very upset because he had already sent the letter out to the bank. AMALO told SCHULMAN to send a follow up letter to the Italian bank apologizing and requesting the letter back. AMALO forged the letter because he did not want to admit to SCHULMAN that he did not have connections in the Somalia government and he did not want to be replaced with another Somali. AMALO was also having personal financial issues. Even before AMALO admitted to SCHULMAN that it was a forgery, SCHULMAN had suspicions about the letter because it did not look right. SCHULMAN told him that his secretary was preparing to send out the original of the same letter he previously emailed. AMALO thought that SCHULMAN sent out the hard copy anyway even after being told it was a forgery.

\* \* \*

AMALO corrected his initial statement regarding how soon he told SCHULMAN about the forged letter. AMALO recalled that he confessed to SCHULMAN when he produced the second forged Attorney General letter with Nur's signature and notary on each page. After being told about the forgery, SCHULMAN asked AMALO, "What am I supposed to do now?" SCHULMAN was angry and told AMALO that he (SCHULMAN) was going lose credibility with the banks.

***

In January 2013 GANJAB reached out to AMALO and said that President Mohamed was interested in working with Shulman Rogers. Bandler, AMALO, SCHULMAN, President Mohamed and Foreign Minister Fawzia Adam met at a hotel in the District of Columbia. SCHULMAN briefed President Mohamed on where he stood regarding the asset recovery and what he needed from the Somali government.  At this time, AMALO was still lobbying for his uncle. Amalow still wanted to be Governor of the Central Bank. President Mohamed and his delegation received a formal recognition from the United States government. GANJAB told AMALO that he was friends with President Mohamed because they were from the same tribe.

AMALO stated that the United Nations Monitoring Group on Somalia ("UNMGS") released a report regarding corruption in the Somalia government and CBS. Much of the report was not true. SCHULMAN told President Mohamed that he should defend himself against the UNMGS.

***

AMALO, GANJAB and SCHULMAN started the investigation of the UNMGS. Additionally, KOUSHIK BHATTACHARYA, and JACOB FRENKEL (attorneys at Shulman Rogers) participated in the counter investigation. AMALO traveled to Somalia before hand to set things up and reserve hotel rooms. He opined that the lawyers conducted a good investigation, looking at all the books of the CBS. The report released by the UNMGS claimed that $11 million dollars was stolen from the CBS. AMALO stated however that it was not stolen. Rather the money was misappropriated within the Somalia government.

***

On behalf of the Central Bank of Somalia and the Somalia government, SCHULMAN applied for and received a 25B certification from the State Department. The 25B certification certified SCHULMAN's authority to act on behalf of the Federal Republic of Somalia and was provided to the U.S. banks and the Federal Reserve Bank. The goal was the release of $20 million dollars held in the United States.

***

[Former Central Bank Governor] Omer was thankful when SCHULMAN offered to conduct the counter investigation.

***

It was Hersiburane's idea to have Osman Mohamed Osman ("Osman") named as the "Director of Asset Recovery and Banking Affairs". SCHULMAN met Osman years earlier in France and told AMALO that he could work with Osman. At that time Osman and Prime Minister Abdi Farah Shirdon ("Prime Minister Shirdon") were best friends. Hersiburane suggested they use Osman to replace Amalow.

***

[AMALO] was asked to review a string of emails dated March 21, 2013 which ended with an email from AMALO to SCHULMAN. Attached to the email was a document titled "Letter of Appointment, Director of Asset Recovery and Banking Affairs" written on letterhead from the Office of the Prime Minister. AMALO admitted that he forged Prime Minister Shirdon's signature on the document. The purpose of the letter was to purportedly appoint Osman as the "Director of Asset Recovery and Banking Affairs". The language in the letter was written by SCHULMAN and they already had the letterhead from the Office of the Prime Minister. SCHULMAN knew the letter was a forgery. Immediately after AMALO emailed it, SCHULMAN called and said "… this won't work. This is like the Italian job." SCHULMAN told AMALO that he was not going to use the letter because it looked like a forgery. SCHULMAN was not as angry as he was when AMALO forged the letter sent to the Italian bank.

**A law enforcement agent described portions of an interview of Abdiaziz Amalo, which was held on April 20, 2017, as follows:**

He was then shown another spreadsheet with the title "Abdi Amalo/UNITEKS" in the top left corner. The spreadsheet reflected dates, hours worked and a description of the work performed. AMALO admitted that it was a forged document and he made up the hours. It was not 100% accurate reflection of the hours worked. He advised that it was about 60% accurate.

\*\*\*

AMALO stated that submitting to SCHULMAN the spreadsheet with falsified hours was the only way he and GANJAB would be paid for their efforts.

\*\*\*

[Regarding the timesheet submitted to Shulman Rogers,] AMALO  stated that the worksheet reflected the hours that he created himself.  He made up the hours randomly. Some of the hours he worked, some he did not. SCHULMAN told him that that Shulman Rogers management would not allow SCHULMAN to pay $1 million or $900,000 dollars to AMALO, which is what AMALO wanted.

\*\*\*

AMALO was having personal financial problems so SCHULMAN loaned $33,000 to AMALO and $7000 in cash to GANJAB.

\*\*\*

[AMALO] was shown a copy of a March 24, 2014 email from GANJAB to himself. Attached to the email was a copy of a fake letter created by AMALO that SCHULMAN rejected because it did not look real. . . AMALO drafted a letter from then Deputy Prime Minister Ridwan Hirsi Mohamed which he admitted was a fake. SCHULMAN refused to use the letter because it looked fake. SCHULMAN told him "It's not going to fly." The language or something in the letter did not look like what SCHULMAN would normally write. AMALO created this fake letter prior to giving SCHULMAN the forged hourly worksheet on the thumb drive.

\*\*\*

Bashir [Former Governor Issa's son] told AMALO that if AMALO created the letter then Bashir would fly to Somalia and get it signed. AMALO created the letter, however Bashir demanded $100,000 to get the letter signed. AMALO stated that he could not afford to pay Bashir the $100,000 out of his own pocket just so SCHULMAN could get the contract. So AMALO went to SCHULMAN and told him what Bashir requested. SCHULMAN refused to pay the $100,000, and advised AMALO that there is a Foreign Corrupt Practices Act (FCPA) law. If AMALO and SCHULMAN bribe the Governor's son that would bring them trouble. SCHULMAN suggested to AMALO that maybe there was another favor that SCHULMAN could do for Bashir. AMALO later learned that Bashir brought a friend to Shulman Rogers who had something similar to traveler's checks that had been frozen by outside banks during the civil unrest in Somalia. He was not aware if SCHULMAN was able to help Bashir.

\*\*\*

[AMALO] was shown an email dated February 19, 2014 from AMALO to Abukar [Abukar Ganjab] and GANJAB. Attached to the email was a letter dated February 19, 2014 which confirms a wire transfer payment of $25,000 to Abukar as repayment of a $45,000 loan. AMALO stated that this is also a fake letter. Abukar and GANJAB told him they could not receive the money because GANJAB's bank would not give him access to the money. So GANJAB was using his brother to receive the money. When the interviewing agent pressed AMALO again about why he split the payment into multiple wires, none of which actually went to GANJAB's account, AMALO replied that GANJAB wanted the wires split. GANJAB said that if AMALO sent the money in one wire, his (GANJAB's) bank would place a hold on the funds and not allow GANJAB to have them. GANJAB did not tell AMALO what he was doing with the money.

\* \* \*

During the 2013 to 2014 time period, President Hassan Sheikh Mohamed was listening to SCHULMAN over everyone else.

\* \* \*

When AMALO wanted SCHULMAN to press President Hassan Sheikh to give more money to the Somalia government, SCHULMAN replied that he (SCHULMAN) could not tell the President what to do.

\* \* \*

In August 2013, when Yussur Abrar ("Abrar"), SCHULMAN, AMALO, GANJAB and Foreign Minister Fawzia Adam met in New York City, SCHULMAN handed Abrar a check for $9 million dollars. Abrar refused to take the check. Abrar wanted the money to go back where it came from, meaning the US bank that released the assets. Abrar wanted Citibank to send the money straight to the CBS. President Hassan Sheikh instructed SCHULMAN to give the check to Abrar. By the time SCHULMAN attempted to give the check to Abrar, Shulman Rogers had already deducted their fees. Abrar complained to the President, who called Abrar, GANJAB, AMALO, SCHULMAN and Foreign Minister Adam to his Presidential Suite at the hotel. President Hassan Sheikh told Abrar that the contract had already been signed. If something was wrong with the contract then she should change it, but until that time the President wanted Abrar to follow the signed contract. Abrar asked everyone else to leave the room. President Hassan Sheikh told them to come back to his room after Abrar left. When AMALO, GANJAB, SCHULMAN and Foreign Minister Adam returned to the President's room the President told them to give Abrar another chance. SCHULMAN told President Hassan Sheikh that he (SCHULMAN) needed to hand the money over to someone. President Hassan Sheikh called Omer on the phone and asked if there was a bank account that could hold the money. Omer told the President that there was an account in Turkey. Omer gave the account information to SCHULMAN. That was how the money came to be deposited into a Turkish bank account.

\* \* \*

SCHULMAN suggested to President Hassan Sheikh that he (the President) should be on the 25B certification because Ministers change. It would be more efficient if the President's name was on the 25B certification. The individual's name on the 25B certification denotes who has authority over the money. Both SCHULMAN and Omer each wanted his own name on the 25B certification.

In the case of SCHULMAN, he wanted the President's name on the 25B certification because SCHULMAN had a good relationship with President Hassan Sheikh, but not Omer.

\* \* \*

The interviewing agent asked AMALO how he financed [his presidential] campaign, he stated that SCHULMAN loaned him $200,000.

\* \* \*

SCHULMAN had issues with Shulman Rogers because they did not support him during the United Nations investigation. SCHULMAN complained to AMALO that he brought in money for the law firm and they did not appreciate him.

**A law enforcement agent described portions of an interview of Abdiaziz Amalo, which was held on May 19, 2017, as follows:**

AMALO did not have anyone to help him pay for the expense associated with a presidential campaign. SCHULMAN sent him a series of wire transfers.

\* \* \*

In July or August of 2016, SCHULMAN traveled with AMALO to Dubai to help AMALO raise money for the campaign. While they were there AMALO and SCHULMAN met with some wealthy businessmen. AMALO made contact with these potential campaign donors through Somali businessmen that he knew previously who lived or worked in Dubai. AMALO and SCHULMAN were in Dubai for approximately two weeks. The purpose of their trip was to "put himself (AMALO) out there". SCHULMAN was soliciting donors to contribute between $3-$5 million dollars to the campaign. SCHULMAN paid for AMALO's flight and hotel through the previously mentioned wire transfers. In previous trips when AMALO paid for the hotel out of his own pocket, he stayed in either the Radisson Blue Hotel or the Rotana Hotel because they were cheaper. When he traveled with SCHULMAN, AMALO stayed at the Address Hotel or the Four Seasons because they were more upscale.  AMALO explained that he charged the flight and hotel on his own personal credit card, but SCHULMAN gave him money to pay for the travel. Prior to a trip to Somalia, SCHULMAN gave AMALO $50,000 cash in an envelope while they were still in the US. AMALO deposited $20,000 in a SunTrust bank account and gave some money to his wife to pay bills.

PM Kheyre previously hired SCHULMAN to refute allegations made by the United Nations Monitoring Group that Kheyre was a member of the terrorist organization Al-Shabaab. SCHULMAN cleared PM Kheyre of the allegations.

\* \* \*

In mid-October, AMALO again met SCHULMAN in Dubai and AMALO stayed in the Radisson Blue. As with other trips, AMALO paid for his flight with money given to him by SCHULMAN. AMALO explained that normally the meetings with prospective contributors were set up on their arrival in Dubai. Some of the contributors in this second trip were new. AMALO and SCHULMAN also followed up on meetings from a previous trip. AMALO and SCHULMAN met with a billionaire Indian businessman who lived in Dubai. This Indian businessman was going to contribute $3 million dollars because he wanted to conduct business in South Sudan. . . SCHULMAN told AMALO not to promise the Indian businessman anything because AMALO was running for President. SCHULMAN warned AMALO that making promises to a potential campaign contributor could get AMALO in trouble with the US government.

\* \* \*

AMALO stated that there was no discussion with SCHULMAN of gifts or bribes to the [Ministers of Parliament] [as part of his presidential campaign].

\* \* \*

AMALO was asked how he came to be represented by Shulman Rogers during his presidential campaign. He stated that SCHULMAN asked him for a favor. If AMALO hired the

Shulman Rogers law firm to represent AMALO in the election, then SCHULMAN would have a cover for the times he was out of the office traveling. AMALO told SCHULMAN that he could not afford to pay the law firm. AMALO stated that at the time he believed he would receive money from a surveillance CCTV contract that he and SCHULMAN were trying to obtain from the Somali government SCHULMAN told AMALO not to worry about paying Shulman Rogers.

\*\*\*

SCHULMAN would advise AMALO not to take contributions from someone on the OFAC list.

\*\*\*

AMALO confirmed that the money he received from SCHULMAN to assist with campaign travel expenses was wired to him from the BV bank account. The money was never meant to be a share of business profits. The funds were used to pay airfare to South Sudan. AMALO stated there was no expectation to pay SCHULMAN back for the campaign expenses. At times AMALO felt like he was getting the money for free.

\*\*\*

AMALO and SCHULMAN have a signed contract with the government of Somalia to install security cameras, but no money has come in yet.

\*\*\*

AMALO stated that in March 2014 Shulman Rogers wanted to renew the contract with the Central Bank of Somalia ("CBS"). AMALO called BASHIR and shortly thereafter met him for dinner at the Olive Garden on Leesburg Pike in Leesburg, Virginia. AMALO explained to BASHIR that Shulman Rogers was trying to renew the contract. AMALO introduced SCHULMAN to BASHIR over the phone. SCHULMAN pleaded the case to BASHIR for Shulman Rogers to renew the asset recovery contract. BASHIR said he would help AMALO and SCHULMAN.

\*\*\*

SCHULMAN instructed AMALO to seek a legal opinion in Somalia regarding potential contributions from outside Somalia. AMALO paid $2000 to a Somali attorney who opined that AMALO was legally allowed to receive campaign contributions from donors outside Somalia. SCHULMAN helped AMALO draft the letters which they sent to potential donors.

\*\*\*

A day or so later, AMALO met BASHIR for coffee at a Starbucks in Leesburg, VA. AMALO and BASHIR sat in BASHIR's car in the parking lot. AMALO showed BASHIR an undated check made payable to Mohamed Bashir Isse in the amount of $100,000. AMALO noted that LIBAN BASHIR now goes by "Mohamed Bashir Isse". After meeting with BASHIR, AMALO drove to Maryland and met with SCHULMAN at Shulman Rogers. AMALO told SCHULMAN that BASHIR asked for $100,000. AMALO showed SCHULMAN the check.

SCHULMAN told AMALO that it was a good thing that he did not give BASHIR the check. When questioned about the legality of BASHIR's request, AMALO acknowledged to the interviewing agent that BASHIR asked for a bribe, even though BASHIR did not work for the Somalia government. SCHULMAN told AMALO that they cannot pay $100,000 to BASHIR. However if BASHIR contacted SCHULMAN and asked for assistance with a legal matter, SCHULMAN would see what he could do to help BASHIR. The purpose of getting BASHIR and SCHULMAN to meet was to get the asset recovery contract renewed.

**A law enforcement agent described portions of an interview of Abdiaziz Amalo, which was held on May 24, 2017, as follows:**

AMALO and JEREMY SCHULMAN first met Somalia's Ambassador to the United Nations, Elmi Duale in the fall of 2009 when they were in New York City to meet then Transitional Federal Government ("TFG") President Sheikh Sharif Ahmed.

\* \* \*

In May of 2010, AMALO, SCHULMAN and Ambassador Duale had lunch together in Manhattan. SCHULMAN told Ambassador Duale that he (SCHULMAN) needed a letter from the Ambassador regarding ALI AMALOW's position in the Central Bank of Somalia ("CBS"). SCHULMAN showed the Ambassador a letter that SCHULMAN wanted him to sign. Ambassador Duale wanted to draft the letter himself, but SCHULMAN preferred to draft his own letter. AMALO was shown a letter date May 27, 2010 that was signed by Ambassador Duale. AMALO advised that Ambassador Duale signed the letter while he and SCHULMAN were in the Ambassador's office. SCHULMAN had the letter on a thumb drive and printed it out on the Ambassador's computer. SCHULMAN called the Shulman Rogers law firm and they sent a notary to Ambassador Duale's office.

\* \* \*

AMALO was directed to the first line of the second paragraph of the letter which referred to ALI AMALOW as "Director Ali Abdi Amalow". AMALO agreed that any statement referring to AMALOW as a "Director" is false because the position never existed within the Somalia government. Likewise the statement in paragraph four of the letter regarding Presidential Decree No. 214 and the appointment of AMALOW as the "Director of Financial Asset Recovery and Banking Affairs" was false. Ambassador Duale read over the letter and signed it. Ambassador Duale was persuaded by SCHULMAN about the job that Shulman Rogers was doing on the asset recovery. Ambassador Duale wanted to call ALI AMALOW so AMALO made the call for the Ambassador. The Ambassador told ALI AMALOW that there was a lawyer in his office who wanted him to sign a letter. ALI AMALOW asked the Ambassador to please cooperate with SCHULMAN. The banks were looking for clarification of AMALOW's position in the Somali government. SCHULMAN wanted the Ambassador to sign the letter so that he could provide the banks validation of ALI AMALOW's position.

\* \* \*

AMALO advised that the false Deputy Prime Minister letter that he created in 2013 was the last forged letter that he could recall preparing. SCHULMAN wanted the letter to use for the asset recovery in the United Kingdom; as well as authority to pay AMALO and MUSA GANJAB for the work they had performed. However, SCHULMAN would not accept the letter. SCHULMAN told AMALO that the letter looked fake.

\* \* \*

[AMALO] was pointed to a letter signed by Mohamed Ali Hussein, Director General of the CBS, identified as Attachment 4 of the previous August 20, 2010 email. Once he reviewed the letter AMALO advised that Hussein's signature was authentic. However, AMALO acknowledged that

the statement in paragraph three referring to ALI AMALOW as the "Director of Financial Asset Recovery and Banking Affairs" was false. ALI AMALOW called Hussein and told him that SCHULMAN needed a letter signed by the Director General. Hussein granted AMALOW's request and signed the letter.

AMALO sent invoices to SCHULMAN from a falsified "MQoono" email address. AMALO did not believe that Qoono received any money from SCHULMAN or Shulman Rogers.

**A law enforcement agent described portions of an interview of Abdiaziz Amalo, which was held on June 22, 2017, as follows:**

In September 2009, AMALO and SCHULMAN were in New York City and met with TFG President Sheikh Sharif Ahmed and Finance Minister Sharif Hassan at the Waldorf Astoria Hotel. Present during this meeting was SCHULMAN, AMALO, ALI AMALOW, the Finance Minister Hassan, President Ahmed and a Somali interpreter.

\* \* \*

AMALO was shown a copy of an email dated June 7, 2010 from SCHULMAN to AMALO.  Attached to the email was a letter signed by Sharif Mohamed Hassan (Note: not the Finance Minister) which served to notify SCHULMAN that ALI AMALOW did not represent the CBS, and the English translation of the Presidential decree was false. After reviewing the email, AMALO stated . . . [a]t the time that SCHULMAN received the letter, Sharif Mohamed Hassan, actually worked for the Governor of the CBS. However, AMALO learned several weeks later that Hassan was fired by Governor ISSE because the Governor was not aware that Hassan sent the letter to SCHULMAN. AMALO admitted that the reason for Hassan's firing was speculation and that he had heard it second or third hand. AMALO never told SCHULMAN to ignore the letter because it was fake. AMALO told SCHULMAN that Hassan did actually work in the Governor's office at the CBS. AMALO never told SCHULMAN that the letter was the result of clan in-fighting.

\* \* \*

Governor ISSE did not believe in lawyers and wanted to recover the assets himself. However, Governor ISSE did not know where the assets were held.

\* \* \*

SCHULMAN told AMALO that he was the lawyer for the Somalia government and he would give the money back to whoever hired him.

\* \* \*

In September 2013, SCHULMAN called AMALO and said that they had finally received the money from CitiBank New York. AMALO told SCHULMAN that they should give it back to Somalia publicly, in front of the press and Parliament. SCHULMAN said he was going to give the money to the person who hired him; in this case it would be President Mohamud. SCHULMAN tried to give the CitiBank New York money to President Mohamud, but the President told SCHULMAN to give it to Governor Yussur Abrar. However, Abrar did not have the CBS bank account number so the President called Abdisalam Omer who identified a bank account in Turkey. AMALO told SCHULMAN that the Somalis are crazy about their money and would attempt to take it for themselves. When SCHULMAN first received the money from CitiBank New York, AMALO warned SCHULMAN about the Somalis. SCHULMAN said it did not matter; he would give the money to whoever hired him.

\* \* \*

Later, Foreign Minister Adam pulled AMALO aside and asked him to get the list of assets from ALI AMALOW because she worked for the Somali government and was entitled to know where the assets were held. AMALO wanted to go somewhere private as there were other people around to hear their conversation. Foreign Minister Adam refused to go somewhere else to have the discussion. AMALO stated that ALI AMALOW did not want to give the list to Foreign Minister Adam.

* * *

In the beginning, SCHULMAN did not know that AMALO had falsified the letter from the Prime Minister appointing Osman to the position.

* * *

In addition to the false letter from the Prime Minister, AMALO also fraudulently signed Osman's name on an engagement letter with Shulman Rogers. At the time, Governor Omer was still negotiating with SCHULMAN and would not sign the engagement letter. AMALO advised that Osman was aware that AMALO was forging his signature on the engagement letter. AMALO got his friend Mark Sivills to notarize Osman's signature. AMALO had already signed the letter when Sivills notarized it. AMALO recalled meeting Sivills in Silver Springs, MD to get it notarized. AMALO had the letter with him when he took his family to the Marriott in Crystal City, Virginia. SCHULMAN kept asking when AMALO was going to send him the letter so AMALO used the hotel's internet to send the documents to SCHULMAN.

* * *

In June 2013, AMALO, SCHULMAN and Hersiburane traveled to London, England to meet with President Mohamud. AMALO and Hersiburane flew together out of Dulles International. SCHULMAN flew separately on an earlier flight. SCHULMAN paid for all three flights. SCHULMAN asked AMALO if he wanted to come on the trip. The purpose of the trip was to expose Governor Omer for going behind their backs to get a 25B certification from the State Department. Governor Omer had contracted with the Moffett Group and was trying to get control of the Somalia assets. The group met with President Mohamud and Foreign Minister Fawzia Adam. Hersiburane wanted to expose Governor Omer for being dishonest. AMALO, SCHULMAN, Hersiburane and Musa Ganjab went to meet President Mohamud in his room at the Hilton Hotel. SCHULMAN and Hersiburane did most of the talking. They told the President that Governor Omer was trying to get the 25B certification. The President had not been aware of that and told them it was very dangerous. The President called the Finance Minister who also did not know that Governor Omer was using the Moffett Group to obtain the 25B certification. SCHULMAN suggested to President Mohamud that the 25B certification be placed under his (the President's) authority. They also discussed about how they were going to replace Governor Omer. Ganjab and Hersiburane suggested they bring in Yussur Abrar because she had a good reputation in the financial community. Hersiburane and SCHULMAN did not trust Governor Omer because he would not sign the engagement letter, and had hired the Moffett Group. The President was upset that he was not aware of the Moffett Group. AMALO advised that SCHULMAN had additional meetings with the President that did not include AMALO.

* * *

AMALO never told SCHULMAN that he was going to give the money to the Somalia government.

**A law enforcement agent described portions of an interview of Abdiaziz Amalo, which was held on June 22, 2018, as follows:**

[AMALO] was next asked to review an email dated January 3, 2013 sent by Schulman to AMALO. AMALO advised that Schulman wanted Ali Amalow to be appointed Governor of the Central Bank. There were some new Ministers in the Somalia government that had letters and were going to the banks in an attempt to gain access to the Somalia assets. Schulman was worried that the Ministers would get to the Somali money first. Some of the Somalia Ministers went to the banks in person. AMALO and Schulman were concerned because the other Ministers would take the money and keep it.

\*\*\*

AMALO reviewed an email dated December 20, 2013 that he sent to Thabit Abdi, Chief of Staff for President Mohamud. AMALO stated the email which he forwarded to Thabit Abdi came from a fake email address. AMALO admitted that he forged the email address "msivillis2003@gmail.com". AMALO could not recall where he got the content of the email. He copied it from somewhere and forwarded it to Thabit Abdi and gave the appearance that it came from Mark Sivils.

\*\*\*

[AMALO] was then asked to review an email also dated December 6, 2013 at 6:01pm from Schulman to AMALO which included Schulman's response to the previous email. In this email Schulman replied, "Abdi, this look like an Italian job. This cannot be used." AMALO reviewed and compared the three previous attachments more closely. He corrected himself and advised that upon reviewing more closely, he did recall writing the letters. It was noted by the interviewing agents that the letters were addressed to Switzerland, but the last line of the letter mentioned France. AMALO could not recall if the initial letter was supposed to go to France or Switzerland. Either way, he agreed that the letter had been altered in some way. AMALO stated that Schulman knew the initial documents were false because Schulman referred to them as an "Italian Job".

\*\*\*

AMALO explained that Central Bank Governor Bashir Isse was questioning Ali Amalow's authority because he (Isse) actually was the Governor. Ali Amalow had no authority with the Central Bank. Osman Mohamed worked for the Prime Minister at the time. Schulman asked AMALO to forward Denham's attachments to someone in the Somalia government. Schulman wanted the Prime Minister to look at the attachments, so AMALO asked Osman Mohamed to have the Prime Minister review the documents sent by Denham. Schulman hoped that the Prime Minister would tell Governor Isse not to interfere with Schulman and their asset recovery. Schulman told AMALO that if the Prime Minister would not talk to Governor Isse, then he and AMALO would not contact De La Rue any further.

**A law enforcement agent described portions of an interview of Abdiaziz Amalo, which was held on September 7, 2018, as follows:**

AMALO confirmed that the description of ALI ABDI AMALOW's position in Paragraph 4 of the 2010 Declaration was a lie. He also confirmed that the description of OSMAN MOHAMED's position in Paragraph 7 of the 2013 Declaration was a lie.

\* \* \*

AMALO had the idea to have Ambassador DUALE sign the 2010 Declaration after SCHULMAN asked AMALO if he knew the Ambassador. AMALO told SCHULMAN that Ambassador DUALE had a close relationship with AMALO's uncle, ALI ABDI AMALOW.

\* \* \*

AMALO and SCHULMAN generally discussed their efforts to recover Somali financial assets with Ambassador DUALE. Ambassador DUALE did not seek to have AMALO or SCHULMAN give him any of the recovered money through a back channel. However, Ambassador DUALE did express an interest in some of the recovered assets eventually being used to pay back pay for multiple years of his salary [presumably as Somali Ambassador to the United Nations] that he believed he was owed. AMALO stated that Ambassador DUALE was hoping to be compensated by the Government of Somalia following the recovery of Somali assets.

AMALO stated that SCHULMAN prepared the text of the 2010 Declaration beforehand and brought it to the meeting on a thumb drive. The technical assistant showed SCHULMAN where to find a copy of official Somali government letterhead on Ambassador DUALE's computer at the consulate. AMALO observed SCHULMAN use the thumb drive to transfer the text of the 2010 Declaration onto the Somali letterhead on Ambassador DUALE's computer. SCHULMAN then printed the 2010 Declaration at the Somali Consulate.

AMALO stated that they did not discuss the contents of the 2010 Declaration before Ambassador DUALE signed it, nor did they discuss the false title/position described in Paragraph 4 of the 2010 Declaration.

\* \* \*

Regarding the 2013 Declaration, AMALO stated that he had called Ambassador DUALE to request that he sign the document for OSMAN MOHAMED.

\* \* \*

To the best of AMALO's knowledge, Ambassador DUALE never received any payment or percentage of some 12 million dollars that was obtained as part of the asset recovery project. Nor did Ambassador DUALE receive any portion of an approximately $600,000 payment from the Shulman Rogers law firm. AMALO stated that Ambassador DUALE did not receive anything for signing the two Declarations. However, AMALO confirmed that Ambassador DUALE knew about the approximately 12 million dollars that had been recovered because SCHULMAN had told Ambassador DUALE about the recovery during a meeting with the President of Somalia in the President's hotel room during a meeting in New York in or about October 2013.

\* \* \*

According to AMALO, GANJAB stated in the e-mail that it was good that GANJAB, HERSIBURANE [ABDUL HERSIBURANE], and AMALO were working together.

\* \* \*

AMALO did not know if OMER was paid money for signing the contract [in context, with Shulman Rogers]. The President of Somalia ultimately ordered OMER to sign the contract. After this, SCHULMAN reportedly got along with OMER.

\* \* \*

AMALO was shown a print-out of an e-mail from asego0ecl@gmail.com, dated August 10, 2010, associated with a letter purportedly from the Deputy Attorney General of Somalia. He was also shown a print-out of an e-mail from asego8ecl@gmail.com, dated August 12, 2010, associated with a letter purportedly from the Attorney General of Somalia.  AMALO admitted that he had doctored the letters attached to the above-referenced e-mails to meet SCHULMAN's needs. AMALO could not recall if he had changed the digit in the e-mail address from "0" to "8."

\* \* \*

AMALO was shown a print-out of an e-mail dated August 9, 2010 from Travel_Ways to aamalo@gmail.com.  AMALO believed he had created the Travel_Ways email account, but he could not remember for sure. AMALO stated that he had created many e-mail accounts. According to AMALO, SCHULMAN had told him that they could only reimburse individuals for travel expenses [in context, as opposed to paying them bribes], so he had created an e-mail address that was travel related for QOONO's travels.

\* \* \*

SCHULMAN told AMALO that it would be legally problematic if AMALO and his associates were paid as a percentage of the amount of Somali assets recovered, so they should seek to get the approximately $693,000 in payment through billing by the hour. SCHULMAN told AMALO not to e-mail about the time sheets. Instead, SCHULMAN instructed AMALO to use a thumb drive to pass time sheets to him. AMALO stated that he did not have the thumb drive he had used for the time sheets anymore. He speculated that the thumb drive might have been seized when he was arrested in or about 2017.