**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | * | |
| | * | |
| **v.** | * | **CRIMINAL NO. PX-20-0434** |
| | * | |
| **JEREMY WYETH SCHULMAN,** | * | |
| | * | |
| | * | |
| **Defendant** | * | |
| | * | |
| | ******* | |

**GOVERNMENT'S OPPOSITION TO DEFENDANT JEREMY SCHULMAN'S
(1) MOTION TO DISMISS THE INDICTMENT PURSUANT TO THE ACT OF STATE
DOCTRINE [ECF 148]; (2) MOTION TO DISMISS THE INDICTMENT PURSUANT
TO THE POLITICAL QUESTION DOCTRINE [ECF 152];
AND (3) OMNIBUS MOTION TO DISMISS [ECF 160]**

The United States of America, by and through its attorneys, submits this memorandum in

opposition to Defendant Jeremy Schulman's motions to dismiss the indictment pursuant to the

"Act of State Doctrine" (ECF 148), the "Political Question Doctrine" (ECF 152), and various other

issues raised in an "omnibus motion" (ECF 160).[1]   The common law Act of State and Political

Question doctrines have no bearing here whatsoever: Schulman has not identified a single instance

in which a federal court dismissed an indictment under either doctrine, nor does he provide any

good reason for this Court to be the first to do so.   The omnibus motion largely urges the Court to

conclude that, as a matter of law, the charges of bank fraud and fraud affecting a financial

institution must be dismissed because the 25B Certification formed Bank A-1's sole basis for

releasing funds to Schulman, and the 25B Certification insulated Bank A-1 from any risk of loss.

These arguments misstate the allegations, raise factual questions that are the province of the jury,

---

[1]      Because Schulman's fourth motion to dismiss under the Fifth and Sixth Amendments potentially implicates
the facts of the Government's investigation, the Government has filed a separate opposition brief in response.

1

and ignore square Supreme Court precedent that risk of loss is not an element of the bank fraud statute. All the motions should be denied.

## I.      Background

### a.  The Indictment's Allegations

Schulman's motions rely on a combination of materials cherry-picked from discovery, suppositions about the trial evidence, and incomplete allegations from the indictment.    For the purposes of the motions to dismiss, however, the indictment's allegations are controlling.  *See* Section II, *supra*.   The allegations pertinent to the motions are set forth below.

### 1.  The Scheme to Defraud

The indictment alleges that from approximately July 2009 through July 2014:

> Schulman, Amalo and others attempted to and did fraudulently obtain control over money and gold that was the property of the Central Bank of Somalia . . . Beginning in July 2009, Schulman, Amalo and others engaged in a scheme to defraud, which scheme and artifice would affect at least one financial institution, namely Bank A-1, in which they attempted to unfreeze the accounts and take control of the accounts based on fraudulent, material misrepresentations about their authority to act on behalf of the Somali government.

ECF 1 ("Indictment" or "Ind.") ¶ 21.

### 2.  Schulman's Use of Forged and Fraudulent Documents

The indictment further alleges that, to carry out the fraud scheme:

> Schulman and Amalo created a series of forgeries and other false documents.   Schulman presented these and other documents to at least one financial institution, namely Bank A-1, and other banks and entities in the United States and elsewhere, and Schulman falsely claimed that these and other documents authorized him to obtain control of the Somali assets.[2]

---

[2]      The Frozen Somali Assets obtained by Schulman included assets held by Bank A-1, which was an "'insured bank' as that term is defined in Title 12, United States Code, Section 1813(h), and a 'financial institution' as that term is defined in Title 18, United States Code, Section 20, and used in Title 18, United States Code, Sections 1344 and 3293." *Id.* ¶ 16.

2

*Id.* ¶ 22.   More specifically, the indictment alleges that Schulman used six forged or fraudulent documents in furtherance of the scheme: the "2009 Forged TFG PM Letter," the "2009 Fraudulent Decree Translation," the "August 2010 Forged AG Letter," the "September 2010 Forged AG Letter," the "2013 Forged PM Letter," and the "2013 Forged POA."   *Id.* ¶¶ 30-33, 40-41, 43-44.

Regarding the 2009 Forged TFG PM Letter, the indictment alleges that in July 2009, Schulman "learned that Amalow [a relative of Schulman's alleged co-conspirator, Amalo] was no longer the Governor of the Central Bank of Somalia and did not hold any position in the Transitional Federal Government of Somalia."   *Id.* ¶ 28.   Nevertheless, "Amalo, with Schulman's assistance, created a forged document purporting to show that the Prime Minister of the Transitional Federal Government of Somalia had 're-affirmed' that [Amalow] was the Governor of the Central Bank."   *Id.* ¶ 30.   Then, Schulman, "knowing that [Amalow] was not the Governor of Central Bank of Somalia," fraudulently asserted exactly that to various entities holding Somali assets.   *Id.*

Regarding the 2009 Fraudulent Decree Translation, the indictment alleges that Former Governor Amalow was appointed an "Advisor" by Presidential Decree No. 214 in December 2009. *Id.* ¶ 31.   Schulman tried to get the Somali President to sign a document granting Amalow "full authority to direct and control the assets of the Central Bank of Somalia."   *Id.*   Having failed to do so, Schulman then fraudulently inflated Amalow's authority by inserting a clause into an English-language translation of the decree that "falsely described [Amalow] as the 'Director with the responsibility and authority to recover the national assets of the country.'"[3]   *Id.* ¶ 32.

---

[3]        Schulman states that the Government merely alleges that "the Presidential Decree was mistranslated."   Def's AoS Mot. 2.   The indictment, however, squarely alleges that Schulman deliberately caused the creation of the false translation, to wit: "Schulman caused to be inserted a clause into the 2009 Fraudulent Decree Translation that falsely described Former Governor 1 as a 'Director with the responsibility and authority to recover the national assets of the country.'" *Id.* ¶ 32.

Schulman provided the 2009 Forged TFG PM Letter and 2009 Fraudulent Decree Translation to entities holding Frozen Somali Assets, including Currency Printer A, Bank A-2, the NY Comptroller, Bank B, and Bank A-1.  *Id.* ¶¶ 30-33.   The indictment alleges that Schulman knew that the 2009 Forged TFG PM Letter was false when he sent it to these entities, and that Schulman fraudulently inflated Amalow's title in the 2009 Fraudulent Decree Translation.  *Id.* ¶¶ 30, 32.   The indictment further alleges that "Schulman continued to assert authority over the Frozen Somali Assets based on the 2009 Fraudulent Decree Translation despite its legitimacy being questioned by Currency Printer A and the Central Bank of Somalia."  *Id.* ¶ 35; *see also, id.* ¶¶ 36-38.

Regarding the August 2010 Forged AG Letter and the September 2010 Forged AG Letter, the indictment alleges that these documents were "created" by Schulman and Amalo in an attempt to defraud Bank B.  *Id.* ¶¶ 40-41.   The indictment specifically alleges that Schulman "rejected as unsatisfactory" three versions of draft letters provided by Amalo "all of which contained signs that they were forgeries."  *Id.* ¶ 40.   Schulman then accepted a fourth version of the forgery and provided it to Bank B.  *Id.*

Regarding the 2013 Forged PM Letter and the 2013 Forged POA, the indictment alleges that Amalo created the 2013 Forged PM Letter "with Schulman's assistance," *id.* ¶ 42, and that Schulman, "knowing that the 2013 Forged PM Letter and the 2013 Forged POA were forgeries, attempted to defraud Bank A-1 and the NY Comptroller by sending them those documents and requesting access to Frozen Somali Assets under their control."  *Id.* ¶ 44.

The indictment alleges that the three entities who provided Schulman or his law firm with control over Frozen Somali Assets—Bank A-2, Bank A-1, and the New York Comptroller—all relied, at least in part, on forged and fraudulent documents provided by Schulman; notably, the

indictment does not assert that any entity chose to release funds to Schulman's control based on the 25B Certification alone.   *Id.* ¶ 34 ("In reliance on the documents provided by Schulman, in or about July 2010, Bank A-2 released to an Interest on Lawyer Trust Account of Law Firm A the full balance of the Central Bank of Somalia account, in the amount of approximately $36,000."); ¶ 53 ("Relying on the 2013 Forged PM Letter, the 2013 Forged POA, and the 25B Certification, Bank A-1 transmitted approximately $7.4 million of Frozen Somali Assets to Law Firm A's trust account between on or about September 25, 2013, and on or about October 7, 2013.") ¶ 57 ("Based on, among other things, the 2009 Fraudulent Decree Translation and Schulman's assertion of delegated authority under the 25B Certification, the NY Comptroller released approximately $4.8 million to a Law Firm A trust account in or about November 2013").

### 3.   *Schulman's Fraud related to the 25B Certification*

The indictment alleges that the State Department issued a 25B Certification establishing that the President of Somalia was "the sole representative of Somalia with full authority to receive, control, and dispose of" the property "received by any Federal Reserve Bank or any insured bank, from or for the account of the Central Bank of Somalia."   *Id.* ¶ 50.   Lawyers for the State Department and the Federal Reserve Bank of New York "advised Schulman that the 25B Certification did not permit the Permanent Government of Somalia President to delegate his authority to any third person."[4]   *Id.* ¶ 54.   Nevertheless, Schulman continued to assert to the NY Comptroller and Bank A-1 that he could exercise delegated authority on behalf of the Somali

---

[4]        Schulman states that "[t]he Indictment does not claim that President Mohamud was not permitted to delegate his power to another individual under United States law."   Def's AoS Mot. 10-11.   It is not clear what Schulman means by this, but the indictment, as shown here, plainly alleges that a State Department lawyer told Schulman that the 25B Certification, issued by the State Department, did not permit delegation.

President, and he concealed from these entities that he had been told otherwise by the State Department.   *Id.* ¶¶ 55, 57, 66.

### 4.   *Schulman's Use of Fraudulent Means to Enrich His Co-Conspirators*

The indictment also alleges that, after Schulman obtained control of ~$12.2 million of Frozen Somali Assets, he caused his law firm to transfer ~$9 million to the Somali Government, while retaining ~$3.3 million.   *Id.* ¶ 58.   Then, "Schulman used fraudulent means to ensure that his co-conspirators would profit from the scheme."   *Id.* ¶ 59.   Among other things, "[i]n order to facilitate Amalo and Co-Conspirator 1's payment, Schulman and Amalo also worked together to create a fraudulent invoice from Haden Global Services LLC, a Maryland corporation controlled by Amalo."   *Id.* ¶ 60.   Schulman, knowing that invoice contained false entries, caused it to be sent to his law firm's finance personnel, and the next day, the law firm sent Haden Global Services $673.784, which Amalo shared with Co-Conspirator 1.   *Id.* ¶¶ 61-65.

### b.   The Court's Tolling Orders

During the investigation, the Court issued two *ex parte* orders tolling the statutes of limitations, pursuant to 18 U.S.C. § 3292, based on the Government's official requests for evidence abroad.   On December 4, 2017, based on the Government's official request to Italy, the Court issued an order tolling the statute of limitations for conspiracy (18 U.S.C. § 371), mail fraud (18 U.S.C. § 1341), wire fraud (18 U.S.C. § 1343), and money laundering (18 U.S.C. §§ 1956 & 1957) offenses.   *See* Ex. B to Omnibus Motion to Dismiss.   On May 18, 2018, based on the Government's official request to Somalia, the Court issued an order tolling the statute of limitations for the same offenses.   The request to Italy remained pending at the time of the May 18 Order: the requested interviews in Italy were not completed until July 2018, and the Government received the interview transcripts the following month.   Somalia did not provide any

of the requested assistance by the time of the indictment on December 2, 2020.   *See* ECF 134, Response in Opposition to Defendant's Motion to Vacate the 18 U.S.C. § 3292 Order. Accordingly, the statute of limitations was tolled from December 4, 2017, through December 2, 2020.[5]   *Id.*

### c.   The Criminal Charges

On December 2, 2020, a duly empaneled grand jury in the District of Maryland returned an indictment charging Schulman with 11 counts of conspiracy, fraud, and money laundering. The charges are discussed in further detail in connection with specific arguments addressed below.

## II.   Legal Standard

Rule 7 provides that "[t]he indictment or information must be a plain, concise, and definite written statement of the essential facts constituting the offense charged."   Fed. R. Crim. P. 7(c)(1).   To warrant dismissal of an indictment, the defendant must show that "the allegations therein, even if true, would not state an offense."   *United States v. Thomas*, 367 F.3d 194, 197 (4th Cir. 2004). The Fourth Circuit has instructed that the review of an indictment for sufficiency should proceed "under a liberal standard [such that] every indictment is ... indulged in support of sufficiency." *United States v. Matzkin*, 14 F.3d 1014, 1019 (4th Cir. 1994)

In ruling on a motion to dismiss an indictment, district courts are limited to reviewing the language used in the indictment, *see United States v. Sharpe*, 438 F.3d 1257, 1263 (11th Cir. 2006), and must accept as true the allegations contained therein, *see United States v. Farmer*, 370 F.3d 435, 440 (4th Cir. 2004).   A motion to dismiss an indictment is therefore not a vehicle to challenge the sufficiency of the Government's evidence.   *United States v. Terry,* 257 F.3d 366, 371 (4th Cir.

---

[5]        The statute of limitations was also tolled during the brief period between November 20, 2020, and December 2, 2020, based on a tolling agreement entered into by the Government and Schulman.

2001) (King, J., concurring) ("It is elementary that a motion to dismiss an indictment implicates only the legal sufficiency of its allegations, not the proof offered by the Government.").

### III.      Argument: The Act of State Doctrine Has No Bearing on the Indictment

Schulman contends that the indictment must be dismissed because "a jury cannot decide whether Mr. Schulman is guilty of the offenses charged without evaluating the official acts taken by the Somali government as a foreign sovereign." ECF 148 ("Def's AoS Mot."), at 1. Schulman does not cite a single criminal case in which a court has granted such relief. Worse yet, he simply ignores the consistent line of cases in which federal courts have held that "where the Executive Branch has chosen to indict and prosecute the defendant, the [Act of State] doctrine is inapplicable." *United States v. Noriega,* 746 F. Supp. 1506, 1523 (S.D. Fla. 1990). And even if the Act of State doctrine were applicable to criminal charges (which it is not), the allegations here do not require a jury to determine whether an action taken by a foreign government is legitimate; they require a jury to find whether the defendant made false and fraudulent representations to financial entities. Further, the rule espoused (without support) by Schulman essentially seeks to foreclose any prosecutions under duly authorized laws whose elements require a jury to potentially consider actions taken or not taken by foreign governments, such as the Foreign Corrupt Practices Act or the Foreign Agent Registration Act. Schulman's motion under the Act of State doctrine should therefore be denied.

#### a.   Federal Courts Have Uniformly Rejected Attempts to Apply the Act of State Doctrine to Federal Criminal or Forfeiture Actions

Schulman's 15-page brief takes the reader through a century-long history of the Act of State doctrine without citing to a single criminal case. Federal courts, however, have consistently rejected motions to set aside criminal prosecutions (as well as forfeiture actions) based on the Act of State doctrine. The reasoning is straightforward: the doctrine was developed at common law

8

to prevent the Judiciary from intruding on the Executive Branch's prerogatives in foreign relations, and no such intrusion is at risk when the Executive Branch has chosen to bring the action.

In *United States v. Evans,* the defendants were prosecuted for illegal international arms sales to a putative agent of a foreign government, and they moved to dismiss the indictment on the grounds that the Act of State doctrine rendered the prosecution non-justiciable.   667 F. Supp. 974, 978 (S.D.N.Y. 1987).   The court denied the motion, holding that "the Executive's view of whether this case presents an affront to its ability to conduct foreign policy is asserted in the most forceful manner; it is prosecuting the defendants."   *Id.* at 987.

Similarly, in *United States v. Noriega*, the defendant was charged with drug trafficking crimes committed while he was the head of the Panamanian National Guard's intelligence branch and Commander-in-Chief of the Panamanian Defense Forces.   *Noriega* at 1510.   Noriega contended that the Act of State doctrine "prohibits the Court from adjudicating the legality of his official actions in Panama."   *Id.* at 1522.   The court rejected the argument because, *inter alia*, "more recent interpretations of the doctrine [] emphasize the separation of powers rationale—more specifically, the need to preclude judicial encroachment in the field of foreign policy and international diplomacy."   *Id.* at 1523 (citing *Republic of the Philippines v. Marcos*, 862 F.2d 1355, 1361 (9th Cir. 1988) ("the doctrine is meant to facilitate the foreign relations of the United States")).   The court reasoned, unassailably, that the concern that "the judiciary may well hinder the Executive's conduct of foreign affairs and the need to speak with one voice on the world stage" does not apply in a criminal prosecution "since the Executive's position is amply demonstrated by its decision to indict and prosecute the defendant."   *Id.*

In *United States v. Giffen*, the defendant was charged with violations of the Foreign Corrupt Practices Act and other crimes arising from alleged bribes to Kazakh officials.   326 F. Supp. 2d

497, 499 (S.D.N.Y. 2004).   Giffen had been named a "Counselor" to the President of Kazakhstan, and he contended that the Act of State doctrine barred his prosecution because otherwise the court would be required to inquire into actions performed by an agent of the Kazakh government.   *Id.* at 502.   The court, however, noted that "[w]here the Executive Branch files an action . . . courts are reluctant to invoke the act of state doctrine."   *Id.* at 502 (citing *Noriega* and *Evans*).   The court denied the motion on multiple grounds, including that "the act of state of doctrine is limited to acts done within their own States" and the illicit activities in the case "had occurred in the United States and Switzerland—not Kazakhstan."   *Id.* at 503.   The court also denied the motion because "it will not need to rule on the legality of any public acts of the Kazakh government."   *Id.*

Government forfeiture actions, like criminal prosecutions, have also uniformly withstood challenge under the Act of State doctrine for the same reasons set forth in *Noriega* and *Evans*.   In *United States v. One Etched Ivory Tusk of Afr. Elephant*, the government seized an elephant tusk under the Endangered Species Act.   871 F. Supp. 2d 128, 130-31 (E.D.N.Y. 2012).   The government conceded the case would require the court to evaluate the validity of an act of the Zimbabwean government, which is a central consideration under the civil common law doctrine. *Id.* at 142.   Regardless, the court held the Act of State doctrine did not apply:

> [W]here the United States Government has brought suit, clearly the court need not worry that it will intrude into an area that the executive branch does not want it, or that the court's action will hinder its administration of its foreign affairs power—because the executive branch itself has made the decision to seek the court's resolution of a claim, and to frame that claim in such a way as to make an issue of the validity of another country's official act.

*Id.* at 143.   Similarly, in *United States v. One Gulfstream G-V Jet Aircraft*, the federal government brought a forfeiture action against a private jet plane owned by son of the president of Equatorial Guinea.   941 F. Supp. 2d 1, 11 (D.D.C. 2013).   The jet plane owner moved to dismiss the action

under the Act of State doctrine and, alternatively, on other grounds.   The court rejected the movant's Act of State claim, holding that "the applicability of this doctrine is weakened when the Executive Branch of the United States is the party that brings suit."   *Id.* at 11-12.

In *United States v. All Assets Held In Acct. No. XXXXXXXX*, the Government sought forfeiture of properties alleged to have been part of an international conspiracy to launder proceeds of alleged corruption by Nigerian government officials.   83 F. Supp. 3d 360, 363 (D.D.C. 2015). Yet again, the court unequivocally rejected a claim under the Act of State doctrine:

> [T]he act of state doctrine does not weigh against this Court's exercise of jurisdiction. Because this action is brought on behalf of the United States to enforce United States laws, there is little concern that the Court's decision may hinder rather than further this country's pursuit of goals both for itself and for the community of nations as a whole.

*Id.* at 372.

Here, as in every case described above, the Executive Branch chose to bring the action. Thus, the concerns animating the Act of State doctrine—which has never been applied to a federal criminal prosecution—simply do not apply.   *Noriega* at 1522; *Giffen* at 502; *see also United States v. All Assets Held at Bank Julius Baer & Co.*, 772 F.Supp.2d 205, 210 n. 3 (D.D.C. 2011) ("[A] case in which the United States is the plaintiff would seem a particularly unsuitable candidate for abstention on international comity grounds. Where, as here, the executive branch has decided that a forfeiture action is in the interests of the United States, declining jurisdiction out of deference

to the interests of a foreign nation would be inappropriate."). [6]

### b. Schulman's Interpretation of the Act of State Doctrine Could Potentially Impact Enforcement of Entire Criminal Statutes

Schulman contends that "the Act of State doctrine requires dismissal of the Indictment" because the charges would require the jury to evaluate "acts by Somali officials, their authority to take these acts, and the effect of these acts."   Def's AoS Mot. 9.   The adoption of Schulman's argument, which every federal court has rejected, could potentially have sweeping consequences for the enforcement of certain criminal laws that may require courts to consider the actions of foreign officials.   Specifically, Schulman's reading could negatively impact any prosecutions under the Foreign Corrupt Practices Act ("FCPA") and the Foreign Agents Registration Act ("FARA").

The FCPA's anti-bribery provisions prohibit certain persons from offering, promising, or paying bribes to foreign officials to obtain or retain business.   *See* 15 U.S.C. 78dd-1 *et seq.*   To prove a FCPA violation, the Government generally must prove, *inter alia*, that the defendant attempted to, or did, corruptly influence an official action of a foreign government. [7]   FCPA cases

---

[6]      Moreover, not only did the Executive Branch (through two offices of the Department of Justice, the FBI, and the IRS) choose to bring this action, the U.S. State Department, which has primacy within the Executive Branch of foreign relations matters, has been well aware of the action: the State Department produced documents and made witnesses available for voluntary interviews during the investigation.

[7]      In relevant part, the statute prohibits giving anything of value to:

(1) any *foreign official* for purposes of—

(A) (i) *influencing any act or decision of such foreign official in his official capacity*, (ii) *inducing such foreign official to do or omit to do any act in violation of the lawful duty of such official,* or (iii) *securing any improper advantage;* or (B) *inducing such foreign official to use his influence with a foreign government or instrumentality thereof to affect or influence any act or decision of such government or instrumentality…*

(2) any foreign political party or official thereof or any candidate for foreign political office for purposes of—

(A) (i) *influencing any act or decision of such party, official, or candidate in its or his official capacity*, (ii) *inducing such party, official, or candidate to do or omit to do an act*

12

often focus on bribes offered, paid, and promised to foreign officials in exchange for improper commercial advantages.   *See, e.g., United States v. Ho*, 984 F.3d 191 (2d Cir. 2020), *cert. denied*, 141 S. Ct. 2862 (2021) (upholding defendant's FCPA conviction for engaging in two schemes to bribe officials in Chad and Uganda); *United States v. Ng*, 18 Cr. 538, 2022 WL 1062704, **3, 9 (E.D.N.Y. Apr. 8, 2022) (upholding defendant's FCPA conviction and noting the trial evidence including testimony about bribery of Malaysian and other foreign officials); *United States v. Harder*, 168 F. Supp. 3d 732 (E.D. Pa. 2016) (denying defendant's motion to dismiss FCPA charges alleging $3.5 million in bribe payments to a Russian official).   If, as Schulman contends, a jury could not "evaluat[e] official acts taken by [a foreign] Government as a foreign sovereign," Def's AoS Mot. 1, FCPA enforcement could be negatively impacted in certain cases.   This would be a highly perverse outcome: a common law principle designed to ensure that the Judiciary does not "intrude into an area that the executive branch does not want it," *One Etched Ivory Tusk of Afr. Elephant,* at 142, would be turned on its head to preclude the Executive Branch from acting.

Schulman's interpretation of the Act of State doctrine could have a similar impact on the

---

*in violation of the lawful duty of such party, official, or candidate*, or (iii) securing any improper advantage; or (B) *inducing such party, official, or candidate to use its or his influence with a foreign government or instrumentality thereof to affect or influence any act or decision of such government or instrumentality* . . .; or

(3) any person, while knowing that all or a portion of such money or thing of value will be offered, given, or promised, directly or indirectly, to any foreign official, to any foreign political party or official thereof, or to any candidate for foreign political office, for purposes of—

(A) (i) *influencing any act or decision of such foreign official, political party, party official, or candidate in his or its official capacity*, (ii) *inducing such foreign official, political party, party official, or candidate to do or omit to do any act in violation of the lawful duty of such foreign official, political party, party official, or candidate*, or (iii) securing any improper advantage; or (B) *inducing such foreign official, political party, party official, or candidate to use his or its influence with a foreign government or instrumentality thereof to affect or influence any act or decision of such government or instrumentality* . . .

15 U.S.C. 78dd-1(a); *see also* 15 U.S.C. 78dd-2(a), 15 U.S.C. 78dd-3(a) (emphasis added).

enforcement of FARA, which provides, "[w]hoever, other than a diplomatic or consular officer or attaché, acts in the United States as an agent of a foreign government without prior notification to the Attorney General if required in subsection (b), shall be fined under this title or imprisoned not more than ten years, or both."   18 U.S.C. § 951(a).    If the Act of State doctrine were interpreted to render it impermissible for juries to consider whether a person is "an agent of a foreign government," it could potentially impact an important criminal statute that has been enforced by the Executive Branch and upheld in the Fourth Circuit and elsewhere.  *See United States v. Rafiekian*, 991 F.3d 529 (4th Cir. 2021) (reversing lower court's Rule 29 decision that had set aside the jury's verdict convicting defendant under FARA for acting as an unregistered foreign agent of the Turkish government); *United States v. Alshahhi*, 2022 WL 2239624 (E.D.N.Y. June 22, 2022) (denying defendant's motion to dismiss charges brought under FARA); *United States v. Manafort*, 318 F. Supp. 3d 1 (D.D.C. 2018) (same).   Schulman's unsupported motion, and its potential implications, should be rejected.

### c.  Schulman's Arguments Fail Even Under the Inapposite Common Law Doctrine

Even if the civil common law principles espoused by Schulman were to apply to actions brought by the United States—which they do not—Schulman's motion would fail just the same. "Act of state issues only arise when a court *must decide*—that is, when the outcome of the case turns upon—the effect of official action by a foreign sovereign."   *W.S. Kirkpatrick & Co., Inc. v. Envt'l. Tectonics Corp.*, 493 U.S. 400, 406 (1990) (emphasis in original).   Here, the outcome of the case turns on whether Schulman knowingly used forged and fraudulent documents and fraudulently concealed information provided to him by the U.S. State Department, and whether he engaged in monetary transactions with proceeds of those fraud crimes. *See* Section I(a), *supra.* The actual actions by the Somali Government are ancillary at best—and Schulman has not

asserted, and cannot assert, that the Somali Government officially authorized him to use forged and fraudulent documents or to conceal information from Bank A-1 or the NY Comptroller.

Further, "[t]he Supreme Court has stated that in every case in which we have held the act of state doctrine applicable, the relief sought or the defense interposed would have required a court in the United States to declare invalid the official act of a foreign sovereign performed within its own territory." *Okinawa Dugong v. Gates*, 543 F. Supp. 2d 1082, 1099 (N.D. Cal. 2008), *citing W.S. Kirkpatrick & Co. v. Environmental Tectonics Co., Int'l,* 493 U.S. 400, 405 (1990) (cleaned up); *see also, Giffen.* at 503.   Here, the dispositive actions are alleged fraudulent acts and financial transactions committed by Schulman outside of Somalia.   *See* Section I(a), *supra.*

## IV.    Argument: The Political Question Doctrine Has No Bearing on the Indictment

In addition to raising the Act of State doctrine, Schulman also contends that the indictment must be dismissed because, in connection with the allegations related to the 25B Certification, "[t]he question of whether the Department of State can restrict a recognized foreign sovereign from delegating the authority bestowed upon him pursuant to Section 632 presents a political question that cannot be presented to a jury under the political question doctrine."   ECF 152 ("Def's PQ Mot."), at 1.   Schulman, yet again, does not cite a single case in which a court has dismissed criminal charges under the political question doctrine, and, yet again, he ignores previous decisions in which courts have squarely considered and rejected the same motion.   Schulman's motion should be denied accordingly.

### a. No Court Has Ever Dismissed an Indictment on Political Question Grounds and Schulman Provides No Basis for the Court to Do So

Schulman does not cite a single case granting the relief he seeks and ignores the consistent line of cases denying it.   In *United States v. Marzook*, the defendant moved to dismiss a RICO charge arising from his alleged support of Hamas, a designated terrorist organization, contending

that the determination of whether Hamas constituted a RICO enterprise was a non-justiciable political question.   426 F. Supp. 2d 820, 824-25 (N.D. Ill. 2006).   The court rejected the motion, holding that the RICO statute "provide[s] manageable standards to allow the jury and court to determine" whether Hamas was a RICO enterprise.   *Id.* at 825.

In *United States v. Ventura-Oliver*, defendants were charged in a superseding indictment with engaging in a fraudulent debt assistance program.   No. 11-00503 JMS, 2013 WL 12205842, at *1 (D. Haw. Sept. 30, 2013).   They moved to dismiss on the grounds that the indictment raised a political question of whether Native Hawaiians had sovereign rights to land titles involved in the scheme.   *Id.*   Defendants pointed to a civil case, *Sai v. Clinton,* in which a civil claim was dismissed on political question grounds.   *Id.*   The court denied the motion and rejected the argument, holding that "*Sai* neither holds nor suggests that a defendant can obtain dismissal of an indictment by raising a (wholly frivolous) political question as his defense in a criminal action." *Id.* at *3.

Similarly, in *United States v. Cisneros*, the defendant moved to dismiss charges arising from his making of false statements and withholding of information from various governmental entities in connection with his nomination to a Cabinet Secretary position.   26 F. Supp. 2d 24, 31-32 (D.D.C. 1998).   Cisneros claimed that the indictment raised "non-justiciable issues involving his eligibility for a security clearance" and "would constitute an unconstitutional intrusion by the judiciary into the inner workings of coordinate branches and would mire the Court in political questions which are not governed by judicially manageable standards."   *Id.* at 35.   The court disagreed.   It found that resolving the case would not require any impermissible evaluation of other branches of government; it would merely require determining whether Cisneros, like any other defendant charged with fraud crimes, committed fraud.   *Id.* at 36 ("the determination of

materiality in no way would require second-guessing the actual criteria used by the coordinate branches in the exercise of their discretion").

The court in *Cisneros* relied on yet another case, *United States v. Durenberger*, in which a defendant (a U.S. Senator) tried unsuccessfully to have criminal fraud claims dismissed on the grounds that principles of separation of powers rendered the prosecution nonjusticiable.   In *Durenberger*, the D.C. Circuit Court held that the defendant's motion to dismiss criminal charges under the False Claims Act was properly denied where "the court's determination of the materiality of Durenberger's alleged false statements to the Senate in no way compromised the independence and authority of that body."   48 F.3d 1239, 1243 (D.C. Cir.1995).   The list of failed attempts to dismiss criminal charges based on the political question doctrine goes on.   *See, e.g., United States v. Funmaker*, 10 F.3d 1327, 1332-33 (7th Cir. 1993) (holding that defendant's motion to dismiss the indictment under the political question doctrine "can be dispatched easily"); *United States v. Poindexter*, 725 F. Supp. 13, 22-23 (D.D.C. 1989) (rejecting contention of a Presidential advisor that his indictment for obstructing Congress presented a political question beyond the competence of the Judiciary under the separation of powers).

Defendants invoking the doctrine to quash grand jury subpoenas have fared no better.   In *United States v. Nixon*, President Nixon moved to squash a subpoena on the grounds that the matter presented a nonjusticiable intra-branch dispute between the President and another executive branch official, the Special Prosecutor.   418 U.S. 683, 694 (1974).   The Court began its analysis by stating, "[o]ur starting point is the nature of the proceeding for which the evidence is sought—here a pending criminal prosecution. It is a judicial proceeding in a federal court alleging violation of federal laws and is brought in the name of the United States as sovereign."   *Id.* at 694.   The Court

rejected Nixon's motion and held that "the fact that both parties are officers of the Executive Branch cannot be viewed as a barrier to justiciability." *Id.* at 697.[8]

The same reasoning consistently applied for decades applies here.  The federal fraud statutes, like the RICO statute, provide "manageable standards to allow the jury and court to determine the issue." *Marzook,* at 825.  Criminal fraud charges, like those facing Schulman, are not rendered inviable simply because they implicate some aspect of the workings of the executive or legislative branches.  *Cisneros* at 36; *Durenberger* at 1243.  Rather, courts have rejected criminal defendants' motions to dismiss under the political question doctrine even when the trials would have implicated an appointment to the President's cabinet, the Congressional testimony of a Presidential advisor, and the actions of a sitting U.S. Senator.  *Cisneros* at 36; *Poindexter*, at 22-23; *Durenberger* at 1243.  Schulman has provided no basis to distinguish this line of cases; he has just ignored them.  His motion should be denied.

### b. Schulman's Alleged Fraudulent Conduct Related to the 25B Certification Does Not Pose a Nonjusticiable Political Question

The indictment alleges that lawyers for the State Department and the Federal Reserve Bank of New York "advised Schulman that the 25B Certification did not permit the Permanent Government of Somalia President to delegate his authority to any third person."  Ind. ¶ 54.   The indictment further alleges that Schulman, despite having received that information, "emailed a version of the 25B Certification with the State Department seal to the NY Comptroller . . . without disclosing that he had just been told by the State Department that—contrary to his previous representations to the NY Comptroller—he did not have authority under the 25B Certification to

---

[8]      In *In Re Grand Jury Subpoenas Returnable December 16, 2015*, a company and its employees who provided services to Chinese diplomatic and consular missions in the United States moved to quash subpoenas requiring them to appear before a grand jury.  871 F.3d 141 (2d Cir. 2017).  The court rejected the political question argument on grounds of waiver alone, and thus did not address the argument's merits.  *Id.* at 147.

take control of Frozen Somali Assets." *Id.* ¶ 55.  Then, "[d]espite Schulman's acknowledgements to the State Department and the Permanent Government of Somalia official regarding his lack of delegation authority, on or about October 15, 2013, Schulman emailed the NY Comptroller to follow up on his request to obtain control over the Frozen Somali Assets based on his purported delegated authority under the 25B Certification." *Id.* ¶ 57.  Months later, Schulman also allegedly "emailed Bank A-1 and requested that additional Frozen Somali Assets in the amount of approximately $300,000 be released to Law Firm A," without revising his previous assertion of authority in connection with the 25B Certification.  *Id.* ¶ 66.

The simple upshot of these allegations is that Schulman concealed certain material information related to the 25B Certification from the NY Comptroller and Bank A-1.  That concealment comprises one of many allegations of fraudulent conduct germane to Counts 1 and 5.  (Counts 7 through 11 allege transactions with criminal proceeds, which in turn relate to Counts 1 and 5.)  The jury will be instructed to consider whether Schulman concealed the information provided to him by the State Department and the NY Federal Reserve and whether that concealment was material.[9]  That Schulman allegedly concealed information he received from the federal government (among his many other acts of alleged fraud) does not warrant the unprecedented step of dismissing the entire indictment under the political question doctrine.

To the contrary, none of the factors set forth by the Supreme Court in *Baker v. Carr* render this issue nonjusticiable.  369 U.S. 186, 216 (1962).  Schulman contends that the first factor—a "textually demonstrable constitutional commitment of the issue to a coordinate political department"—is satisfied because the "the only question before this Court is whether the

---

[9]      The jury of course will also be instructed on other relevant elements of the charges, such as, for Count 1, whether Schulman agreed with another person to carry out a scheme to defraud, and for Count 5, whether Bank A-1 is a financial institution as defined in the statute.

Department of State could further restrict a foreign sovereign's authority following the issuance of a 25B Certification."   Def's PQ Mot. 12.   Yet the question before the Court has nothing to do with whether the State Department could or could not do what it did.   The question before the Court, as framed by the indictment, is whether Schulman concealed material information from Bank A-1 and the NY Comptroller.   Ind. ¶ 54-57, 66.   A nonjusticiable political question under *Baker* does not arise simply because a party wants to create one, and Schulman cites no authority holding that a defendant can obtain dismissal of an indictment simply by threatening to raise creative defenses.

The second factor -- "a lack of judicially discoverable and manageable standards for resolving the issue" -- also does not favor dismissing the indictment.   *Baker* at 217.   Schulman contends the court will be "at a loss" to evaluate internal State Department communications. Def's PQ Mot. 14.   This makes little sense; to the extent those communications are relevant to the Government meeting its burden proof, it will put them before the Court through documents and testimony of percipient witnesses, including witnesses from the State Department; Schulman can do the same in his defense. And the credibility and clarity of those documents are matters for the jury to decide.

Similarly unavailing is Schulman's argument that the remaining *Baker* factors favor dismissing the indictment because otherwise the jury could make a finding at odds with either State Department pronouncements or the indictment.   Def's PQ Mot. 15.   Juries frequently are asked to find facts related to the conduct of another federal government agency.   Those findings could contradict the agency's pronouncements or the indictment's charges, and that does not foreclose the prosecution.   For example, defendants are often prosecuted for disseminating information that the Government alleges has been identified as classified by other agencies in the

20

federal government.   *See, e.g., United States v. Schulte*, No. 17-CR-548 (JMF), 2022 WL 1639282, at *1 (S.D.N.Y. May 24, 2022) (describing defendant's trial on charges of stealing national defense information from the CIA); *United States v. Morison*, 604 F. Supp. 655, 657 (D. Md. 1985) (denying defendant's motion to dismiss charges arising from defendant's release of classified documents to the media).   Similarly, defendants are often prosecuted for defrauding the federal government, requiring the jury to evaluate whether statements or omissions by the defendants were material to the government's contracting process.   *See, e.g., U.S. v. Whyte*, 918 F.3d 339, 350 (4th Cir. 2019) (upholding conviction of government contractor under the False Claims Act and other charges).   The jury's obligation to find facts related to federal agencies' classification decisions or contracting processes (which, like the 25B Certification, are governed by federal laws) does not render these cases nonjusticiable.

### c. *Republic of Panama* **Is Inapposite**

While wholly ignoring all the criminal cases rejecting the application of the political question doctrine, Schulman contends that *Republic of Panama v. Citizens and Southern Intern. Bank*, a civil banking dispute, is instructive.   Def's PQ Mot. 17.   In *Republic of Panama,* the litigation arose out of a dispute over which government of Panama was entitled to control funds held in U.S. banks in the name of the Republic of Panama, its agencies and instrumentalities.   682 F. Supp. 1544, 1548 (S.D. Fla. 1988).   The Court held that "[t]he Executive branch's exclusive power to recognize and legitimize a foreign government is binding upon the courts." *Id.* at 1545. It thereby granted a preliminary injunction in favor of the party recognized by the State Department

in the 25B certification as the legitimate representative of Panama and rejected the motions to intervene brought by others.

Schulman makes the attenuated assertion that, as in *Republic of Panama*, "the Department of Justice is seeking to intervene in the Somali Government's disbursement of funds pursuant to the 25B Certification."  Def's PQ Mot. 17.  But DOJ is not seeking to do any such thing, and there will be no competing civil claims for Somali assets at stake in the upcoming criminal trial. Rather, DOJ seeks to prove that Schulman, in connection with the wire fraud conspiracy and bank fraud scheme, fraudulently concealed information he received from the State Department.  The court can make the requisite findings of fact without challenging the State Department's determination of who is the rightful government of Somalia.  Neither *Republic of Panama*, nor any other precedent, compels dismissal of these charges under the Political Question doctrine.[10]

## V.   Argument: Count Five (Bank Fraud) Adequately Alleges a Section 1344(1) Crime and a Section 1344(2) Crime Under Established Precedent, and Schulman's Factual Challenges Are Questions for the Jury

In Count Five, the indictment alleges in the conjunctive a violation of both prongs of the bank fraud statute, 18 U.S.C. § 1344(1) and (2).  Ind. p. 24.  "Where a statute specifies several alternative ways in which an offense can be committed, the indictment may allege the several ways in the conjunctive, and a conviction thereon will stand if proof of one or more of the means of commission is sufficient."  *United States v. Brandon*, 298 F.3d 307, 314 (4th Cir. 2002) (holding that indictment alleging both prongs of Section 1344 in the conjunctive was legally sufficient).

---

[10]     Schulman also contends that dismissal of the indictment is warranted under the Court's supervisory powers because Schulman would be prejudiced by evidence related to the 25B Certification.  Def's PQ Mot. 16-19. Schulman's conclusory allegation does not make any specific showing as to how the evidence would potentially prejudice him.  To the contrary, Schulman contends that "numerous communications among Department of State officials -- which the Government obtained and provided Schulman in discovery -- "are exculpatory and substantiate Schulman's reasonable belief" that Mohamud could designate his authority to Schulman.  *Id.* at 19.   Schulman thereby contends that he is amply prepared to use the materials produced in discovery to rebut the Government's evidence regarding the 25B Certification fraud, and thus there can be no showing of prejudice.

Here, the indictment adequately alleges violations of both prongs.   Schulman's various arguments about the impact of the 25B Certification, and the materiality of the forged and fraudulent documents, are factual questions for the jury to decide at trial.   Schulman's motion to dismiss Count Five should therefore be denied.

### a.   The Indictment Adequately Alleges a Violation of Section 1344(1)

"In order to prove a violation of section 1344(1), the government must demonstrate that the accused [1] executed a scheme to defraud [2] a federally insured or chartered bank and [3] that the accused did so knowingly."   *Brandon* at 311.   "The 'scheme to defraud' clause of Section 1344(1) is to be interpreted broadly . . . and requires that the defendant act with the specific intent to deceive or cheat . . . for the purpose of getting financial gain for one's self or causing financial loss to another."   *Id.* (cleaned up).

Count Five adequately alleges that Schulman committed bank fraud by executing and attempting to execute a scheme to defraud Bank A-1.   To establish the necessary elements, the indictment alleges, among other things, that Schulman knowingly created and used fraudulent documents, including the 2009 Fraudulent Decree Translation.   Ind. ¶¶ 31-32. The indictment also alleges that Bank A-1 was a federally insured bank, Ind. ¶ 16, that held Frozen Somali Assets, Ind. ¶ 53.   Further, the indictment alleges two specific instances in which Schulman knowingly sent forged and fraudulent documents to Bank A-1 in attempts to gain control over Frozen Somali Assets held there:

> Beginning in or about February 2010, SCHULMAN attempted to gain control of the Frozen Somali Assets by sending the 2009 Fraudulent Decree Translation via private and commercial mail carriers and interstate and foreign wires to various Target Institutions, including Bank A-1, Bank A-2, the NY Comptroller and Bank B.   For example, on or about March 19, 2010, SCHULMAN sent a letter via Federal Express to Bank A-1, attaching

the 2009 Fraudulent Decree Translation.  *Id.* ¶ 33.

In or about April 2013, SCHULMAN, knowing that the 2013 Forged PM
Letter and the 2013 Forged POA were forgeries, attempted to defraud Bank
A-1 and the NY Comptroller by sending them those documents and
requesting access to Frozen Somali Assets under their control.  *Id.* ¶ 44.

"The presentation of a forged or altered instrument is evidence, in and of itself, of an intent to
defraud a bank."  *Brandon,* at 313.  Thus, these allegations sufficiently allege a crime under
Section 1344(1).

Schulman contends that these allegations do not constitute bank fraud because Bank A-1
did not turn over any funds to Schulman until after it received the 25B Certification in September
2013.  ECF 160-1 ("Def's Omn. Mot."), 9-13.  Setting aside whether Schulman, as the
indictment alleges, committed additional fraud related to the 25B Certification, Ind. ¶¶ 50, 54, 55,
57, 66, this argument fails because attempting to execute a scheme to defraud—as Schulman
allegedly did in transmitting to Bank A-1 the 2009 Fraudulent Decree Translation, the 2013 Forged
PM Letter and the 2013 Forged POA—would complete the crime: after all, the statue provides,
"Whoever knowingly executes, *or attempts to execute*, a scheme or artifice— (1) to defraud a
financial institution [shall be punished]".  18 U.S.C. § 1344(1) (emphasis added).

Schulman also contends that the bank fraud claim must be dismissed because "Bank A-1
was shielded from any liability by the text of 12 U.S.C. § 632" and thus it "faced no actual or
potential risk of loss."  Def's Omn. Mot. 11.  This argument, however, is squarely foreclosed by
a unanimous 2016 Supreme Court decision, *Shaw v. United States*.  In *Shaw*, the Supreme Court
held that Section 1344(1) "demands neither a showing of ultimate financial loss nor a showing of
intent to cause financial loss. . ."  137 S. Ct. 462, 467 (2016).  The Court further held, "[w]e have
found no case from this Court interpreting the bank fraud statute as requiring that the victim bank
ultimately suffer financial harm, or that the defendant intend that the victim bank suffer such

harm." *Id.* *Shaw* accords with an earlier 2014 decision from the Fourth Circuit, *United States v. Adepoju*, holding that "risk of loss to the bank is unnecessary for a § 1344(1) conviction, although it tends to prove the requisite intent under that subsection." 756 F.3d 250 (4th Cir. 2014). To the extent that any of the cases cited by Schulman—all of which pre-date 2014—actually held that the bank fraud statute requires that the defendant harmed a bank or exposed a bank to risk of loss, those holdings are all superseded by *Shaw* and *Adepoju*. *See* Def's Omn. Mot. 8-11 (citing *United States v. Royston*, 184 F. Supp. 2d 517 (W.D. Va. 2002); *United States v. Agne*, 214 F.3d 47 (1st Cir. 2000); *United States v. Sprick*, 233 F.3d 845 (5th Cir. 2000); *United States v. Ubakanma*, 215 F.3d 421 (4th Cir. 2000); *United States v. Grass*, 274 F. Supp. 2d 648 (M.D. Pa. 2003); and *United States v. Esterman*, 135 F. Supp. 2d 917 (N.D. Ill. 2001)).

In sum, an indictment charging a violation of Section 1344(1) must merely allege that the defendant knowingly attempted to execute a scheme to defraud a federally insured bank—and the allegations here that the defendant knowingly and repeatedly sent Bank A-1 false and fraudulent documents in seeking to obtain control of Frozen Somali Assets amply suffice. *Brandon,* at 313.

### b. The Indictment Adequately Alleges a Violation of Section 1344(2)

Section 1344(2) provides, "[w]however knowingly executes, or attempts to execute, a scheme or artifice . . . to obtain any of the moneys . . . or other property owned by, or under the custody or control of, a financial institution, by means of false or fraudulent pretenses, representations, or promises [shall be punished]." 18 U.S.C. § 1344(2). Thus, as the Supreme Court formulated in *Loughrin v. United States,* the elements are: (1) "the defendant intend to obtain any of the moneys ... or other property owned by, or under the custody or control of, a financial institution"; and (2) "the envisioned result—*i.e.*, the obtaining of bank property—occur 'by means

of false or fraudulent pretenses, representations, or promises.'"   573 U.S. 351, 355–56 (2014).

Notably, in *Loughrin* the Court rejected the defendant's contention that the Court should add an additional element (an intent to defraud) that Congress did not include in the statutory text. *Id.*   Further, just as the Court in *Shaw* rejected a risk of loss requirement for Section 1344(1), the Court in *Loughrin* held that exposure of the bank to risk of loss is not an element of Section 1344(2) either.   *Loughrin* at 367 ("I agree with the Court that neither intent to defraud a bank nor exposure of a bank to a risk of loss is an element of the crime codified in 18 U.S.C. § 1344(2)") (J. Scalia, concurring in part and concurring in the judgment).

The same allegations described above satisfy the elements of Section 1344(2).   The indictment alleges that Schulman knowingly and repeatedly provided Bank A-1 with false and fraudulent documents in an attempt to obtain property (Frozen Somali Assets) under Bank A-1's custody or control.   Ind. ¶¶ 16, 30-33, 44.   Because Section 1344(2), like Section 1344(1), criminalizes an attempt to execute a scheme, these allegations sufficiently plead the crime, regardless of whether Bank A-1 actually parted with property in its custody in response to Schulman's false and fraudulent representations.   *Loughrin*, at 2395 n. 9 ("the gravamen of § 1344 is the scheme, rather than the completed fraud, and [ ] the offense therefore does not require damage or reliance") (cleaned up).

Schulman contends that the bank fraud charge must be dismissed because, as a matter of law, "the 25B Certification insulated Bank A-1 from any liability associated with its transfer of funds held in accounts in the name of the Somali government." Def's Omn. Mot. 10-11.   In *Loughrin*, however, the Supreme Court foreclosed this type of argument as follows:

> As a last-gasp argument, Loughrin briefly asserts that § 1344(2) at least
> requires the Government to prove that the defendant's scheme created a risk
> of financial loss to the bank. But once again, nothing like that element

appears in the clause's text. *Indeed, the broad language in § 1344(2) describing the property at issue* -- "property owned by or under the custody or control of" a bank -- *appears calculated to avoid entangling courts in technical issues of banking law about whether the financial institution or, alternatively, a depositor would suffer the loss from a successful fraud.*

*Loughrin*, at 2395 n. 9.   The indictment alleges that Schulman used false and fraudulent means in a scheme to obtain Frozen Somali Assets.   Under *Loughrin,* the technical issues surrounding Section 25B of the Federal Reserve Act provide no grounds to dismiss the charge.

### c.   Schulman's Arguments Related to Materiality and Bank A-1's Reliance on the 25B Certification Are Factual Questions for the Jury

Schulman further contends that Count Five fails to allege a material false statement because, according to Schulman, Bank A-1 did not release funds based on the forgeries and false documents furnished by Schulman, but only on the basis of the 25B Certification. Def's Omn. Mot. 12.   Schulman contends that these forged documents were not material because "only the 25B Certification was capable of influencing a reasonable banker."[11]   *Id.* at 13.

The indictment, however, alleges that Bank A-1 did rely on the forged documents: "Relying on the 2013 Forged PM Letter, the 2013 Forged POA, and the 25B Certification, Bank A-1 transmitted approximately $7.4 million of Frozen Somali Assets to Law Firm A's trust account between on or about September 25, 2013, and on or about October 7, 2013."  Ind. ¶ 53.  The Court must accept the indictment's allegation as true for the purpose of this motion.   *Thomas* at 197.   Although Schulman may contest whether the forged documents were capable of influencing Bank A-1, or whether Bank A-1 was reasonable in relying on them, the Supreme Court in *Neder v. United States* firmly established that these materiality questions are factual issues for the jury to

---

[11]       This argument is dubious at best, particularly given the indictment's allegation that Bank A-2 did in fact rely on fraudulent documents provided by Schulman and release funds to Schulman's control years before the 25B Certification.   Ind. ¶ 34. Regardless, as set forth *infra,* this is an issue of fact for the jury.

decide at trial.   527 U.S. 1, 25 (1999); *see also United States v. Mara,* 15 Fed. App'x 98, 103 (4th Cir. 2001) ("the Supreme Court recently held that materiality of a false statement was a matter of fact for the jury.").

Schulman's materiality argument fails for the independent reason that the indictment alleges that Schulman also made material fraudulent omissions related to the 25B Certification. Specifically, it alleges that Schulman was "told by the State Department that—contrary to his previous representations to the NY Comptroller—he did not have authority under the 25B Certification to take control of Frozen Somali Assets."   Ind. ¶ 55.   Schulman then sent an email to a State Department lawyer stating that FRB NY had "explained the issue fully" regarding the lack of delegation authority under the 25B Certification.   *Id.* ¶ 56.   Schulman "also acknowledged in an email to a Permanent Government of Somalia official that only the Permanent Government of Somalia President was authorized to control the Frozen Somali Assets under the 25B Certification."   *Id.*   Nevertheless, the indictment alleges that Schulman subsequently obtained another $300,000 from Bank A-1 without disclosing his lack of delegation authority:

> On or about June 25, 2014, SCHULMAN emailed Bank A-1 and requested that additional Frozen Somali Assets in the amount of approximately $300,000 be released to Law Firm A.   On or about July 1, 2014, Bank A-1, *relying on the documentation SCHULMAN had previously provided, including SCHULMAN's assertion of authority in connection with the 25B Certification*, wired an additional $300,000 of Frozen Somali Assets to a Law Firm A trust account.   SCHULMAN caused Law Firm A to retain all those funds for itself and its vendors.

Ind. ¶ 66 (emphasis added).   Again, Schulman may contest whether this concealment was material, but under *Neder,* that is a factual issue for the jury to decide.   *Neder,* at 25; *Mara,* at 103.

VI.     **None of the Charges Are Time-Barred**

a.     **The Indictment Adequately Alleges that Bank A-1 Was "Affected" by the Scheme to Defraud, and the Jury Will Determine Whether Section 3293 Applies**

In Counts 1, 3, and 6, the Government invokes the ten-year tolling period provided by 18 U.S.C. § 3293 because the crimes allegedly affected Bank A-1.   Ind. ¶¶ 16, 24 (Count One), pp. 23 (Count Three), 25 (Count Six).   The Government alleges that Bank A-1 was affected by, among other things, receiving from Schulman false and fraudulent documents, including the 2009 Fraudulent Decree Translation, the 2013 Forged PM Letter, the 2013 Forged POA, and then releasing $7.4 million of Frozen Somali Assets to Schulman's control in reliance, at least in part, on those documents.   Ind. ¶¶ 30-33, 42-44, 53.

The allegations that Schulman used fraudulent means to obtain control of customer funds held by Bank A-1 sufficiently establish that Bank A-1 was "affected" by the crimes charged in Counts 1, 3, and 6.   In *Shaw*, the Supreme Court established that a bank such as Bank A-1 has a property right in the funds it holds on deposit for its customers.   *Shaw* at 466.   The Court rejected the defendant's contrary argument that the bank was not affected by a scheme to obtain money that it held for a customer.   The Court stated, "for purposes of the bank fraud statute, a scheme fraudulently to obtain funds from a bank depositor's account normally is also a scheme fraudulently to obtain property from a [bank]."   *Id.*   The Court explained, "the basic flaw in defendant's argument lies in the fact that the bank, too, had property rights in [the customer's] bank account. When a customer deposits funds, the bank ordinarily becomes the owner of the funds and consequently has the right to use the funds as a source of loans that help the bank earn profits."   *Id.*   Thus, the indictment alleges that the schemes charged in Counts 1, 3, and 6 affected

Bank A-1 by attempting to fraudulently obtain customer funds held by Bank A-1, in which Bank A-1 had a property right.[12]

Schulman contends that, despite these allegations, Bank 1 was not affected.   Def's Omn. Mot. 17.   Yet Schulman's arguments on that score are inappropriate for a motion to dismiss: courts have routinely held that whether the defendant's conduct affected a financial institution is a question of fact for the jury.   *See, e.g., United States v. Bouyea*, 152 F.3d 192, 195 (2d Cir. 1998) (holding that "there was sufficient evidence to support the jury's necessary finding that the wire fraud affected a financial institution"); *United States v. Murillo*, 443 Fed. App'x 472, 475 (11th Cir. 2011) (holding "there was sufficient evidence for the jury to conclude that Murillo's fraud affected a financial institution").   Thus, it is the province of the jury, not the Court, to evaluate Schulman's longshot argument that Bank A-1 was not affected by a multi-year scheme to obtain control of more than $7 million in Bank A-1's custody through false and fraudulent documents.

### b.  Schulman's Reliance on *Agne* and the 25B Certification Is Misplaced

Schulman specifically asserts that Bank A-1 was not "affected" by the scheme to defraud because of the purported insulation provided by the 25B Certification.   Def's Omn. Mot. 13-17. Schulman relies on *United States v. Agne,* where the First Circuit held that Section 3293 did not apply.   Def's Omn. Mot. 14-16. The court in *Agne*—after reviewing the factual record from trial—concluded that the facts established that the bank could not have been affected by the defendant's alleged scheme because any withdrawals from the bank that the defendant caused were fully protected by a letter of credit.   214 F.3d 47, 52 (1st Cir. 2000).   Here, in contrast, the factual

---

[12]      Counts 3 and 6 are wire and mail fraud charges, not bank fraud charges, but the reasoning in *Shaw* applies equally.   *See United States v. Lewis*, 67 F.3d 225, 230 (9th Cir. 1995) ("Section 1344 is modeled directly on the mail and wire fraud statutes. However, . . . the jurisdictional distinction between the mail and wire fraud statutes on the one hand and § 1344 on the other suggests that the latter's reach is more limited than that of its sister statutes.").

record has yet to be developed, and the court must accept the indictment's allegation as true. *Thomas* at 197.   And the indictment does not allege that the 25B Certification rendered Bank A-1 "unaffected" from the scheme as a matter of law.

Rather, as alleged in the indictment, only a transfer of property *to the specific persons identified in the 25B Certification* is presumed to be lawful.   Ind. ¶ 49 (emphasis added); 12 U.S.C. § 632.   The indictment further alleges that "the State Department issued a 25B certification establishing that the President of Somalia was 'the sole representative of Somalia with full authority to receive, control, and dispose of'" the Frozen Somali Assets.   *Id.* ¶ 50.   Thus, according to the indictment (and as undisputed by Schulman), neither Schulman nor his law firm were identified in the 25B Certification; only the Somali President was identified in the 25B Certification.   *Id.*   The indictment goes on to allege that Bank A-1 transferred the funds to Schulman's law firm on Schulman's false representation that the President could delegate his authority under the 25B Certification to Schulman.   *See Ind.* ¶¶ 50, 54, 55, 57, 66.

In sum, the indictment alleges that Bank A-1 transferred assets in its custody and control in reliance on false and fraudulent documents submitted by Schulman and based on concealment of material information about the 25B Certification by Schulman.   The indictment further alleges that the 25B Certification only authorized Bank A-1 to transfer funds at the direction of the Somali President, not at the direction of Schulman.   Whether this conduct affected Bank A-1 within the meaning of Section 3293 is a question of fact for the jury.   *Bouyea*, at 195; *Murillo*, at 475.

### c.   The Section 3292 Order Is Valid and All the Counts Are Within Statute

Schulman devotes 12 pages of his brief to repeating the arguments set forth in the pending motion to vacate the Section 3292 order, and then delineating the potential impact of that pending motion, and his request to strike the application of Section 3293, on each of the indictment's 11

counts.   Def's Omn. Mot. 17-29.   The Government will not restate here its arguments that the Section 3292 order was duly issued.   ECF 138.   For the Court's convenience, however, the Government sets forth below a chart showing which charges depend on the challenged Section 3292 Order, which depend on application of Section 3293, and which depend on either or both.

| COUNT | CHARGE | DATE OF OFFENSE OR LAST ALLEGED OVERT ACT | BASIS FOR TIMELINESS BEYOND A FIVE-YEAR LIMITATIONS PERIOD | |
|---|---|---|---|---|
| 1 | 1349 (Conspiracy to Commit Mail Fraud, Wire Fraud, and Bank Fraud) | 07/01/2014 | Section 3292 *or* 3293 | |
| 2 | 1343 (Wire Fraud) | 01/24/2013 | Section 3292 | |
| 3 | 1343 (Wire Fraud) | 04/19/2013 | Section 3292 *or* 3293 | |
| 4 | 1343 (Wire Fraud) | 03/31/2014 | Section 3292 | |
| 5 | 1344 (Bank Fraud Scheme) | 07/01/2014 | | Section 3293 |
| 6 | 1341 (Mail Fraud) | 03/19/2010 | Section 3292 *and* 3293 | |
| 7 | 1956(h) (Money Laundering Conspiracy) | 04/14/2014 | Section 3292 | |
| 8 | 1957 (Money Laundering) | 04/07/2014 | Section 3292 | |
| 9 | 1957 (Money Laundering) | 04/07/2014 | Section 3292 | |
| 10 | 1957 (Money Laundering) | 04/14/2014 | Section 3292 | |
| 11 | 1957 (Money Laundering) | 04/14/2014 | Section 3292 | |

Thus, Count One, for example, is not time barred for two independent reasons: pursuant to Section 3293 alone, it would not expire until July 1, 2024 (ten years from the last overt act); pursuant to Section 3292 alone, it would not expire until June 29, 2022 (five years from the last overt act plus an additional nearly three years by virtue of Section 3292 tolling[13]).   Similar arithmetic shows that all the charges were timely filed: Could Two is not time barred because

---

[13]       As described in Section I(b) *supra*, the tolling period provided by Section 3292 is two days short of three years

pursuant to Section 3292, it did not expire until January 22, 2021 (five years from the date of the offense plus an additional nearly three years by virtue of Section 3292 tolling), etc.

**VII.    None of the Counts Are Duplicitous and Any Duplicity Could be Cured through a Jury Instruction**

An indictment is duplicitous if "it charges two offenses in one count, creating the risk that a jury divided on two different offenses could nonetheless convict for the improperly fused double count."  *United States v. Robinson*, 855 F.3d 265, 269 (4th Cir. 2017) ("*Robinson I*").   Schulman complains of the language that precedes Counts Two, Three, and Four, which alleges that Schulman devised a scheme to defraud Bank A-1, the NY Comptroller, and Law Firm A.   Def's Omn. Mot. 31. Schulman contends that this language renders Counts Two, Three, and Four duplicitous because each of these counts "allege that one wire transfer was made in furtherance of multiple schemes to defraud at least three institutions."   Def's Omn. Mot. 31.

A common sense reading of the table in the indictment setting forth Counts Two, Three, and Four, however, shows that each count clearly alleges a single, distinct, instance of wire fraud: namely, a specific email or wire sent on a specific date.  *See United States v. Drew*, 722 F.2d 551, 552-53 (9th Cir. 1983) (holding that a court must give the indictment a common-sense construction).   There is no meaningful risk that a jury would fail to understand the distinct conduct charged in each count, and thus the counts are not duplicitous.  *Robinson*, at 269.   Moreover, it is "black letter law that duplicitous indictments can be cured through appropriate jury instructions." *United States v. Robinson*, 627 F.3d 941, 958 (4th Cir. 2010) ("*Robinson II*"); *see also United States v. Jackson*, 926 F. Supp. 2d 691, 706 (E.D.N.C. 2013) (holding that dismissal of a charge for duplicity would be "inappropriate. . . when a less drastic ruling will suffice."). Thus, to the extent that there could be any confusion as to what precisely is being charged in Counts 2, 3, and 4, it can be addressed with a jury instruction or a less drastic remedy than

dismissal.

Schulman also objects that the indictment's reference to the scheme "affecting a financial institution" in the paragraph that precedes Counts 2, 3, and 4, could lead to Section 3293's ten-year tolling period applying to all of Counts 2, 3, and 4.   Def's Omn. Mot. 32.   The Government does not intend that: as set forth in the chart above, the Government acknowledges that Section 3293 applies to Count 3 (alleging a fraudulent wire sent to Bank A-1) but not to Counts 2 or 4.

**VIII.   Conclusion**

For the foregoing reasons, the motions to dismiss all should be denied.

Respectfully submitted,

LORINDA LARYEA            EREK L. BARON
Acting Chief              United States Attorney
Fraud Section             District of Maryland

_____/s_____         _____/s_____
Jason M. Manning          David I. Salem
Amy Markopoulos           Assistant United States Attorney
Trial Attorneys

34