IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
Greenbelt Division

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | REDACTED |
| | : | |
| v. | : | Criminal Case No. PX-20-0434 |
| | : | |
| JEREMY SCHULMAN | : | |

**DEFENDANT JEREMY SCHULMAN'S REPLY MEMORANDUM IN SUPPORT OF HIS MOTIONS TO DISMISS THE INDICTMENT PURSUANT TO THE POLITICAL QUESTION AND ACT OF STATE DOCTRINES**

This case is not about six documents. The Indictment plainly alleges that Mr. Schulman lacked authority to act on behalf of the Somali government. The government asserts in its Opposition, "[t]he actual actions by the Somali Government are ancillary at best—and Schulman has not asserted, and cannot assert, that the Somali Government officially authorized him to use forged and fraudulent documents or to conceal information from Bank A-1 or the NY Comptroller." Opp'n to Mot. to Dismiss ("Opp'n") 14-15, ECF No. 174. But the Indictment is not limited to allegations that false or fraudulent documents were transmitted to Bank A-1, and challenges Mr. Schulman's actual authority to conduct the asset recovery project. The government cannot now re-write its indictment.

First, with respect to the political question doctrine, the government fails to address the key difference between this case and those cited by the government: the statutory language of 12 U.S.C. § 632 ("Section 632") states that transfers made to or "upon the order of" an accredited representative of a state "shall be conclusively presumed to be lawful." 12 U.S.C. § 632. In light of this edict, courts have repeatedly held that the judiciary has limited jurisdiction to adjudicate disputes pursuant to Section 632. The Indictment, thus, presents a political question of whether

the Department of State may restrict a recognized foreign sovereign from delegating his authority, after the foreign sovereign's authority is ratified pursuant to Section 632.

Second, the government inaccurately argues that the Act of State doctrine is not applicable to criminal cases, and then cites a litany of cases where courts applied the Act of State doctrine in the criminal context. The government also misstates the public acts at issue in the Indictment. The Indictment clearly challenges public acts taken by Somali officials to authorize and ratify the asset recovery project. The government's remaining arguments fare no better, and rather than addressing case law that requires this Court to dismiss the Indictment pursuant the Act of State doctrine, the government argues, wholesale, that the Act of State doctrine cannot apply in this case because it would jeopardize the government's ability to prosecute cases brought under the Foreign Corrupt Practices Act ("FCPA") and the Foreign Agents Registration Act ("FARA"). The Court should reject the government's arguments and dismiss the Indictment because the Indictment requires that the Court adjudicate the validity, legality, and sufficiency of officials acts undertaken by senior officials within the Somali government.

## **LEGAL STANDARD**

Rule 12(b) allows consideration at the pretrial stage of any defense "that the court can determine without a trial on the merits." Fed. R. Crim. P. 12(b)(1). A motion to dismiss is "generally capable of determination before trial if it involves questions of law rather than fact." *United States v. Nukida*, 8 F.3d 665, 669 (9th Cir. 1993). Even so, courts may make "preliminary findings of fact necessary to decide the questions of law presented by pre-trial motions so long as the court's findings on the motion do not invade the province of the ultimate finder of fact." *United States v. Jones*, 542 F.2d 661, 664 (6th Cir. 1976). A motion requiring preliminary factual determinations may be decided before trial if "trial of the facts surrounding the commission of the

alleged offense would be of no assistance in determining the validity of the defense." *United States v. Covington*, 395 U.S. 57, 60 (1969).

## ARGUMENT

**I.   The Indictment Must Be Dismissed Under The Political Question Doctrine.**

The Indictment must be dismissed under the political question doctrine because the Indictment puts at issue the political question of whether the Department of State can restrict a recognized foreign sovereign from delegating the authority bestowed upon him pursuant to Section 632. The cases cited by the government are distinguishable from this case in one key respect: none of the cases cited by the government involve a statute, like Section 632, that explicitly prevents a court from evaluating the question put at issue by the Indictment. *See Republic of Panama v. Citizens & S. Int'l Bank*, 682 F. Supp. 1544, 1545 (S.D. Fla. 1988). *See also Banco Nacional de Cuba v. Sabbatino*, 376 U.S. 398, 410 (1964) ("Political recognition is exclusively a function of the Executive."); *contra United States v. Marzook*, 426 F. Supp. 2d 820, 824-25 (N.D. Ill. 2006) (stating that the Racketeering Influenced and Corrupt Organizations ("RICO") statute "provides the basis to determine the sufficiency of the allegations…").

**A.   The Government Fails To Distinguish *Republic of Panama*.**

The government fails to distinguish *Republic of Panama* on the grounds that "there will be no competing civil claims for Somali assets at stake in the upcoming criminal trial." Opp'n 22. This argument fails for two reasons. First, the government has sought to recover Somali assets in the upcoming criminal trial because it has brought a claim for forfeiture to recover the funds transferred pursuant to the 25B Certification. *See* Indictment ("Ind.") 29, ECF No. 1. Thus, upon conviction, the government would seek an order to recoup the assets transferred "upon the order of" Somali President Hassan Sheikh Mohamud. Just as the court in *Republic of Panama* was without authority to adjudicate the Panamanian officials' request for an injunction over the transfer

3

of assets held in an accounts in the name of the Republic of Panama upon the issuance of a 25B Certification, Section 632 explicitly precludes the government from criminally adjudicating or seeking forfeiture of assets transferred from an account in the name of Somalia, upon the issuance of the 25B Certification in favor of President Mohamud, and upon President Mohamud's order.

Second, whether the action is criminal or civil is irrelevant if the relief sought is a ruling on the validity of a transfer of assets pursuant to Section 632. Section 632 provides that transfers to or upon the order of an authorized representative identified in the 25B Certification are "presumed to be lawful." 12 U.S.C. § 632. Courts interpret this language as removing from the judiciary's province questions regarding the recognition of a foreign sovereign—and the scope of that recognition—under Section 632, and *Republic of Panama* clearly holds that upon recognition of a foreign sovereign pursuant to Section 632, "the only judicial task . . . is to determine whether particular funds are held on the account of a foreign state or central bank." *Republic of Panama*, 682 F. Supp. at 1551 (emphasis added). *See also Sabbatino*, 376 U.S. at 410. *Republic of Panama* requires this Court to dismiss the Indictment under the political question doctrine.

### B. The Government's Argument Regarding Materiality Overlooks The Political Question At Issue.

The Government argues that the "simple upshot" of the Indictment's allegations is that "Schulman concealed certain material information related to the 25B Certification from the New York Comptroller and Bank A-1." Opp'n 19. The government's argument, however, assumes that the information allegedly concealed is material. Whether that information is material turns on Department of State officials' ability to limit delegation under Section 632, in the absence of any limitation in the 25B Certification itself.

The evidence presented to this Court overwhelmingly demonstrates that any restriction on the delegability of the 25B Certification was a policy—not legal—decision. As early as June 2013,

Department of State officials engaged in back and forth about the delegability of authority under the 25B Certification, with the consensus being that the 25B Certification was delegable—even if the text of the 25B Certification did not include explicit delegation language.  *See* Ex. I to ECF No. 152 (███████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████); Ex. N to ECF No. 152 (███████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████).

Additionally, on September 16, 2013, the same date as the 25B Certification, Department of State officials corresponded internally regarding the absence of delegation language in the 25B Certification.  Julie Limoges, Economic/Commercial Officer, Somalia Affairs Unit, U.S. Embassy Nairobi, wrote to Gabriel Swiney, Attorney Adviser, Office of the Legal Adviser, ███████████████████████████████████████████████████████████████████████████████████████████████████  *See* Ex. 1, Sept. 16, 2013 Email from J. Limoges, Dep't of State, to G. Swiney, Dep't of State, DOJ-SCH-0002476391.

Thus, leading up to and on the date the 25B Certification was executed, Department of State officials internally communicated about their limited authority to authorize (or restrict) delegation pursuant to the 25B Certification.  Per the allegations in the Indictment, the Department of State subsequently instructed Mr. Schulman that delegation was not permitted to "any third person."  Ind. ¶ 54.  In the absence of any statutory language authorizing Department of State officials to limit delegation under Section 632, this Court must find the Indictment presents a political question that requires the Court to adjudicate the Department of State's authority under Section 632 to restrict delegation under Section 632.

### C. The Baker Factors Require Dismissal Of The Indictment Under The Political Question Doctrine.

Contrary to the government's assertions, the *Baker* factors require dismissal of the Indictment.  With respect to the first *Baker* factor, as set forth above, Section 632 explicitly removes from this Court's province questions regarding transfers made pursuant to Section 632. *Al Shimari v. CACI Premier Tech., Inc.*, 840 F.3d 147, 155 (4th Cir. 2016) (holding there is a "textually demonstrable constitutional commitment of the issue to a coordinate political department.").  *See also supra* Part I.A-B.  Further, case law cited in Mr. Schulman's Motion—and completely ignored in the Opposition—demonstrates that the propriety of foreign policy decisions is "not subject to judicial inquiry or decision." *See, e.g. Schneider v. Kissinger*, 412 F.3d 190, 194 (D.C. Cir. 2005) (quoting *Oetjen v. Cent. Leather Co.*, 246 U.S. 297, 302 (1918)).  The government has not provided any justification for this Court to ignore ample case law and fundamental principles of separation of powers to adjudicate a policy decision made within the Department of State.

The government fails to liken this case to others in which a defendant sought to invoke the political question doctrine based on a claim of state sovereignty.  *See United States v. Ventura-*

*Oliver*, No. 11-00503, 2013 WL 12205842, at *2 (D. Haw. Sept. 30, 2013) ("Defendants' assertion that mortgagors may somehow cancel their debts on the basis of Hawaiian sovereignty is untenable."); *United States v. Funmaker*, 10 F.3d 1327, 1333 (7th Cir. 1993) ("The prosecution of a member of an Indian tribe under a statute that applies to members of that tribe is perfectly consistent with the separation of powers along the three branches of the federal government."). Neither of these cases involve instances in which a defendant's criminal liability was inextricably tied with the legitimacy of a political decision within the executive branch. And the cases cited in Mr. Schulman's motion clearly demonstrate that where parties seek to impose liability on their adversaries based on political decisions made by the executive branch, courts rightfully decline to hear those matters. *See* Mot. 10, 13.

With respect to the second *Baker* factor, as explained in Mr. Schulman's Motion, neither Section 632 nor any other statute provides a "manageable standard" for evaluating the Department of State's policy decision. *Al Shimari*, 840 F.3d at 155. Courts are not equipped to evaluate policy decisions against criminal statutes. *See, e.g.*, *Schneider*, 412 F.3d at 196-97 (holding that there were no mechanisms for the court to evaluate "whether actions or omissions by an Executive Branch officer in the area of foreign relations and national security were 'wrongful' under tort law.").

With respect to the remaining *Baker* factors, it is clear that the "multifarious pronouncements" by the Department of State render it impossible for the judiciary to avoid conflict with the executive branch should this case proceed. *Al Shimari*, 840 F.3d at 155 (noting "potentiality of embarrassment from multifarious pronouncements by various departments on one question."). The government argues that this case can proceed because "[j]uries frequently are asked to find facts related to the conduct of another federal government agency." Opp'n 20. The

7

government cites two categories of cases for this proposition: the first involving prosecutions of leaks of classified information, and the second involving prosecutions for false statements made to the federal government. These lines of cases are inapposite. First, these cases involve criminal statutes that provide the court with concrete standards against which the court can evaluate the defendant's conduct. *United States v. Schulte*, No. 17-CR-548 (JMF), 2022 WL 1639282, at *3–4 (S.D.N.Y. May 24, 2022) (describing the statutory requirements of 18 U.S.C. § 793); *United States v. Morison*, 604 F. Supp. 655, 658 (D. Md. 1985) (same); *United States v. Whyte*, 918 F.3d 339, 350 (4th Cir. 2019) (describing the standard used to determine whether the U.S. government was defrauded under the False Claims Act and major fraud statutes). Second, none of the cases cited by the government describe an instance in which the judiciary was required to evaluate *discretionary* or *policy* decisions by a coordinate branch. *See El-Shifa Pharm. Indus. Co. v. United States*, 607 F.3d 836, 842 (D.C. Cir. 2010) ("We have consistently held . . . that courts are not a forum for reconsidering the wisdom of discretionary decisions made by the political branches in the realm of foreign policy or national security."). *See also* Mot. 12–14. Third, in each of the false statement cases, the court found that the question before the court was whether the defendant's false statement was capable of influencing the coordinate branches of government. *See United States v. Cisneros*, 26 F. Supp. 2d 24 (D.D.C. 1998); *United States v. Durenberger*, 48 F.3d 1239 (D.C. Cir. 1995); *United States v. Poindexter*, 725 F. Supp. 13 (D.D.C. 1989); *United States v. Nixon*, 418 U.S. 683 (1974). In each of those cases, the court found that no political question existed because an adjudication of whether the statement was capable of influencing the coordinate branches did not "compromise[] the independence" of the coordinate branch. *Durenberger*, 48 F.3d at 1243. To contrast, the political question before the Court in this case is whether information provided to Mr. Schulman was inconsistent with (i) the 25B Certification, (ii) Section 632, (iii)

prior representations made to Mr. Schulman regarding delegability, and (iv) internal Department of State communications concerning whether delegability, was binding on Mr. Schulman. Adjudicating this political question compromises the independence of the executive branch and the Indictment must be dismissed.

## II. The Indictment Must Be Dismissed Under The Act Of State Doctrine.

The Act of State doctrine prevents a court from adjudicating "the legality of the sovereign act of a foreign state." *Int'l Ass'n of Machinists & Aerospace Workers v. OPEC*, 649 F.2d 1354, 1358 (9th Cir. 1981). The Indictment asks this Court to do just that. The Indictment requires the Court to determine whether Presidential Decree No. 214 issued by Somali President Sheikh Sharif Ahmed gave Governor Abdi Ali Amalow authority to recover assets on behalf of the Somali government (Ind. ¶¶ 31-32); whether Governor Amalow, in turn, had authority to retain Mr. Schulman for the same purpose (Ind. ¶ 39); whether Somali law required Mr. Schulman to be re-retained by the Central Bank of Somalia after the then-governor of the Central Bank of Somalia resigned (Ind. ¶ 48); and the legal effect of President Hassan Sheikh Mohamud's delegation of his authority to Mr. Schulman to receive, control, and dispose of Somalia's assets located in the United States (Ind. ¶ 51). None of these issues are within the province of the Court. *See Int'l Ass'n of Machinists & Aerospace Workers*, 649 F.2d at 1358 ("When the courts engage in piecemeal adjudication of the legality of the sovereign acts of states, they risk disruption of our country's international diplomacy."). The Act of State doctrine prevents courts from adjudicating the legality of public acts of foreign heads of state. Where the Indictment clearly impedes upon the sovereignty of a foreign sovereign, dismissal is required, and appropriate, at the motion to dismiss stage. *See United States v. Noriega*, 746 F. Supp. 1506, 1521-23 (S. D. Fla. 1990) (evaluating act of state claim at pre-trial motion to dismiss stage); *United States v. Evans*, 667 F. Supp. 974, 986-88 (S.D.N.Y. 1987) (same).

The government attempts to obfuscate the public acts in question by arguing that the Indictment challenges "fraudulent acts and financial transactions committed by Schulman outside of Somalia." Opp'n 15. In the first instance, the government completely ignores that its characterization of certain documents as fraudulent or false turns on whether the Somali government actually authorized Mr. Schulman to engage in asset recovery activities on its behalf (which the Indictment concedes the Somali government did, at least in part). The question then becomes whether Mr. Schulman was fully authorized to undertake specific acts on behalf of the Somali government. The extent of Mr. Schulman's authority turns on "the effect of official action" by the Somali government. *United States v. Giffen*, 326 F. Supp. 2d 497, 501-02 (S.D.N.Y. 2004). This determination is barred by the Act of State doctrine, which prevents a U.S. court from adjudicating "the validity of the public acts of a sovereign state performed within its own territory." *Callejo v. Bancomer, S.A.*, 764 F.2d 1101, 1113 (5th Cir. 1985). *See also Compania de Gas de Nuevo Laredo, S.A. v. Entex, Inc.*, 686 F.2d 322, 325-26 (5th Cir. 1982) (holding that district court did not err in dismissing a conspiracy claim between private parties that would require adjudicating the legality of the Mexican government's actions). The government challenges Somalia's issuance of authority to Mr. Schulman—conduct that occurred in Somalia and is a quintessential sovereign action. *See Hourani v. Mirtchev*, 796 F.3d 1, 12-13 (D.C. Cir. 2015) (applying Act of State doctrine to activity by ambassador at country's embassy in Washington, D.C.). The government's position threatens basic principles of comity and is contradicted by case law that requires that legal effect be given to public acts taken within a foreign sovereign's borders. *See Philippine Nat'l Bank v. U.S. Dist. Ct. for the Dist. of Haw.*, 397 F.3d 768, 773 (9th Cir. 2005) (applying Act of State doctrine to a foreign court's judgment that affected property outside of its borders because its

"interest in the enforcement of its laws does not end at its borders") (internal quotations and brackets omitted). The Indictment must be dismissed under the Act of State doctrine.

### A. The Act Of State Doctrine Applies In Criminal Matters And The Cases Cited By The Government Are Distinguishable From This Case.

The government incorrectly argues that the Act of State doctrine does not apply in criminal cases, notwithstanding the government's own reliance on criminal cases where courts applied the Act of State doctrine. *See United States v. Noriega*, 746 F. Supp. 1506 (S. D. Fla. 1990); *United States v. Evans*, 667 F. Supp. 974 (S.D.N.Y. 1987). The cases cited by the government, in which courts declined to dismiss the relevant indictments pursuant to the Act of State doctrine, are readily distinguishable from this case.

In *Noriega*, the defendant was charged in connection with a criminal conspiracy "to import cocaine and materials used in producing cocaine into and out of the United States." 746 F. Supp. at 1510. The indictment further alleged that Noriega "exploited his official position as head of the intelligence branch of the Panamanian National Guard, and then as Commander-in-Chief of the Panamanian Defense Forces" to assist the Medellín Cartel in smuggling drugs and laundering money from Panama to the United States in exchange for payoffs. *Id.* Noriega argued in his motion to dismiss that his actions were protected by the Act of State doctrine. The court found that the Act of State doctrine did not apply to his case because the court "fail[ed] to see how Noriega's alleged drug trafficking and protection of money launderers could conceivably constitute public actions taken on behalf of the Panamanian state." *Id.* at 1522.

To contrast, in this case, the public acts put at issue by the Indictment were in furtherance of Somalia's "state policy" and served the "overriding national interest" of Somalia's recovery of its frozen assets. *Contra id.* at 1522. *See also Hunt v. Mobil Oil Corp.*, 550 F.2d 68, 73 (2d Cir. 1977) (Act of State doctrine barred suit where nationalization of oil and gas assets in Libya was

11

concerted policy decision on behalf of Libyan government).  In January 2013, Deputy Prime Minister and Foreign Minister Fawzia Y. Adam announced the Somali government's concerted effort to "conduct an exceptional review of all of Somalia's global assets" with the help of "Somali and foreign financial and legal advisers."  *See* NATION, "Somalia steps up bid to recover assets stashed in foreign states" (Jan. 3, 2013), https://nation.africa/kenya/news/africa/1066-1657252-xcibw0/index.html.  Throughout 2013, Foreign Minister Adam, Somalia's Finance Minister, and Mr. Schulman, at the direction of President Mohamud, corresponded with U.S. Department of State officials regarding steps required to unfreeze Somalia's assets within the United States.  *See* ECF No. 152 at 2-5.  *See also* ECF No. 103 at 5-8 (describing efforts within the Somali government to obtain documentation to unfreeze Somalia's assets).  And, when the assets were unfrozen and released to Somalia, former Deputy and Acting Chief of Staff to the Somali President Thabit Abdi congratulated Mr. Schulman on ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ *See* Ex. 2, Nov. 6, 2013 Email from T. Abdi to J. Schulman, DOJ-SCH-0000124120.  The next day, Mr. Schulman met with President Mohamud.  *See id.*  (Thabit Abdi writing, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮).  Later that month, on November 27, 2013, President Mohamud authorized the transfer of $9 million (and withholding of $3 million) from the assets recovered pursuant to the 25B Certification.  In authorizing the transfer of $9 million, President Mohamud acknowledged that those funds were obtained under President Mohamud's direct authority and that certain funds were being withheld less agreed to fees and expenses.  *See* Ex. 3, Nov. 27, 2013 Memorandum from J. Schulman to President Hassan Sheikh Mohamud, DOJ-SCH-0000204612; *see also* Ex. 4, Dec. 5, 2013 Email from J. Schulman to President Hassan Sheikh Mohamud, DOJ-SCH-0000204623.  The evidence before the Court clearly demonstrates that the recovery of frozen assets on behalf of the Somali government was

"in the public interest of [Somalia]" and judicial examination of actions taken by Somalia in furtherance of this effort would be an "affront to [Somalia's] sovereignty." *Virtual Def. & Dev. Int'l, Inc. v. Republic of Moldova*, 133 F. Supp. 2d 1, 7–8 (D.D.C. 1999); *Int'l Ass'n of Machinists & Aerospace Workers*, 649 F.2d at 1360.

*Evans* is likewise distinguishable from this case. Rather than standing for the proposition that the Act of State doctrine does not apply to criminal actions, as the government asserts, *Evans* stands for the proposition that the Act of State doctrine applies where an Indictment challenges "*public* acts of the *sovereign*." 667 F. Supp. at 987 (quoting *Republic of the Philippines v. Marcos*, 806 F.2d 344, 358 (2d Cir. 1986)) (emphasis in original). In *Evans*, the court determined that the defendants had not shown that the relevant acts in question—acts taken vis-à-vis defendants' positions as "licensed arm dealers in Israel"—were public acts. Further, the relevant foreign sovereign explicitly consented to the prosecution of the defendants. *Id.* at 984.

This case is distinguishable from *Evans* because the Indictment puts at issue public acts by Somali officials. *See Noriega* discussion *supra* pp. 11-13. Additionally, unlike in *Evans*, the government has not made any effort to ascertain the Somali government's position on the official acts at issue, making no effort to interview President Sharif, President Mohamud, Foreign Minister Adam, Governor Abdusalam Omer, or Governor Amalow throughout its years' long investigation. The government's failure to inquire into the Somali government's position on acts taken by senior Somali officials (and Mr. Schulman at multiple Somali presidents' direction) demonstrates why this case threatens Somalia's sovereignty, and the Court must dismiss the Indictment pursuant to the Act of State doctrine.

Likewise, in *Giffen*, the trial court found that the Act of State doctrine did not bar the indictment because the court did "not need to rule on the legality of any public acts of the Kazakh

government" where the defendant argued that "his *de facto* position within the Kazakh government enabled to him to pay" bribes to senior Kazakh officials, "not that his official duties required him to make secret payments." 326 F. Supp. 2d at 503 (emphasis in original).

Unlike in *Giffen*, the Indictment in this case requires the Court to "rule on the legality of [] public acts of the [Somali] government." *Contra id.* at 503. The government argues that the Act of State doctrine does not protect Mr. Schulman from engaging in fraudulent monetary transactions. But the government's argument does not capture the relevant public acts at issue. The relevant public acts were official acts taken by Somali officials within Somalia, and these acts informed Mr. Schulman's authority to engage in certain transactions on behalf of the Somali government. The government concedes that funds were returned to Somalia and that attorneys' fees and expenses were withheld pursuant to a valid engagement agreement between Somalia and Mr. Schulman's law firm. Thus, the relevant transactions cannot be fraudulent as they were actually authorized by the Somali government. At base, the Indictment requires the Court to inquire into whether the Somali government, under Somali law, authorized Mr. Schulman to engage in certain transactions. *See id.* at 502. But this inquiry is barred by the Act of State doctrine. Because "the act of state doctrine requires a court to deem the 'acts of foreign sovereigns taken within their own jurisdictions' as lawful and valid," the Indictment must be dismissed. *Id.* (quoting *W.S. Kirkpatrick & Co. v. Env. Tectonics Corp.*, 493 U.S. 400, 409 (1990)).

### B. The Government's Charging Decision Does Not Preclude Application Of The Act Of State Doctrine.

The government incorrectly asserts that its charging decision precludes application of the Act of State doctrine. But the government misstates relevant precedent. Even those cases cited by the government require the court to apply a "case-by-case" analysis to determine whether the Act of State doctrine applies. *United States v. One Etched Ivory Tusk of Afr. Elephant*, 871 F. Supp.

2d 128, 142 (E.D.N.Y. 2012) (Act of State doctrine requires "case-by-case analysis of whether separation-of-power concerns are implicated"). The government's charging decision does not bar the Court from finding that the Act of State doctrine applies, and this Court should not adopt such a bright-line rule, particularly because the Indictment baldly attacks Somalia's sovereignty. *See Noriega*, 746 F. Supp. at 1523 (stating, "[o]f course, the Executive's position, though relevant, is not dispositive"); *Evans*, 667 F. Supp. at 987 (stating that "the Executive's position on the act of state issue is not dispositive") (internal citations omitted).

### C. The Government's Argument By Analogy As To Other Criminal Statutes Is Not Persuasive.

Rather than address the specific public acts put at issue by the Indictment, the government instead argues that the Act of State doctrine cannot apply to this case because it "could potentially have sweeping consequences for the enforcement of certain criminal laws[.]" Opp'n 12. Specifically, the government claims that "FCPA enforcement could be negatively impacted in certain cases." Opp'n 13. Nonetheless, the government fails to describe which cases would be affected and how. And, the government itself relies on a case prosecuted under the FCPA in which the court analyzed the defendant's motion to dismiss under the Act of State doctrine. *Giffen*, 326 F. Supp. 2d 497. *Giffen* demonstrates that the Act of State doctrine is not at odds with the FCPA or any other criminal statute involving bribery of foreign officials because the trial court in the Southern District of New York applied the Act of State doctrine in evaluating a charge under the FCPA. Notably absent from the court's decision in *Giffen* is any mention of the government's concerns regarding the Act of State doctrine eroding the government's ability to prosecute FCPA cases. Further, as the court noted in *Giffen*, the FCPA explicitly includes an affirmative defense that permits a defendant to argue that that payments were "lawful under the written laws and regulations of the foreign official's . . . country." *Id.* at 503 (quoting 15 U.S.C. § 78dd-2(c)(1)).

Thus, the FCPA, like the Act of State doctrine, anticipates that a United States court cannot adjudicate "the legality of the sovereign act of a foreign state." *Optopics Lab'ys Corp. v. Savannah Bank of Nigeria, Ltd*., 816 F. Supp. 898, 906 (S.D.N.Y. 1993) (quoting *Int'l Ass'n of Machinists & Aerospace Workers*, 649 F.2d at 1358). *See also Banco De Espana v. Fed. Rsrv. Bank of N.Y.*, 114 F.2d 438, 444 (2d Cir. 1940) ("So long as the act is the act of the foreign sovereign, it matters not how grossly the sovereign has transgressed its own laws.").

Likewise, the government posits that application of the Act of State doctrine in this case would threaten juries' ability to evaluate whether a person is an agent of a foreign government under FARA. Opp'n 14. This is incorrect. Under FARA, a court considers whether an individual is an agent of a foreign government based on statutorily enumerated criteria. *See United States v. Rafiekian*, 991 F.3d 529, 538 (4th Cir. 2021) (citing 18 U.S.C. § 951(d)). Each of these criteria require that a person "do more than act in parallel with a foreign government's interests or pursue a mutual goal. An 'agent' further 'agrees to operate . . . subject to the *direction or control*' of that government." *Id.* (quoting 18 U.S.C. § 951(d)) (emphasis in quotation). That is, whether a defendant is an agent of a foreign government turns on the defendant's actions taken at the direction of the foreign entity – not the actions by the foreign sovereign, as this Indictment challenges. Even so, this Court can narrowly construe any ruling in this case to not implicate other, factual-specific matters.

## **CONCLUSION**

The arguments set forth by the government regarding the political question doctrine and Act of State doctrine are unavailing. The Indictment puts at issue the political question of whether Department of State officials can restrict a recognized foreign sovereign from delegating the authority bestowed upon him under Section 632. The Indictment likewise challenges the validity and scope of official actions taken by Somali officials in furtherance of their official duties in

16

violation of the Act of State doctrine. The Court cannot evaluate the charges against Mr. Schulman without adjudicating these issues that are protected by the political question and Act of State doctrines. For the foregoing reasons, and the reasons set forth in Mr. Schulman's opening papers, Mr. Schulman respectfully moves this Court to dismiss the Indictment.

Dated: August 5, 2022                     Respectfully submitted,

/s/_____
Mark J. MacDougall (MD Bar No. 851201)
Paul W. Butler (*Pro Hac Vice*)
Allison Thornton Coffin (*Pro Hac Vice*)
Madeline M. Bardi (*Pro Hac Vice*)
*Counsel for Jeremy Wyeth Schulman*
Akin Gump Strauss Hauer & Feld LLP
2001 K Street NW
Washington, DC 20006
Telephone: (202) 887-4000
Fax: (202) 887-4288
E-mail:  mmacdougall@akingump.com
             pbutler@akingump.com
             acoffin@akingump.com
             mbardi@akingump.com


/s/_____
Stanley E. Woodward (MD Bar No. 18115)
*Counsel for Jeremy Wyeth Schulman*
Brand Woodward Law
1808 Park Rd NW
Washington, DC 20010
Telephone: (202) 996-7447
Fax: (202) 996-0113
E-mail:  stanley@brandwoodwardlaw.com

## CERTIFICATE OF SERVICE

I hereby certify that on the 5th day of August 2022, I electronically filed the foregoing Reply in Support of Defendant Jeremy Schulman's Motions to Dismiss the Indictment Pursuant to the Political Question and Act of State Doctrines with the Clerk of the Court for the U.S. District Court for the District of Maryland, using the Court's CM/ECF system. The CM/ECF system sent a "Notice of Electronic Filing" to all counsel of record who have entered an appearance in this matter.

Dated: August 5, 2022

Respectfully submitted,

/s/_____
Mark J. MacDougall (MD Bar No. 851201)
*Counsel for Jeremy Wyeth Schulman*
Akin Gump Strauss Hauer & Feld LLP
2001 K Street NW
Washington, DC 20006
Telephone: (202) 887-4000
Fax: (202) 887-4288
E-mail: mmacdougall@akingump.com