**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND**
Greenbelt Division

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | **REDACTED** |
| | : | |
| **v.** | : | **Criminal Case No. PX-20-0434** |
| | : | |
| **JEREMY WYETH SCHULMAN** | : | |

**DEFENDANT JEREMY WYETH SCHULMAN'S POST-HEARING BRIEF IN
SUPPORT OF HIS MOTION TO DISMISS THE INDICTMENT PURSUANT TO
THE FIFTH AND SIXTH AMENDMENTS TO THE U.S. CONSTITUTION**

Defendant Jeremy Wyeth Schulman, by and through counsel, files this brief in support of

his Motion to Dismiss the Indictment Pursuant to the Fifth and Sixth Amendments to the U.S.

Constitution (the "Motion"), ECF No. 156.  The testimony and evidence at the January 18-19,

2023 Evidentiary Hearing on the Motion (the "Evidentiary Hearing") clearly demonstrated that

the Department of Justice's conduct in this matter has resulted in actual prejudice to Mr.

Schulman's Fifth and Sixth Amendment rights.  Any trial in this matter would violate a basic sense

of decency and fair play due to the government's unjustified delay in bringing this case, purposeful

avoidance of witnesses with clear exculpatory testimony, manipulation of witnesses who *were*

available, and highly questionable tolling of the statute of limitations.

I.      **THE GOVERNMENT'S DELAY IS UNJUSTIFIED**

The government asserts, in face of ample contradiction, that its "lengthy pre-indictment

investigation . . . was commensurate with the criminal scheme's complexity and scope."  ECF No.

177.  But the record shows that the government knew most, if not all, facts relevant to the

Indictment in early 2016.  The government initiated its investigation on June 26, 2014.  Gov't Ex.

6.  In May 2016, the government submitted an affidavit in support of a search warrant for Mr.

Amalo's email account.  *See* Ex. 1, Affidavit in Support of an Application for Search Warrants

("Affidavit" or "Aff."), 16-1270-CBD (D. Md. May 13, 2016).  This Affidavit largely recites the allegations contained in the Indictment.  Nonetheless, the Indictment was not filed until December 2020 and charges conduct that began in July 2009 (eleven and a half years before the Indictment was filed), concluded in 2014 (six and a half years before the Indictment was filed), and of which the government was fully aware in 2016 (four and a half years before the Indictment was filed).  *See United States v. Harmon*, 379 F. Supp. 1349, 1351 (D. N.J. 1974) (dismissal proper under Sixth Amendment where the government identified facts essential to its case two years before it brought the indictment, and defendant experienced prejudice as a result of delay).

    **1.   Abdiaziz Amalo—**████████████████████

                ██████████████████████Abdiaziz Hassan Amalo, was arrested in January 2017 and was interviewed by the government multiple times thereafter.  At the time of his arrest, Mr. Amalo's home and person were searched, and six electronic devices were seized.  *See* ECF No. 209, Ex. 1.  None of those devices were imaged or inspected by the government at that time.  *See, e.g.*, ECF No. 209, Ex. 2.  In fact, none of those devices were imaged or inspected until the defense requested them in discovery in June 2022—five years later—despite the obvious possibility that material evidence, evidence of other crimes, or other material relevant to Mr. Amalo's credibility would be contained in these devices.  ECF No. 95.  As the stipulation entered into evidence at the Evidentiary Hearing shows, one of the devices seized from Mr. Amalo's home, a Blackberry that Mr. Amalo used during the time period relevant to the Indictment, is permanently inaccessible due to the government's delay in obtaining the password from Mr. Amalo.  *See* ECF No. 209; *see, e.g.*, Ex. 2, Jan. 15, 2010 email from A. Amalo to J. Schulman, DOJ-SCH-0000126951 ("████████ ███████████████████").  The government's failure to image and preserve the cellular devices of ██████████████████ demonstrates the government's failure of diligence in its

investigation of this case, as well as its reckless disregard for the prospect that critical evidence would be lost over time.

In addition, throughout the period prior to the Indictment, the government took steps to shield Mr. Amalo.  His entire docket remained under seal.  Testimony at the Evidentiary Hearing (corroborated by a contemporaneous FBI FD-302) showed that when Mr. Amalo's cousin, Abdelhakim Abdi ("Mr. Abdi"), informed the government that, shortly after Mr. Schulman was indicted, ███████████████████████████████████████████████, the government apparently did nothing to investigate this accusation—███████████████ ████████████████████████████████████████████████████████.  *See* Ex. 3, Sept. 6, 2017 ████████████████████████████; Jan. 19, 2023 Hr'g Tr. 63:4–64:7; Gov't Ex. 3.

### 2. Governor Amalow—The "Key Figure" in the Government's Investigation

The testimony at the Evidentiary Hearing also demonstrated that Mr. Abdi's father and Mr. Amalo's uncle—former Central Bank Governor Ali Abdi Amalow—was, according to the FBI case agent Nanette Schumaker, a "key figure" in this matter.  *See* Gov't Ex. 5; Jan. 19, 2023 Hr'g Tr. at 155:19–25.  In early 2017, the FBI team in Baltimore sought assistance from SA Ciapas from the FBI Resident Agency in Columbus, Ohio to locate and interview Governor Amalow and Mr. Abdi.  Jan. 19, 2023 Hr'g Tr. at 152:7–12.  SA Ciapas then confirmed with SA Schumaker that Governor Amalow is the top priority for interviews, and that he should attempt to interview Governor Amalow and Mr. Abdi separately.  *Id.*  Even still, SA Ciapas jointly interviewed Governor Amalow and Mr. Abdi on March 23, 2017.  *See* Gov't Ex. 11.  The government recorded numerous hearsay statements from Mr. Abdi, who the agent allowed to answer for Governor Amalow throughout the interview.  *See, e.g.*, Jan. 19, 2023 Hr'g Tr. 28 at 14:17.  At the conclusion

of the interview, both Governor Amalow and Mr. Abdi were served with grand jury subpoenas and agreed to appear before the grand jury. *Id.* at 41:11–17; Jan. 19, 2023 Hr'g Tr. at 137:3–20. SA Ciapas did not indicate in the FD-302 that Governor Amalow suffered any physical or mental conditions, nor did he convey to the case team that Governor Amalow appeared to be impaired in any way that would preclude his testimony before the grand jury. *See* Gov't Ex. 11; Jan. 19, 2023 Hr'g Tr. at 137:21–138:1, 158:19–159:21, 177:12–179:25.

With no apparent basis, the government excused Governor Amalow from testifying before the grand jury in April 2017, asserting, without any corroboration, that he was not "*compos mentis* enough." Jan. 19, 2013 Hr'g Tr. at 275:3. Yet the government did not seek or obtain any professional references regarding Governor Amalow's health. *See* Gov't Ex. 4, Jan. 19, 2023 Hr'g Tr. at 46:25–47:14. Indeed, SA Ciapas testified that, though he had been advised that Governor Amalow may have health issues, (a) he did not observe any health issues (mental or physical) that would have impeded Governor Amalow's ability to travel to testify at the grand jury, (b) Governor Amalow accepted service of the grand jury subpoena, and (c) SA Ciapas interpreted Governor Amalow's acceptance of the subpoena as demonstrating a willingness to testify. *Id.* at 177:12–178:12. According to Mr. Abdi, Governor Amalow remained willing and able to provide testimony to the FBI in this matter between April 2017 and in the Indictment, but Governor Amalow never heard from the government about providing testimony after 2017. *Id.* at 30:22–31:4.[1] Other than uncorroborated testimony from Mr. Abdi that Governor Amalow began experiencing "pre-dementia" in 2015, testimony regarding Governor Amalow's health from 2017–2022 was limited

---

[1] The government has argued that it made additional efforts to interview Governor Amalow, but this argument should not be credited in light of SA Ciapas's testimony that he returned to the Cheryl Court address in 2018 and 2019 to interview only Mr. Abdi, not Governor Amalow. Jan. 19, 2023 Hr'g Tr. at 139:15–25, 141:18–142:9.

to describing Governor Amalow as experiencing only physical difficulties as a result of his age and an apparent (but undocumented) stroke.  *See id.* at 138:2–11 (testimony of SA Ciapas), 21:18–23:24 (testimony of Mr. Abdi).  The government elicited testimony from Mr. Abdi that Governor Amalow was instructed by his doctor to not travel after 2015, but, as questioning by the Court revealed, in 2020 Governor Amalow was able to travel by plane from Columbus, Ohio to Toronto, Canada—illustrating that Governor Amalow could have travelled to Greenbelt, Maryland three years prior to testify before the grand jury.  *See id.* at 25:17–19, 82:4–20.[2]

Contrary to the government's representations, despite numerous contacts by the FBI, there is no evidence that Governor Amalow experienced any diminished mental capacity until January 2022.  Gov't Ex. 4; Jan. 19, 2023 Hr'g Tr. at 170:16–171:9.  The government conceded that between March 7, 2017, when SA Schumaker described Governor Amalow as a "key figure" in this case, and April 26, 2017, the date of Governor Amalow's scheduled grand jury testimony, the government determined that Governor Amalow was somehow not a critical witness in this case—an about-face that seriously undermines the government's credibility.  *See* Gov't Ex. 5; Sept. 6, 2022 Hr'g Tr. at 104:4–7 ("[A]t that point we decided, for a variety of reasons, including related to his health, [Governor Amalow] was not going to be a critical witness for any case the government might make, and we didn't further pursue him."); Jan. 19, 2023 Hr'g Tr. at 264:1–3 ("We made certain prosecutorial decisions, and the medical issue was only one of them.").  At the Evidentiary Hearing, AUSA Salem stated that they "[didn't] need to put him in the Grand Jury" and they "didn't ***have*** to do that."  Jan. 19, 2023 Hr'g Tr. at 273:12–13, 274:8–13.

---

[2] Governor Amalow did not leave the United States for Canada until 2020, and would have been under the subpoena power of this Court had the government not delayed bringing its Indictment.

5

The evidence also shows that from Mr. Abdi's 2017 grand jury testimony onwards, the government scrupulously avoided memorializing Governor Amalow's testimony. SA Ciapas admitted that he had contacts with Mr. Abdi that are not documented in FD-302, a clear breach of FBI procedure, and Mr. Abdi testified that SA Ciapas met with Governor Amalow when Mr. Abdi was not present.[3] Jan. 19, 2023 Hr'g Tr. at 156:24–157:3, 55:13–56:6. In meetings with Mr. Abdi, the FBI failed to ask about or document Governor Amalow's location. *See* Gov't Exs. 3, 4. Mr. Abdi himself gave incredulous testimony regarding his knowledge of his father's location and refused to acknowledge service of the court's Rule 15 subpoena at the Columbus, Ohio address—despite being confronted with a photo of the subpoena taped to Mr. Abdi's door. Jan. 19, 2023 Hr'g Tr. at 76:20–80:12. Relatives of Governor Amalow in Canada repeatedly lied to investigators and refused to accept service of the Rule 15 Order and letters rogatory, with the aid of a spatula. *See* Jan. 18, 2023 Hr'g Tr. at 108:10–117:21.

The remainder of Mr. Abdi's testimony was devastating to the integrity of the government's investigation. Remarkably, when asked about his father's medical diagnosis, Mr. Abdi responded: "I cannot . . . talk on behalf of my father…I am Abdelhakim. I can only speak for myself[.]" Jan. 19, 2023 Hr'g Tr. 46:7–10. Yet minutes earlier, Mr. Abdi acknowledged that he spoke for his father numerous times during FBI interviews. *Id.* at 28:9–17. Mr. Abdi repeatedly denied making statements that were written in the FD-302 of his interviews. Those denials included affirmative statements in SA Ciapas' 2017 FD-302 that Governor Amalow expressed a willingness to testify before the grand jury, and that Mr. Abdi told SA Ciapas that Governor Amalow had the title of Director of Asset Recovery, which "empowered banks overseas to deal with [his] father as a current

---

[3] SA Ciapas testified that he failed to document his interviews with Mr. Abdi in FD-302 because he unilaterally determined that the interviews were not relevant to the case, even though he was not a member of the investigative team. Jan. 19, 2023 Hr'g Tr. at 157:11–18.

official of the TFG, as the banks would only accept the letter or [his] father's physical presence to release [the] funds." Jan. 19, 2023 Hr'g Tr. at 42:10–44:7. Those are precisely the facts, however, to which Mr. Abdi testified in the grand jury. *Id.* at 51:10–52:9. And Mr. Abdi confirmed at the Evidentiary Hearing that the Presidential Decree appointing his father Director of Asset Recovery was a "legitimate decree" and that it grants his father responsibility to collect assets. *Id.* at 48:9–52:9. As the Court observed in the midst of this ball of confusion, "I cannot accept that [Abdelhakim] would be a proper substitute if his testimony changes with the wind. And that's exactly what this demonstrates." *Id.* at 49:4–7.

And what did the government do in response to Mr. Abdi's truthful testimony before the grand jury? It sent SA Ciapas out to meet with him in March 2019 at the request of the new case agent (Richard Anderson) to "clarify" his grand jury testimony. *See* Gov't Ex. 12. An attempt that was repeated before this Court as AUSA Salem unsuccessfully tried to rehabilitate Mr. Abdi on redirect examination, after Mr. Abdi's courtroom testimony directly contradicted the government's allegations in the Indictment. Jan. 19, 2023 Hr'g Tr. at 86:1–95:15.

### 3. The Government's Efforts to Thwart Governor Amalow's Testimony

Further, the government's resistance at Mr. Schulman's post-indictment efforts to preserve Governor Amalow's testimony compels a finding that pre-indictment delay directly impairs Mr. Schulman's "ability to mount an effective defense." *United States v. Lovasco*, 431 U.S. 783, 795 (1977). On December 1, 2021, defense counsel raised its intention to depose Governor Amalow and the government represented that it would not object to the deposition on the basis of Governor Amalow's health. Dec. 1, 2022 Hr'g Tr. at 51:5–8. Defense counsel sought the government's consent to seek the deposition of Governor Amalow pursuant to Fed. R. Crim. P. 15, which the government vigorously refused. ECF No. 98-1 at 2. In its opposition to Mr. Schulman's motion

to depose Governor Amalow, the government argued that the defense failed to show that Governor Amalow is unavailable.  ECF No. 116 at 3.  At the motions hearing, the government argued that the defense failed to show that Governor Amalow is likely to provide material testimony.  Mar. 11, 2022 Hr'g Tr. at 5:2–8.  The government further represented that Governor Amalow had relocated to Canada, but then failed to provide the Court or Mr. Schulman with an address or any other information that could lead to the location of Governor Amalow.  *Id.* at 24:11–26:13.  The government likewise failed to provide Mr. Schulman with an address in the ten months between the motions hearing and the Evidentiary Hearing, and only "facilitated" procuring this address when the Court refused to excuse Mr. Abdi until such address was provided.  Jan. 19, 2023 Hr'g Tr. at 96:9–10.  So now, as trial approaches, this "key figure" in this case remains squirreled away behind locked doors and under the protection of hostile relatives in Canada, outside the compulsory power of this Court.  The government's actions with respect to Governor Amalow have clearly and substantially prejudiced Mr. Schulman and his ability to put on a defense.

### 4.  Other Critical Witnesses Are Dead or Unavailable

The hearing testimony also demonstrated that numerous other key witnesses in the case are unavailable due to the government's substantial delay, highly questionable tactics, and conscious avoidance of witnesses with critical information.  First, since the investigation began in 2014 and Mr. Amalo pled guilty in 2017, several key witnesses have died, including (i) former Ambassador Donald Bandler who interacted with the State Department on the asset recovery project; (ii) Professor Ahmed Warfa, senior advisor to President Sheikh Sharif Ahmed who was at Mr. Schulman's meeting with President Sharif and Finance Minister Hassan in 2009; (iii) Ambassador Nur Hassan Hussein, who served a Somalia's Ambassador to Italy under President Sharif, repeatedly confirmed Mr. Schulman's authority and communicated with the Italian Foreign

Ministry on behalf of Mr. Schulman to assist with the Italian bank that is referenced in the Indictment; and (iv) Abdirahman Omar Osman, who served as a Senior Advisor and Spokesperson for President Hassan Sheikh Mohamud in Fall 2013.

Second, and perhaps more importantly, the record made clear that key witnesses in the Somali government—who are the subject of the Court's Rule 15 orders—are now unavailable to testify and that the government made *no* effort to obtain their testimony over its six-and-a-half-year investigation. Jan. 18, 2023 Hr'g Tr. at 202:4–10, 204:18–25, 207:5–13; Jan. 19, 2023 Hr'g Tr. at 254:13–255:18. The record firmly establishes that each of these witnesses has (or, for those deceased, had) material testimony, their testimony would be favorable to the defense, and they are currently unavailable to provide that testimony at trial—despite diligent efforts by the defense to obtain their testimony.

But, most importantly, the government made no effort, across its six-and-a-half-year investigation, to preserve testimony of any of the Somali witnesses who are clearly in possession of critical material testimony. The government brought an indictment based on conduct that took place in Somalia, but travelled only to Italy and Switzerland to investigate it. The Court must balance Mr. Schulman's constitutional rights against the cause for the government's delay to determine whether such delay violates a basic sense of decency and fair play. The government's assertion that its hypothetical efforts would have been unsuccessful because of the inherent danger of traveling to Somalia are self-serving and inadequate.[4] Put plainly, the government made no effort to obtain testimony from Somalia: no prosecutor, FBI agent in this case, or other member of

---

[4] Similarly, the Court must reject the government's argument that Mr. Schulman was required to collect exculpatory information prior to his indictment. This argument contravenes all principles underlying a criminal prosecution, including those regarding a defendant's presumption of innocence and the government's burden of proof.

the prosecution team, travelled to Somalia to investigate this case or attempted to interview or compel the grand jury testimony of Somali witnesses when they travelled to the United States, even though Mr. Schulman identified many of these witnesses as having relevant testimony as early as 2017.[5]

Instead, the government, satisfied with the statements provided by ████████████████ in early 2017, did nothing.  It cannot now excuse its inaction by proffering that efforts to investigate this matter would have been impossible—particularly where it only first inquired about the possibility of interviewing any Somali witnesses in April 2020.  *See* Gov't Ex. 16 at 3.  Absent any justification for the delay, and where the result of the government's delay is that multiple witnesses have died, others have limited recollections regarding the underlying events, and others are unavailable because they have either left the United States or are immune from testimony, the Court must conclude that the government delayed indictment of this case in reckless disregard of circumstances known to it, and did so to secure a tactical advantage over Mr. Schulman.  *See Harmon*, 379 F. Supp. at 1351; Jan. 18, 2023 Hr'g Tr. at 192:15–193:16; 197:13–198:19, 211:10–217:3.[6]

So what is the government's legal basis for this delay?  In no small part, the government relied upon a court order tolling the statute of limitations for nearly three years based on the

---

[5] At the Evidentiary Hearing, the Court inquired as to whether the defense ever asked the government to interview key witnesses.  Jan. 19, 2023 Hr'g Tr. at 267:1–4.  Defense counsel repeatedly attempted to engage with prosecutors in this case, and those efforts were continuously rebuffed, including (i) during a proffer interview on June 14, 2017 and (ii) in a September 29, 2020 letter to the government.  *See* Ex. 4, Sept. 29, 2020 Letter from Defense Counsel to Department of Justice.

[6] Such conclusion is further supported by the government's vigorous objection to this Court granting Mr. Schulman's request to depose six Somali witnesses.  The government's pre-indictment failure to investigate this case, coupled with its post-indictment efforts to prevent Mr. Schulman from obtaining testimony from witnesses, supports the conclusion that the government's delay was, at worst, strategic and done in bad faith or, at best, reckless and careless.

government's letter request to Somalia. *See* Def. Ex. 44.[7]  The government initially refused even to provide the name of the "competent authority" to whom the evidence request was delivered or the U.S. government official who served the request.  Only after this Court ordered the production of such information did the government identify SA Timothy Nock as the official who delivered the request and Police Commissioner General Bashir Abdi Mohamed as the "competent authority" who apparently received the request.  *See* Dec. 1, 2021 Hr'g Tr. at 41:23–44:5.

The Court now knows that: SA Nock only served as an Assistant Legal Attaché for two months after the request was served in 2018, *see* Jan. 19, 2023 Hr'g Tr. 182:7–9; the request passed through numerous hands including SAs Dodson, Kaiser, and McGonigle, none of whom were identified by the government until the eve of the Evidentiary Hearing, *see* ECF No. 211, Gov't Ex. 16; the only follow-up that occurred was two meetings between April 25, 2018 and July 27, 2018 with Commissioner Bashir who "claimed" he sent letters to the Central Bank and Ministry of Finance, yet no such letters were produced or exist in the case file, *see* Gov't Ex. 21; Jan. 19, 2023 Hr'g Tr. at 192:20–195:18, *contra* ECF No. 133, Ex. 10; and no U.S. personnel in Somalia had been informed that the limitations period in this action would be tolled based on their efforts to obtain records from Somalia, *id.* at 240:23–241:4.  Indeed, the record demonstrates that personnel within the Office of International Affairs ("OIA") were unaware of whether the request had even been delivered to the Somali government in April 1, 2019 (eleven months after the government sought the tolling order), and that OIA personnel believed that the request was made through a "dipnote," which would have been the correct procedure for serving a "competent authority" under the tolling statute, a procedure that was ignored here.  Gov't Ex. 16; *see also* Jan. 18, 2023 Hr'g

---

[7] Mr. Schulman maintains that sufficient grounds persist for this Court to vacate the tolling order.

Tr. at 211:10–22 (testimony of Former Ambassador Schwartz about diplomatic note procedures). Likewise, SA Michael Kaiser, who SA Nock testified became the ALAT in late 2018, was entirely unaware of the request until April 2019.  *See* Jan. 19, 2023 Hr'g Tr. at 212:17–23; Gov't Ex. 16. And, in October 2019, OIA was instructed to re-submit the evidence request to the Somali government through the current ALAT, but did not do so.  Gov't Ex. 16.

Further, the government knew it was unlikely to obtain evidence in response to this request. On May 31, 2018, SA Nock advised the FBI case team that it " ████████████████████ ████████████████████████████████ "  Gov't Ex. 21 at 2.  This representation directly contradicts the representation made to Judge Grimm to obtain the tolling order, in which the government stated that it had " ████████████████████ ████████ "  ECF No. 133 at 24 (emphasis added).  Likewise, though SA Nock transmitted the request to General Bashir, he expressed skepticism regarding General Bashir's diligence in enforcing the request.  *See id.* at 1 (" ████████████████████ ████████████████████████████████ ") (emphasis added). Nock's misgivings were on full display when he informed SA Kaiser in April 2019 that he had " ████████████ " that the Somali government would complete the request.  *See* Gov't Ex. 13. But any subsequent effort would have been fruitless since the U.S. government did not have "regular access" to the then-Police Commissioner General Xijaar, General Xijaar "ha[d] not been a good partner so far," and U.S. personnel did not think he could read English.  Gov't Ex. 16.

Likewise, the government's efforts to deliver the request to a truly competent authority within the Somali government were grossly deficient.  The government initially contemplated sending the request to the Ministry of Foreign Affairs, via diplomatic note, but then failed to pursue that avenue.  Gov't Ex. 16 at 12–13.  The defense presented expert testimony that the only effective

procedure for obtaining assistance from Somalia would have been to transmit the request to the Somali Ministry of Foreign Affairs through a diplomatic note from either the Ambassador to Somalia or the Deputy Chief of Mission.  Jan. 18, 2023 Hr'g Tr. at 211:10–22.  Moreover, because this request involved documentation regarding the Somali head of state, the request would have required significant follow-up, engagement with the highest levels of the Somali government, and engagement with senior U.S. officials to demonstrate that the "full force" of the U.S. government was behind the request.  Jan. 18, 2023 Hr'g Tr. at 232:7–12, 230:2, 232:24–233:5.  Yet the Court did not hear any evidence regarding the government's use of a diplomatic note or any sort of diligent effort to effectuate the request.  Rather, the government feebly proffered that it was not required to engage with the Ministry of Foreign Affairs or senior Somali officials because those individuals might be involved in a leak.  But, as former U.S. Ambassador Schwartz testified, the request was "going to be known instantly . . .by a lot of people even if [the request is] in the form of just the letter to the Chief of Police."  *Id.* at 230:18–20.

The government's consistent failure to preserve or obtain evidence from Somalia or memorialize testimony of Governor Amalow—while obtaining a three-year extension of the statute of limitations without any substantive basis—has resulted in an insurmountable level of prejudice to Mr. Schulman that defies basic considerations of decency and fair play.

## II.      ACTUAL PREJUDICE TO MR. SCHULMAN'S DEFENSE

The Court entered Rule 15 orders for seven witnesses with material testimony.  ECF No. 128, ECF No. 129.  Mr. Schulman's Motion identifies four additional witnesses who are now deceased and two witnesses that are unavailable and now serve at the highest levels of the Somali government, all of whom have material testimony, and whose unavailability prejudices Mr. Schulman.  ECF No. 156.

The Indictment alleges that Mr. Schulman engaged in a conspiracy to obtain assets that belonged to the Somali government and, further to that conspiracy, "created a series of forgeries and other false documents" and "falsely claimed that these and other documents authorized [Mr. Schulman] to obtain control of the Somali assets." Ind. ¶ 22. Testimony at the Evidentiary Hearing demonstrated that Mr. Schulman first met with Governor Amalow, Mr. Abdi, and Mr. Amalo in July 2009. Ind. ¶ 28. Mr. Abdi testified that the then-president of Somalia, President Sheikh Sharif Ahmed, executed a decree in favor of Governor Amalow that appointed him to the position of Senior Advisor to the President and Director of Asset Recovery. Consistent with an English-translated version of this decree, the original Somali-language document appointed Governor Amalow as "[d]irector with the responsibility and authority to recover the national assets of the country." Ind. ¶¶ 31–32; Jan. 19, 2023 Hr'g Tr. at 89:24–90:15; *see id.* at 91:7–92:9 ("Q. I want you to focus on the language here at the end, "director with the responsibility and authority to recover the national assets of the country" . . . is that in the original Somali document? A. Yes."). This testimony was further corroborated by at least two prior statements given by Mr. Abdi regarding the authority bestowed upon Governor Amalow by President Sheikh Sharif Ahmed. *See* Gov't Ex. 11; Jan. 19, 2023 Hr'g Tr. at 47:18–48:14, 50:22–52:8.

Contemporaneous billing records indicate that in September 2009, Mr. Schulman met with President Sharif and other senior Somali officials regarding the asset recovery project and Governor Amalow's role in the project, and regularly communicated with Governor Amalow by telephone. *See* Def. Ex. 66A at 3 (SR_00311). In early 2010, Shulman Rogers retained Donald Bandler, the former Ambassador to Cyprus, to assist in the asset recovery project. Def. Ex. 10. This engagement resulted in an extensive exchange of communications between Ambassador Bandler, Mr. Schulman, Somali officials including Somalia's Ambassador to Italy Nur Hassan

Hussein, and French and Italian officials regarding the recovery of Somali assets located in Italy and France.  *See id.*; *see also* Def. Exs. 12, 14–20, 66A at 5 (SR_00313), 66A at 20 (SR_000328).

In September 2012, President Mohamud became the president of Somalia, a position he held until February 2017.  In January 2013, Mr. Schulman initiated contact with President Mohamud's administration.  Def. Ex. 66A at 20 (SR_000328).  The Indictment alleges that in March 2013, Mr. Amalo created two forged documents that were transmitted to Bank A-1 and the NY Comptroller: one purporting to be from the Prime Minister of Somalia demonstrating that the Prime Minister had appointed Osman Mohamed as the Director of Financial Asset Recovery and Banking Affairs, and a second in which Mr. Mohamed asserts that he retained Shulman Rogers. Ind. ¶¶ 43, 44, Def. Ex. 69.  These materials were transmitted to Bank A-1 and the NY Comptroller with a letter signed by Ambassador Duale, the then-Ambassador/Permanent Representative of Somali Republic to the United Nations, affirming the authority of Mr. Mohamed and independently certifying Mr. Mohamed's authority to recover and direct accounts held by the Somali government. Def. Ex. 69 at 9–11.  Mr. Bhattacharya testified that Ambassador Duale reviewed the documents that the government alleges were forged, and subsequently executed a letter affirming the authenticity of these documents.  Jan. 18, 2023 Hr'g Tr. at 55:6–56:8.  Contemporaneous time-keeping records demonstrate that Mr. Schulman and Mr. Bhattacharya met with Ambassador Duale on the day that this letter was executed.  Def. Ex. 66A at 35 (SR_000343).  And Ambassador Duale, who has a limited recollection regarding the asset recovery project due to his age and the passage of time, affirmed to defense counsel that he was aware of the asset recovery project and Mr. Schulman's role.  *See* Jan. 19, 2023 Hr'g Tr. at 110:23–111:9.

In July 2013, Shulman Rogers executed an engagement agreement with then-current Central Bank Governor Abdusalam Omer regarding the asset recovery project.  Ind. ¶ 46; Def. Ex.

23; Jan. 18, 2023 Hr'g Tr. at 34:24–35:2.  The government does not allege fraudulent conduct in connection with this agreement.  Ind. ¶ 46.  Instead, the government suggests that Shulman Rogers should have executed another engagement agreement with another Somali official following Governor Omer's resignation.  Ind. ¶ 47.  The government further alleges that Mr. Schulman and others pressured Governor Omer's successor to ratify the agreement with Governor Omer, or execute a new contract.  Ind. ¶ 48.  These allegations, relevant to Count 1, conspiracy to commit bank fraud, put at issue Mr. Schulman's authority to act on behalf of the Somali government following Governor Omer's resignation.  Nonetheless, Mr. Schulman presented ample evidence demonstrating that multiple unavailable witnesses possess material and exculpatory testimony regarding Mr. Schulman's authority to act on behalf of the Somali government, and that Mr. Schulman was not required to obtain a new engagement letter in order to act on behalf of the Somali government.  *See* Jan. 19, 2023 Hr'g Tr. at 104:12–106:14, 108:16–109:11; Jan. 18, 2023 Hr'g Tr. at 45:1–15, 43:21–44:22.

Despite the government's ever-changing theory of relevance, President Mohamud undeniably possesses exculpatory and material testimony related to Mr. Schulman's authority to act on behalf of the Somali government, as well as evidence relevant to Mr. Schulman's *mens rea.*[8] *See* Jan. 18, 2023 Hr'g Tr. at 43:18–44:11; Def. Ex. 29; Def. Ex. 41.  Indeed, the former

---

[8] The government's misleading representations regarding the theory of its case have further impaired Mr. Schulman's ability to mount an effective defense.  At the time of Indictment, the government issued press releases claiming that Mr. Schulman "made material misrepresentations" regarding his authority to act on behalf of the Somali government.  *See* Dep't of Justice, *Maryland Lawyer Charged with Defrauding Financial Institutions and Other Entities to Obtain Control over $12.5 Million of Somali Sovereign Assets*, Dep't of Justice Off. of Pub. Affairs,  Dec. 3, 2020, https://www.justice.gov/opa/pr/maryland-lawyer-charged-defrauding-financial-institutions-and-other-entities-obtain-control.  Now the government concedes that Mr. Schulman *did* possess authority from the highest levels of the Somali government.  Jan. 19, 2023 Hr'g Tr. at 283:25–284:1–2.

Ambassador to Somalia affirmed that President Mohamud would have been intimately involved in the asset recovery project given the value of assets at stake.  Jan. 18, 2023 Hr'g Tr. at 192:15–193:16.  President Mohamud's exculpatory testimony was corroborated by Stanley Woodward's testimony, which reflected conversations with Ms. Adam and Thabit Abdi in which both officials, who worked under President Mohamud, affirmed that they viewed Mr. Schulman as fully authorized to engage in the asset recovery project and that Mr. Schulman was acting at President Mohamud's direction.  *See* Jan. 19, 2023 Hr'g Tr. at 104:12–106:14, 108:16–109:11.

Ms. Adam and Thabit Abdi likewise possess exculpatory information.  Testimony demonstrated that all dealings with President Mohamud went through Thabit Abdi, Thabit Abdi was present when documents relevant to the Indictment were executed, and Thabit Abdi was party to communications in which President Mohamud directed Mr. Schulman to transfer a portion of the recovered assets to the Central Bank account.  Jan. 18, 2023 Hr'g Tr. at 39:3–21 ("Everything had to go through Thabit Abdi."), 43:21–25, 49:16 –50:6; Jan. 19 2023 Hr'g Tr. at 108:22–109:11.  Ms. Adam executed multiple documents in furtherance of the asset recovery project, including letters to the Department of State submitted with the 25B Certification, was aware that President Mohamud had delegated all necessary authority to Mr. Schulman to execute the asset recovery project, and confirmed with the Ministry of Finance and Central Bank that there was proper documentation of Mr. Schulman's authority.  Jan. 18, 2023 Hr'g Tr. at 45:5–20; Jan. 19, 2023 Hr'g Tr. at 104:17–106:14, 117:18 –24, 118:4–12; Ind. ¶ 49–53.

In the next phase of the asset recovery project, Mr. Schulman worked with the Somali government, including Ms. Adam, and the U.S. Department of State to obtain a 25B Certification.  Ind. ¶¶ 49–50; Jan. 18, 2023 Hr'g Tr. at 45:8–20.  The 25B Certification was issued on or about September 16, 2013.  Ind. ¶ 50; Def. Ex. 31.  Mr. Schulman provided the 25B Certification to the

NY Comptroller, Federal Reserve Bank of New York, and Bank A-1.  Bank A-1 subsequently remitted $7.4 million to Shulman Rogers' trust account. Ind. ¶ 53.  Only after Bank A-1 **completed** this transfer did the Department of State allegedly advise Mr. Schulman that the 25B Certification did not permit President Mohamud to delegate his authority.[9]  Ind. ¶ 54.  The government's allegations regarding the use of the 25B Certification are relevant to Counts 1 and Count 5.

Finally, the Indictment alleges wire fraud, conspiracy to commit money laundering, and money laundering arising out of the transfer of funds from the Shulman Rogers trust account to a bank account controlled by Haden Global Services, an entity controlled by Mr. Amalo.  Ind. ¶¶ 64–67.  The Indictment alleges that these transfers were made without the approval of the then-Central Bank Governor, Bashir Isse.[10]  Ind. ¶ 59.  However, testimony and other evidence demonstrated that (a) Mr. Schulman communicated either directly with President Mohamud or through President Mohamud's staff, including Thabit Abdi, regarding the asset recovery project; (b) Mr. Schulman was expressly instructed to work under presidential direction, Def. Ex. 36; (c) senior Somali officials continue to view the asset recovery project as a success; and (d) Mr. Schulman maintained a relationship with President Mohamud through 2017, meeting with him on multiple occasions to discuss the asset recovery project.  Jan. 18, 2023 Hr'g Tr. at 52:18–54:8; Def. Ex. 3D at 3, 20, 23–25, 32–33, 44, 46 (time-keeping records of 2013 meetings with President Mohamud and his staff); Jan. 19, 2023 Hr'g Tr. at 105:14–25 (Mr. Woodward testifying that Fawzia Adam considered the

---

[9] The government's allegations are undercut by the text of the wire transmitting the 25B Certification, sent from Secretary Kerry to Foreign Minister Adam, which states: "████████████████████████████████████████████████████████████████████████████████████████████" Def. Ex. 31 at 8 (emphasis added).

[10] Though the government asserted at the hearing that it had interviewed two Somali officials, Yussur Abrar, who served as Central Bank Governor from September 13, 2013 until November 1, 2013, and Bashir Isse, who served as Central Bank Governor from November 27, 2013 until April 4, 2019, the government has not produced to Mr. Schulman any FD-302, memorandum, or statements from these interviews.

Asset recovery project a success), 109:5–11 (Mr. Woodward testifying that Thabit Abdi considered the Asset recovery project a success).  Testimony regarding President Mohamud's continued work with Mr. Schulman, even after transactions that the government alleges were not authorized by Governor Isse, demonstrates that senior and clearly unavailable Somali officials possess pivotal testimony relevant to the transactions that form the basis of Counts 4 and 6–11 of the Indictment.

Defense counsel made extraordinary efforts to obtain the testimony of these unavailable witnesses, proffering testimony by two investigators and one lawyer who attempted to locate and serve Governor Amalow in Columbus, Ohio and Toronto, Canada.  Efforts to hand-serve the Rule 15 Order in Columbus, Ohio, where Mr. Abdi testified that he currently lives and where Governor Amalow apparently lived until the COVID-19 pandemic, and to a Toronto address linked to Governor Amalow's wife and daughter, were unsuccessful.  *See* Jan. 18, 2023 Hr'g Tr. at 79:7–89:18, 104:15–117:21.  The testimony of Canadian counsel confirmed that efforts to effect process on Governor Amalow through the Ontario court system would be futile.  *See* Jan. 18, 2023 Hr'g Tr. at 150:1–14; Jan. 19, 2023 Hr'g Tr. at 11:2–10.

Defense counsel made diligent efforts to secure their testimony, first by seeking their Rule 15 depositions, and then by contacting these witnesses, either directly, through a third party intermediary, or through service of process.  Jan. 18, 2023 Hr'g Tr. at 165:1–167:2; Jan. 19, 2023 Hr'g Tr. at 102:10–106:8, 106:19–109:11, 109:16–111:18; ECF No. 103, Ex. 1 (affidavit of Paul W. Butler).  None of these witnesses are in the United States, and testimony heard by the Court confirms that, not only are there insufficient processes in Somalia and Kenya for effectuating the Rule 15 Order, but that these individuals expose themselves to great risk by voluntarily agreeing to testify in U.S. court proceedings.  Jan. 18, 2023 Hr'g Tr. at 197:13–198:2 (testimony of Former Ambassador Stephen Schwartz), 200:22–203:15 (testimony of Former Ambassador Schwartz

about President Mohamud), 204:14–205:21 (testimony of Former Ambassador Stephen Schwartz about Fawzia Adam), 207:3–13 (testimony of Former Ambassador Stephen Schwartz about Thabit Abdi); *see also* ECF No. 156, Ex. 19.

## CONCLUSION

The government has engineered a case in which Mr. Schulman and his lawyers face insurmountable prejudice in preparing and presenting a defense.   The only fair inference from the record now before the Court, is that the government (a) studiously avoided the collection of evidence that is clearly exculpatory, (b) resisted attempts by the defense to obtain that evidence through Rule 15 Orders, (c) made a bare token effort to obtain documentary evidence through a request for international assistance (while using that pretext to extend the statute of limitations), and (d) withheld vital information that might have allowed Mr. Schulman's counsel to prepare his defense.   These unseemly efforts by the prosecution have proven to be an extraordinary success.   Now, little more than three months from trial, the defense is left without the testimony of a cast of clearly exculpatory witnesses and associated documentary evidence.   The resulting prejudice to Mr. Schulman's rights under the Fifth and Sixth Amendments is clear and profound.   Decency, fair play, and the most fundamental conception of due process compel this Court to bring the government's gamesmanship to an end and dismiss the Indictment in this case.


Dated: February 3, 2023                         Respectfully submitted,

                                                 /s/ _____
                                                 Mark J. MacDougall (MD Bar No. 851201)
                                                 Paul W. Butler (*Pro Hac Vice*)
                                                 Allison T. Coffin (*Pro Hac Vice*)
                                                 Madeline M. Bardi (*Pro Hac Vice*)
                                                 *Counsel for Jeremy Wyeth Schulman*
                                                 Akin Gump Strauss Hauer & Feld LLP
                                                 2001 K Street NW
                                                 Washington, DC 20006

Telephone:  (202) 887-4000
Fax:  (202) 887-4288
E-mail:   mmacdougall@akingump.com
           pbutler@akingump.com
           acoffin@akingump.com
           mbardi@akingump.com


/s/
Stanley E. Woodward (MD Bar No. 18115)
*Counsel for Jeremy Wyeth Schulman*
Brand Woodward Law
1808 Park Rd NW
Washington, DC 20010
Telephone:  (202) 996-7447
Fax:  (202) 996-0113
E-mail:   stanley@brandwoodwardlaw.com