**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**
Greenbelt Division

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | **REDACTED** |
| | : | |
| **v.** | : | **Criminal Case No. PX-20-0434** |
| | : | |
| **JEREMY WYETH SCHULMAN** | : | |

**DEFENDANT JEREMY WYETH SCHULMAN'S RESPONSE TO THE**
**GOVERNMENT'S POST-HEARING BRIEF**

Defendant Jeremy Wyeth Schulman, by and through counsel, files this brief in response to the Government's Post-Hearing Brief (the "Government's Brief"), ECF No. 247, and in further support of his Motion to Dismiss the Indictment Pursuant to the Fifth and Sixth Amendments to the U.S. Constitution (the "Motion"), ECF No. 156.[1]

The issue before the Court is whether Mr. Schulman can receive a fair trial, given the passage of time and the unavailability of critical witnesses. The answer to that question is clear—he cannot. Mr. Schulman has identified thirteen witnesses with material testimony who—due to the government's delay—are either dead, beyond the Court's subpoena power, or cloaked in immunity. The United States government asserts that it can investigate its cases in any manner it chooses, even if that means initiating an investigation in 2014 of conduct alleged to have begun in 2009, ███████████████████████████████████ in 2017, and then waiting more than three years—until December 2020—to seek an indictment. The government's position is legally

---

[1] If this case is not dismissed, Mr. Schulman's trial will begin in less than 90 days. Due to the government's delay in producing discovery, imaging devices, and resisting Rule 15 depositions, some 26 months have passed since the Indictment was returned. Given these facts, and recognizing the pressures on the Court's time, Mr. Schulman respectfully asks that the Court provide an indication of its ruling on this Motion at the earliest convenient date—perhaps with the Court's opinion to follow.

indefensible, violative of constitutional standards, and offensive to the most basic sense of decency and fair play. The Fifth and Sixth Amendments serve as an absolute backstop against the government's "discretionary investigative choices" and mandate that the government not delay its investigation in reckless disregard of known facts and circumstances or to secure tactical delay. Here, the government willfully avoided obtaining testimony of at least one "key witness" for no apparent reason but to prejudice Mr. Schulman, and then sought to mislead the Court as to its reasons.[2] The government also recklessly disregarded that elderly or ailing witnesses, or witnesses known to travel between the United States and Somalia, would be unavailable for trial when the government finally brought its Indictment. Mr. Schulman cannot receive a fair trial due to the government's delay and the Constitution mandates dismissal of the Indictment.

## I. The Government Misstates The Applicable Legal Standard.

The Government's Brief obfuscates the legal standard to be applied by the Court, seeking to replace its duty to promptly investigate and indict with a supposed duty to collect exculpatory information.

Mr. Schulman has met the first prong of the relevant analysis by (a) identifying the unavailable witnesses; (b) proffering extensive documentary evidence and credible testimony regarding what these witnesses would say, if they were available; (c) describing his legitimate attempts to locate these witnesses through this Court's orders, process servers, intermediaries, direct outreach, and private investigators; and (d) demonstrating that there is no substitute for the

---

[2] At the Evidentiary Hearing, with regard to the unexplained series of events surrounding the total absence of any testimony from Governor Amalow, counsel for the government stated that the government excused Governor Amalow from testifying before the grand jury because "he was not compos mentis enough." Jan. 19, 2023 Hr'g Tr. at 274:24-275:5. The government did not present any evidence at the Evidentiary Hearing indicating that Governor Amalow suffered from dementia prior to 2022—nearly five years after his scheduled grand jury testimony.

missing witnesses' testimony.  *See United States v. Harris*, 551 F. App'x 699, 703 (4th Cir. 2014) (quoting *Jones v. Angelone*, 94 F.3d 900, 908 (4th Cir. 1996)).  The Government's Brief does not seek to refute—and therefore concedes—that Mr. Schulman has met these requirements with respect to the missing witnesses.  Instead, the government claims that the witnesses identified by Mr. Schulman do not have testimony relevant to the Indictment.  That argument is addressed *infra* at pages 17-20.

Upon this showing of prejudice, the Court must apply a balancing test to determine why there was delay and whether the cause for delay outweighs a defendant's constitutional right. *Howell v. Barker*, 904 F.2d 889, 895 (4th Cir. 1990).  The government erroneously cites case law related to the government's *Brady* obligations to conclude that "the Fourth Circuit . . . has foreclosed the contention that a fair trial can be compromised by the Government's discretionary investigative choices . . . ."  ECF No. 247 at 6.  This conclusion is not supported by case law.  Both the Supreme Court and Fourth Circuit have articulated the constitutional bounds of investigative delay.  Unconstitutional delay includes: "prosecutorial delay incurred in reckless disregard of circumstances, known to the prosecution, suggesting that there existed an appreciable risk that delay would impair the ability to mount an effective defense," *United States v. Lovasco*, 431 U.S. 783, 795 n.17 (1977), intentional delay "to gain some tactical advantage over" the defendant, *United States v. Marion*, 404 U.S. 307, 325 (1971), and delay borne out of "mere convenience," *Howell*, 904 F.2d at 895.  And, "[i]n the lack of any reason advanced by the government for the delay," the Court "may infer that there was an intent by the government to secure a tactical advantage over the defendant."  *United States v. Harmon*, 379 F. Supp. 1349, 1351 (D.N.J. 1974).

The government conflates its obligation to diligently investigate a case with a supposed duty to collect *Brady* material.  ECF No. 247 at 3-6.  While Mr. Schulman has identified witnesses

with exculpatory testimony who are no longer available, the Court need not determine whether the government was required to preserve exculpatory testimony. Rather, the fact that certain unavailable witnesses have exculpatory testimony is relevant to the first prong of the analysis— Mr. Schulman must demonstrate materiality of the missing witnesses' testimony—as well as the second prong of the analysis—(a) the government recklessly disregarded the possibility that certain exculpatory evidence would become unavailable and impair Mr. Schulman's ability to mount an effective defense, and (b) the government failed to present exculpatory evidence to the grand jury with the aim of obtaining a tactical advantage over Mr. Schulman in hopes that such evidence would no longer be available by the time of trial.[3] Where the government has declined to use the grand jury process to "identif[y] key participants and witnesses" and "'lock in' their testimony," the Court must conclude that the government prolonged its investigation to obtain tactical advantage. *In re 14416 Coral Gables Way*, 946 F. Supp. 2d 414, 422 (D. Md. 2011) (internal citations omitted).

## II. The Government's Investigative Decisions Demonstrate Reckless Disregard For The Possibility That Evidence Would Become Unavailable.

The government concedes that its investigation was substantially complete a year before the Indictment was returned in this case, and the record before the Court demonstrates that the case could have been brought as early as 2016. *See* ECF No. 177 at 9, ECF No. 242 at 1-2, ECF No. 247 at 9. In the two years prior to Indictment, "the Government did not attempt to conduct further

---

[3] While the Supreme Court has held that prosecutors are not required to present exculpatory evidence to a grand jury, the U.S. Justice Manual requires that "when a prosecutor conducting a grand jury inquiry is personally aware of substantial evidence that directly negates the guilt of a subject of the investigation, the prosecutor must present or otherwise disclose such evidence to the grand jury before seeking an indictment against such a person." U.S. Dep't of Justice, Justice Manual § 9-11.233 (2020), justice.gov/jm/jm-9-11000-grand-jury#9-11.233. The failure to do so constitutes grounds for appellate courts to refer violations of the policy to the Office of Professional Responsibility. *Id.*

Somali interviews" because "the Somali Government had not provided documents in response to the official request."[4] ECF No. 247 at 9. This suggestion highlights why the government's delay violated Mr. Schulman's constitutional rights. More than *two years* before presenting its Indictment, the government determined that testimony from relevant witnesses was not available, and yet it did not move forward and present its Indictment to the grand jury.[5] The government decided that the Somali government's lack of response to the Somali evidence request constituted sufficient grounds to take no steps to obtain testimony of Somali witnesses. Still, it took no action with respect to the pending Somali evidence request, while taking advantage of the tolling of the limitations period and the further loss of material and exculpatory testimony and other evidence. *See*, *e.g.*, Gov't Ex. 16. This delay was done in reckless disregard of the likelihood that these Somali witnesses and documentary evidence would become unavailable to Mr. Schulman's defense by the time of trial.

Moreover, the government's "investigative efforts" do not justify its delay. The government interviewed only two Somali officials in eight years.[6] ECF No. 247 at 6-7. The government evidently "attempted" to interview ███████████████████████████

---

[4] This representation is contradicted by Government's Exhibit 16, in which the government inquired about attempting interviews of Somali witnesses in April 2020, and demonstrates the government's attorneys' lack of candor with the Court in describing its investigative efforts. *See* MD Rules Attorneys, Rule 19-303.1(a)(1); *see also* District of Maryland L.R. 704 ("This Court shall apply the Rules of Professional Conduct as they have been adopted by the Maryland Court of Appeals.").

[5] In the timeline advanced by the government, it issued the evidence request to Somalia in April 2018, obtained a tolling order in May 2018, determined it could not obtain evidence from Somalia in late 2018, and did not seek to collect additional evidence from Somalia thereafter. If the Court is to credit the government's assertion that any further investigation, including witness interviews, would have been futile (and thus unnecessary) unless the Somali government responded to the information request, then the government is conceding that it was ready to indict this case as of May 2018. For unexplained reasons, the government waited until December 2020 to indict.

[6] The government has not produced to Mr. Schulman any FD-302 from these interviews.

5

████████████████████—four years after the investigation began. The government made no other effort to interview any Somali witnesses across its nearly seven-year investigation. As this Court recognized at the Evidentiary Hearing, many of the Somali witnesses identified as unavailable by Mr. Schulman would have possessed testimony relevant to the Somali evidence request. Jan. 19, 2023 Hr'g Tr. at 255:3-9. *See* Gov't Ex. 15.

Instead, the government now (for the first time) asserts that it made the strategic decision to not interview any Somali officials because they were *always* unavailable. *See* ECF No. 247 at 7-8. This self-serving argument is undercut by the government's acknowledgement that: (a) ████ ████████████████████████████████████████████████████████████████████ ████████████████████████ (b) ██████████████████████████████████████ and (c) any effort to interview other Somali witnesses did not take place until April 2020. *Id.* at 6-9. The government could have interviewed many, if not all, of the witnesses identified by Mr. Schulman— but it never made such effort. The government cannot now say that it did not undertake certain investigative efforts because those efforts would have been futile. Rather, the Court must conclude that the government recklessly failed to interview witnesses known to possess material information, as evinced by the government's request for evidence from Somalia, in hopes that these witnesses would become unavailable.

Likewise, the government's efforts to obtain records from Somalia were feeble, at best, and did not justify delay of the Indictment or the attendant three-year tolling order. The Government's Brief misstates a number of relevant facts. First, the evidence request was transmitted to the Somali National Police ("SNP") (rather than the Ministry of Foreign Affairs and accompanied by a diplomatic note) based on the government's asserted interest in "efficiency and speed taking into account any risks attendant to travel in Mogadishu" and "control[ling]" leaks—not because the

SNP was best suited to process the request.  Gov't Ex. 16; *see also* Gov't Ex. 21 (describing the SNP's non-responsiveness to other pending requests).  As Ambassador Schwartz testified, however, to have any prospect of obtaining a substantive response, the government should have transmitted the request via diplomatic note to the Ministry of Foreign Affairs.  Jan. 18, 2023 Hr'g Tr. at 211:17-22.

Second, while SA Nock testified that he repeatedly met with the SNP, he also testified that he discussed the request with General Bashir on only one occasion after delivering the request. *See* Jan. 19, 2023 Hr'g Tr. at 209:19-24 (SA Nock testifying that he first received a response from General Bashir regarding the request on June 9, 2018).

Third, the government states that SA Nock believed there was "some possibility that the SNP would produce records."  ECF No. 247 at 8-9.  This is not true.  Only through leading questions did the government elicit testimony from SA Nock that he thought "there was a chance" the government would receive something back from the SNP.  Jan. 19, 2023 Hr'g Tr. at 214:8-13. But SA Nock also testified that he had "little expectation" that the request would be completed, which was corroborated by contemporaneous records.  *Id.* at 213:16-17; Gov't Ex. 13.  This testimony was further supported by Ambassador Schwartz, who testified that the U.S. government could expect a response to its request only if the highest levels of the U.S. diplomatic mission and Somali government were engaged, and the U.S. government consistently followed up with the Somali government.  *See* Jan. 18, 2023 Hr'g Tr. at 230:1-4, 232:7-12, 232:24-233:5; ECF No. 242 at 12-13.  The government, however, did not take these steps.

Finally, the government misleadingly argues that SA Nock was "in regular contact with the highest official at the US Embassy, *Chargé d'Affaires*, Martin Dale, as well as the Department of Justice's Office of International Affairs[.]"  ECF No. 247 at 9 n.3.  This assertion is also not true.

SA Nock testified that he did not recall discussing the evidence request with either Mr. Dale or OIA.  *See* Jan. 19, 2023 Hr'g Tr. at 190:23-25 ([Manning]: "Do you have any specific recollection of speaking with any specific State Department colleague about this DOJ request?"  [Nock]: "I don't.").

As a whole, the government's representations regarding its meager investigative efforts, balanced against the prejudice experienced by Mr. Schulman, require dismissal of the Indictment.[7]

## III.     The Government's Delay Caused These Witnesses' Unavailability.

Of the thirteen witnesses identified by Mr. Schulman, (a) four witnesses have passed away, (b) three witnesses presently hold positions within the Somali government but did not hold positions within the Somali government during the pendency of the investigation, (c) two witnesses are U.S. citizens who the government never sought to interview and are presently located abroad, (d) two witnesses no longer recall sufficient facts to testify in this matter, and (e) one key witness is now beyond the Court's subpoena power, purportedly suffering from dementia, and making concerted efforts to avoid this Court's legal process, although he was located in the United States during the government's investigation.  The government never sought to preserve the testimony of any of these witnesses.  ECF No. 247 at 7-8.  All six Somali witnesses for which the Court previously issued Rule 15 deposition orders are now beyond this Court's jurisdiction and there are insufficient processes in Somalia and Kenya to obtain these witnesses' testimony.  *See*

---

[7] At the Evidentiary Hearing, the Court invited the government to describe its investigative efforts between 2017 and December 2020 in its Brief.  Jan. 19, 2023 Hr'g Tr. at 276:18–277:8. The government apparently declined to do so.  For an avoidance of doubt, any investigative measures taken by the government in an effort to manufacture additional charges against Mr. Schulman do not justify the government's delay.  *See Harmon*, 379 F. Supp. at 1351 (additional investigative steps did not justify delay where that investigation "was not essential" to the government's case against defendant).

ECF No. 242 at 19; Jan. 18, 2023 Hr'g Tr. at 197:13-198:19 (former Ambassador Schwartz's testifying about the lack of legal process in Somalia).

Ambassador Schwartz testified to President Mohamud's unwillingness to testify in this matter as "the head of state" of Somalia, and that testifying in a U.S. proceeding would "diminish[] the role of the presidency of Somalia to a foreign court." Jan. 18, 2023 Hr'g Tr. at 202:19-23. Ambassador Schwartz likewise testified that Fawzia Adam would face serious obstacles given her position as a member of parliament in Somalia, and that testifying in a U.S. proceeding would be perceived as "upsetting the applecart" and could result in "dismiss[al] from a government position" or no longer being welcome "in polite company or high levels of government." *Id*. at 204:14-205:21. Indeed, these are constraints unique to President Mohamud, Ms. Adam, and former President Ahmed because they *currently* hold positions within the Somali government. Each of these individuals are *presently* immune from appearing in a U.S. court and testifying in this matter under principles of sovereign immunity. *See Yousuf v. Samantar*, 699 F.3d 763, 768-69 (4th Cir. 2012); *Wultz v. Bank of China Ltd*., 32 F. Supp. 3d 486, 493 (S.D.N.Y. 2014). These witnesses, of course, were not always unavailable. President Mohamud was not president between February 2017 and early 2022, Ms. Adam left office as Deputy Prime Minister and Foreign Minister in January 2014, and Former President Ahmed held no government office between August 2012 and early 2022. *See* ECF No. 156 at 14; *see also* Jan. 18, 2023 Hr'g Tr. at 201:15-17.[8]

---

[8] The government argues that testimony by Ambassador Schwartz regarding the likely unwillingness of President Mohamud and other current Somali officials to testify at trial excuses the government's failure to request interviews or gather evidence from these individuals when they were private citizens. This argument does not withstand scrutiny. Had the government promptly attempted interviews of these witnesses, it is likely that they would have agreed to informal interview requests given the U.S. government's influence, and a motive to defend the integrity of the asset recovery program. The point is, we will never know because the government never bothered to ask.

Two witnesses, Governor Amalow and former Governor Abdusalam Omer, are U.S. citizens and could have been interviewed by the government at any time, regardless of their location. *See* 28 U.S.C. § 1783. As to Governor Amalow, the evidence clearly shows how the government's investigative delay caused his unavailability. *See* ECF No. 242 at 3-7. Had the government sought the Indictment in this case before 2020, Governor Amalow would have resided in the United States and been subject to this Court's subpoena power, and his testimony could have been preserved. Further, the government aggravated the prejudice to Mr. Schulman through its determined unwillingness to disclose basic information in its possession to defense counsel that would have permitted Governor Amalow to be located and his testimony obtained through appropriate legal process. *See* ECF No. 242 at 7-8. Moreover, the government failed to interview Governor Omer, who maintained a residence in Washington, D.C. during the investigation but now resides outside of the United States and serves as the Somali envoy to the East African Community.[9]

Former Deputy and Acting Chief of Staff Thabit Abdi is now beyond the Court's subpoena power, but was resident in the United States during the government's investigation. Thabit Abdi resided in Washington, D.C. until February 2017. *See* https:// www.hiiraan.com/news4/2017/Apr/141440/thabit_abdi_named_as_the_new_mayor_of_mogadis hu.aspx. Thabit Abdi then became the Mayor of Mogadishu, a role he only held until early 2018. Nonetheless, the government made no effort to interview Thabit Abdi when he resided in the

---

[9] The government's failure to investigate this case is further demonstrated through its efforts to secure a Rule 15 deposition subpoena for a witness who is a United States citizen. *See* ECF No. 106. As the Court noted at the March 11, 2022 motions hearing, the United States government has "more arrows in [its] quiver," Mar. 11, 2022 Mot. Hr'g Tr. at 38:17-19, and yet the government maintained that it required the Court's assistance to secure the testimony of a U.S. citizen who maintains a U.S. residence. There should be no surprise that the government now argues that it could not secure the testimony of any other witness at any other time.

United States or to travel to Somalia or Kenya to interview Thabit Abdi in the two years prior to bringing this Indictment. ECF No. 247 at 6. Thabit Abdi now remains beyond the Court's jurisdiction, and there are insufficient mechanisms in Somalia and Kenya to secure his testimony.

Two witnesses, Ambassador Duale and Deputy Prime Minister and Foreign Minister Mohamed A. Omaar, are unavailable due to the government's delay because they no longer recall sufficient details to testify in this matter. Ambassador Duale served as the Permanent Representative of Somalia to the United Nations in New York until 2016. Ambassador Duale could have been interviewed by the government when he resided in the United States from 2014 through 2016. The government ███████████████████████████████████—four years after it initiated its investigation. *See* ECF No. 247 at 7. Even then, ███████████████ ██████████████████████████████████████████████████████████████████ Defense counsel contacted Ambassador Duale in November 2021. Jan. 19, 2023 Hr'g Tr. at 109:23-110:18. As Mr. Woodward testified, Mr. Schulman's counsel identified Ambassador Duale as likely possessing material evidence through materials produced by the government. *Id.* at 110:4-7. But when defense counsel interviewed Ambassador Duale, he was eighty-five years old and did not have sufficient recollection of the relevant conduct; eight years had passed since the relevant conduct occurred and five years had passed since Ambassador Duale left his position within the Somali government. *Id.* at 110:23-111:9. Had the government attempted to interview Ambassador Duale when he served as the Permanent Representative of Somalia or in the four years following his retirement, it is very likely that he would have recalled conduct related to his official role. But

---

[10] The government did not produce any evidence at the Evidentiary Hearing concerning its claim ████████████████████████████ thus, the Court is limited in its ability to credit this representation, and to evaluate ████████████████████████████████████████ ██████████████████████.

the government did not even attempt to interview Ambassador Duale, and the government did not expedite its Indictment when its investigation stalled, causing Ambassador Duale's unavailability.

Similarly, Foreign Minister Omaar, for whom this Court authorized Mr. Schulman to conduct a Rule 15 deposition, corresponded with French officials in 2011 and affirmed Governor Amalow's authority to act on behalf of the Somali government. Foreign Minister Omaar left his position in 2011, and the government made no effort to interview him over its nearly seven-year investigation. Foreign Minister Omaar is presently unavailable and beyond the subpoena power of this Court. He represented to defense counsel in April 2022, eleven years after the relevant conduct, that due to "██████████" and "████████████" he "████████████████████████" ECF No. 156, at Ex. 19. Had the government not delayed its Indictment until December 2020, then Foreign Minister Omaar would not be unavailable.

Finally, the four deceased witnesses are undoubtedly unavailable because of the government's delay, including Ambassador Donald Bandler. The government argues that it is not responsible for Ambassador Bandler's unavailability because he died in February 2017, ███████ ██████████████████████████. But as the government notes, other witnesses were interviewed as early as April 2014—while no explanation is offered as to why Ambassador Bandler was not interviewed between April 2014 and the time of his death in February 2017.

## IV. Governor Amalow's Unavailability Provides Sufficient Grounds To Dismiss The Indictment.

Mr. Schulman's Brief describes the inexplicable effort by prosecutors to avoid memorializing Governor Amalow's testimony, notwithstanding the plain admission by government agents that he is a "key figure" in this case. Moreover, numerous statements recorded in FD-302, and repeated by Mr. Abdi before the grand jury, indicate that Governor Amalow is in possession of material exculpatory testimony. ECF No. 242 at 3-8.

The government's decision to not make a record of Governor Amalow's testimony was unreasonable, done in reckless disregard that he may become unavailable, and absent any valid justification. Given the evidence now of record in this case, the Court must conclude that the government's pattern of conduct was intended to secure tactical advantage. The government maintains that it dismissed Governor Amalow from testifying before the grand jury because of Governor Amalow's failing health, even though SA Ciapas' FD 302 does not include any observations regarding Governor Amalow's health, and the government has not proffered any contemporaneous medical records substantiating Governor Amalow's purported health issues. Jan. 19, 2023 Hr'g Tr. at 137:21-138:1. To the contrary, SA Ciapas testified, consistent with his FD 302, that Governor Amalow expressed a willingness to testify at the grand jury. *See* Gov't Ex. 11, at 6; *see also* Jan. 19, 2023 Hr'g Tr. at 137:3-20.

Indeed, the record demonstrates that the government concluded that Governor Amalow was in poor health *based solely on assertions made by Mr. Amalo—*███████████████ ███████████████. ████████████████████████████████████████ ████████████████████████████████████████████████████ ████████. As the record now makes clear, Governor Amalow is the only witness, other than Mr. Schulman, who was present at meetings and on phone calls that occurred in 2009 and 2010, and can testify as to what actually occurred. ECF No. 274 at 13. Nonetheless, even if the government excused Governor Amalow from testifying before the grand jury because of his health, the government would have then been aware that Governor Amalow was in declining health, and had a heightened obligation to preserve his testimony in light of the government's uncontroverted admission that he was a "key figure" in this case.

The prejudice caused by the government's failure to take Governor Amalow's testimony is exacerbated by the government's knowledge that he possessed exculpatory testimony.  In the first meeting with SA Ciapas, the government learned that Governor Amalow engaged with Mr. Schulman: (a) "because his father was the only individual the banks recognized as having the authority to recover the assets"; (b) "banks that held the frozen assets would not recognize anyone else but [Governor Amalow] to unfreeze the assets because he was the representative of the last recognized Somali Government"; (c) Governor Amalow "had the title of Director of Recovery Assets for Somalia . . . this empowered the banks overseas to deal with [Governor Amalow] as a current official of the TFG as the banks would only accept a letter or his father's physical presence to release funds"; (d) Governor Amalow "attended meetings or had phone calls with foreign bank representatives regarding the asset recovery efforts"; (e) "banks only recognized [Governor Amalow's] authority as the former and last governor of the last recognized Somali Government"; (f) other officials within the transitional government, including Governor Isse, ███████████ ██████ "could not be trusted and would not have the best interest of the Somali people in mind";[11] and (g) Ms. Adam told Governor Amalow that Mr. Schulman had permission to access Somalia's assets.  Gov't Ex. 11.  This testimony is clearly exculpatory.  Where the government's theory is that Mr. Schulman misstated Governor Amalow's authority in communicating with certain financial institutions, testimony that Governor Amalow did not need to *currently* serve in any specific position within the Somali government to be authorized to recover the assets (but inherently possessed that authority by virtue of serving as the last Central Bank Governor of

_____

[11] Governor Amalow's testimony regarding witnesses to be called by the government, ███████████████████, constitutes impeachment evidence.  Mr. Schulman is further prejudiced by the unavailability of this testimony.  *See Monroe v. Angelone*, 323 F.3d 286, 316 (4th Cir. 2003).

Somalia) is highly relevant and exculpatory.[12] *See id.* ("banks only recognized [Governor Amalow's] authority as the *former and last governor* of the last recognized Somali Government") (emphasis added). One month after this interview, Mr. Abdi testified before the grand jury that Governor Amalow was appointed as a senior advisor to the president of Somalia. Jan. 19, 2023 Hr'g Tr. at 51:15-52:8. At the Evidentiary Hearing, Mr. Abdi testified that the English-version of the decree accurately described the Somali decree giving Governor Amalow this authority.[13] *Id.*, at 51:15-52:8, 90:18-91:12. There was no doubt in 2017, as there is no present doubt, that Governor Amalow possesses testimony that is clearly exculpatory of the charges in this case. The government failed to preserve Governor Amalow's exculpatory testimony in reckless disregard that he would become unavailable, irrevocably prejudicing Mr. Schulman.

The government further asserts that it did not believe Governor Amalow possessed exculpatory testimony because Mr. Abdi "leveled accusations against Schulman during that meeting which Former Governor Amalow" (who the government says "wasn't talking as fast") "did not contest." ECF No. 247 at 12, 14. But none of the allegations leveled by Mr. Abdi relate to the charged conduct. Mr. Abdi claimed that President Mohamud received "kickbacks" and that Mr. Schulman "wanted more money than the $50,000 that he would receive a month for his services." *Id.* at 14. Yet the Indictment does not allege that Mr. Schulman paid kickbacks to

---

[12] Governor Amalow also signed numerous documents representing his status to Mr. Schulman, as of 2009, to be "Governor of the Central Bank of Somalia," and as of 2010, to be "Director of Financial Asset Recovery and Banking Affairs." Def. Exs. 4, 11. These documents contradict the government's theory that Mr. Schulman misrepresented Governor's Amalow's authority, and they provide considerable support to Mr. Schulman's *mens rea* defense, *i.e.*, that Mr. Schulman believed Governor Amalow to have the titles that Governor Amalow represented himself to have.

[13] The Government's Brief states that Mr. Abdi testified before the grand jury that the title of "Director of Asset Recovery and Banking Affairs" was "███████████████████ ███████████████████████████████████" but the government did not elicit this testimony at the Evidentiary Hearing, and this testimony does not appear in the evidentiary record. ECF No. 247 at 15; Jan. 19, 2023 Hr'g Tr. at 90:18-91:11. The Court cannot credit this representation.

President Mohamud, or that Mr. Schulman enriched himself beyond the compensation provided for in the engagement agreement between Shulman Rogers and the Somali government. And so, the government's conclusion that Governor Amalow would have only inculpated Mr. Schulman is inherently flawed. More troubling is that, even after indicting this case on unrelated charges, the government continues to justify its failure to preserve the testimony of a "key witness" based on the uncorroborated statements of Mr. Amalo and Mr. Abdi—a witness whose testimony "changes with the wind." Jan. 19, 2023 Hr'g Tr. at 49:4-7.

The government repeatedly argues that Mr. Schulman had a pre-indictment obligation to preserve testimony of witnesses with exculpatory information, including that of Governor Amalow. ECF No. 247 at 1, 15-16. The Court has already expressed that this position is untenable because it creates "███████████████": "█████████████████████████ ██████" Sept. 6, 2022 Hr'g Tr. at 122:11-18. The government attempts to obfuscate its position that there are two Constitutions by arguing that Mr. Schulman cannot show prejudice because Mr. Schulman "had every ability to contact this purportedly favorable defense witness and made no effort to do so." ECF No. 247 at 16. This is a specious argument and, in many respects, a shocking contention when proffered by counsel for the United States. If a defendant cannot show prejudice, or such prejudice cannot outweigh the harm caused by the government's delay, because he *could have* interviewed witnesses prior to indictment, then, under the framework articulated by the Supreme Court, defendants with the resources to conduct a pre-indictment investigation into uncharged conduct cannot have their Sixth Amendment rights violated. The Constitution prohibits the government, or the Courts, from imposing an obligation on an individual to defend himself before he is indicted.[14] The government's argument must be summarily rejected.

---

[14] Additionally, a defendant who contacts potential witnesses pre-indictment risks being prosecuted for witness tampering. *See* 18 U.S.C. § 1512; *United States v. Davis*, 380 F.3d 183,

## V.    The Remaining Unavailable Witnesses Possess Material Testimony Relevant To The Indictment.

The government incredulously argues that the witnesses identified by Mr. Schulman do not possess material testimony.  The Court previously ordered Rule 15 depositions for seven of the witnesses identified by Mr. Schulman, upon finding that those witnesses possessed "material" testimony—the same standard the Court must now apply.  *See United States v. Rosen*, 240 F.R.D. 204, 209 (E.D. Va. 2007) (applying materiality as set forth in *Brady* to evaluate motions for Rule 15 deposition subpoenas); *United States v. Valenzuela-Bernal*, 458 U.S. 858, 867-68 (1982) (applying materiality as set forth in *Brady* to evaluate a claim of a Sixth Amendment violation). *See also* ECF No. 98, ECF No. 103, ECF No. 128, ECF No. 129; Mar. 11, 2022 Mot. Hr'g Tr. at 13:21-15:24, 42:24-48:4 (describing materiality of the Rule 15 witnesses' testimony).

The government has conceded that President Ahmed, Governor Amalow, and Ambassador Duale possess testimony relevant to the charged conduct, and Mr. Schulman has extensively briefed for this Court the materiality of these witnesses' testimony.  ECF No. 247 at 17 and Exs. A, B; *see also* ECF No. 98 at 12-13; ECF No. 103 at 16-17; ECF No. 156 at 19.  As set forth in Exhibits A and B to this brief, other witnesses undeniably possess material testimony as well.  *See* Exs. A and B.  Foreign Minister Omaar, Ambassador Nur Hassan Hussein, and Ambassador Duale affirmed the authenticity and authority of documents that the government now alleges were forged. *See* Ex. A at 1-2.  The evidentiary record demonstrates that certain witnesses were present at meetings with senior Somali officials where the asset recovery process was discussed, including

---

196 (4th Cir. 2004) ("As we read the statute, 'the "corruptly persuades" language of the [current] statute encompasses non-coercive attempts by a target of a criminal investigation to tamper with prospective witnesses.'") (quoting *United States v. Khatami*, 280 F.3d 907, 908 (9th Cir. 2002)).

Presidential Advisor Ahmed Warfa, Finance Minister Sharif Hassan Sheikh Aden, Ambassador Duale, and Ambassador Bandler. *See*, e.g., Ex. A at 1-3; Ex. B at n. 3-5, 12.

Further, Mr. Schulman has conclusively demonstrated that multiple witnesses possess material testimony that undermines the government's theory of the case. *Wolfe v. Clark*, 819 F. Supp. 2d 538, 559-60 (E.D. Va. 2011) (finding that the government violated a defendant's due process rights when it failed to review or disclose favorable evidence that undermined the prosecution's theory of the case). The government states, "None of the indictment's charges relate to any alleged misuse by Schulman or his co-conspirators of any document signed by" President Mohamud, Ms. Adam, or Thabit Abdi "or any authority conferred by any of these officials." ECF No. 247, at 17-18. This is not true. The government acknowledges that the "25B Fraud" is relevant to Counts 1, 5, and 7-11 of the Indictment. ECF No. 247, Ex. B. While the government's reductive view of these charges is that the State Department's purported instruction regarding the use of the 25B Certification is dispositive, Jan. 19, 2023 Hr'g Tr. at 257:21-24, Mr. Schulman is entitled to present a defense to these charges. One prospective defense is that senior Somali officials, including President Mohamud and Ms. Adam, authorized him to engage in this conduct, and he believed that he was authorized to engage in this conduct based on the authority bestowed upon him by the Somali government. Def. Exs. 25, 28. This defense is relevant to whether the government can prove materiality of any instruction purportedly provided by the State Department. This defense is also relevant to whether the government can prove that Mr. Schulman acted with the requisite intent to defraud. Proof of this element of the offense—and Mr. Schulman's ability to defend himself at trial—is of particular consequence since Mr. Schulman has proffered that President Mohamud, Thabit Abdi, and Ms. Adam are all likely to testify that the Somali government (i) fully supported Mr. Schulman's engagement with various financial institutions, (ii)

approved the remittance of $9 million to the Somali government, and (iii) authorized Mr. Schulman to withhold certain amounts pursuant to the engagement agreement with Shulman Rogers.[15]

The Government's Brief relegates six of the thirteen witnesses identified by Mr. Schulman to a footnote, asserting that their testimony is "too attenuated" to the allegations in the Indictment and "of marginal, if any, relevance." ECF No. 247 at 20-21 n.9. The facts before the Court demonstrate otherwise. *See* Exs. A and B. As the Court is aware, when a defendant asserts that multiple pieces of evidence were improperly withheld or are now unavailable, the Court is to look at the cumulative effect of the missing evidence. *See Kyles v. Whitley*, 514 U.S. 419 (1995) (finding materiality determination depends on cumulative effect of all evidence missing at trial on the trial's probable outcome); *Long v. Hooks*, 972 F.3d 442, 465 (4th Cir. 2020) ("Viewing the withheld evidence cumulatively as we must, there is no 'possibility for fairminded disagreement' that the cumulative effect of the suppressed evidence—favorable to the defendant and suppressed by the State in order to make its own case appear stronger—would have impacted [defendant's] trial."); *Wolfe v. Clarke,* 819 F. Supp. 2d 538, 546 (E.D. Va. 2011), *aff'd*, 691 F.3d 410 (4th Cir. 2012) ("[W]hen making a materiality finding, courts should consider the suppressed evidence

---

[15] The government objects to the testimony of Mr. Woodward, which it argues is inadmissible hearsay because the underlying statements of the unavailable witnesses are unreliable. Mr. Woodward's testimony is non-hearsay under Rules 804(b)(6) and 807(a) of the Federal Rules of Evidence. The government does not articulate why the underlying statements are unreliable, but where the declarants' statements are based on personal knowledge, the declarants had no motivation to lie, and the statements are corroborated by contemporaneous documentation, the Court should conclude that the statements have sufficient indicia of reliability. *See Goode v. United States*, 730 F. Supp. 2d 469, 473 (D. Md. 2010), *United States v. Wilson*, 281 F. App'x 96, 99 (3d Cir. 2008); *Copperweld Steel Co. v. Demag-Mannesmann-Bohler*, 578 F.2d 953, 957 (3d Cir. 1978) (applying Rule 807 (then Rule 804(b)(5)) to admit an attorney's memorandum relaying statements of an unavailable witness).

The government also asserts that the Federal Rules of Evidence apply except "in those hearings specifically designated as exempt under Rule 110[1]." ECF No. 18 at n.8. However, the "such as" language of Rule 1101(d) demonstrates that the Rule's list is not exhaustive.

collectively, rather than judging the materiality of each item of suppressed evidence."). Here, the cumulative effect of these witnesses' unavailability is that Mr. Schulman cannot receive a fair trial.

## CONCLUSION

Mr. Schulman, like every citizen, has a right to due process and a fair trial at which he can call witnesses and present an effective defense. The government's delay of nearly seven years in this case has caused thirteen witnesses with material testimony to become unavailable. The government's nominal and perfunctory efforts to obtain critical records from Somalia, notwithstanding the formidable tools available to the United States, have denied Mr. Schulman the basic documentary evidence that will refute any notion of guilt.

With the evidentiary record before the Court, the government's strategy has now been unmasked. ████████████████████████████████████████ ████████████████████████████████████████████████ ███████ Other witnesses and documentary evidence, including Mr. Amalo's own electronic devices, would just confuse the government's narrative.

What has followed has been an odious campaign of artificial delay and overt action by prosecutors in pursuit of that strategy. The clear objective of the government's campaign has been to prevent Mr. Schulman from marshaling exculpatory documents and testimony that will directly contradict the story told by ████████████████████████. The government's effort to characterize this inexplicable pattern of prosecutorial conduct as routine "discretionary investigative decisions" defies belief. The government has denied Mr. Schulman the basic tools of an effective trial defense in a way that offends fundamental constitutional norms and the most basic sense of decency and fair play. Only the Court can make this right. With the evidentiary record now in hand, the Court must grant Mr. Schulman's Motion and dismiss the Indictment.

Dated: February 17, 2023

Respectfully submitted,

/s/_____
Mark J. MacDougall (MD Bar No. 851201)
Paul W. Butler (*Pro Hac Vice*)
Allison T. Coffin (*Pro Hac Vice*)
Madeline M. Bardi (*Pro Hac Vice*)
*Counsel for Jeremy Wyeth Schulman*
Akin Gump Strauss Hauer & Feld LLP
2001 K Street NW
Washington, DC 20006
Telephone:  (202) 887-4000
Fax:  (202) 887-4288
E-mail:  mmacdougall@akingump.com
        pbutler@akingump.com
        acoffin@akingump.com
        mbardi@akingump.com


/s/_____
Stanley E. Woodward (MD Bar No. 18115)
*Counsel for Jeremy Wyeth Schulman*
Brand Woodward Law
1808 Park Rd NW
Washington, DC 20010
Telephone:  (202) 996-7447
Fax:  (202) 996-0113
E-mail:  stanley@brandwoodwardlaw.com

## CERTIFICATE OF SERVICE

I hereby certify that on the 17th day of February 2023, I electronically filed the foregoing Response in Opposition to the Government's Post-Hearing Brief in Opposition to Defendant Jeremy Schulman's Motion to Dismiss the Indictment Pursuant to the Fifth and Sixth Amendments to the U.S. Constitution with the Clerk of the Court for the U.S. District Court for the District of Maryland, using the Court's CM/ECF system. The CM/ECF system sent a "Notice of Electronic Filing" to all counsel of record who have entered an appearance in this matter.

Dated: February 17, 2023                    Respectfully submitted,

_/s/_____
Mark J. MacDougall (MD Bar No. 851201)
*Counsel for Jeremy Wyeth Schulman*
Akin Gump Strauss Hauer & Feld LLP
2001 K Street NW
Washington, DC 20006
Telephone: (202) 887-4000
Fax: (202) 887-4288
E-mail: mmacdougall@akingump.com