# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | * | |
| | | **UNDER SEAL**[1] |
| | * | |
| | | Crim. Action No. 20-cr-0434-PX |
| v. | * | |
| JEREMY WYETH SCHULMAN, | | |
| | * | |
| Defendant. | | |
| | *** | |

## <u>MEMORANDUM OPINION</u>

Attorney Jeremy Wyeth Schulman has been charged with engaging in a conspiracy to defraud his former law firm and multiple banks by misrepresenting his authority to recover sovereign assets on behalf of the post-civil war Somali government. ECF No. 1. The offenses allegedly occurred between 2009 and 2014, and involved a political rebuilding in one of the world's most war-torn countries. The Department of Justice ("the Government") began investigating the case in June 2014. Schulman was indicted on December 2, 2020, for conspiracy to commit mail, wire, and bank fraud (Count One), wire fraud (Counts Two through Four), bank fraud (Count Five), mail fraud (Count Six), conspiracy to commit money laundering (Count Seven), and substantive money laundering (Counts Eight through Eleven). ECF No. 1.

After indictment, several protracted and contentious battles between the Government and Schulman ensued over Schulman's entitlement to discovery. These battles resulted in eight motions, twelve letters to the Court, seven hearings, and six Court orders. The Court ultimately

---

[1] Because the parties filed certain exhibits under seal, the Court has provisionally sealed this Memorandum Opinion to give the parties an opportunity to request what, if any, portions of the Opinion should remain under seal permanently. Accordingly, within seven days from the date of this Opinion and the accompanying Order, the parties shall propose redactions to this Opinion. Failure to provide any such proposed redactions will result in the unsealing of the entire Memorandum Opinion without further warning.

granted several motions ordering that the Government produce evidence critical to Schulman's defense that it otherwise held.

Along the way, Schulman requested that the Court enter a briefing schedule for various motions to dismiss the Indictment. The Court granted that request and thereafter Schulman filed five motions. The most meritorious is the motion to dismiss for pre-indictment delay. Schulman contends that the Government's delay in prosecution rendered unavailable several key witnesses such that permitting the case to proceed to trial would violate fundamental principles of fairness protected by the Fifth and Sixth Amendments to the United States Constitution. ECF No. 156. Schulman also pursues a companion motion to vacate the order that tolled the limitations period, ECF No. 133, as well as motions to dismiss the Indictment under the act of state and political question doctrines, ECF Nos. 148 & 152, and an omnibus motion to dismiss, ECF No. 160.

After briefing, the Court held a hearing on September 6, 2022. ECF No. 188. At the hearing, the Court conveyed that it would address the motion to dismiss for pre-indictment delay first. The Court also granted Schulman an evidentiary hearing to ascertain whether he could meet his burden of demonstrating actual prejudice arising from the delay, and if so, whether the Government's investigative justifications for the delay outweigh that prejudice. ECF No. 194 at 150.

The evidentiary hearing took place on January 18 and 19, 2023. ECF Nos. 235 & 237. Eleven witnesses testified and exhibits totaling hundreds of pages were admitted. The parties also submitted post-hearing briefing, and the Government produced supplemental evidence regarding its pre-indictment investigation. Trial is currently scheduled to begin March 4, 2024. ECF No. 307. After thorough review, the motions must be DENIED.

The Court turns first to the motion to dismiss for pre-indictment delay.

## I.    Motion to Dismiss for Pre-Indictment Delay

### A.  Background

Schulman concentrates this motion on twelve witnesses whom he contends are unavailable for trial because the Government did not indict him until December 2020.[2]  Four are dead,[3] and the other eight are beyond the compulsory process of this Court.  Of these eight,[4] one currently enjoys head-of-state immunity after spending several years as a private citizen;[5] at least one key witness appears to have actively evaded Schulman's diligent efforts to secure his testimony;[6] another had resided in the United States before indictment but not after;[7] and two others report that because of age, infirmity, and the passage of time, they no longer recall any meaningful details of the Indictment events.[8]

Schulman argues that the collective absence of the witnesses undermines his ability to mount a vigorous defense.  To best understand the full thrust of Schulman's argument, the Court must place each witness in proper context.  Accordingly, the Court will review the Indictment allegations in the order presented by the charging document, alongside the evidence that

---

[2] The Court does not include Former Somali Finance Minister Hassan Sheikh Aden among these witnesses because, even though Schulman contends that Finance Minister Hassan is missing, Schulman does not address the reasons for Hassan's absence or his efforts to contact Hassan.

[3] The deceased witnesses are Former Somali Presidential Advisor Dr. Ahmed Warfa; Former Somali Ambassador to Italy Nur Hassan Hussein; Former United States Ambassador to Cyprus Donald Bandler; and Former Somali Presidential Advisor Abdirahman Omar Osman.

[4] Those who are beyond the Court's compulsory process, but do not fall into any of the foregoing categories, are President Mohamud's Former Chief of Staff Thabit Abdi, Former President of Somalia Sheikh Sharif Ahmed, and Former Foreign Minister of Somalia Fawzia Adam.

[5] Current and Former President of Somalia Hassan Sheikh Mohamud.

[6] Former Governor Ali Abdi Amalow.

[7] Former Central Bank Governor Abdusalam Omer.

[8] Former Somali Ambassador to the United Nations Elmi Duale and Former Foreign Minister of Somalia Mohamed A. Omaar.

Schulman has generated as to how each presently unavailable witness would have assisted in rebutting the allegations of fraud.

### 1. The Indictment Allegations and Missing Evidence

#### a) 2009–10: Schulman is Hired to Recover Somali Assets

At the heart of this case is a decades-old civil war that has ravaged Somalia's government and economy. In 1991, as the Somali political structure was on the verge of collapse, Ali Abdi Amalow was the Governor of the Central Bank of Somalia ("Governor Amalow"). Governor Amalow proactively requested that foreign banks freeze Somali assets until stability could be restored. ECF No. 1 ¶ 26. From 2004 through 2012, Somalia operated under the Transitional Federal Government ("TFG"), until the permanent government, known as the Federal Government of Somalia ("FGS"), was formally established in 2012. *Id.* ¶¶ 6–7.

In June 2009, Abdiaziz Hassan Amalo ("Amalo"), a relative of Governor Amalow, approached Schulman, then a partner at the law firm of Shulman, Rogers, Gandal, Pordy & Ecker P.A. ("Shulman Rogers" or "the Firm"), for assistance in recovering and repatriating to the TFG the frozen Somali assets from domestic and foreign banks. *Id.* ¶ 27. Amalo claimed that because of his relationship with Governor Amalow, he could easily identify the frozen assets. *Id.* Amalo allegedly proposed that he and Schulman collaborate to recover the frozen assets and keep a percentage of the wealth for themselves. *Id.* Under Amalo's proposal, Shulman Rogers would be paid from the recovered assets, and Amalo would receive a commission for his work. *Id.* ¶ 29.

In July 2009, Schulman, Amalo, and Governor Amalow met at the Firm to discuss the asset recovery project. *Id.* ¶ 28. Governor Amalow executed an engagement letter with Schulman and the Firm, purportedly on behalf of the Central Bank of Somalia. ECF No. 159-3.

According to the Indictment, Schulman learned at this meeting that Governor Amalow was no longer the Governor of the Central Bank of Somalia and in fact held no current position in the TFG.  ECF No. 1 ¶ 28.  The Indictment alleges that Schulman nonetheless helped forge a document that reflected otherwise.  Specifically, the allegedly forged document claims falsely that the Prime Minister of the TFG had "re-affirmed" that Governor Amalow was the Central Bank Governor ("2009 TFG PM Letter"), thus giving Amalow the authority to repatriate the assets for the country.  *Id.* ¶ 30.  The Indictment further alleges that Schulman presented this letter to multiple entities, including at least one bank and one currency printer, to convince the financial institutions that Schulman's client, Governor Amalow, was authorized to recover the assets on behalf of the Central Bank of Somalia.  *Id.*

The Indictment also accuses Schulman of puffing Amalow's bona fides to perpetrate a fraud.  It is undisputed that President Sheikh Sharif Ahmed ("President Ahmed") of the TFG issued a "Presidential Decree" in December 2009 ("Presidential Decree No. 214"), which bestowed certain authority on Governor Amalow.  *Id.* ¶¶ 31–32.  The Indictment alleges that Schulman and Amalo altered the English translation of the decree to oversell Governor Amalow's position as "Director with the responsibility and authority to recover the national assets of the country" ("2009 Decree Translation").  *Id.*  This change, the Government contends, was designed to make it appear that Amalow retained clear authority to recover assets on behalf of the TFG when in fact he did not.  *Id.*  Schulman then sent the 2009 Decree Translation to multiple financial institutions to induce each into releasing Somali assets.  *Id.* ¶ 33.

Schulman, however, presses that several missing witnesses, if available, would squarely rebut these allegations.  Chief among them is Governor Amalow.  During Governor Amalow's March 2017 interview with FBI Agent Victor Ciapas, Amalow stated ███████████

5

███████████████████████████████ ECF No. 253 at 4.  But

Amalow is in failing health, has long since left the jurisdiction, and has actively evaded

Schulman's efforts to secure his testimony.

Schulman also points to then Somali Ambassador to the United Nations Elmi Duale

("Ambassador Duale"), who certified that Amalow's position, pursuant to Presidential Decree

No. 214, indeed was "Director of Financial Asset Recovery and Banking Affairs" with

"authority and power to recover all the national assets of the country."  ECF No. 159-23.  This

certification also corroborates Governor Amalow's statements to FBI Agent Ciapas in March

2017 tha ████████████████████ ECF No. 253 at 4.  Thus, says

Schulman, were Ambassador Duale available to testify, he would corroborate the accuracy of the

Presidential Decree translation.[9]

Other Somali officials at the highest levels of the TFG, if called to testify, could

corroborate Governor Amalow's authority.  For example, Schulman and Governor Amalow met

with President Ahmed in September 2009 to discuss the asset recovery project.  ECF Nos. 159-4.

They also met with presidential advisor Dr. Ahmed Warfa.  ECF No. 159-5.  Schulman and

Governor Amalow also corresponded with President Ahmed and Dr. Warfa in the weeks

following these meetings.  ECF Nos. 159-4; 159-5.  The correspondence reflects that President

Ahmed supported working with Schulman and Governor Amalow.  Schulman expressed to Dr.

Warfa that he and Governor Amalow were "looking forward to working with the President" to

"release assets that were under [Amalow]'s exclusive custody and control prior to the collapse of

---

[9] There also appears to be a live dispute over whether Presidential Decree No. 214, properly translated to English, actually names Governor Amalow as "Director." ████████████████████████████

████████████████████████████ ECF No. 207-9 at 25, 27, 40.  A. Abdi reaffirmed his position on this at the hearing regarding this motion. Jan. 19, 2023 Hearing ("Jan. 19 Hearing"), Transcript ("Tr.") at 90–91.

the Siad Barre regime, and then to putting those assets to work for the benefit of the Somali people." ECF No. 159-5 at 2. Schulman also shared Governor Amalow's curriculum vitae and that he knew where as much as $300-400 million of Somali assets were located. *Id.* at 3.

Likewise, contemporaneous correspondence between Governor Amalow and President Ahmed discussed Governor Amalow's role in repatriating assets for the TFG. Of particular note, Governor Amalow specifically warned President Ahmed in October 2009 that another TFG official, Bashir Issa Ali ("Governor Issa"), was trying to access for personal gain "several hundred million U.S. dollars" which rightfully belong to Somalia. ECF No. 159-4 at 3. Governor Amalow told President Ahmed that Issa was working with "criminal elements in Puntland" and that any further association with Governor Issa could compromise the TFG's "standing in the international community" and undermine "what I have devoted myself over the past 18 years," the safeguarding of Somali assets for the "benefit of the Somali people." *Id.* Governor Amalow concluded by urging President Ahmed to "instruct" the currency printer "not to release any currency to the custody of Bashir Issa Ali or his designee." *Id.*

But those involved in the early asset recovery efforts, as reflected in the correspondence, are not available for testimony. Dr. Warfa is dead. ECF No. 157 at 17–18. Governor Amalow is laying low in Canada and avoiding Schulman's attempts to serve him. *See* Jan. 18 Hearing, Tr. at 77–117. President Ahmed is currently a member of the Somali Parliament beyond the compulsory process of the Court. ECF No. 157 at 18. And Ambassador Duale is now in his eighties and asserts that with the passage of time, he recalls few details about his involvement with Schulman and the events from nearly fourteen years ago. Jan. 19 Hearing, Tr. at 111.

As further evidence of Schulman's good faith belief in Governor Amalow's authority to repatriate the assets, Schulman would have called former U.S. Ambassador to Cyprus, Donald

Bandler. Bandler was hired to assist in navigating the international asset recovery effort. ECF No. 159-12. He remained an integral partner in the asset recovery project for several years and so could legitimate that Schulman, like he, engaged in what they believed to be genuine asset recovery efforts for the Central Bank of Somalia. But Bandler died in 2017, so he, too, is not available for Schulman's defense. ECF No. 157 at 18.

The Indictment next alleges that after obtaining the 2009 Decree Translation, the Firm and Governor Amalow executed a new fee agreement and power of attorney in 2010, which echoed that Governor Amalow was the "Director of Financial Asset Recovery and Banking Affairs." ECF No. 1 ¶ 39. Schulman also used the 2009 Decree Translation to register the Firm with the United States Department of Justice as an agent of the TFG pursuant to the Foreign Agent Registration Act. *Id.* Schulman thereafter continued his efforts to liberate the Somali assets from financial institutions, several of which challenged the legitimacy of Governor Amalow's authority, and by extension, the authority of the attorney that Amalow had hired.

According to the Indictment, on May 24, 2010, a currency printer in the United Kingdom ("Currency Printer A") told Schulman that it had spoken to an unnamed "official" from the Central Bank of Somalia who claimed ignorance as to whether Shulman Rogers had been hired to legitimately recover Somali assets. *Id.* ¶ 36. Currency Printer A attached a letter from the Central Bank of Somalia confirming that Governor Amalow had been removed from his position as an advisor. *Id.* Also, on June 7, 2010, Governor Issa sent Schulman a letter entitled, "Warning Against Fabricated Information" which declared that Governor Amalow had never been appointed as "Director of Financial Asset Recovery and Banking Affairs." *Id.* ¶ 37; ECF No. 244-2 at 15. The Indictment alleges that despite these warning signs, Schulman pressed forward.

Significantly, however, Governor Amalow had already warned Schulman and President Ahmed about Governor Issa. ECF No. 159-4. Governor Amalow reiterated the same to FBI Agent Victor Ciapas during a March 2017 interview: ███████████████ ████████████████████████████████████████████ ECF No. 253 at 4. But because both Amalow and Ahmed are unavailable, this evidence, too, is lost for Schulman.

The Indictment further alleges that in July 2010, Schulman submitted the 2009 Decree Translation to a Swiss subsidiary of a New York bank ("Bank A-2") which, in turn, released $36,000 of Somali assets to Shulman Rogers. ECF No. 1 ¶¶ 33–34. Schulman promptly transferred approximately $18,000 to a bank account for a corporation controlled by Amalo. *Id.* The following month, Schulman and Amalo presented to "Bank B" (which held $1.5 million in Somali assets) another allegedly fake letter purporting to be from the Attorney General of Somalia ("August 2010 AG Letter"); this letter, too, supported Schulman's authority to direct the bank to release the Somali funds. *Id.* ¶ 40. Schulman submitted the August 2010 AG Letter to Bank B, which rejected it as unsatisfactory and refused to release the assets. *Id.* ¶ 41. Schulman and Amalo submitted a similar purportedly fake letter the following month for the same purposes ("September 2010 AG Letter"). *Id.*

As to these documents, Schulman cannot point to any witness that would directly attest to their authenticity. Rather, Schulman more broadly argues that Governor Amalow, as corroborated by other missing witnesses, would confirm Schulman indeed had the authority to act on behalf of the TFG and with the blessing of President Ahmed's administration. Schulman was also in communication with Ambassador Duale, who now recalls little. Other witnesses who worked directly with Schulman during this time, such as Dr. Warfa and Somali Ambassador

9

to Italy Nur Hassan Hussein, are dead.  Jan. 18, 2023 Hearing ("Jan. 18 Hearing"), Def. Ex. 3C at SR_000322–24 (billing records regarding Schulman's meetings with Hussein); ECF No. 157 at 17–18.  These officials could corroborate Schulman's good faith belief that Governor Amalow retained lawful authority to recover the assets, and by extension, so did Schulman.

Schulman also highlights that then Foreign Affairs Minister Mohamed Omaar ("Foreign Minister Omaar") personally attested to Governor Amalow's "authority to act" for the TFG asset recovery project in a March 2011 letter to the French Foreign Minister.  ECF No. 159-20.  In this regard, Omaar would provide at least circumstantial evidence that the 2010 AG Letters accurately reflected Schulman's legitimate authority, as hired by Amalow, to recover Somali assets.  But now, Foreign Minister Omaar has also made clear that due to his advancing age, "lack of records," and having "left Somali politics for good" in 2011, he is unavailable to testify at trial.  ECF No. 159-19.

### b)  The 2013–14 Recovery Efforts

The Indictment suggests that Schulman's asset recovery efforts cooled until early 2013, when Schulman and Amalo allegedly forged yet another set of documents to rekindle the push for funds.  One was a letter purportedly authored by FGS Prime Minister Abdi Farah Shirdon, which stated that Mohamad Osman (a friend of Amalo's) had been installed as the new "Director of Financial Asset Recovery and Banking Affairs" ("2013 PM Letter").  ECF No. 1 ¶ 43.  The other was a power of attorney from Osman to Schulman, giving Schulman the authority to act on Osman's behalf ("March 2013 POA").  *Id.*  Schulman sent these documents to a New York bank ("Bank A-1") and the New York Comptroller, allegedly with intent to induce the banks into liberating the assets.  *Id.* ¶ 44, Count Three.

However, were Ambassador Duale able to testify, Duale could certify that these documents were true, authentic, and accurate. Duale would be expected to confirm—as he did by sworn declaration in 2013—that Osman was the true Director of Financial Asset Recovery. Jan. 18 Hearing, Def. Ex. 69 at SH_R-00033927–29; *see also* Jan. 18 Hearing, Def. Ex. 3C at SR_000330 (Schulman Rogers billing records corroborating that Schulman met with Duale). Thus, Duale's testimony would rebut the allegation that Osman had no lawful authority which he could extend to Schulman.

Likewise, during the same period, several other now unavailable witnesses would reaffirm that Governor Amalow's role was diminishing, but Schulman nonetheless retained legitimacy as the American attorney hired to assist with asset recovery. In January 2013, Schulman and Amalo met with FGS President Hassan Sheikh Mohamud ("President Mohamud") and Somali Foreign Minister Fawzia Adam ("Foreign Minister Adam") to discuss ongoing efforts to repatriate Somali assets. ECF Nos. 104 at 5; 65-5; 65-6; Jan. 18 Hearing, Def. Ex. 66A at SR_000328. President Mohamud, in particular, would confirm that by early 2013, Governor Amalow's role in the effort was waning, and Mohamud, with Schulman's help, would be taking over the project. In summer of 2013, Mohamud met with Amalow, in the presence of Foreign Minister Adam, to make clear that Governor Amalow was no longer needed. ECF No. 253 at 3. Governor Amalow also informed Schulman in writing that as the former "director of financial recovery assets," his relationship with Schulman and the Firm was ending. ECF No. 159-8.

Meanwhile, Somali Central Bank Governor Abdusalem Omer ("Governor Omer") executed a new contract and power of attorney with Schulman so he could continue assisting in the repatriation effort for the FGS. ECF No. 1 ¶ 47. The Power of Attorney particularly made clear that, to the FGS, Schulman was "the true and lawful attorney-in-fact to claim, recover and

direct all assets of the Central Bank of Somalia and its subsidiary and affiliate banks . . . that are held in accounts in financial institutions located outside of Somalia" ("July 2013 POA"). ECF No. 151-4 at 2.[10] As to this, Mohamud, Adam, and Omer, if available to testify at trial, could corroborate Schulman's lawful authority to repatriate assets on behalf of the FGS during President Mohamud's tenure in 2013.

In any event, and as the Indictment explains, the 2013 PM Letter and March 2013 POA did not appear to convince Bank A-1 and the New York Comptroller to release Somali funds. ECF No. 1 ¶ 49. The financial institutions told Schulman that he must secure a certification from the State Department pursuant to Section 25B of the Federal Reserve Act before the funds would be released. *Id.* A Section 25B certification reflects the United States' formal recognition of the person or persons with the authority to control foreign government assets held in United States banks. *Id.*; ECF No. 151-3 at 2–3. Upon issuance of a 25B certification, the transfer of foreign assets to the designee recognized by the 25B certification is presumed lawful. ECF No. 1 ¶ 49; *see also* 12 U.S.C. § 632.

On September 16, 2013, the State Department issued the 25B Certification ("the 25B Certification"). ECF No. 1 ¶¶ 50–51. The 25B Certification named President Mohamud as "the sole representative of Somalia with full authority to receive, control, and dispose of" any Somali assets held by a federally insured bank. *Id.* ¶ 50. On September 19, Schulman forwarded the 25B Certification to the New York financial institutions with an accompanying email message that read, "I am happy to report that we have just obtained the 25B Certification from the State Department." *Id.* ¶¶ 51–53. Schulman also attached a letter authored by President Mohamud.

---

[10] The Government alleges that after Governor Omer resigned as Central Bank Governor in September 2013, neither successor, Yussur Abrar ("Governor Abrar") or Governor Issa, ratified the July 2013 POA. ECF No. 1 ¶ 48.

*Id.*; ECF Nos. 159-16; 159-17; 159-18. In the letter, President Mohamud expressly affirmed Schulman's "delegated authority" to recover Somali assets located in the United States. *Id.*

Based on these collective representations, the New York financial institutions released over $12 million worth of Somali assets to Schulman's firm account. ECF No. 1 ¶¶ 53–57. In December 2013, Shulman Rogers transferred $9 million to an account in the name of the Central Bank of Somalia. *Id.* ¶ 58. As part of the negotiated fee, the Firm kept approximately $3.3 million of the Somali assets and also paid Schulman nearly twice the compensation he had earned the previous year. *Id.* Schulman also asked Governor Issa to permit payment to Amalo, which Issa denied. *Id.* ¶ 59. Nonetheless, in March of 2014, Schulman sent $673,784 to Haden Global Services ("Haden"), an entity created by Amalo. *Id.* ¶¶ 60–64. Finally, on June 25, 2014, Bank A-1 released one final installment of frozen Somali assets to Shulman Rogers. *Id.* ¶ 66.

As to the events surrounding the 2013–14 release of Somali assets, the Government's liability theory is that Schulman fraudulently misrepresented to the New York banking entities that he had the power to authorize release of the assets. *Id.* ¶¶ 54–57. Specifically, the Government contends that the 25B Certification plainly bestowed such authority *exclusively* on President Mohamud—not the attorney to whom Mohamud gave power to act on the FGS's behalf. *Id.* Thus, says the Government, Schulman's representation to the banks that *he* possessed authority delegated by President Mohamud constitutes fraud. *Id.*; *see also* ECF No. 194 at 96 (Government claims that President Mohamud "must be the one to pick up the phone."); Jan. 19 Hearing, Tr. at 257, 282–83. The Indictment further alleges that the State Department explicitly told Schulman as much on October 9, 2013, and so, any contrary representations to financial institutions that he had such authority were fraudulent. ECF No. 1 ¶ 54–57.

13

Schulman's position is that the Government's case, at best, reflects no more than a good faith misunderstanding about the reach of the 25B Certification. To shore up this defense, Schulman would call President Mohamud, were he available, to confirm that Mohamud had knowingly delegated to Schulman, by power of attorney, the authority to act on Mohamud's behalf pursuant to the 25B Certification. *See* ECF Nos. 151-4 at 2; 159-15 at 4. Mohamud could testify that as President of Somalia, he would not be expected to personally negotiate with financial institutions to release assets, so he secured counsel who could engage in the nitty gritty work necessary to further the project.

President Mohamud would also testify that this plan had been the product of several meetings with Schulman in Mogadishu. Jan. 18 Hearing, Tr. at 35–43. Also present at the meetings were Foreign Minister Adam and President Mohamud's Chief of Staff Thabit Abdi. *Id.*[11] Shortly after, President Mohamud executed a letter to the Federal Reserve Bank of New York which confirmed that, "for purposes of administrative convenience," President Mohamud designated Schulman "on behalf of Somalia to receive, control, and/or dispose of Somalia's property located in the United States." ECF No. 159-15 at 4.

Likewise Foreign Minister Adam, if available for trial, could attest that she forwarded President Mohamud's letter to then Secretary of State John Kerry, and also requested that the 25B Certification name both Mohamud and Schulman as authorized to secure Somali assets. *Id.* at 2. A State Department official then told Schulman that Foreign Minister Adam's letter "should do the trick" in terms of securing the necessary 25B Certification. ECF No. 107-16.

Similarly, President Mohamud and Thabit Abdi could confirm that after the 25B Certification had issued, they learned that the New York Federal Reserve would only release

---

[11] Schulman's associate, Koushik Bhattacharya, accompanied Schulman to certain meetings with President Mohamud, but was not privy to all high-level meetings in Somalia. *Id.* at 53.

funds directly to President Mohamud through formal diplomatic channels. ECF No. 107-25. Thabit Abdi confirmed that Schulman and the Firm would continue "to represent and perform all pending works[,] but under the exclusive authority and direction of the President, H.E. Hassan Sheikh Mohamud." *Id.* President Mohamud could also verify that he submitted a letter to the New York Federal Reserve on October 23, 2013, expressly stating that Schulman had the authority to negotiate the asset release on President Mohamud's behalf. ECF No. 107-27. Stated plainly, now unavailable witnesses—Thabit Abdi, President Mohamud, and Foreign Minister Adam—could corroborate Schulman's sincere belief that he had the authority to assist President Mohamud in repatriating the assets.

As to the Indictment allegations surrounding Schulman's payment to Amalo through Haden, it is less clear that President Mohamud was directly involved. President Mohamud could confirm that he continued meeting with Schulman throughout 2014. Jan. 18 Hearing, Tr. at 52–53, Def. Ex. 3D at SR_000638. And perhaps Mohamud would attest that he had approved such payments to Amalo, as Schulman proffered in his 2017 interview with the Government. ECF No. 159-2 at 13. At the very least, because President Mohamud's testimony could support the legitimacy of Schulman's asset recovery efforts, it could help Schulman defend against the allegation that the Haden invoice had omitted that Schulman was "fraudulently trying to obtain Somali funds." ECF No. 1 ¶ 62.[12]

### 2. The Government's Investigation

#### a) 2014

The Government principally relies on the sworn declaration of FBI Special Agent Benjamin Johnson to chronicle the course of its investigation. ECF No. 283. The Government's

---

[12] One of the Somali witnesses the Government had interviewed ███████████

███████████████████████████████ *See* ECF No. 207-9 at 15.

investigation began in June 2014 when it received a referral from the United Nations Monitoring Group ("UNMG"), alleging that Schulman and Amalo were co-conspirators in a scheme to obtain Somali sovereign assets. *Id.* ¶ 5. Over the remaining months of 2014, the Government interviewed six witnesses, including three members of the UNMG, a State Department attorney who communicated with Schulman, and Former Somali Central Bank Governor Yussur Abrar. *Id.* ¶ 8; ECF No. 283-2 at 2. The Government also executed three electronic search warrants for accounts belonging to Amalo and Musa Ganjab, another participant in the asset recovery project who is listed as Co-Conspirator 1 in the Indictment. ECF No. 283 ¶ 9. The Government also obtained 12 grand jury subpoenas for, among other documents, ███████████████████

███████████████████████████████████████████████████████████

███████████████████████████ *Id.* ¶ 10. According to Johnson, the Government conducted a covert investigation for the first two and a half years to minimize the risk that its targets would flee or destroy evidence. *Id.* ¶ 11.

### b) 2015–16

By early 2015, the Government had developed evidence against Amalo involving tax and mortgage fraud unrelated to this case. *Id.* ¶ 6. In an effort to secure Amalo's cooperation, the Government concentrated on shoring up those unrelated fraud charges. *Id.* Specifically, the Government obtained a search warrant for an additional email account of Amalo, as well as for an account belonging to his wife, and for two associates—████████████████████

███████████████████████████████████████████████ who participated in meetings with Amalo and Schulman regarding the asset recovery project. *Id.* ¶ 12; ECF No. 283-4.

16

During this same time, the grand jury also issued over 70 subpoenas for an array of

███████████████████████████████████████████████  The Government

sought the subpoenaed documents to better understand the nature of Amalo and Schulman's

communications and track potential use of criminal proceeds.  ECF No. 283 ¶ 16.  The

Government also subpoenaed ████████████████████████████████████

██████████████████  *Id.*  Many documents obtained had to be translated from Somali to

English before the Government could review them.  *Id.* ¶ 15.  Moreover, any documents obtained

in connection with Schulman had to be screened for potential attorney-client privilege concerns.

*Id.* ¶ 13.  All told, the Government's filter team screened 770,000 documents and ultimately

released over 560,000 documents.  *Id.* ¶ 14.

As for witness interviews, the Government continued to conduct them covertly.  *Id.* ¶ 17.

Specifically, the Government talked to the UNMG Coordinator ████████████████████████

██████████████████████████████████████████████████████

██████████████████  *Id.*  By the end of 2016, the Government had developed sufficient

evidence to indict Amalo on a series of fraud and tax-related offenses separate from the Somali

asset recovery investigation.  *Id.* ¶ 18.

### c)  2017

On January 24, 2017, the Government started off the year by arresting Amalo and seizing

fifteen of his electronic devices.  *Id.* ¶ 19–20; ECF Nos. 176 at 4; 255 at 4.  The Government

immediately imaged nine of the devices, focusing on Amalo's computers and tablets because it

believed them most likely to contain evidence of forged documents.  *Id.*  The Government

ultimately extracted over 400,000 records from those devices.  ECF No. 283 ¶ 20.

With Amalo's arrest known to Schulman and others, the Government thereafter turned its sights on Schulman in a far more public fashion. Three days after arresting Amalo, ████████

████████████████████████████████████████████████████

████████ *Id.* ¶ 22–23. According to the Government, ████████████████████████

████████████████████████████████████████████

████████████ *Id.*

The ████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

*Id.* ¶¶ 24–25. Documents obtained from these subpoenas ultimately helped the Government identify payments to Haden as part of the asset recovery project. *Id.* The Government also sought and received judicial authorization, pursuant to 18 U.S.C. § 2703(d), to access email accounts controlled by Schulman and President Mohamud. *Id.* ¶ 36; ECF No. 283-4.

The Government also conducted six substantive interviews with Amalo. ECF No. 283 ¶ 29. Amalo thoroughly discussed Schulman's role in the asset recovery scheme, ████████

████████████████████████████████████████

████████████████████████ *See* ECF No. 72-1 at 15, 18. Nothing suggests that the Government has ever interviewed or attempted to interview these witnesses.[13] ECF No. 248 at 10; Jan. 19 Hearing, Tr. at 254.

During this same time, the Government also conducted over 20 other voluntary interviews. ECF No. 283 ¶ 31. Key witnesses particularly relevant to the Schulman investigation included ████████████████████████████████████

---

[13] The Government's post-hearing brief offhandedly mentions a "border alert" issued in 2018 for Duale, but provides no other evidence or details about this supposed alert. ECF No. 248 at 7.

████████████████████████████ the translator of Presidential Decree No. 214).  ECF Nos. 283-2 at 3–5; 207-5; 207-7; 207-9. ██████████████████████████████████

████  ECF No. 283-3.  The Government also interviewed Mark Sivills, an associate of Amalo who allegedly notarized some of the forged documents, as well as officials at financial institutions who communicated with Schulman.  ECF No. 283-2 at 3–5.

The 2017 interviews also included Governor Amalow, the circumstances of which bear heavily on this motion, and so deserve detailed discussion.  FBI Special Agent Nanette Schumaker directed FBI Special Agent Ciapas to interview Governor Amalow and his son, A. Abdi, at their home in Columbus, Ohio.  ECF No. 253; Jan. 19 Hearing, Tr. at 155, Gov't Ex. 5. Agent Schumaker emphasized for Agent Ciapas that Governor Amalow was a "key figure" in the investigation, and that because Amalow may be ill, ████████████████████████████████ ████████████████████████████  Jan. 19 Hearing, Tr. at 155, Gov't Ex. 5.

Agent Ciapas conducted the interview on March 28, 2017, and authored a formal memorandum memorializing that interview.  ECF No. 253.  The memorandum states that A. Abdi and Governor Amalow both told Agent Ciapas █████████████████████████████ ████████████████████████████████ *Id.* at 2. ██████████████████████████████ ████████████████████████████████ *Id.* at 4. ██████████████ ██████████████████████████████████████████████████████ ███████████████████████████████████████████████████ █████████████████████████████████████████████████ ██████████████████████████████████████████████████████ ███████████████████████████████████████████████████████ █████████████████████████████████████████████

19

At the end of the interview, ██████████████████████████████████
██████████████████████ *Id.* at 7. Evidently, Agent Ciapas determined that Governor

Amalow seemed sufficiently fit to testify, so he served the Governor with a subpoena to appear

before the grand jury the following month. *Id.* Governor Amalow accepted the subpoena and

confirmed that he would travel to Maryland to give sworn testimony. *Id.*

But Amalow never did testify before the grand jury. ████████████████████████

██████████████████████ ECF No. 283 ¶ 27. ████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████ ECF No. 207-9 at 45; Jan. 19

Hearing, Tr. at 25–26. The Government accepted this odd excuse for Amalow's absence, and

sought no additional detail as to ████████████████████████████ Jan. 19

Hearing, Tr. at 46–47; 274–75 ████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████ ECF No. 207-9 at 40. █

████████████████████████████████████████████

████████████████████████████████ *Id.* at 44.

Less than two months after ████████████████████████ in June 2017, Schulman

initiated a lengthy proffer with the Government, during which he walked prosecutors through his

role in the asset recovery project. ECF Nos. 159-2; 176 at 6. Schulman specifically identified

several key Somali officials who had conferred to him the authority to repatriate assets on behalf

of the Somali Government. He described his first meetings in 2009 with Governor Amalow and

President Ahmed, noting that President Ahmed was the one who came up with the idea for Amalow to become "Director of Financial Asset Recovery."  ECF No. 159-2 at 4.  Schulman also told the Government that he had witnessed Ambassador Duale signing the verification of Governor Amalow's authority to recover the assets.  *Id.* at 5.  He also discussed a series of meetings in Paris with Foreign Minister Omaar, during which Foreign Minister Omaar submitted several letters to the French government in support of the asset recovery project.  *Id.* at 5–6.

Schulman next discussed his relationship with President Mohamud and his administration, beginning with a January 2013 meeting in Washington.  *Id.* at 8.  Schulman described how "he met with President Mohamud multiple times and left the meetings with lots of encouragement to move forward with the asset recovery."  *Id.* at 9.  Schulman told prosecutors about his work with Governor Omer on a new contract between the FGS and Shulman Rogers; according to Schulman, Hersiburane was present for some but not all of these meetings.  *Id.* at 9–10.  Schulman also discussed his meetings with Mohamud and Foreign Minister Adam in furtherance of the 25B Certification, asserting that President Mohamud wanted Schulman's name on the 25B Certification.  *Id.* at 10–12.  Schulman noted that he "often worked through Thabit Abdi" during their efforts to secure the 25B Certification.  *Id.* at 12.

The Government also asked Schulman about the Firm's payments to Amalo through Haden.  Schulman shared that President Mohamud had directed Schulman to compensate Amalo for his work from the funds retained by Shulman Rogers, based on Amalo's stated hourly rate.  *Id.* at 13.  Schulman also proffered that Deputy Prime Minister Ridwan authorized the payment in writing, although that correspondence is not currently in the record.  *Id.* at 13–14.

On September 6, 2017, the Government ██████████████████████████████████ ████████████████████████████████████████ that is the subject of this case.  █████

 ECF Nos. 283 ¶
29; 244-4.

████████████████████████████████████████ the Government
had put together much of its theory of the case against Schulman. ████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
███████████████ *Id.* However, the Amalo matter remained entirely under seal such that
Schulman had no notice ██████████████████████████████████████
█████████████████████████

Last in 2017, the Government sought documents from several foreign countries, to
include Canada, Italy, and the United Kingdom. ECF No. 283 ¶ 33.[14] The Government received
the requested documents from each country within a year of these requests. ECF No. 283-5.
The Government also attempted to contact the Somali government through the law firm Kobre
and Kim, which it believed to represent the Somali Central Bank. ECF No. 283 ¶ 38. The firm
responded that it no longer represented the government of Somalia. *Id.*; ECF No. 248 at 7.

### d) 2018

In March 2018, the Government initiated a similar document request to the FGS for
evidence related to Schulman's alleged scheme. ECF Nos. 283 ¶ 38; 136-4. The Somalia
request not only is the subject of Schulman's separate motion to vacate the related tolling order,

---

[14] On December 4, 2017, the Government obtained a tolling order, pursuant to 18 U.S.C. § 3292, based on the
request for evidence from Italy pursuant to a mutual assistance treaty. ECF No. 136-2. Italy took its "final action"
regarding the request on July 26, 2018. ECF No. 136-3. Under Section 3292, this "final action" ended the tolling
period. 18 U.S.C. § 3292(b). Schulman does not take issue with the Court's tolling order regarding the evidence
request to Italy. ECF No. 134 at 2 n.4.

but also features prominently in his pre-indictment delay arguments. Thus, the Court will detail the circumstances surrounding its issuance.

On March 28, 2018, the Deputy Director for the United States Department of Justice, Office of International Affairs ("OIA") authored the formal request for "any official records establishing any lawful authority of Jeremy Schulman … to act on behalf of the Central Bank of Somalia, the Transitional Government of Somalia, and/or the Federal Government of Somalia between August 1, 2009, and July 15, 2013." ECF No. 136-4 at 28–29. The next month, FBI Special Agent Timothy Nock, then Acting Assistant FBI Legal Attaché responsible for Somalia, delivered the request in person to Somali Police Commissioner General Bashir Abdi Mohamed ("General Bashir") in Mogadishu. Jan. 19 Hearing, Tr. at 182–91, Gov't Ex. 21. Agent Nock also presented the request to the Somali Office of the Attorney General and Financial Reporting Center. Jan. 19 Hearing, Tr. at 195.

In May 2018, the Government asked this Court to toll limitations based on its request for evidence from Somalia, pursuant to 18 U.S.C. § 3292. ECF No. 136-4. Section 3292 permits tolling if the Court finds by a preponderance of the evidence that an "official request" for evidence to an "authority of a foreign country" is pending. 18 U.S.C. § 3292. The limitations period is tolled until the foreign authority takes "final action" on the request, and for no more than three years. *Id.*

The sworn affidavit in support of the tolling motion reflects that the Government had largely solidified its prosecution theory as to Schulman. The affidavit submitted to the Honorable Paul W. Grimm in May 2018 largely mirrors the allegations handed down in the Indictment two and a half years later. *Compare* ECF No. 136-4 at 18–25 *with* ECF No. 1. The affiant also represented to Judge Grimm that tolling was necessary because "[t]he Government

23

has not yet received all of the requested evidence from Somalia," even though Agent Nock had just submitted the request to General Bashir and the Government had not received any evidence. *Id.* at 25. Nonetheless, and based on that affidavit, Judge Grimm granted the motion. ECF No. 136-5.

Once the tolling order was signed, the Government made little meaningful effort to secure any responsive documents from Somalia. Agent Nock had one follow up meeting with General Bashir on June 9, 2018, during which General Bashir "claimed" to have drafted letters to the Finance Ministry and the Central Bank about the request. Jan. 19 Hearing, Tr. at 193, Gov't Ex. 21. Agent Nock never received any confirmation of these claimed efforts, and later that month, Agent Nock left his post as Legal Attaché to Somalia and was replaced by Special Agent Jesse Dodson. *Id.* In July 2018, a lawyer from OIA emailed Agent Nock and other FBI officials asking about the status of the request. Jan. 19 Hearing, Gov't Ex. 16. OIA never received a response.

Nonetheless, while the Somali records request was pending, the Government continued to pursue other investigative avenues. The Government sought official financial records from Switzerland and obtained those records between 2019 and 2020. ECF Nos. 283 ¶ 39; 283-5. The grand jury also issued 28 more subpoenas, largely for ██████████████████████████ ██████████████████ ECF Nos. 283 ¶ 36; 283-1. ████████████████████ ████████████████████████████████████████████ ████████████████████████████████████████

ECF No. 283 ¶ 36–37.

The Government also conducted 18 voluntary witness interviews, including with Former Somali Central Bank Governor Issa, as well as officials from the State Department and several

financial institutions. *Id.* ¶ 40; ECF No. 283-2 at 6. At the same time, the Government sought, and was granted, an order clarifying that the crime-fraud exception to the attorney-client privilege and work product protections applied to the Shulman Rogers documents so as to permit Government review of additional documents from the Firm. ECF No. 283 ¶¶ 42, 49.

### e) 2019

In 2019, the Government occasionally inquired of agents in Mogadishu about the status of the Somali document request. In April, OIA reached out to Agent Nock again, but he had not had any contact with General Bashir in the 10 months since he left his post. Jan. 19 Hearing, Gov't Ex. 16. Agent Nock forwarded the inquiry to the new FBI Legal Attaché, Special Agent Michael Kaiser, who told OIA that he knew nothing of the request. Jan. 19 Hearing, Tr. at 212, Gov't Ex. 16. Agent Nock stressed to Agent Kaiser that he had "little expectation that [the Somali Police Force] would complete the request." Jan. 19 Hearing, Gov't Ex. 13.

Six months later, on October 8, 2019, OIA asked again about the request. Jan. 19 Hearing, Gov't Ex. 16. But by now, Agent Kaiser was no longer serving as attaché, although he did confirm that his replacement had not received any response, and so he recommended that OIA resubmit the request through the current attaché. *Id.* Agent Kaiser added that he was "not even positive Gen. Bashir is still the commissioner." *Id.*

In the same email chain, FBI Somalia Program Manager Jesse Dodson, who had previously replaced Agent Nock as attaché, confirmed that General Bashir had left his post. *Id.* Agent Dodson told OIA that the FBI did not have a relationship with the new police commissioner, General Xijaar, who likely did not even read English. *Id.* Agent Dodson also commented that since he had started working in Somalia eighteen months prior, they had *never*

　
received any records from the Somali Police. *Id.* No further efforts were made to obtain documents from Somalia.[15]

In March 2019, Agent Ciapas, along with another FBI agent, ██████████████████ ███████████████████████████ ECF No. 253-1. During that interview, ██████ █████████████████████ He now told Agent Ciapas that ██████████████████ ██████████████████████████████████████████████████████ ████████████████████████████████████ *Id.* Although Governor Amalow was present during this interview, Agent Ciapas did not ask Amalow any questions and even told Amalow that he could stay upstairs while he interviewed his son downstairs. Jan. 19 Hearing, Tr. at 142. Agent Ciapas testified that he had been concerned about Governor Amalow's ability to make it down the stairs without hurting himself, but Ciapas' contemporaneous interview memorandum was silent on this point. *Id.*; ECF No. 253-1.

Also during 2019, the Government secured immunity for ██████████████████ ██████████████████████████████████████████████████████ ██████████ ECF Nos. 207-9 at 28; 283 ¶ 44. The Government further continued its interviews of various officials at the law firms and financial institutions involved. ECF No. 283 ¶¶ 46–47. As part of these efforts, the Government obtained an order from the Court authorizing it to share a redacted version of the Crime Fraud Order with another law firm hired by Shulman Rogers to assess the risk of Schulman's proposed payments to Amalo through Haden. *Id.* This order enabled the Government to interview members of the related firm as well as a third-party vendor hired by that firm. *Id.*

---

[15] By April of 2020, having received no response on the now two-year-old document request, OIA attorneys asked the FBI generally about interviewing witnesses in Somalia or Kenya; the FBI responded that it would be difficult to conduct such interviews given the recent onset of the COVID-19 pandemic. *Id.*

#### f) 2020

By early 2020, the Government's investigation was "substantially complete." ECF No. 283 ¶ 50. It received the last remaining documents from Shulman Rogers and Swiss authorities. *Id.* ¶ 49; ECF No. 283-5. But then the COVID-19 pandemic hit, which brought an unexpected halt to grand jury proceedings between March and July of 2020. ECF No. 283 ¶ 50. By September, however, the Government alerted Schulman that it was ready to indict him. *Id.* Schulman's attorneys then attempted to convince the Government not to charge him. ECF No. 244-5. After negotiations failed, the Government indicted Schulman on December 2, 2020. ECF No. 1.

### 3. Hearings on Post-Indictment Discovery and Motions Practice

Following indictment, the Government often resisted Schulman's efforts to obtain evidence crucial to his defense. First, Schulman argued that the Government had not disclosed all *Brady* and *Giglio* information as to its main cooperator, Amalo. ECF Nos. 34 & 41.[16] Schulman noted that the Government had turned over only limited excerpts of its interviews with Amalo such that the excerpts were "not of much use" in their current form. ECF No. 86 at 16. Schulman pressed for the full interview memoranda, but the Government objected, arguing that certain information was not discoverable. *Id.* at 16–17.

After much wrangling, the Court decided to conduct its first of several *in camera* reviews to ascertain whether the Government had honored its production obligations under *Brady* and *Giglio* as to a number of witnesses. ECF No. 89 at 81–82. Ultimately, the Court concluded that

---

[16] Under *Brady v. Maryland*, 373 U.S. 83 (1963), and *Giglio v. United States*, 405 U.S. 150 (1972), the Government is required, pursuant to the Due Process Clause, to disclose evidence "material to guilt or punishment" that may "exculpate the accused" or "adversely affect[] the credibility of the government's witnesses." *United States v. Trevino*, 89 F.3d 187, 189 (4th Cir. 1996).

the Government had not made sufficient disclosures as to Amalo and directed the Government to turn over additional excerpts to the defense.  ECF No. 97 at 4–6.

At a December 1, 2021, status hearing, Schulman also brought to the Court's attention that the Government had not yet imaged six of the fifteen electronic devices seized from Amalo in 2017.  ECF No. 97 at 8.  Once again, the Government pushed back on the defense request. The Government argued that they did not image these devices because it would be "duplicative" of evidence already obtained from Amalo's Gmail account, despite having never examined the devices.  *Id.* at 33–38.  To this, Schulman highlighted that one of the devices, the BlackBerry, could prove particularly useful because the device was designed to combine phone and email technology.  *Id.* at 56.  Thus, the BlackBerry likely held draft or other communications relevant to the case on the device itself.  *Id.*

Schulman also voiced concern that the Government had delayed producing any evidence from the other phones until the last day of their agreed-upon discovery period, September 30.  *Id.* at 58–59.  Even though the Government had reported to the Court that discovery was near completed, when pressed to produce the evidence from the phones, that production topped out at a whopping 1.9 *million pages.  Id.*  In response, the Government asserted simply that it had not "recognize[d] that the phones would be of any relevance. . . ."  *Id.* at 60.

Also at the December 1 hearing, the defense outlined its intention to seek the Court's permission to conduct Rule 15 depositions.  *Id.* at 15.  Schulman highlighted that even though a year had passed since his Indictment, the Government had *just disclosed* that Governor Amalow was in poor health and likely would not be able to testify at trial.  *Id.* at 14, 19.  The Government quite clearly represented that because of Governor Amalow's failing health, *it would not oppose* a defense request to depose Governor Amalow pursuant to Rule 15.  *Id.* at 51 ("[W]e wouldn't

28

object to the defense trying to take his testimony based on our review of his health."). The Court accordingly encouraged the parties to work together to secure this deposition. *Id.*

About five weeks after this hearing, the Government reversed course on Governor Amalow in many respects. The Government now confirmed that agents *had* interviewed him, but still refused to produce the full interview memoranda. ECF No. 159-21. It did turn over redacted excerpts of what it considered *Brady* material, but offered no explanation for why it took thirteen months to give exculpatory evidence to Schulman. *See* ECF No. 47-4 at 6 (Schulman first requests *Brady* material relating to Governor Amalow). Moreover, the disclosed excerpts were so heavily redacted that no reasonable reader could ascertain which statement had been made by Governor Amalow. ECF No. 207-5 at 16.[17] The excerpts also suggested that A. Abdi "provided most of the information during the interview," even though the full version of the interview memorandum—which the Government held back for another year—makes clear that ████████████████████████████████████████ with Agent Ciapas. *Compare id.* with ECF No. 253.

In January 2022, Schulman moved for this Court to order Rule 15 depositions for unavailable witnesses, to include (1) Governor Amalow, (2) President Ahmed, (3) Finance Minister Hassan, (4) Foreign Minister Omaar, (5) President Mohamud, (6) Foreign Minister Adam, and (7) Thabit Abdi. ECF Nos. 98 & 103. The Government opposed the motions across the board—even as to Governor Amalow. ECF No. 116. The Government now took the near frivolous position that Schulman had not established Governor Amalow's *unavailability*. *Id.*

At the next hearing two months later, the Government advanced yet another novel theory for denying Governor Amalow's Rule 15 deposition—that his testimony would not be material

---

[17] The Government also disclosed redacted interview excerpts and ████████████████████████████ ████████████████ *Id.*; ECF Nos. 207-6 & 207-7.

to Schulman's defense.  ECF No. 132 at 5.  The Government further continued to contest the propriety of the Rule 15 motion even as it disclosed that Amalow lived in Canada and was in failing health.  *Id.* at 5–10.  The Court squarely rejected the Government's arguments and granted Schulman's motion to depose Governor Amalow.  ECF No. 128.

As to the remaining Rule 15 depositions, the Court also rejected the Government's contention that Schulman had not established the unavailability or materiality of Presidents Ahmed and Mohamud, Finance Minister Hassan, Foreign Minister Omaar, Foreign Minister Adam, and Thabit Abdi.  Citing the "highly unusual" nature of the case and that "important evidence and witnesses" are located in war-torn Somalia, the Court found it would be "counter to the interest of justice" to require any further evidence in support of the Rule 15 depositions.  ECF No. 132 at 56–58.

At the same hearing, the Court ordered that with regard to twelve witnesses, the Government produce the interview memoranda and grand jury testimony for *in camera* review so that the Court could determine whether the Government had fully honored its *Brady* and *Giglio* obligations.  *Id.* at 69–70.  The Court ultimately determined that more disclosure was required; the Government was ordered to produce to Schulman additional excerpts of memorialized interviews and ███████████████████████████████████████████ ███████████████████████  ECF Nos. 207-1 at 5; 207-9.  Thereafter, on May 13, 2022, the Government turned over a sizeable additional production.  *Compare* ECF Nos. 207-5, 207-6, & 207-7 (32 pages of interview content) *with* ECF No. 207-9 (66 pages).

Schulman next filed the motion to vacate the tolling order based on the Somali document request and, after the Court set a formal briefing schedule, followed with the remaining motions to dismiss the Indictment.  ECF Nos. 133; 148; 152; 156; 160.  On September 6, 2022, the Court

held a hearing on the motions.  ECF No. 188.  At the end of the hearing, the Court granted

Schulman's request to present evidence as to his efforts to locate the array of unavailable

witnesses and the prejudice flowing from the delay in indictment.  ECF No. 194 at 117.  The

Court also directed the Government to make available for testimony two witnesses who appeared

to be largely under the Government's control—A. Abdi and Agent Nock.  *Id.* at 127–29.

Leading up to the evidentiary hearing, the parties moved to compel the production of

witness statements for those scheduled to testify at the hearing.  ECF Nos. 206 & 220.  After

reviewing the material *in camera*, the Court ordered the Government to produce additional

excerpts of the FBI interview memoranda for A. Abdi and Governor Amalow.  ECF No. 236.

From this, Schulman learned for the first time the extent to which the Government had in fact

interviewed Governor Amalow in March 2017, including which statements Governor Amalow

himself made during that interview.  *Compare* ECF No. 253 *with* ECF No. 207-9 at 53–56.  The

Court also ordered the Government to turn over email correspondence concerning the evidence

request to Somalia.  ECF No. 236.

At the hearing, the Court heard testimony from several witnesses about Schulman's

efforts to secure the presence of the Rule 15 deponents.  As to Governor Amalow, Schulman

hired two separate investigation firms—one in Ohio and one in Toronto, Canada—to find him.

Steven Chase, a private investigator in Ohio, testified that in February 2022, he traveled three

times to the Columbus housing complex at which Governor Amalow and A. Abdi lived.  Jan. 18

Hearing, Tr. at 77–89.  Despite speaking with neighbors and the manager of the housing

complex, Chase never interviewed Governor Amalow or A. Abdi.  *Id.*  His colleague ultimately

taped the Rule 15 subpoena to the door during a fourth visit in April 2022.  *Id.* at 89.

Meanwhile, having learned that Governor Amalow was likely with family in Canada, Schulman enlisted King International Advisory Group to locate him. *Id.* at 103–17. Investigator Karen Ruddom testified that she made four visits in April and May 2022 to an apartment near Toronto where Governor Amalow was believed to live. *Id.* During the first visit to the apartment, a woman answered the door, "rais[ed] her voice" at Ruddom, announced she did not know Amalow, and slammed the door. *Id.* at 108. On the second visit, Ruddom attempted to deliver the Rule 15 subpoena in a marked envelope. Ruddom reached inside the door and touched an older woman's hand with the envelope as is required to perfect service in Canada. *Id.* at 114. The woman immediately shut the door, and then pushed the envelope under the door with a spatula. *Id.* at 115. Ruddom subsequently taped the envelope to the door and mailed a copy to the same address. *Id.* at 117.

As to President Mohamud, who had been re-elected as President of the FGS in May 2022, process server Carl Miller testified to his unsuccessful attempts to serve Mohamud with the Rule 15 deposition notice while Mohamud was in New York City for a United Nations General Assembly meeting. *Id.* at 163–68. Miller's efforts followed Schulman's earlier attempts to meet with Mohamud through a Somali liaison, Liban Nur. ECF No. 186-4. Nur had been hired by Schulman to find several witnesses in Somalia, including President Mohamud. *Id.* Although Mohamud initially said he would be willing to assist Schulman, Nur noted that he did "not expect" President Mohamud to voluntarily subject himself to this Court's jurisdiction after Mohamud was reelected as President. *Id.*

Next, one of Schulman's attorneys, Stanley Woodward, testified about defense counsel's efforts to contact several key witnesses. Woodward conducted virtual meetings with Ambassador Duale and Foreign Minister Adam in November 2021, a virtual meeting with Thabit

32

Abdi in December 2021, and an in-person meeting with Adam in February 2022.  Jan. 19

Hearing, Tr. at 101–23.  Duale told Woodward that, at 85, he has only a dim recollection of the

events that had transpired nearly a decade ago.  *Id.* at 111.  Foreign Minister Adam initially had

expressed a willingness to assist Schulman, *id.* at 103, but ultimately declined to testify, citing

her current service in the Somali Parliament, *id.* at 120.  Likewise, although Thabit Abdi initially

indicated that he would be willing to testify, Abdi has since disappeared and cannot be located

by the defense.  *Id.* at 122–23.  Schulman also called Koushik Bhattacharya, who testified about

his participation in meetings with Schulman and various Somali government officials, Jan. 18

Hearing, Tr. at 30–75; Former U.S. Ambassador to Somalia, Stephen Schwartz, who provided

expert testimony on the political and security environment in Somalia, *id.* at 177–234; and

Robert Baumgarten, the Custodian of Records for Shulman Rogers, who testified about the

authenticity of the Shulman Rogers billing records, *id.* at 22–29

A. Abdi also testified regarding Governor Amalow's continued unavailability.  On the

question of his father's current whereabouts, Abdi was patently evasive.  He claimed that he

talked *every day* with his sister, father, and mother, who all lived together in Toronto, yet he did

not know their home address.  Jan. 19 Hearing, Tr. at 21, 65.  When pressed, Abdi claimed to

have the address in his phone, but when the Court demanded he retrieve the address, Abdi spent

several moments appearing to fiddle with his phone and concluded that he could not locate the

address.  *Id.* at 66–67.  He next testified that he had texted his sister for the address and that she

responded by saying that she will text him back.  *Id.* at 71.  Given this dubious testimony, the

Court warned Abdi that he would not be released until he provided the address.  It was at this

point that the Government offered to "facilitate" the production of the address.  *Id.* at 71, 95–96.

33

After a brief recess, Abdi produced the address to defense counsel. *Id.* at 96–97. The address was for an apartment in the same building that Ruddom had visited. *Id.*

Abdi was also evasive as to his father's current health. Even though Abdi had plainly testified in April 2017 that his father's supposed poor health prevented his travel, Abdi would not answer whether his father's health would prevent him from testifying at this trial. All Abdi would say is that he could not "talk on behalf of my father." *Id.* at 46. He also admitted that his father was healthy enough to fly to Canada in 2020, three years after he was supposedly too sick to appear before the grand jury in Maryland. *Id.* at 81.

Agent Ciapas next testified about his interviews of Governor Amalow and A. Abdi in March 2017 and March 2019. *Id.* at 128–80. Agent Ciapas confirmed that Governor Amalow had expressed a willingness to testify before the grand jury and seemed healthy enough to travel. *Id.* at 137, 178–79. Agent Ciapas also noted that he "didn't see a difference" in Governor Amalow's health between the March 2017 interview and the follow-up interview with Abdi in March 2019. *Id.* at 144.

Agent Nock testified about his involvement in serving the evidence request in Somalia, including his communications with General Bashir and his successors at the FBI. *Id.* at 181–242. Because the Government did not produce the other officials involved in the Somali request (Agents Dodson and Kaiser), Schulman asked that the Court draw an adverse inference from their absence. ECF Nos. 213-1. Lastly, the parties stipulated at the hearing that Amalo's BlackBerry cannot be accessed because Amalo has forgotten the password, the company can no longer reset the password, and no other means exist to access the data on the BlackBerry. Jan. 18 Hearing, Def. Ex. 1.

After post hearing briefing, the motions are now ready for the Court's consideration.

34

### B. Analysis

Schulman contends that the passage of time between the last alleged criminal act and the Indictment has visited such prejudice on his case that proceeding to trial would risk the deprivation of his liberty without due process of law. ECF No. 156. The Fifth Amendment of the United States Constitution provides that "[n]o person shall…be deprived of life, liberty, or property, without due process of law." U.S. Const. amend. V. The Due Process Clause protects criminal defendants against "lengthy preindictment delay." *See United States v. Lovasco*, 431 U.S. 783, 788–89 (1977). The relevant statute of limitations provides "the primary guarantee against bringing overly stale criminal charges . . . specifying a limit beyond which there is an irrebuttable presumption that a defendant's right to a fair trial would be prejudiced." *United States v. Marion*, 404 U.S. 307, 322 (1971); *see also United States v. Sample*, 565 F. Supp. 1166, 1174 (E.D. Va. 1983) ("[T]he statute of limitations erects a legislatively determined safeguard" against the prejudice inherent in delaying prosecution.). That said, the Due Process Clause guards against excessive pre-indictment delay even within the time limit set by the statute of limitations, as such delay may still render a prosecution so fundamentally unfair that it cannot go forward. *Marion*, 404 U.S. at 324.

"[C]losely related" to the Fifth Amendment's protection against pre-indictment delay is the Sixth Amendment right "to have compulsory process for obtaining witnesses" in one's favor. *United States v. Beyle*, 782 F.3d 159, 170 (4th Cir. 2015) (quoting U.S. Const. amend. VI). The compulsory process clause of the Sixth Amendment is violated when a defendant is "arbitrarily deprived" of "relevant and material" witnesses that are "vital to the defense." *Id.* To obtain requested relief on such a violation, a defendant must demonstrate actual prejudice stemming from missing witnesses. *United States v. Valenzuela-Bernal*, 458 U.S. 858, 868 (1982). Because

35

the analyses under the Fifth and Sixth Amendments overlap, *see id.*; *Beyle*, 782 F.3d at 170, the Court will analyze the potential Fifth and Sixth Amendment violations together.

To ascertain whether the Government's delay in bringing the Indictment violates due process, the Court must perform a delicate and highly fact-specific inquiry as to whether the delay has prejudiced the accused's ability to mount an adequate defense. *Howell v. Barker*, 904 F.2d 889, 895 (4th Cir. 1990) (noting that there is "no black-letter test" and that the Court must conduct "a case-by-case inquiry based on the circumstances of each case"). The defendant establishes sufficient prejudice by showing that his ability to defend against the charges "was meaningfully impaired . . . to such an extent that the disposition of the criminal proceeding was likely affected." *Jones v. Angelone*, 94 F.3d 900, 907 (4th Cir. 1996). The defendant must show which witnesses are missing, their expected testimony, sufficient efforts to locate the witnesses, and that the evidence otherwise cannot be obtained from other sources. *Id.* at 908.

Next, if the defendant makes such a showing, the Court must balance that prejudice against the Government's justifications for the delay. *United States v. Automated Med. Lab'ys, Inc.*, 770 F.2d 399, 403–04 (4th Cir. 1985). The Court must examine the time "between the commission of an offense and the initiation of prosecution," essentially to determine whether permitting prosecution in the face of injurious delay would violate "fundamental conceptions of justice" or "the community's sense of fair play and decency." *Lovasco*, 431 U.S. at 784, 790; *see also Automated Med. Lab'ys*, 770 F.2d at 403–04.

In balancing the reasons for delay against the prejudice visited, the Court must keep in mind certain key principles. First, although bad faith or prosecutorial misconduct is certainly relevant, the defendant need not make such a showing to prevail. *Howell*, 904 F.2d at 895; *but*

*see United States v. Crouch*, 84 F.3d 1497, 1510 (5th Cir. 1996).[18]  Second and relatedly, a showing that the Government delayed indictment with a "reckless disregard of circumstances, known to the prosecution," of an "appreciable risk that delay would impair the ability to mount an effective defense," may support dismissal as a remedy.  *Howell*, 904 F.2d at 895 n.9 (quoting *Lovasco*, 431 U.S. at 795 n.17).

Third, the Court must be careful not to encroach on the wide berth given to prosecutors when investigating serious and complex crimes.  *See Lovasco*, 431 U.S. at 790–92.  The inquiry is not meant to second guess any individual prosecutorial decisions.  The Court is not, after all, a super-prosecutor.  Rather, it must assiduously weigh the evidence to ascertain whether continued prosecution would offend "the expectations of all citizens that prosecutors will serve, not threaten, the public."  *United States v. Alderman*, 423 F. Supp. 847, 857 (D. Md. 1976); *see also Marion*, 404 U.S. at 325.

With these principles guiding the analysis, the Court first turns to whether Schulman has established actual prejudice arising from the six-plus-year delay between the start of the investigation and the Indictment.

### 1.  Actual Prejudice

Schulman has identified twelve witnesses of varying importance who are now dead, infirm, or beyond the Court's compulsory process.  The Court considers their absence collectively.  *See United States v. Gross*, 165 F. Supp. 2d 372, 383 (E.D.N.Y. 2001) (noting that while one missing witness alone may not result in prejudice, "when considered in combination,"

---

[18] Several circuits have found that a showing of bad faith is necessary to establish a violation of a defendant's Sixth Amendment right to compulsory process.  *See, e.g., Buie v. Sullivan*, 923 F.2d 10, 11–12 (2d Cir. 1990) (citing *Arizona v. Youngblood*, 488 U.S. 51, 58 (1988)); *United States v. Damra*, 621 F.3d 474, 489 (6th Cir. 2010); *United States v. Leal-Del Carmen*, 697 F.3d 964, 969–70 (9th Cir. 2012).  The Fourth Circuit has not squarely addressed this question.  *See United States v. Kaixiang Zhu*, 854 F.3d 247, 255 (4th Cir. 2017).

the collective unavailability of the evidence can demonstrate prejudice); *cf. Kyles v. Whitley*, 514

U.S. 419, 421 (1995).

Schulman's defense centers on two of the twelve missing witnesses:  Governor Amalow

and President Mohamud.  Amalow is central to the 2009–10 offense conduct, and Mohamud is

central to the 2013–14 conduct.  The Court assesses the prejudice prong based on the

unavailability first of Governor Amalow and related corroborating witnesses, followed by

President Mohamud and those related witnesses.

It is undisputed that Governor Amalow is not available for trial, and Schulman has shown

how his unavailability undermines his defense.  Much of the Government's fraud theory as to

Schulman centers on the allegation that he knowingly puffed Amalow's authority to recover

Somali assets, including by procuring a fake English translation of Presidential Decree No. 214.

ECF No. 1 ¶¶ 30–32, Counts Two, Five through Eleven.  But as Schulman has shown, Amalow

told Agent Ciapas that he *did* have such authority in 2009 when he hired Schulman.  ECF No.

253 at 4.  Amalow would also corroborate that as the Central Bank Governor who secured the

assets in 1991, he was uniquely positioned to locate and liberate the same.  *Id.*  Governor

Amalow could also testify about his meetings with President Ahmed in furtherance of the asset

recovery project.  ECF No. 159-4.  Such testimony would rebut the allegation that Schulman

knowingly inflated Governor Amalow's authority in these allegedly forged documents.

Schulman has also demonstrated that were Amalow available, he would provide

important evidence to counter a likely Government witness, Governor Issa.  ECF Nos. 248 at 7;

283-2 at 6.  Governor Issa allegedly told Schulman that Amalow lacked authority to retrieve the

assets.  ECF Nos. 1 ¶ 37; 140-1 at 20.  But as Governor Amalow warned President Ahmed

then—and disclosed to Agent Ciapas later—Issa could not be "trusted" to have the welfare of the

Somali people at heart.  ECF No. 253 at 4; *see also* ECF No. 159-4.  Moreover, Governor

Amalow could help explain that Schulman continued the asset recovery project with President

Mohamud after Mohamud had informed Amalow his services were no longer needed.  ECF No.

253 at 3.  Governor Amalow, in short, would corroborate the legitimacy of Schulman's role as

the U.S.-based attorney assisting Somali government officials in repatriating government assets.

The Government responds that Amalow may testify adversely to Schulman's interests.

ECF No. 176 at 18–19.  That may be.  But Schulman does not need to show Amalow would be a

perfect witness for the defense; rather, Schulman must show Amalow's unavailability has

"meaningfully impaired" the defense, and he has done just that.  *Jones*, 94 F.3d at 907; *see also*

ECF Nos. 159-4; 253.[19]

Likewise, Schulman has demonstrated that he cannot obtain the evidence Amalow would

provide from any other source.  Other than the self-serving testimony of the Government's main

cooperator, Amalo, many if not all other individuals involved in those early days are either dead

or beyond the reach of this Court's compulsory process.  President Ahmed, who signed

Presidential Decree No. 214 appointing Governor Amalow, is currently a member of Somali

Parliament.  ECF No. 157 at 18.  And Dr. Warfa, Ambassador Bandler, and Ambassador Hussein

all have passed away.  *See id.*; ECF No. 159-5 (memo from Schulman to Warfa after their

September 2009 meeting); Jan. 18 Hearing, Def. Ex. 3C at SR_000322–24 (billing records

regarding Schulman's meetings with Hussein).[20]  The absence of Ambassador Bandler is

particularly detrimental to Schulman's defense.  Schulman had hired Bandler for his expertise as

---

[19] The Court also rejects the Government's speculation that Governor Amalow would invoke his Fifth Amendment privilege not to testify, especially given that the statute of limitations appears to have run on any conduct involving Governor Amalow.  ECF No. 176 at 19–20.

[20] Dr. Warfa died in March 2021, Ambassador Bandler died in February 2017, and Ambassador Hussein died in April 2020.  ECF No. 157 at 17–18.

a former diplomat.  Bandler had been involved in key meetings, as Schulman's putative consultant, to liberate assets in Italy on behalf of the Somali Government.  *See, e.g.*, ECF No. 159-26.

Ambassador Duale and Foreign Minister Omaar, who had previously attested to Governor Amalow's authority, are also unavailable.  *See* ECF Nos. 159-20 (Foreign Minister Omaar certifies Amalow's authority in letter to the French Foreign Minister); 159-23 (Ambassador Duale certifies Amalow's authority in notarized letter).  Both men were out of government by 2016, and they now do not remember much of the events from over a decade ago.  ECF No. 159-19; Jan. 19 Hearing, Tr. at 109–11; *see also Sample*, 565 F. Supp. at 1178 (finding that a witness' lost memory "concretely established actual and material prejudice").  The passage of time and their advancing age have dimmed memories to the point that they would be of little assistance at trial.

The Government, for its part, has done nothing to demonstrate otherwise.  ██████████ ██████████████████ no one else seemingly remains to recount Schulman's direct involvement in the early days of the asset recovery project.  *See* ECF Nos. 1; 244-4; 253 at 4.  The delay has also deprived Schulman any opportunity to access the BlackBerry Amalo had used during the asset recovery project.  Jan. 18 Hearing, Def. Ex. 1.

Next, Schulman has demonstrated sincere, good faith efforts to locate Amalow and the other witnesses.  *Jones*, 94 F.3d at 908.  Schulman hired two private investigation firms to find Amalow.  See Jan. 18 Hearing, Tr. at 77–89, 103–17.  The investigators faced resistance at every turn, including open hostility from individuals at the Toronto apartment complex where Governor Amalow was living.  *Id.*  Schulman also moved under Rule 15 to depose Amalow, President Ahmed, and Foreign Minister Omaar.  ECF Nos. 98 & 103.  Schulman's attorneys also

40

contacted Foreign Minister Omaar and Ambassador Duale, but both men attested to dim memories as to key events. ECF No. 159-19; Jan. 19 Hearing, Tr. at 109–11. Schulman, thus, has diligently attempted to secure Governor Amalow and any potential substitutes.

The Government, in response, posits that Schulman has other options at trial. It argues that Schulman could call Governor Amalow's son, A. Abdi, to testify instead of the Governor. ECF No. 194 at 109. This argument is unavailing. Abdi has proven himself wholly unreliable on the most critical of evidence: he has testified under oath that his father was, and was not, the "Director" of asset recovery. *See* Jan. 19 Hearing, Tr. at 91–95; ECF Nos. 207-9 at 39–40; 253 at 4; 253-1. And at the evidentiary hearing, Abdi refused to discuss his father's health or even give a straight answer as to Amalow's current whereabouts until commanded to do so. Jan. 19 Hearing, Tr. at 46, 71, 95–96. A. Abdi simply cannot cure the prejudice visited on Schulman by the Governor's absence.

The Government also argues that Schulman should have attempted to secure the testimony of Governor Amalow *before indictment*. ECF Nos. 176 at 20–21; 248 at 16. This argument is specious. Nowhere does the law impose an obligation on a mere target of a criminal investigation to mitigate any potential delay, especially when such delay is wholly the Government's doing. To conclude otherwise would turn justice on its head. It would require the defendant to foresee all possible prosecution theories he may one day face, then rebut those non-existent charges, all while the Government can rest easy knowing the specter of unreasonable pre-indictment delay is of no worry to it. *See United States v. Sabath*, 990 F. Supp. 1007, 1015 (N.D. Ill. 1998) (To impose such an obligation on the defendant "would subvert two fundamental constitutional protections—the presumption of innocence and the government's burden to prove guilt beyond a reasonable doubt.").

This outcome would visit a special unfairness considering that in 2017, Schulman already had laid bare for the prosecutors his involvement in the asset recovery project.  ECF No. 159-2. For the next 40 months, the Government could have, but chose not to, interview the witnesses that Schulman identified.  ECF No. 253 at 7; Jan. 19 Hearing, Tr. at 254.  Thus, the unavailability of these witnesses cannot merely be laid at Schulman's feet.

For these reasons, Schulman has demonstrated that the delay has prejudiced his ability to defend against the 2009–10 offense conduct.

As to the 2013 asset recovery efforts, Schulman has demonstrated that the unavailability of President Mohamud and others close to him also has prejudiced his defense.  It is undisputed that Schulman met with President Mohamud and other Somali officials throughout 2013.  *See* ECF Nos. 65-5; 65-6; 107-27; 159-15; Jan. 18 Hearing, Tr. at 35–53, Def. Ex. 66A at SR_000328.  These officials could establish that Schulman had been acting legitimately to repatriate assets at President Mohamud's direction.

First, President Mohamud would testify that he viewed the 25B Certification as conveying sole, but delegable, authority that he in turn conferred to FGS' counsel, Schulman. *See* ECF No. 1 ¶¶ 50–55; Counts Five, Seven through Eleven.  The Government steadfastly maintains that Schulman knew the 25B Certification to be extremely narrow in scope, granting authority to negotiate Somali assets *only* to President Mohamud and no one else.  ECF No. 176 at 26–27.  But contemporaneous documents—including letters that President Mohamud and Foreign Minister Adam sent to the Federal Reserve and State Department—reflect that President Mohamud believed he could delegate his authority to Schulman.  ECF Nos. 159-15; 186-3.

Thus, Mohamud would be a critical witness supporting Schulman's defense of good faith in using the 25B Certification to repatriate the Somali assets from the New York banks.[21]

As to the subsequent efforts to release assets, President Mohamud's testimony remains vital. Indeed, Mohamud could attest that Schulman told him immediately about the State Department's position, ECF No. 186-3; *see also* ECF No. 1 ¶ 56, and that Mohamud responded by reaffirming that in his view, Schulman retains authority to "represent and perform all pending works[,] but under the exclusive authority and direction of the President, H.E. Hassan Sheikh Mohamud," ECF No. 186-3. President Mohamud also signed a letter communicating this directly to the New York Federal Reserve. ECF No. 107-27. At a minimum, this testimony would shore up Schulman's defense that he worked for Mohamud, who retained sole authority to facilitate the release of Somali assets to the FGS.

Second, President Mohamud could rebut the contention that Schulman forged the "March 2013 POA" and the "2013 PM Letter," on which the banks supposedly relied to release Somali assets. ECF No. 1 ¶¶ 43–44, 53; Counts Three, Five, Seven through Eleven. President Mohamud first met with Schulman about the asset recovery project in January 2013, several months before Schulman sent the letters to financial institutions. *See* ECF Nos. 65-5; 65-6; Jan. 18 Hearing, Def. Ex. 66A at SR_000328. Thus, it is reasonably likely that President Mohamud would confirm he had conferred the authority to Schulman as reflected in the documents.

In response, the Government contends that President Mohamud is irrelevant to the March 2013 POA and 2013 PM Letter because neither was "authored" by President Mohamud. Jan. 19

---

[21] Although the Government contends that President Mohamud's expected testimony is purely speculative, ECF No. 176 at 24, record evidence amply demonstrates otherwise, *see* ECF No. 186-4 (affidavit of Liban Nur, in which he attests that President Mohamud confirmed Schulman's authority to assist the FGS with the asset recovery project); *see also* ECF Nos. 186-2; 186-3 (2013 documents in which Mohamud confirms Schulman's authority to repatriate the assets). Rather, it is the Government that engages in speculation when it posits that Mohamud would disavow those documents. ECF No. 176 at 24.

Hearing, Tr. at 261.  But this argument misses the point.  Schulman has demonstrated that Mohamud supported Schulman's efforts to recover the assets and ultimately delegated authority to him, which is consistent with these documents.  Even more crucially, were Ambassador Duale available, he would confirm, as he did in 2013, that the March 2013 POA and 2013 PM Letter are authentic.  *See* Jan. 18 Hearing, Def. Ex. 69.  When the Court considers the combined absence of both Mohamud and Duale, the prejudice is clear.

Third, President Mohamud's absence also undermines Schulman's defense as to the Haden payments.  ECF No. 1 ¶¶ 60–64, Counts Four and Seven through Eleven.  The Government contends that Schulman and Amalo conspired to create a fake Haden invoice that misrepresented the hours that Amalo spent working on the asset recovery project and omitted that Amalo was being paid for fraudulent activity.  *Id.* ¶¶ 60–64.  But here too, these allegations depend first on whether the payment was itself a product of fraud, and President Mohamud's testimony could support Schulman's defense against those fraud allegations.  *Id.*  Separately, Mohamud could confirm, as Schulman proffered and Hersiburane testified, that he directed Schulman to pay Amalo for the work he had performed.  ECF Nos. 159-2 at 13; 207-9 at 15.  Accordingly, Schulman has made the requisite showing that President Mohamud would provide helpful testimony such that his absence "meaningfully impaired" Schulman's ability to mount a defense.  *Jones*, 94 F.3d at 907.

Schulman has further demonstrated that President Mohamud's testimony is not available from other sources.  *Id.* at 908.  Setting aside that President Mohamud—as the *President* of Somalia—is uniquely poised to give the most helpful testimony to Schulman, others involved are also unavailable as a result of the delay.  As noted above, Ambassador Duale, who had contemporaneously confirmed Schulman's authority as set out in the 2013 PM Letter and March

44

2013 POA, remembers little due to his age and infirmity.  Jan. 18 Hearing, Def. Ex. 69; Jan. 19

Hearing, Tr. at 109–11.  Similarly, Mohamud's then right-hand-man Thabit Abdi, who

communicated directly with Schulman on President Mohamud's behalf, *see* ECF No. 186-3; Jan.

18 Hearing, Tr. at 39, cannot be located by the defense despite multiple efforts, *see* Jan. 19

Hearing, Tr. at 122–23.  Foreign Minister Adam, who personally met with President Mohamud

and Schulman and confirmed to the State Department Schulman's authority, *see* ECF Nos. 159-

14 & 159-15; Jan. 18 Hearing, Tr. at 41, has declined to testify, citing her status as a member of

Somali Parliament, *id.* at 119–20.  And Governor Omer, who personally executed the 2013 fee

agreement with Schulman, now lives overseas as the Somali envoy to the East African

community.  ECF No. 259 at 10.  In short, no one subject to compulsory process or otherwise

competent to testify to those critical events can take President Mohamud's place.

On this point, the Government touts that it has interviewed former █████████████

███████████ who can fill in the breach.  ECF No. 248 at 6–7.  But neither Abrar nor Issa were

in the Somali government for most of 2013 when Schulman was working with President

Mohamud on the asset recovery project.  Governor Abrar assumed her position in September

2013 and resigned less than two months later; and Governor Issa did not reassume his former

role until 2014.  ECF No. 1 ¶¶ 10, 12.  Similarly, advisor Hersiburane's limited involvement

does not suffice.  *See* ECF No. 207-7 at 7.

Bhattacharya, █████████████████████████ can certainly set the stage

for Schulman's relationship with President Mohamud, as he did at the evidentiary hearing.  But

Bhattacharya was a new associate at the time, and he was not in the room for all discussions

between Schulman, Mohamud, and the presidential advisors.  *See* Jan. 18 Hearing, Tr. at 53.  In

the end, Schulman has demonstrated that no other witnesses could supplant the missing

testimony of President Mohamud.

Schulman has also made sufficient efforts to locate President Mohamud and several of

the supplemental missing witnesses to no avail. *Jones*, 94 F.3d at 908. In 2021, Schulman

communicated with President Mohamud through Liban Nur, who learned that President

Mohamud would be willing to assist Schulman after the presidential election. ECF No. 186-4;

*see also* ECF No. 85 at 8 (defense counsel proffering in July 2021 that Mohamud would not be

available until after the election). However, after Mohamud was elected President, he expressed

his unwillingness to testify. ECF No. 186-4. Despite this, Schulman tried to serve President

Mohamud with a subpoena while he was in New York, without success. Jan. 18 Hearing, Tr. at

163–68. Schulman made similar unavailing efforts to convince the other potential substitute

witnesses to testify, through virtual meetings with Foreign Minister Adam, Thabit Abdi, and

Ambassador Duale. Jan. 19 Hearing, Tr. at 99–126.

The Government responds that any such prejudice does not favor dismissal because these

witnesses were always beyond the compulsory power of the Court. ECF No. 176 at 24–28. The

record is more complicated than the Government's argument suggests. For roughly three years,

President Mohamud had been a private citizen, not currently in or running for office, and thus

was reasonably more available to testify by Rule 15 deposition had Schulman been indicted

sooner. But once re-elected as Somalia's President, Mohamud could once again claim head-of-

state immunity. *See Yousuf v. Samantar*, 699 F.3d 763, 769, 774 (4th Cir. 2012) (explaining

head-of-state immunity). Nor can the Government deny that despite its investigative presence in

Mogadishu between 2018 and 2020, it appears to have made no effort to contact President

Mohamud. ECF No. 248 at 10; Jan. 19 Hearing, Tr. at 254; *cf. United States v. Minkkinen*, No.

46

22-163, 2023 WL 4191261, at *9 (S.D.W. Va. June 26, 2023) (Defendant cannot be blamed for loss of evidence during six-year investigation where the Government "apparently did not think to seek out documents that would help establish" the offense conduct). Thus, Mohamud was *more* available to the Government whose delay in indictment rendered him *less* available to Schulman.

Others, too, became less available to Schulman during the delay. For the first three years of the Government investigation, Ambassador Duale lived in the United States. ECF No. 259 at 11. Not so by the time Schulman was indicted. This, combined with Duale's infirmity and lack of memory, reflect the prejudice that the Government delay has visited on Schulman. *See Sample*, 565 F. Supp. at 1178. Similarly, Governor Omer resided in the United States at times during the investigation, and thus would have been far easier to reach than he is now. ECF No. 259 at 10. Accordingly, Schulman has demonstrated clear prejudice resulting from the delay in indictment as to the 2013–14 offense conduct.

The Court must now weigh this prejudice against the Government's justifications for the delay.

### 2. Balancing the Justifications for Delay Against the Prejudice to Schulman

The Court next considers whether the prejudice to Schulman resulting from the delay eclipses the Government's justifications such that allowing trial would violate "the community's sense of fair play and decency." *Lovasco*, 431 U.S. at 790. Understandably, where the defendant has established a substantial degree of prejudice, the Government must meet a commensurate burden to justify its delay. *See Automated Medical Lab'ys.*, 770 F.2d at 403–404. But equally true is that a certain degree of delay in complex prosecutions such as this must be expected. *See Lovasco*, 431 U.S. at 795. The Government's investigatory choices should not be subjected to judicial flyspecking and second guessing, as "a judge's duty to safeguard a

defendant's due process rights must be tailored to avoid inappropriate intrusion in the areas properly assigned to prosecutorial discretion." *Alderman*, 423 F. Supp. at 855.

Moreover, "prosecutors do not deviate from 'fundamental conceptions of justice' when they defer seeking indictments until they have probable cause to believe an accused is guilty." *Lovasco*, 431 U.S. at 790–91. "Rather than deviating from elementary standards of 'fair play and decency,' a prosecutor abides by them if he refuses to seek indictments until he is completely satisfied that he should prosecute and will be able promptly to establish guilt beyond a reasonable doubt." *Id.* at 795. Accordingly, when pre-indictment delay stems from legitimate "investigative delay," a defendant's due process rights are not violated, "even if his defense might have been somewhat prejudiced by the lapse of time." *Id.* at 796.

The Government's principal reason for waiting over six years to indict is, unsurprisingly, the need to amass sufficient evidence to justify prosecution such that it could "establish guilt beyond a reasonable doubt." ECF No. 176 at 14 (quoting *Lovasco*, 431 U.S. at 795–96). The Government rightly underscores that its lengthy investigation encompassed issuing over 150 grand jury subpoenas, executing 8 search warrants, reviewing over 1.5 million documents, and conducting 60 voluntary witness interviews, ████████████ and five foreign evidence requests. ECF Nos. 283 ¶ 51; 283-4; 283-5. The nature of this prosecution also resulted in a certain amount of baked-in delay. Because the heart of the investigation involved an attorney, his clients, and more than one law firm, sensitive questions of attorney-client privileged material necessarily delayed review and production of critical evidence. *Id.* ¶¶ 13–14. The investigation also required obtaining evidence from people and institutions located in five countries over three continents. *Id.* In short, the Government's investigation was a massive undertaking which necessarily took time.

Second and relatedly, the manner in which the investigation unfolded does not reflect a lack of diligence for any measurable period of time. For the first two and a half years, the Government reasonably focused on obtaining evidence by covert methods to avoid alerting the targets of the investigation and risking the destruction of evidence. *Id.* ¶ 11. Despite this caution, the Government was able to conduct eight witness interviews, including with members of the UNMG, a State Department official, and Governor Abrar. ECF No. 283-2 at 2–3. The Government also executed six electronic search warrants and issued nearly 100 grand jury subpoenas. ECF No. 283 ¶¶ 9–16.

The Government focused these warrants and subpoenas ███████████████████ ████████████████████████████████████████████ *See id.* This strategy is well within the heartland of reasonable prosecutorial aims. *See United States v. McKoy*, 129 F. App'x 815, 819 (4th Cir. 2005) (noting that the government's delay was legitimate when it prosecuted "others against whom the government had developed strong cases, and then [] us[ed] their evidence to complete the development of a solid case against" the defendant). And given the nature and complexity of this case, this investigative priority was bound to take substantial time. That said, the Government simultaneously pursued relevant documents about Schulman's finances and communications that would either confirm or dispel his involvement in the alleged asset recovery scheme. ECF No. 283 ¶¶ 9–16.

After Amalo was indicted, the Government understandably turned up the burners regarding its investigation of Schulman. From Shulman Rogers alone, the Government sought and received thousands of relevant records through early 2020. *Id.* ¶¶ 22–23, 51. The Government obtained additional information about Schulman's communications with various financial and government officials, including his reliance on allegedly forged documents,

49

through subpoenas and voluntary interviews that took place through 2019. *Id.* ¶¶ 24–40. The Government also issued formal requests for evidence to five foreign countries and obtained documents from four of them, with the last of the evidence from Switzerland arriving in early 2020. *Id.* ¶¶ 33, 48; ECF No. 283-5.



ECF No. 244-4. The Government then interviewed several key Somali witnesses between 2017 and 2019, including Amalo, A.

*See, e.g.*, ECF Nos. 72-1; 207-9; 283-2. The Government also obtained immunity for                                              ECF No. 283 ¶ 44.

Given the sheer magnitude and complexity of the transcontinental investigation, the Court cannot conclude that the Government delay somehow lacked sufficient justification. In this delicate balance, applying proper deference to prosecutorial aims and decisions, the Government's grounds for delay are sufficient to save the Indictment.

Schulman, in response, emphasizes the Government's deliberate avoidance of those witnesses who would aid Schulman's defense, chief among them Governor Amalow. ECF No. 244-1 at 9–10. The Court agrees that the Government's approach to Amalow is disturbing. Amalow promised to honor the grand jury subpoena served on him in March of 2017, yet a month later, he did not comply with the subpoena and the Government essentially released him on the thinnest of excuses. ECF No. 253 at 7; Jan. 19 Hearing, Tr. at 26, 47. The Government next did nothing to assist Schulman in securing Amalow's testimony, even though the Government specifically knew that Amalow was elderly and in declining health such that further delay in securing his testimony would jeopardize his availability.

Likewise, Schulman rightly questions the Government's lackadaisical approach to the Somali foreign document request. *See* Jan. 19 Hearing, Gov't Ex. 13 & 16. Indeed, Agent Nock confessed that he had "little expectation that [the Somali Police Force] would complete the request." Jan. 19 Hearing, Gov't Ex. 13. And yet, the Government did little more than send an occasional email for updates. Nor did there appear to be any real attention paid by Agents Dodson and Kaiser to the request after Nock left Somalia.[22]

These investigative lapses cannot easily be overlooked. The Government appeared all too willing to avoid those witnesses that would likely aid Schulman's defense. And because the loss of key witness testimony is as plain as the Government's careful avoidance of the same, the Court may ultimately need to relax certain rules of evidence at trial to right the scales. *See, e.g.*, Fed. R. Evid. 807.

That said, while the Government's actions may be disturbing, the Court cannot find that the Government delayed to "gain tactical advantage" or with "reckless disregard" as to the consequences for Schulman's defense. *Lovasco*, 431 U.S. at 795. This is so because the Government was not merely sitting on its hands. It was, instead, earnestly and consistently investigating this highly complex transcontinental case through early 2020, and any further delay can reasonably be attributed to the court closures associated with the COVID-19 pandemic. *See* ECF No. 283. At bottom, this investigation did not suffer from "large gaps of time with no case activity whatsoever." *Gross*, 165 F. Supp. 2d at 384; *cf. Sample*, 565 F. Supp. at 1183–84 (two-and-a-half-year period with no investigation at all); *Sabath*, 990 F. Supp. at 1016 (four-year period with virtually no investigative activity). And "the Due Process Clause does not permit

---

[22] As to Schulman's motion for an adverse inference at ECF No. 211, the Court has already inferred that Agents Dodson and Kaiser were less than diligent in pursuing the evidence request. Schulman has not requested that the Court draw any further adverse inference beyond that which is made plain by the record. Thus, the motion is denied.

51

courts to abort criminal prosecutions simply because they disagree" with prosecutorial strategy. *Lovasco*, 431 U.S. at 790. Thus, carefully balancing the prejudice to Schulman resulting from the delay against the reasons behind the lengthy Government investigation, the Court must deny Schulman's motion to dismiss the Indictment.

The Court next turns to Schulman's remaining motions.[23]

## II. Motion to Vacate the Tolling Order

Schulman moves to vacate the May 8, 2018 tolling order issued pursuant to 18 U.S.C. § 3292, which tolled the statute of limitations for the pendency of the Government's evidence request to Somalia. ECF No. 133. Pursuant to Section 3292, a district court may, upon application of the Government, toll the statute of limitations for an offense if the reviewing court "finds by a preponderance of the evidence that an official request has been made for such evidence and that it reasonably appears, or reasonably appeared at the time the request was made, that such evidence is, or was, in such foreign country." 18 U.S.C. § 3292(a)(1). If approved, the order tolls limitations until the foreign authority takes "final action" on the request, or for up to three years—whichever is sooner. 18 U.S.C. § 3292(b)–(c).[24] An "official request" includes "a letter rogatory, a request under a treaty or convention, or any other request for evidence made by a court of the United States or an authority of the United States having criminal law enforcement responsibility, to a court or other authority of a foreign country." 18 U.S.C. § 3292(d).

Schulman first contends that the letter Agent Nock passed to General Bashir from DOJ was too "informal" to constitute an "official request." ECF No. 134 at 12. Although § 3292(d)

---

[23] The relevant facts previously discussed are incorporated into the analysis and will not be repeated.

[24] Under 18 U.S.C. § 3292(c)(2), when the foreign authority takes "final action" on the evidence request within the natural limitations period, the tolling period lasts for six months beyond the natural end of limitations.

defines "official request" to include letters rogatory and formal requests made pursuant to a treaty or convention, it also includes "any other request for evidence made by…an authority of the United States having criminal law enforcement responsibility." 18 U.S.C. § 3292(d). The request—from the Department of Justice to the Chief of the Somali Police—is sufficiently official to pass muster.[25]

Schulman alternatively argues that the Somali Police Force is not an "authority of a foreign country." ECF No. 134 at 15. Schulman points out that of the Mutual Legal Assistance Treaties ("MLATs") that the United States has with foreign governments, none of these MLATs designate the chief of police as the "central authority." *Id.* But simply because MLATs refer to other government officials in other situations does not undermine that, under the plain text of the statute, the Somali Chief of Police is an "authority" of the Somali government. Section 3292 imposes no other restrictions on whom the Government's official request may be directed. *Cf. United States v. Wardrick*, 141 F.3d 1161, 1998 WL 169223, at *8 (4th Cir. Apr. 13, 1998) (finding a request for evidence made by telephone "sufficient to constitute an official request"); *United States v. Hagege*, 437 F.3d 943, 955 (9th Cir. 2006) ("[T]he statute does not regulate the mechanics of how the government goes about obtaining foreign evidence.").[26]

Schulman next contends that the Court should vacate the order because the affidavit submitted in support essentially misled the Court. ECF No. 134 at 19. Schulman highlights that the agent's declaration which chronicled the course of the investigation represented that the "Government has not yet received all of the requested evidence from Somalia," when in fact, the

---

[25] Schulman nonetheless points to the DOJ Justice Manual, which defines a police-to-police request as an "informal means" of requesting evidence. ECF No. 133 at 12–13. But the Justice Manual does not bind the Government to confine itself when seeking official assistance pursuant to Section 3292. *See* Dep't of Just. U.S. Atty's Manual § 1-1.200. Because the request here suffices under the relevant statute, the DOJ Justice Manual does little for Schulman.

[26] The Court also rejects Schulman's baseless argument that the Due Process Clause somehow imposes extra-textual limitations on the plain text of the statute. ECF No. 134 at 17.

Government had not received any requested information.  ECF No. 136-4 at 25.  But the declaration also makes clear that the Government had just submitted the official request to Somalia a mere eight days before applying for the tolling order.  *Id.*  A reasonable reading of the declaration, therefore, would be that at the time of the submission, the Government had not received the requested documents; hence the application to toll limitations.

Finally, Schulman seeks vacatur of the order because the agent who submitted the declaration had no personal knowledge of how the request was transmitted in Somalia.  ECF No. 134 at 21.  But Schulman has not, and cannot, make any showing that personal knowledge is *required* as part of the tolling order application.  Rather, so long as the sworn application provides the "necessary factual information" to include "hearsay evidence," the Court may approve the tolling of limitations.  *See United States v. Trainor*, 376 F.3d 1325, 1331–33 (11th Cir. 2004).

In sum, Schulman gives the Court no reason to disturb the considered decision of Judge Grimm.  Given the fractured nature of the Somali government and the limited lines of communication available, DOJ determined that the evidence request would have the best chance of bearing fruit if it were passed through General Bashir and the Somali Police Force with whom the FBI had a relationship.  Jan. 19 Hearing, Gov't Ex. 16.  This may have been an unconventional route for requesting evidence, but this is decidedly an unconventional case.  Thus, even though the Government may have been less than diligent in following up on that request, the statute does not require any specific diligence before the Government can enjoy the benefit of extended limitations periods.  *See Hagege*, 437 F.3d at 955 ("[T]here is no requirement in § 3292 that the government diligently seek evidence located in a foreign country since the

statute has a built-in time limitation on the suspension period."). The motion to vacate the tolling order is denied.

### III. Motion to Dismiss Under Act of State Doctrine

Schulman separately moves to dismiss the Indictment pursuant to the "act of state doctrine." ECF No. 148. Prudential in nature, the act of state doctrine recognizes that courts should refrain from adjudicating cases which require the invalidation of "[an] official act of a foreign sovereign performed within its own territory." *W.S. Kirkpatrick & Co., Inc. v. Enviro. Tectonics Corp., Int'l*, 493 U.S. 400, 405 (1990); *see also Virtual Def. and Dev. Int'l, Inc. v. Republic of Moldova*, 133 F. Supp. 2d 1, 7 (D.D.C. 1999). The doctrine is designed to avoid judicial encroachment into the executive branch's purview over foreign affairs. *United States v. Evans*, 667 F. Supp. 974, 987 (S.D.N.Y. 1987). Such concerns are diminished greatly, however, when the executive branch chooses to prosecute, thereby "set[ing] in motion the very process which defendants assert will affect adversely the Executive's special role in foreign policy." *Id.*; *see also United States v. Noriega*, 746 F. Supp. 1506, 1523 (S.D. Fla. 1990) ("[T]he Executive's position is amply demonstrated by its decision to indict and prosecute the defendant."). Thus, the doctrine remains narrow in scope, applying only where "a court *must decide*—that is, when the outcome of the case turns upon—the effect of official action by a foreign sovereign." *W.S. Kirkpatrick*, 493 U.S. at 406.

Schulman argues that the doctrine compels dismissal of the Indictment to avoid adjudication over "whether public acts by Somali officials were sufficient—under Somali law— to permit Mr. Schulman's actions." ECF No. 149 at 9. The Court disagrees. The Government's theory of guilt is far more straightforward than Schulman suggests. The Indictment alleges that Schulman used forged documents and otherwise intentionally misled banks as to his authority to

negotiate the release of Somali assets. Although certainly this alleged fraud involves a foreign county, Schulman has made no showing that the jury will have to interpret foreign law, or even inquire as to whether any particular action is legal or valid under Somali law. *See United States v. Giffen*, 326 F. Supp. 2d 497, 501–02 (S.D.N.Y. 2004) (citing *W.S. Kirkpatrick*, 493 U.S. at 406–07). Rather, the key issue is whether Schulman believed that he had authority to retrieve the assets, not whether he actually possessed such authority under Somali law. The act of state doctrine, therefore, has no application to this prosecution. Schulman's motion is denied.

## IV. Motion to Dismiss Under Political Question Doctrine

Schulman's motion to dismiss pursuant to the political question doctrine fails for similar reasons. ECF No. 152. Resting on analogous separation of powers concerns, the political question doctrine "deprives courts of jurisdiction over 'controversies which revolve around policy choices and value determinations constitutionally committed'" to the legislative or executive branches. *Al Shimari v. CACI Premier Tech., Inc.*, 840 F.3d 147, 154 (4th Cir. 2016) (quoting *Japan Whaling Ass'n v. Am. Cetacean Soc'y*, 478 U.S. 221, 230 (1986)). This "narrow exception" to the judicial branch's constitutional power to adjudicate a case applies "where there is a textually demonstrable constitutional commitment of the issue to a coordinate political department; or a lack of judicially discoverable and manageable standards for resolving it." *Zivotofsky v. Clinton*, 566 U.S. 189, 195 (2012) (quoting *Nixon v. United States*, 506 U.S. 224, 228 (1993)) (internal quotations omitted). In the civil context, dismissal of the case, so as to avoid judicial encroachment on a separate branch of government, is warranted only if the political question "is inextricable from the case." *Baker v. Carr*, 369 U.S. 186, 217 (1962).

Notably, Schulman identifies no criminal indictment that has ever been dismissed on this ground, and he has given this Court no reason why this should be the first. He principally argues

that the fraud claims turn on whether the State Department could restrict President Mohamud's ability to delegate his 25B Certification authority to Schulman. Whether 25B authority is delegable, says Schulman, remains a political question that is textually committed to the executive branch by Section 632 of the Federal Reserve Act. ECF No. 153 at 12–16. Setting aside whether this issue is a true "political question," Schulman misapprehends the gravamen of the fraud. The Indictment alleges that Schulman misrepresented to financial institutions that he had authority under the 25B Certification to retrieve Somali funds even though State Department officials expressly told Schulman otherwise. ECF No. 1 ¶¶ 54–57. Thus, the question for the jury will be whether Schulman misled the banks when he represented that he had authority beyond that which State Department officials communicated; not whether the officials were correct as a matter of law. Of course, Schulman may assert that he *thought* the 25B Certification did not bar President Mohamud from delegating his authority, and so Schulman did not have the requisite intent to defraud. To the extent the statute itself, or practices surrounding its implementation, are relevant to that defense, the Court will address that issue accordingly at trial. But the Court need not intrude upon the coordinate branches of Government to field those relatively straightforward issues.[27] The motion to dismiss is denied.

## V.    Omnibus Motion to Dismiss

Finally, Schulman lobs a series of miscellaneous challenges at the Indictment in an "Omnibus Motion to Dismiss." ECF No. 160. The Court will consider each of these challenges in turn.

---

[27] Schulman's request that the Court dismiss the Indictment under its supervisory authority rests on similar separation of powers concerns that are likewise not implicated by this case, and so the Court rejects Schulman's request. ECF No. 153 at 16–19.

### A. Dismissal of Count Five for Failure to State a Claim

Schulman first moves to dismiss Count Five of the Indictment for failure to state a claim. Dismissal of an indictment for failure to state a claim arises only where the defendant demonstrates "that the allegations therein, even if true, would not state an offense." *United States v. Thomas*, 367 F.3d 194, 197 (4th Cir. 2004). Moreover, an "indictment that tracks the statutory language is ordinarily valid." *United States v. Fogel*, 901 F.2d 23, 25 (4th Cir. 1990). The Court "may not 'review the sufficiency of the evidence supporting' the indictment because a valid 'indictment returned by a legally constituted and unbiased grand jury' is 'enough to call for trial of the charges on the merits.'" *United States v. Burks*, 746 F. App'x 191, 198 (4th Cir. 2018) (quoting *United States v. Wills*, 346 F.3d 476, 488–89 (4th Cir. 2003)).

As to Count Five, charging bank fraud, Schulman argues that the alleged victim, Bank A-1, could not be victimized because the 25B Certification shielded Bank A-1 from liability. ECF No. 160-1 at 14–17. But this argument rests on a misstatement of law. As the Supreme Court recently held, the plain text of 18 U.S.C. § 1344(1) "demands neither a showing of ultimate financial loss nor a showing of intent to cause financial loss." *Shaw v. United States*, 580 U.S. 63, 67 (2016); *see also United States v. Weigand*, 482 F. Supp. 3d 224, 236 (S.D.N.Y. 2020) (concluding that *Shaw* abrogated previous precedent that required victimization of a bank to establish bank fraud). So, for example, where "cash is taken from a bank but the bank is fully insured, the theft is complete when the cash is taken; the fact that the bank has a contract with an insurance company enabling it to shift the loss to that company is immaterial." *Shaw*, 580 U.S. at 68 (quoting *United States v. Kucik*, 844 F.2d 493, 495 (7th Cir. 1988)) (internal brackets and quotations omitted). Nor does Section 1344(2), which the Government pleads in the conjunctive, require a loss or intent to cause loss. *See Loughrin v. United States*, 573 U.S. 351, 356–57, 363–

66 (2014). In the end, even if Bank A-1 can secure protection from fraud loss pursuant to the 25B Certification, that does not mandate dismissal of the Count. Rather, because the Government has sufficiently alleged "a plan to deprive a bank of money in a customer's deposit account," the Indictment has stated a claim for bank fraud. *Shaw*, 580 U.S. at 72; *see also Weigand*, 482 F. Supp. 3d at 234 n.4 ("A scheme to obtain an accountholder's funds is enough, because the bank holds a property interest in those funds, akin to a bailee.").

In the alternative, Schulman argues that the Indictment fails to allege that Schulman made any materially false representations to Bank A-1. In support of this argument, Schulman presses that Bank A-1 did not release assets until Schulman provided the 25B Certification, and so the other purportedly forged documents alleged in the Indictment were not material. ECF No. 160-1 at 17–19. To be sure, Bank A-1 released most of its Somali funds before October 9, 2013, when the State Department clarified to Schulman that he lacked delegated authority under the 25B Certification. ECF No. 1 ¶¶ 53–56. Thus, arguably, any subsequent misrepresentations that Schulman made about his authority under the 25B Certification were immaterial to this first release of funds. But Bank A-1 released an additional tranche of funds in June 2014, well after the State Department warned Schulman about his lack of authority. *Id.* ¶ 66. Moreover, the Indictment plainly alleges that Bank A-1 "[r]el[ied] on the 2013 Forged PM Letter, the 2013 Forged POA, and the 25B Certification." ECF No. 1 ¶ 53. Viewing these allegations to be true, as the Court must at this stage, the Court finds that the Government has alleged the requisite elements of bank fraud under Section 1344. Count Five will not be dismissed.

### B. Dismissal of All Other Counts as Untimely

Schulman next argues that most, but not all, counts of the Indictment must be dismissed as time barred. ECF No. 160-1 at 19–35. Schulman appears to concede that Count Five,

charging him with bank fraud under 18 U.S.C. § 1344, is subject to a ten-year statute of limitations pursuant to 18 U.S.C. § 3293, and has been timely filed. *Id.* As to the remaining counts, Schulman principally argues that the requested vacatur of Judge Grimm's tolling order would render the counts untimely. Last, Schulman argues that Count Six is untimely because even if the tolling order is not vacated, the applicable limitations period is five, not ten, years.

The defendant bears the burden of raising the statute of limitations defense; but once the defense is raised, the burden shifts to the Government to show that the Indictment was timely. *Musacchio v. United States*, 577 U.S. 237, 248 (2016). The limitations clock begins to run "when the crime is complete." *United States v. Perry*, 757 F.3d 166, 173 (4th Cir. 2014) (quoting *Toussie v. United States*, 397 U.S. 112, 115 (1970)). The parties agree that the alleged offenses, as charged, had been completed by July 2014, or more than six years before the December 2020 Indictment. *See* ECF Nos. 1; 160-1 at 19–35; 174 at 32.

As to the applicable limitations for each contested count, the analysis is complex. Because Count One charges conspiracy to commit three kinds of fraud—mail, wire, and bank— the limitations period is as follows: conspiracy to commit mail and wire fraud is subject to a five-year statute of limitations unless the conspiracy "affects a financial institution," in which case a ten-year statute of limitations applies. 18 U.S.C. § 3293. Conspiracy to commit bank fraud is subject to a ten-year statute of limitations. *Id*. The substantive wire fraud (Counts Two through Four) and mail fraud (Count Six) counts are subject to a ten-year limitations period if the fraud affects a financial institution; otherwise, they are subject to a five-year limitations period. *Id.* The money laundering counts (Seven through Eleven) are subject to a five-year statute of limitations. *See id.*; 18 U.S.C. § 3282(a) (applying five-year statute of limitations to non-capital offenses).

Schulman contends that Counts One through Four and Seven through Eleven are barred if the Court vacates the tolling order arising from the Somali document request. The Court has already rejected Schulman's motion to vacate that tolling order, which tolled limitations between May 8, 2018, and the December 2, 2020 Indictment. *See infra*, Section II. Moreover, the overlapping tolling order related to the Italy evidence request—which Schulman does not contest—tolled limitations between December 4, 2017, and July 26, 2018. *See* ECF Nos. 136-2 & 136-3. Thus, all alleged offenses which were completed less than five years before December 4, 2017—that is, Counts One through Four and Seven through Eleven—are timely. ECF No. 1. Schulman's limitations defense as to those counts fails.

Count Six requires a slightly different analysis. The offense conduct alleged for Count Six was completed in March 2010. ECF No. 1, Count Six. Thus, Count Six is timely only if, in addition to the tolling orders, the ten-year limitations period under 18 U.S.C. § 3293 applies because the fraud "affected" a financial institution. Schulman argues that the ten-year limitations period does not apply because Bank A-1 was not "affected" by the fraud scheme. Bank A-1, says Schulman, had been "insulated from any potential loss" by operation of the 25B Certification. ECF No. 160-1 at 21–22.

Schulman's narrow reading of what it means for fraud to "affect" a financial institution pursuant to Section 3293 is not supportable. The Indictment alleges that Bank A-1 transferred funds in its custody and control to Schulman based on his allegedly false representations. ECF No. 1 ¶ 53, Count Six. At the moment of transfer, the bank was "affected" insofar as it lost the benefits and financial gain associated with rightful retention of customer funds. *Cf. Shaw*, 580 U.S. at 66. This is so because the Bank retains property rights in the customer's account and "consequently has the right to use the funds as a source of loans that help the bank earn profits."

61

*Id.* (describing the bank fraud statute); *see also id.* at 67–68 (In the "analogous mail fraud" context, it is "'sufficient' that the victim (here, the bank) be 'deprived of its right' to use of the property, even if it ultimately did not suffer unreimbursed loss." (quoting *Carpenter v. United States*, 484 U.S. 19, 26–27 (1987))). Thus, because Count Six alleges that Schulman deprived Bank A-1 of its property rights in the Somali funds, it sufficiently alleges that he "defrauded" Bank A-1 such that the ten-year statute of limitations applies.[28] Further, because the tolling orders extended limitations by nearly three additional years, Count Six is timely filed.

### C. Dismissal of Counts Two Through Four as Duplicitous

In his final argument, Schulman contends that Counts Two, Three, and Four must be dismissed as duplicitously charged. ECF No. 160-1 at 35–39. An indictment is duplicitous if "it charges two offenses in one count, creating the risk that a jury divided on two different offenses could nonetheless convict for the improperly fused double count." *United States v. Robinson*, 855 F.3d 265, 269 (4th Cir. 2017) (internal quotations and citations omitted). Counts Two, Three, and Four each charge Schulman with wire fraud pursuant to 18 U.S.C. § 1343. The elements of wire fraud are (1) a scheme to defraud; and (2) the use of a wire communication in furtherance of that scheme. 18 U.S.C. § 1343; *United States v. Jefferson*, 674 F.3d 332, 366 (4th Cir. 2012). Counts Two, Three, and Four each relate to a single scheme to defraud—the conspiracy laid out in Count One of the Indictment—and each involve a separate wire communication. Schulman nonetheless contends that the wire fraud counts each involve multiple schemes because Schulman sent each wire communication to multiple financial

---

[28] It would be a peculiar outcome if the same alleged conduct supporting mail fraud does not also "affect a financial institution" involving the same bank and the same transactions for the purposes of Section 3293. Schulman points to no authority requiring this Court to read the phrase "affects a financial institution" more narrowly than "defrauds" under the substantive mail fraud provision. *Cf. United States v. Heinz*, 790 F.3d 365, 367 (2d Cir. 2015) (noting that the term "affect" in Section 3293 "expresses a broad and open-ended range of influences," and illustrates that "Congress chose to extend the statute of limitations to a broader class of crimes than those in which the financial institution is the object of fraud") (internal quotations and citations omitted).

institutions.  But Section 1343 does not require that a wire fraud count involve only one institution.  *See United States v. Smith*, 555 F. Supp. 3d 563, 587 (N.D. Ill. 2021) ("The wire fraud counts are not duplicitous for including multiple financial institutions in a single scheme.").  Schulman gives this Court no grounds to dismiss the counts simply because the Government charged that he defrauded more than one bank.  Accordingly, the motion to dismiss is denied in its entirety.

### VI.    Conclusion

For the foregoing reasons, the Court DENIES Schulman's motions to dismiss the Indictment and vacate the tolling order.  A separate Order follows.


9/28/2023                                                         /S/
Date                                                         Paula Xinis
                                                         United States District Judge