## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| **UNITED STATES OF AMERICA,** | ) |
| | ) |
| **v.** | ) |
| | ) |
| | ) **Crim. No. PX-20-0434** |
| **JEREMY WYETH SCHULMAN** | ) |
| | ) |
| **Defendant.** | ) |

---

**THE UNITED STATES' OMNIBUS RESPONSE IN OPPOSITION TO DEFENDANT
JEREMY SCHULMAN'S (1) MOTION TO EXCLUDE EVIDENCE, (2) MOTION
TO VACATE CRIME FRAUD ORDER, (3) MOTION TO COMPEL
WITHHELD WITNESS STATEMENTS AND TESTIMONY, AND
(4) MOTION TO ADMIT STATEMENTS OF UNAVAILABLE WITNESS**

The United States respectfully submits this omnibus response in opposition to defendant

Jeremy Schulman's motions seeking to: (1) exclude evidence or, in the alternative, to conduct an

evidentiary hearing (ECF No. 324) ( "Motion to Exclude Evidence"); (2) vacate the crime fraud

order previously entered by this Court (ECF No. 326) ("Motion to Vacate"); (3) compel certain

witness statements and testimony (ECF No. 318) ("Motion to Compel"); and (4) admit out-of-

court statements of an unavailable witness (ECF No. 321) ("Motion to Admit Statements").  For

the reasons outlined below, the Court should deny one of the motions as moot and the others on

the merits.

Schulman aims to misuse the Court's memorandum opinion denying his motions to dismiss

as a summary-judgment-like sword against the Government.  *See* ECF No. 308.  Schulman cites

the Court's opinion no less than 100 times across all four motions, often as supposed conclusive

interpretations of the evidence in this case that, according to Schulman, demonstrate an

insufficiency of the Government's evidence.  "Conspicuously absent from the Federal Rules of

Criminal Procedure, however, is an analogue for summary judgment under Federal Rule of Civil

Procedure 56." *United States v. Sampson*, 898 F.3d 270, 279 (2d Cir. 2018); *United States v. Weaver*, 659 F.3d 353, 355 n* (4th Cir. 2011) ("there is no provision for summary judgment in the Federal Rules of Criminal Procedure").  While the Court stated that it may "need to relax certain rules of evidence at trial" due to the prejudice it found had resulted from the delay in indictment, ECF No. 308 at 51, Schulman cannot transform the Court's findings for the purposes of the motions to dismiss into findings of fact for the trial on the merits.  Rather, the Court made clear that its findings related to Schulman's pre-indictment delay motion did not constitute conclusive findings as to the facts alleged in the indictment.  *See, e.g.*, *id.* 308 at 39 ("The Government responds that Amalow may testify adversely to Schulman's interests . . . That may be."); at 59 ("Viewing these allegations to be true, as the Court must at this stage, the Court finds that the Government has alleged the requisite elements of bank fraud under Section 1344.").  The factual findings on the merits will be made by the jury, which "acts as the factfinder and makes the determination whether the defendant is criminally liable." *United States v. McHan*, 345 F.3d 262, 274 (4th Cir. 2003).

First, the Court should deny the Motion to Exclude Evidence because Schulman appears to misapply the co-conspirator hearsay exception in Fed. R. Evid. 801(d)(2)(E) to in-court testimony by a declarant.  Clear Fourth Circuit precedent disfavors the evidentiary hearing Schulman seeks, which is neither necessary nor proper in this case.  Moreover, to the extent the co-conspirator hearsay exception applies to the narrow category of the testifying co-conspirator's prior out-of-court statements, there is more than sufficient extrinsic evidence of Schulman's participation in the criminal conspiracy outlined in the Indictment.

Second, the Court should deny the Motion to Vacate because it seeks the extraordinary remedy of the suppression of evidence obtained by court order where Schulman has made no

showing that any of the materials are actually privileged or subject to work-product protection, and where the Court order followed from the Government's ample, good-faith *prima facie* showing that the materials indeed were not subject to any valid claim of privilege or protection.

Third, the Court should deny the Motion to Compel because it is moot. While the Government disagrees with Schulman's baseless and inflammatory accusations in the Motion to Compel, it has agreed to produce the requested interview reports and any notes as well as grand jury transcripts. The Government has already produced the bulk of this material and is preparing to produce the remainder.

Finally, the Court should deny the Motion to Admit Statements because hearsay statements in interview reports that Schulman seeks to admit do not meet the standard of the residual hearsay exception. These hearsay statements are entirely lacking in any sufficient guarantees of trustworthiness and, instead, risk misleading the jury and wasting time.

## ARGUMENT

Schulman advances four separate motions: a motion to exclude evidence; a motion to vacate the crime fraud order; a motion to compel witness statements and testimony; and a motion to admit hearsay statements of an unavailable witness. These motions misstate the applicable legal standards, misapply the facts to the law, seek unwarranted relief, or have been resolved and are, therefore, moot. All four motions should be denied.

## I.   THE COURT SHOULD DENY SCHULMAN'S MOTION TO EXCLUDE EVIDENCE

The Motion to Exclude Evidence should be denied without an evidentiary hearing. *See* ECF No. 324, 324-1. The Motion to Exclude Evidence twists the rules of evidence governing hearsay in an attempt to limit direct testimony of a live witness, Abdiaziz Hassan Amalo ("Amalo"), Schulman's co-conspirator in the Somali asset recovery scheme. The Government

intends to call Amalo as a witness at trial, where he will be subject to cross examination and potential impeachment.  Neither the Federal Rules of Evidence nor relevant case law supports treating direct testimony by a declarant as out-of-court hearsay.  To the extent Schulman intends to preclude only Amalo's testimony about his prior statements to Schulman, the cooperating co-conspirator is expected to testify at trial as to the truth of any such prior assertions such that the prior statements are not hearsay.  Finally, even if hearsay, the evidence is admissible as a statement of a co-conspirator and for non-hearsay purposes other than the truth, including its effect on the listener.

### A.      Amalo's In-Court Testimony Is Not Hearsay and Is Admissible

Schulman's Motion to Exclude Evidence attempts to constrain direct trial testimony by misapplying Rule 801(d)(2)(E), which concerns out-of-court statements of co-conspirators—*i.e.*, statements by an in-court witness about what an out-of-court declarant said—*not* the witness's in-court testimony about what occurred.  Schulman is wrong on the law:  Rule 801(d)(2)(E) does not apply to Amalo's direct testimony at trial and, thus, is not a basis to exclude Amalo's testimony.

Hearsay is defined as "a statement that: (1) the declarant does not make while testifying at the current trial or hearing; and (2) a party offers in evidence to prove the truth of the matter asserted in the statement."  Fed. R. Evid. 801(c).  "[T]he hearsay rule, 'is premised on the theory that out-of-court statements are subject to particular hazards,' including dangers of insincerity, ambiguity, erroneous perception, and faulty memory."  *United States v. Udeozor*, 515 F.3d 260, 267 (4th Cir. 2008) (quoting *Williamson v. United States*, 512 U.S. 594, 598 (1994)).  These concerns are alleviated when the declarant is in-court and subject to cross-examination, "the 'greatest legal engine ever invented for the discovery of truth.'"  *California v. Green*, 399 U.S. 149, 158–59 (1970) (citation omitted).

4

Courts evaluating the admissibility of a co-conspirator's in-court testimony consistently find that "[t]he direct testimony of a conspirator . . . describing his participation in the conspiracy and the actions of others is not hearsay, and the cases concerning co-conspirator hearsay under Rule 801(d)(2) are inapplicable." *United States v. Mobile Materials, Inc.*, 881 F.2d 866, 871 (10th Cir. 1989); *see also United States v. Szabo*, 789 F.2d 1484, 1487 (10th Cir. 1986) ("the bulk of [witness's] testimony was admissible without regard to the hearsay rules" because "[t]hat testimony consisted of [witness's] own statements made while testifying at trial subject to cross-examination by the defendant"). The Tenth Circuit evaluated arguments similar to those raised by Schulman in *United States v. Smith*, 692 F.2d 693 (10th Cir. 1982). In *Smith*, the defendant challenged the trial court's admission of a co-conspirator's in-court testimony, contending that such testimony was proper only after independent evidence showed a conspiracy existed. *Id.* at 697. The court rejected this argument, finding instead that:

> [t]he flaw in [defendant's] argument is simply that Rule 801(d)(2)(E) and the cases construing it are irrelevant to the *direct testimony* of a coconspirator. By definition, hearsay is 'a statement, *other than one made by the declarant while testifying at the trial or hearing*, offered in evidence to prove the truth of the matter asserted.' Fed. R. Evid. 801(c). There is absolutely no need to fit [co-conspirator's] *in-court* statements into the coconspirator provision of Rule 801(d)(2)(E).

*United States v. Smith*, 692 F.2d 693, 697–98 (10th Cir. 1982) (emphasis in original). Faced with a similar argument in *Laughlin v. United States*, 385 F.2d 287, 292 (D.C. Cir. 1967), the court found the defendant's attempt to exclude in-court testimony by a co-conspirator was based on "a misunderstanding of the rule" requiring evidence independent of a co-conspirator's statement to establish a conspiracy existed. "That rule applies only to out-of-court (i.e., hearsay) statements of a coconspirator. It does not exclude proof of a conspiracy by the direct testimony under oath of a party to it." *Id.* at 292 (citation omitted).

Courts (including courts within the Fourth Circuit) routinely reject defendants' efforts to employ Rule 801(d)(2)(E) to exclude direct testimony by a co-conspirator, and the Court should do the same here. *See McCullers v. United States*, No. 07-CR-49, 2012 WL 1942068, at *8 (E.D. Va. May 29, 2012) ("Co-conspirators . . . testified directly, at trial, to their and [defendant's] involvement in the conspiracy; Rule 801(d)(2)(E) is not applicable to their testimony because it was given at trial."); *United States v. Williams*, 14 Fed. Appx. 469, 474 (6th Cir. 2001) ("[Defendant] misunderstands the distinction between 'non-hearsay' admissions of co-conspirators as retold by witnesses on the stand and the direct testimony of co-conspirators."); *Chen v. United States*, No. 13-CV-3903 (KAM), 2016 WL 5874989, at *2 (E.D.N.Y. Oct. 7, 2016) (objection to co-conspirator's in-court testimony "on the basis of Fed. R. Evid. 801(d)(2)(E) would have been fruitless"); *Debreus v. United States*, No. 03-CR-0474, 2012 WL 3686250, at *10 (D.S.C. Aug. 24, 2012) ("The petitioner's co-conspirators testified directly, at trial, to their involvement, and the petitioner's involvement, in the conspiracy.  Rule 801(d)(2)(E) does not apply to the co-conspirators' testimony at trial."); *Benson v. United States*, No. 1:11-CV-368, 2011 WL 6009961, at *4 (W.D. Mich. Dec. 1, 2011) ("Rule 801(d) does not apply to statements that are not considered hearsay, such as direct testimony by witnesses, including coconspirators who testify as witnesses.") (quoting *United States v. Benson*, 591 F.3d 491, 502 (6th Cir. 2010)); *United States v. Nunez*, 658 F. Supp. 828, 835 (D. Colo. 1987) ("Statements of a co-conspirator made during the course of a conspiracy may be used to establish the existence of the conspiracy 'by the direct testimony under oath of a party to it,' and such testimony is not hearsay within the meaning of Rule 801(d)(2)(E)."); *United States v. Townley*, 472 F.3d 1267, 1274 (10th Cir. 2007) (recorded conversation between co-conspirators "is not problematic because both men testified at trial and, therefore, were available for cross-examination regarding their statements"); *United States v.*

*Rivera-Santiago*, 872 F.2d 1073, 1086 (1st Cir. 1989) (witness's testimony in drug conspiracy trial "about paying the unloaders and then identifying defendant was . . . not a statement within the definition of Fed. R. Evid. 801(d)(2)(E).").

None of the cases Schulman cites compels a different result.  In each, the in-court witness testified regarding another declarant's out-of-court statements.  *See* ECF No. 324-1 at 5–6 (citing *Bourjaily v. United States*, 483 U.S. 171, 181–82 (1987) (recorded phone call of non-testifying co-conspirator admitted under Rule 801(d)(2)(E)); *United States v. Neal*, 78 F.3d 901, 904 (4th Cir. 1996) ("Burris to testify at trial concerning statements made by Wilmore Thrower"); *United States v. Shores*, 33 F.3d 438, 440 (4th Cir. 1994) (co-conspirator's cellmate testified about statements co-conspirator made about co-conspirator and defendant's murder-for-hire plot); *United States v. Blevins*, 960 F.2d 1252, 1255 (4th Cir. 1992) (DEA agent testified about co-conspirator's statements regarding defendant's role in drug conspiracy); *Precision Piping & Instruments, Inc. v. E.I. du Pont de Nemours & Co.*, 951 F.2d 613, 618 (4th Cir. 1991) ("Beall would testify that: Jerry Marks told him and Bill Hale that Jerry Marks had been receiving telephone call[s] from Rose Stemple;" and "Hale would testify that . . . Mr. Emerick told him that the purchase orders of PPI were being cut off; . . . the next part was that Mr. Zicherman made—Mr. Zicherman related that this was done after conversation with Rose Stemple")).

To the extent Schulman appears to attempt to exclude only Amalo's prior statements to Schulman, he fares no better.  *See* ECF No. 324-1 at 4 (quoting statements in the Indictment about what Amalo told Schulman).  Amalo is expected to testify as to the truth of the assertions he made to Schulman during the course of the conspiracy.  For instance, Schulman asserts that Amalo should not be permitted to testify that he "told SCHULMAN that his uncle [Amalow] was not the Governor," or that he "told SCHULMAN that the decree put Amalow in charge of asset recovery

but not banking affairs," and that "the decree did not appoint Amalow to the position of 'Director of Asset Recovery and Banking Affairs.'"   *Id.* (quoting prior interview reports).   But Amalo is expected to testify that his uncle was not the current Governor of the Central Bank of Somalia, and that the Director of Financial Asset Recovery and Banking Affairs appointment was false.   That is not hearsay.   And Amalo is expected to testify about how he communicated these facts to Schulman and what Schulman said and did in response.   That is not hearsay either.

Rather, as to Amalo's testimony that he communicated these facts to Schulman, his prior statements would be admissible for the fact that they were made and their resulting effect on Schulman, rather than for their truth.   "A statement is not hearsay if it is offered to prove knowledge, or show the effect on the listener or listener's state of mind."   *United States v. Guerrero-Damian*, 241 F. App'x 171, 173 (4th Cir. 2007) (citing *United States v. Safari*, 849 F.2d 891, 894 (4th Cir. 1988)); *see also United States v. Martin*, 657 F. App'x 193, 199 (4th Cir. 2016) (admitting witness's conversations with defendant to show that defendant "**believed** that [witness] no longer needed a gun") (emphasis in original); *United States v. Leake*, 642 F.2d 715, 720 (4th Cir. 1981) (statement to defendant about use of returned funds was not hearsay because it was not offered to prove that the money was, in fact, used as described to defendant but rather to show that the defendant believed that the funds were being used legitimately); *United States v. Seko*, No. 1:15CR301 (JCC), 2017 WL 1318008, at *2 (E.D. Va. Apr. 10, 2017) ("[I]t is well established that statements offered to prove the effect of the statement on the listener, as well as statements offered to prove a person's state of mind, are not hearsay and are, therefore, admissible.").

Here, Amalo's testimony about his communications with Schulman are independently admissible to show their effect on Schulman.   The examples of Amalo's potential testimony that Schulman identifies illustrate this point.   *See* ECF No. 324-1 at 4.   As set forth above, Amalo is

expected to testify that, in fact, his uncle was the not current Governor of the Central Bank of Somalia and that the Director of Financial Asset Recovery and Banking Affairs title was false. That is direct testimony by a co-conspirator about facts, not an out-of-court statement offered for the truth. Amalo's testimony that he transmitted these facts to Schulman may then also be offered to show what Schulman knew and what, if anything, Schulman did in response, *i.e.*, continuing to pursue Somali assets and to represent to financial institutions that Ali Abdi Amalow ("Ali Amalow") was Central Bank Governor. "Stated differently, the focus here was not to prove as true the reasons for the 'beef' as stated on the call, but to prove how those reasons caused [defendant] to react just days later." *United States v. Simmons*, 11 F.4th 239, 264 (4th Cir. 2021) (trial court did not err in admitting statements in phone call as non-hearsay). Thus, Amalo's testimony about his communications with Schulman are admissible for their effect on Schulman.

In the event that the Government offers any of Amalo's out-of-court statements for their truth, it would, indeed, be correct that the plain language of Rule 801(d)(2)(E) applies. That is, in the event Amalo testifies to an out-of-court statement that he made, and the Government seeks to admit that particular statement for its truth, the statement would have to meet the requirement of Rule 801(d)(2)(E).[1] This mere possibility, however, does not warrant a pre-trial *James* hearing: it does not do so because such hearings are widely disfavored in the Fourth Circuit as described below. And it does not so particularly here where the Government expects this type of testimony to comprise little or none of Amalo's direct examination. In the event that the Government seeks to introduce testimony from a witness about any out-of- court statements from a non-testifying co-conspirator, such as Co-Conspirator 1, the Government will preview its intention to do so before

---

[1] To admit evidence as a co-conspirator's statement, a court must conclude (1) that there was a conspiracy involving the declarant and the party against whom admission of the evidence is sought and (2) that the statements at issue were made during the course of and in furtherance of that conspiracy. *Bourjaily*, 483 U.S. at 175; *Blevins*, 960 F.2d at 1255.

that witness testifies so any objection can be properly raised and addressed out of the purview of the jury.

Accordingly, the Court should deny the Motion to Exclude Evidence both because Amalo's direct testimony about his own words and actions is not hearsay under Rule 801 and under case law and because Amalo's statements are independently admissible, including for their effect on the listener.

**B.    The Court Should Deny Schulman's Request for an Evidentiary Hearing**

The Government submits the precedents and logic set forth above are dispositive of the Motion to Exclude Evidence.  Moreover, Schulman also is not entitled to an evidentiary hearing based on well-settled Fourth Circuit precedent.

"Although some circuits require a pretrial hearing to determine the admissibility of co-conspirator statements . . . ours is not among them." *United States v. Nelson*, 530 F. Supp. 2d 719, 728 (D. Md. 2008); *see also United States v. Hines*, 717 F.2d 1481 (4th Cir. 1983) ("This Court . . . does not require the *James* hearing."). "Instead, a trial judge retains the option to admit conditionally the declarations of co-conspirators before the conspiracy has been independently established, subject the subsequent fulfillment of that factual predicate." *Id.* (citing *United States v. McCormick*, 565 F.2d 286, 289 (4th Cir. 1977)); *see also United States v. Blevins*, 960 F.2d 1252, 1256 (4th Cir. 1992) ("[W]e allow a trial court to conditionally admit co-conspirators' statements subject to the subsequent satisfaction of the requirements for their admission.").

Indeed, courts in the Fourth Circuit routinely deny defendants' requests for *James* hearings because "[t]he preferred method . . . for admissibility determinations pursuant to Federal Rule of Evidence 801(d)(2) is to conditionally admit the disputed evidence subject to later proof of conspiracy." *United States v. McDonnell*, No. 3:14-CR-12, 2014 WL 3545206, at *2 (E.D. Va.

July 16, 2014) (denying motion and finding that "a *James* hearing would be duplicative and a waste of time"); *see also United States v. Petrini*, No. 3:10CR170-18-HEH, 2010 WL 3396804, at *1 (E.D. Va. Aug. 20, 2010) ("This Court will follow the teachings of *Blevins* and allow co-conspirators' statements to be conditionally admitted subject to subsequent proof by the government that they were made 'during the course of and in furtherance of the conspiracy.'"); *United States v. Young*, No. 2:09-CR-00223, 2010 WL 742480, at *6 (S.D.W. Va. Feb. 26, 2010) ("[T]he Court declines to hold a hearing and will instead conditionally allow such statements, subject to the Government's duty to present a prima facie case for conspiracy and Defendants' rights to renew objections to these statements should the Government fail to do so . . . .").

Contrary to Schulman's suggestion, a *James* hearing does not save time nor judicial resources. "Absent extraordinary circumstances, a '*James*' hearing to determine the admissibility of co-conspirator statements as to defendant's alleged involvement in a criminal conspiracy is neither justified nor necessary under Fourth Circuit law. The same function can be performed by the trial judge in a much more economical fashion by ruling on objections to evidence at trial. It makes no sense to conduct what amounts to a mini trial in the absence of a showing by the defendant of actual prejudice." *United States v. Morris*, No. 2:00CR7-19, 2000 WL 36732760, at *2 (N.D.W. Va. Sept. 29, 2000). Here, no such extraordinary circumstances exist, especially considering that the co-conspirator hearsay exception does not apply to Amalo's direct testimony about his own words and actions. As such, the Court should deny Schulman's request for an evidentiary hearing.

## C.     There is Ample Evidence of Schulman's Participation in the Conspiracy

For the reasons set forth above, the Court need not—and should not at this stage—evaluate the sufficiency of the alleged conspiracy. Nevertheless, there is more than sufficient extrinsic

evidence supporting Schulman's knowing participation in the Somali asset recovery and money laundering conspiracy.[2]   Schulman attempts to cabin the conspiracy into "whether Mr. Schulman had, or believed he had, legitimate authority to recover the assets on behalf of the Somali government," ECF No. 324-1 at 7.   But that is only half of the story.   The alleged conspiracy encompasses Schulman's and his co-conspirators' attempts to gain access to Somali assets both without proper authority *and* through the use of false and fraudulent documents as well as the conspiracy to launder their ill-gotten gains.   The Indictment alleges that Schulman used six forged or fraudulent documents in furtherance of the Somali asset scheme: the "2009 Forged TFG PM Letter," the "2009 Fraudulent Decree Translation," the "August 2010 Forged AG Letter," the "September 2010 Forged AG Letter," the "2013 Forged PM Letter," and the "2013 Forged POA." ECF 1 ("Indictment" or "Ind.") ¶¶ 30, 32, 40, 41, 43.   Schulman made additional fraudulent representations related to a seventh document, the 25B Certification issued by the U.S. Department of State.   *Id.* ¶¶ 49–57.   Schulman also caused his former law firm to submit false documents to the U.S. Department of Justice.   *Id.* ¶¶ 39, 42.   Thus, even if Schulman believed he had authority to pursue Somali assets—which the Government disputes—he still participated in the criminal conspiracy by creating and sending forged or fraudulent documents to financial institutions to gain access to those assets.

Schulman asserts that "[t]he only evidence available to the government to prove the existence of a conspiracy is the hearsay testimony of its cooperating witness, Mr. Amalo."   ECF

---

[2]   Schulman asserts that there is a "conclusive showing that numerous Somali witnesses, if available, would testify that Mr. Schulman was authorized to recover assets on behalf of the Somali government and had a good faith belief that he had such authority."   ECF No. 324-1 at 7.   This is simply not the case.   Where, as here, there is conflicting evidence about what a witness may have testified, "[t]he fact finder, not the reviewing court, weighs the credibility of the evidence and resolves any conflicts in the evidence presented, and if the evidence supports different reasonable interpretations, the jury decides which to believe."   *United States v. Broadway*, 37 F. App'x 696, 697 (4th Cir. 2002) (citing *United States v. Murphy*, 35 F.3d 143, 148 (4th Cir. 1994)).

No. 324-1 at 7.  This is incorrect.  First, as discussed above, Amalo's in-court testimony about the underlying facts (*i.e.*, the fact that his uncle was not the Governor or that the title of Director of the Financial Asset Recovery and Banking Affairs), is not hearsay and thus independent evidence of the existence of the conspiracy.  *See* Fed. R. Evid. 801(c).  Second, the Government has produced ample corroborating evidence that (1) Schulman knew the documents he provided to financial institutions were fraudulent or forged; (2) at times, Schulman participated in creating the fraudulent documents; and (3) Schulman conspired with Amalo and others to conceal and launder the proceeds of the Somali asset recovery scheme, all of which is evidenced by the grand jury returning the Indictment against Schulman.[3]

For example, documentary evidence will show that in the early days of the conspiracy, Schulman began representing to banks that Ali Amalow was the current Central Bank Governor. He did so despite knowing that Ali Amalow was not Central Bank Governor and at a time when Schulman was still actively working to convince the Somali government to give Ali Amalow a title or role in the Somali government.  The Government intends to introduce documents, including emails and memoranda prepared by Schulman, which demonstrate that Schulman knew Ali Amalow was not the current Central Bank Governor and that Schulman nevertheless sent letters to financial institutions seeking access to Somali assets at those institutions based on "Governor Amalow's recent re-appointment as Governor of the Central Bank of Somalia."  Ex. 1.

---

[3] Schulman's Motion to Exclude Evidence ignores this finding.  Although not admissible evidence at trial, it is worth noting that the grand jury found probable cause to believe that Schulman committed the charged offenses. *Cf. Gerstein v. Pugh*, 420 U.S. 103, 117, n.19 (1975) (quoting *Ex parte United States*, 287 U.S. 241, 250 (1932)) ("[A]n indictment 'fair upon its face,' and returned by a 'properly constituted grand jury,' conclusively determines the existence of probable cause" to believe that the defendant perpetrated the offenses alleged.").

Schulman, however, was ultimately unsuccessful in his attempt to have Ali Amalow re-appointed as Governor or Acting Governor of the Central Bank, Treasurer, or Commissioner of Economic Recovery and Banking Affairs.  Instead, on December 13, 2009, President Sharif Sheikh issued a decree naming Ali Amalow an advisor to the president on matters concerning the recovery of financial assets.  Ind. ¶¶ 30–31.  The Government intends to offer up, among other things, a 2009 English translation of the decree with Schulman's "proposed revisions" that elevated Ali Amalow to "Director of Financial Asset Recovery and Banking Affairs."  *Id.* ¶ 32; Ex. 2. Schulman sent the 2009 Fraudulent Decree Translation to at least nine financial institutions in an attempt to gain access to Somali funds, including the New York Comptroller, which ultimately released $4.8 million to Schulman's then-law firm.  Ind. ¶¶ 33–36, 38, 57.

The same is true for the 2013–2014 timeframe when Schulman pursued Somali assets in part through the 25B Certification, a process which did not involve Amalo.  Extrinsic evidence including statements and emails from Gabriel Swiney at the Department of State are expected to demonstrate that Schulman knew that the 25B Certification did not give him authority to collect and control Somali assets and that such authority could not be delegated to Schulman and did not allow for that authority to be delegated to Schulman by the Somali president.  *See* Ind. ¶¶ 54–55; Ex. 3.  Schulman, nevertheless, represented to the New York Comptroller that he had "delegated authority over all Somali assets located in the United States" based, in part, on the 25B Certification.  Ind. ¶ 55.

Schulman also ignores that he is charged with money laundering conspiracy, in addition to conspiracy to commit mail, wire, and bank fraud.  After Schulman and his co-conspirators fraudulently obtained control over millions of dollars of Somali assets from three different sources, they used complex, fraudulent means to enrich themselves: Schulman and his co-conspirators

14

distributed the proceeds of the scheme by causing Schulman's law firm to make wire transfers to shell companies located domestically and overseas.   Ind. ¶¶ 64–65.   Schulman did so after furnishing his law firm with a fraudulent invoice misrepresenting work performed by his co-conspirators.   *Id.* ¶¶ 60–63.   The Government intends to introduce independent evidence that corroborates Amalo's statements that Schulman assisted Amalo with preparing fraudulent invoices and timesheets to submit to Schulman's law firm.   Simply put, Schulman's contention that there is no evidence outside of Amalo's testimony about his participation in the conspiracy is without merit.

Furthermore, the Court has already found that evidence of the conspiracy is sufficient to support



In sum, Schulman provides no legal basis for the relief he seeks, and the Court should deny the Motion to Exclude Evidence.

## II.   SCHULMAN HAS NOT SHOWN THAT THE EXTRAORDINARY REMEDY OF VACATING THE CRIME FRAUD ORDER IS WARRANTED

Schulman moves to vacate the Court's crime fraud order, alleging both that the Court misapplied the law in issuing its order, and that Government withheld relevant information in its *ex parte* application.  ECF No. 326 at 1.   As an initial matter, Schulman lacks standing to assert privilege over any of the communications implicated by the Crime Fraud Order.[4]   The order required Schulman's former law firm to release communications that it had withheld from the Government out of a prudential concern that certain purported former law firm clients—whom the law firm was unable to contact—could potentially assert privilege over the communications.   The Crime Fraud Order did not implicate any communications for which Schulman was the privilege holder, and Schulman does not contest otherwise.   Nor did the Crime Fraud Order require Schulman to release communications that he possessed on behalf of a current or former client.

---

[4]   Schulman's motion is directed at the Court's November 5, 2018 Order.  *See* 17-cr-481, ECF No. 50.   The Court's subsequent April 5, 2019 Order did not expand the categories of information authorized by the Court to be disclosed by Shulman Rogers to the Government.   Rather, the April 5 Order merely provided that two other persons who also possessed information (in the form of documents or potential testimony) encompassed by the November 2018 Order would similarly be bound by that order to provide that information to the Government.   Those persons were the law firm Milbank Tweed, which produced records and made available a witness for a voluntary interview, and ███████████████ who ultimately testified in the grand jury.

Schulman lacks standing to assert privilege over any of the communications at issue.  *See, e.g.*, *Bethune-Hill v. Virginia State Bd. of Elections,* 114 F. Supp. 3d 323, 346 (E.D. Va. 2015) (holding that the "attorney-client privilege must be asserted and established by the privilege holder").

Schulman also cannot invoke the attorney work-product protection over any of the communications at issue because he has not shown that any of them were "prepared in anticipation of trial."  *See, e.g.*, *Allison v. McCabe, Trotter & Beverly, P.C.*, No. 2:17-CV-1727-PMD, 2017 WL 6363635, at *2 (D.S.C. Dec. 12, 2017) (citing Fed. R. Civ. P. 26(b)(3)).   Schulman therefore seeks an extraordinary remedy: suppression of materials over which he has no claim.  For the reasons set forth below, Schulman fails to show that the Crime Fraud Order was in any way improperly granted, let alone that it contravenes due process and warrants vacatur.

### A.    The Court Properly Found that the Government Made a *Prime Facie* Case that No Attorney-Client Relationship Existed Before July 2013

The Crime Fraud Order stated that "[t]he Government's investigation to date has revealed that, prior to July 2013, Shulman Rogers and Jeremy Schulman had not been engaged by any official of the FGS or its predecessor, the Transitional Federal Government, and therefore no attorney-client relationship existed…"  17-cr-481, ECF No. 50 at 2.  This finding followed from the Government's *prima facie* showing in its application that both engagement letters allegedly executed by Schulman and Ali Amalow were vitiated by fraud, and that no competent official of any Somali government had engaged Schulman prior to July 2013.

Specifically, the first engagement letter provided that the Central Bank of Somalia, purportedly acting through Ali Amalow as its purported Governor, engaged Shulman Rogers.  Ex. 4, Letter from Jeremy Schulman to Ali Amalow (Jul. 29, 2009).  The Government's *prima facie* showing, however, indicated that Ali Amalow was not the Governor of the Central Bank at the time, and he did not have a position within the Transitional Federal Government ("TFG") or the

authority to sign a contract on behalf of the TFG.  Ex. 5, Gov't Crime Fraud Motion at 6–7.   The second engagement letter provided that the Republic of Somalia, purportedly acting through Ali Amalow as its purported Director of Financial Asset Recovery and Banking Affairs, engaged Shulman Rogers.  Ex. 6, Letter from Jeremy Schulman to Ali Amalow (Feb. 17, 2010).   The Government also made a *prima facie* showing that this purported representation was fraudulent, based on information showing that Ali Amalow was merely an advisor, and that Schulman knew the inflated title and authority of "Director of Financial Asset Recovery and Banking Affairs" was false.  Gov't Crime Fraud Motion at 7–8.

The Government's *prima facie* showing was supported by information provided by Abdiaziz Amalo, ███████████████████████████████████████████████████
███████████████████████████████████████   Gov't Crime Fraud Motion at 7–8.  ████████████████████
████████████████████████████████████████████████████████████████████████████
████████████████████████   The Government's *prima facie* showing was also supported by additional evidence independent of Amalo. This evidence included communications showing that, when presented with fraudulent documents, a U.K.-based currency printer, De La Rue International Ltd., specifically informed Schulman that Ali Amalow was not the Governor of the Central Bank.  In response, Schulman did not contest De La Rue's information—yet Schulman continued to use the same fraudulent documents and assertions of authority with other financial institutions.  *Id.* at 9–10.

In sum, the information furnished by the Government amply supported the Court's finding that there was no attorney-client privilege prior to July 2013 and, thus, the communications at issue from that period were not shielded by privilege.  *See, e.g.*, *In re Grand Jury Subpoena: Under Seal,* 415 F.3d 333, 340 (4th Cir. 2005) (upholding district court ruling that movants had not shown

an attorney-client relationship existed in the communications at issue and therefore rejecting their claim of privilege).  In other words, the Court's threshold finding was that, prior to July 2013, the documents were not privileged because there was no attorney-client relationship between Schulman Rogers and either the Central Bank or the Republic of Somalia—not that there was such a relationship, but the particular communications satisfy the crime-fraud exception.

Schulman contends that the Crime Fraud Order is erroneous because the Government did not show that Ali Amalow himself had criminal intent.  Thus, according to Schulman, the Court could not have found that the crime-fraud exception applied.  This contention completely misconstrues the Crime Fraud Order in two separate ways.

*First,* Schulman's argument is based on the idea that Ali Amalow was Shulman Rogers' client.  It follows, according to Schulman, that the Government needed to show Ali Amalow's criminal intent to establish the crime fraud exception.  ECF No. 326 at 10–12.  Schulman's premise is fundamentally flawed: Ali Amalow did not engage Shulman Rogers in his personal capacity, and Schulman has not shown otherwise.  Rather, as set forth above, both of the purported engagement letters clearly provided that the Central Bank of Somalia or the Republic of Somalia were the purported clients.[5]  Schulman has, therefore, not established that Ali Amalow was the privilege holder for any of the communications related to Schulman's purported representation of the Central Bank of Somalia or the Republic of Somalia.  *See In re Grand Jury Proceedings*, 469 F.3d 24, 26 (1st Cir. 2006) (CEO, acting in his individual capacity, did not have standing to assert attorney-client privilege); *In re Hechinger Inv. Co.*, 285 B.R. 601, 606 (D. Del. 2002) (former

---

[5]  Further, it does not make any sense that Ali Amalow would have retained *personal* counsel in connection with *sovereign* assets.

officers and employees could not assert corporation's privilege). As such, the Government's motion did not depend on showing Ali Amalow's criminal intent.[6]

*Second*, the Crime Fraud Order provides that there was no attorney-client relationship between Shulman Rogers and the Central Bank of Somalia or the Republic of Somalia prior to July 2013. The crime fraud exception was, therefore, wholly inapplicable to communications prior to July 2013. Simply put, the Crime Fraud Order did not depend on any finding of any "client" of Shulman Rogers—Ali Amalow, the Central Bank of Somalia, or any other person—having had the intent to commit a crime or fraud prior to July 2013. Rather, for the period prior to July 2013, the Crime Fraud Order was premised on the amply supported *prima facie* showing that Schulman and Amalo had purported to have a client relationship with the Somali government that, in fact, they did not have.

## B. The Court Properly Found that Fraud Permeated the Limited Categories of Post-July 2013 Communications Held to Be Not Privileged

The Crime Fraud Order also authorized the release of categories of communications post-July 2013 that related to the fraud scheme involving Schulman, Amalo, and ████████ This component of the order followed from the Government's *prima facie* showing that, although the Central Bank of Somalia retained Shulman Rogers in July 2013, the undertaking among Schulman, Amalo, and (later) ████ was permeated with fraud, and that the fraud continued after July 2013. The Government's *prima facie* showing was supported by detailed allegations related to many aspects of the fraud scheme, including a forgery by Amalo of a purported Attorney General letter (Gov't Crime Fraud Motion at 12–13); a forgery by Amalo (that he expressly discussed with

---

[6] Notably, however, the Government's motion did allege the following: in the time period in which the relationship with Ali Amalow was central to Schulman and Amalo's criminal conspiracy, Schulman obtained control of approximately $36,000 of Somali funds held in Switzerland—and "[n]one of these funds were ever sent to [the Central Bank of Somalia], the [Transitional Federal Government of Somalia] or any other arm of the Somali Government. Gov't Crime Fraud Motion at 11.

Schulman) of a letter purportedly conferring authority on another individual known to Amalo named █████████ (*id.* at 14–15); and a forgery by Amalo (in coordination with Schulman) of an invoice used to obtain a $673,784 payment from Shulman Rogers to a shell company controlled by Amalo (*id.* at 17–19).

Schulman's motion contends that aspects of Schulman's relationships with Somali officials in the post-July 2013 period, including his dealings with Somali Central Bank Governor Abdusalem Omer and President Hasan Sheikh Mohamud, were not shown to be tainted by fraud. ECF No. 326 at 13–14. Yet the Government made a *prima facie* showing, as stated in the Order, "that, even though Shulman Rogers was retained by Somalia in July 2013, the scheme continued, in part, to allow Schulman and Amalo to prepare and submit a false accounting of the fees." 17-cr-481, ECF No. 50 at 2. At the same time, the Government acknowledged in its motion that there were certain categories of communications that "may appropriately be considered privileged." Gov't Crime Fraud Motion at 4. The Government thus did not seek an order authorizing the release of all the materials withheld by Shulman Rogers.

### C. Schulman Has Not Shown that Any Communications Obtained Through the Order Are Actually Privileged

Markedly lacking from Schulman's motion is a showing that *any* of the materials obtained by the Government through the Crime Fraud Order are indeed subject to a valid claim of privilege, which is an independent basis to deny the motion. Schulman's motion is entirely silent on this point, yet he seeks the extraordinary remedy of suppression of "all records obtained by the government" pursuant to the Court's orders regardless of whether they are in fact privileged. ECF No. 326 at 14. And Schulman has not met his burden to prove that his supposed services of contacting financial institutions on behalf of the Somali government constitute the rendering of privileged legal advice as opposed to commercial or other non-legal services. *See United States*

*v. Wilson,* 798 F.2d 509, 513 (1st Cir. 1986) (holding that lawyer functioned as a negotiator and messenger for a business deal, rather than as a lawyer, and therefore the communications were not privileged); *Cf. In re Lindsey (Grand Jury Testimony)*, 158 F.3d 1263, 1270 (D.C. Cir. 1998) (advice given by White House counsel to Office of the President "on political, strategic, or policy issues . . . would not be shielded from disclosure by the attorney-client privilege").  To the contrary, the purported engagement letters signed by Schulman and Ali Amalow make clear that Shulman Rogers was not providing legal services.  *See* Ex. 6 (providing that "the scope of the Firm's representation will be limited to leading informal efforts to obtain information about and recover assets of the Republic of Somalia . . . The Firm will also lead informal efforts to persuade De La Rue International Limited to honor contractual commitments . . . For the avoidance of any doubt, at present we are not being retained to commence, prosecute, defend, or otherwise assist in connection with any legal proceeding …").

The Government's crime-fraud motion was not prompted by any assertion of privilege by a privilege-holder during the investigation.  Rather, it was prompted by Shulman Rogers prudentially asserting potential privilege claims on behalf of former clients that it could not contact.[7]  Years later, and after extensive public litigation, not a single putative privilege-holder has come forward to assert privilege over anything.

Schulman may contend that this is because Somali officials are just too busy or too unreachable to assert their duly held privileges.  But that should not sway this Court.  Earlier this fall, no less an official than the General Manager of the Central Bank of Somalia, Mohamed Abdi Mohamed, apparently had no difficulty coordinating with Jeremy Schulman.  On September 10,

---

[7]  To be clear, the Government does not take any issue with Shulman Rogers' undertaking to safeguard potential privileges here, particularly under these circumstances, where the firm could not contact the former clients, and firm personnel had limited visibility into the former client relationships after Schulman and others had departed the firm.

2023, Schulman, apparently currently representing Mohamed, sent a blustering cease and desist letter to a Somali Member of Parliament who dared to accuse the Central Bank of corruption. Ex. 7, Letter from Jeremy Schulman to Abdillahi Hashi Abi dated September 10, 2023 (claiming that particular allegations of a public official's corruption are "malicious and demonstrate defamation *per se* under [unspecified] United States law").[8] If a Central Bank official could hire Schulman to threaten a defamation suit in a court in the United States, he could presumably assert a privilege here too, if there were a valid privilege to assert.

### D.    Suppression Is Not Otherwise Warranted

Schulman also contends that the crime fraud order should be vacated because the Government omitted pertinent facts from its application, focusing in particular on statements made by Ali Amalow when he and his son were jointly interviewed by the FBI in March 2017. ECF No. 326 at 4–6. The Government's motion, however, fairly represented to the Court both the evidence in support of its *prima facie* case and the presence of information that potentially undercut its allegations.   The Government's disclosures included the following:

- Ali Amalow had executed two engagement letters with Shulman Rogers purporting to represent Somali government entities (Gov't Crime Fraud Motion at 6–7);

- Ali Amalow, although not made a Governor or Director in 2009, was appointed to an advisor position (*id.* at 8);

- Farah Abdi, who created the translation of the decree that falsely inflated Ali Amalow's authority, ██████████████████████████████

---

[8] Putting aside the question of how Schulman apparently continues to represent officials at the Central Bank of Somalia while under indictment for committing fraud in connection with that very entity, or the propriety of threatening to silence someone who alleges corruption within the Central Bank, this revelation casts serious doubt on his prior complaints that he has been unable to make any inroads in Somalia to obtain purportedly exculpatory materials. Indeed, Schulman has frequently insisted that the records requested by the Government in its official request to Somalia would have been "exculpatory" had the Government obtained to them. ECF No. 133 at 18, n.10. In the event that Schulman has obtained, or in the future does obtain records, exculpatory or otherwise, that he intends to use at trial from the Central Bank of Somalia through his current client, the Central Bank's General Manager, the Government requests their reciprocal disclosure pursuant to Rule 16(b)(1)(A).

███████████████████████████████████████████████████

(*id.* at 8, n.6); and

- Amalo, who had pleaded guilty and provided considerable information referenced in support of the motion, had made some inconsistent statements over the course of many proffer sessions (*id.* at 11, n.8.).

Taken as a whole, the Government's motion reflects the Government's good-faith efforts to provide the Court with fair notice that, although the totality of the evidence it had obtained to that point during its ongoing investigation made out a *prime facie* case of fraud, the Government had also obtained information that challenged its theory.

Schulman makes much of the Government's choice not to describe in its motion a handful of statements made by Ali Amalow in a 2017 FBI interview. One supposedly key statement by Ali Amalow to the FBI was his statement that the banks holding the Somali assets purportedly required Ali Amalow's presence or blessing to release assets. ECF No. 326 at 5.

This statement is particularly dubious: after all, in the years that Ali Amalow allowed Schulman and Amalo to associate themselves with him, their enterprise yielded a mere $36,000 from a single institution—not a penny of which Ali Amalow caused to be remitted to the Somali government. These facts suggested that Ali Amalow's actual authority to obtain the release of Somali asserts was considerably weaker than he represented, and his full commitment to returning those assets to the Somali government was in question as well. Ali Amalow's dubious and self-serving statements exalting his own importance were not sufficiently credible or material given the other evidence set forth in the motion to indicate the Government acted in bad faith by not including them, or to indicate that their exclusion affected the Court's decision.

Moreover, if the Government were to have brought that particular FBI interview to the Court's attention in the motion, it would have balanced the self-serving statements by Ali Amalow

with other inculpatory statements made by his adult son, Abdelhakim Abdi, in his presence.  These

inculpatory statements by Abdelhakim Abdi, as memorialized by the FBI in sum and substance,

included the following:

- In 2013, Schulman got involved with people who were corrupt and wanted to steal the money they were trying to recover.  Ex. 8 at 2.

- Abdelhakim Abdi and his father believed that President Mohamud and Foreign Minister Adam received kickbacks during the asset recovery process and that Central Bank of Somalia  Governor Abdusalam Omer had orchestrated everything with Schulman.  *Id.*

- Schulman was a corrupt lawyer who wanted more money than the $50,000 that he would receive a month for his services.  *Id.*

- Somali public officials were offered bribes in exchange for helping [Amalo] and Schulman.  *Id.* at 5.

Under these circumstances, although the motion did not include the specific statements by

Abdelhakim Abdi and Ali Amalow, the fact that the government alerted the Court to other

information contrary to its theory of the case, such as the above-mentioned ███████████

███████, reflects the Government's good-faith effort to provide the Court with sufficient and

balanced information to assess the motion, without offering every detail, both favorable and

unfavorable, from its ongoing investigation.   Schulman's motion thus falls far short of establishing

a due process violation warranting vacatur of the order, let alone suppression of all materials

provided pursuant thereto.

## III.    SCHULMAN'S MOTION TO COMPEL WITHHELD WITNESS STATEMENTS AND TESTIMONY IS MOOT

The Government has complied and will continue to comply with its ongoing discovery

obligations, including those found in *Brady v. Maryland*, 373 U.S. 83 (1963), *Giglio v. United

States*, 405 U.S. 150 (1972), and their progeny.   While the Government disagrees with Schulman's

characterization of the Government's actions in this case, his claim that interview reports and

testimony in this case must include *Brady* and *Giglio* material, and his assertion that he is entitled to discovery into the grand jury,[9] the Government nonetheless produced all the grand jury transcripts from this investigation and an initial round of approximately 60 unredacted interview reports on November 30, 2023.  The Government is compiling any interview notes and additional reports and will produce those as soon as possible.  Thus, Schulman's Motion to Compel Withheld Witness Statements and Testimony is moot and should be denied or, at minimum, held in abeyance.

## IV.    THE COURT SHOULD DENY SCHULMAN'S MOTION TO ADMIT STATEMENTS OF UNAVAILABLE WITNESS

Schulman's Motion to Admit Statements should also be denied.  *See* ECF No. 321, 321-1. Schulman argues that Ali Amalow's statements during FBI interviews should be admitted, but he ignores that Ali Amalow's statements—which are unquestionably hearsay—are utterly lacking any indicia of trustworthiness.  Furthermore, admitting Ali Amalow's statements would run afoul of Rule 403 by creating a mini-trial into the context and reliability of these statements, which would confuse the issues, mislead the jury, and waste the jury's and court's time.  If, however, the Court is inclined to admit Ali Amalow's hearsay statements, it should do so through the testimony of the interviewing agent rather than the interview reports so that the jury has the full context necessary to evaluate this evidence.

---

[9]    Schulman's threat to report the government to the Office of Professional Responsibility for supposed ethical violations is misplaced, at best.  As discussed above, Ali Amalow's statements are neither substantial evidence nor do they directly negate Schulman's guilt, particularly in light of the independent corroborating evidence set forth above (and presented to the grand jury).  "The Government is not required to present exculpatory information to the grand jury, nor is it required to anticipate and present all of a defendant's affirmative defenses to the grand jury."  *United States v. Stevens*, 771 F. Supp. 2d 556, 566–67 (D. Md. 2011) (citing *United States v. Williams*, 504 U.S. 36, 52–53 (1992) ("Imposing upon the prosecutor a legal obligation to present exculpatory evidence in his possession would be incompatible with this system.")).  "[T]he Justice Manual provides internal DOJ guidance to prosecutors that can neither overrule Supreme Court precedent nor confer substantive rights on criminal defendants."  *United States v. Foistner*, No. 18-CR-98-01-PB, 2021 WL 930001, at *4 (D.N.H. Mar. 10, 2021) (collecting cases).

### A.   Ali Amalow's Hearsay Statements Are Not Admissible Under the Residual Exception

In the Motion to Admit Statements, Schulman seeks to "admit statements of unavailable witness Governor Ali Abdi Amalow under Rule 807 of the Federal Rules of Evidence." ECF No. 321-1 at 1. Schulman claims that he has "been prejudiced by the numerous key witnesses in this case who are now unavailable due to the government's preindictment delay," one of whom he claims was Ali Amalow, who Schulman states was "'central' to the overt acts in 2009 and 2010 and the government's allegations of a conspiracy throughout the entire relevant period." *Id.* Schulman claims that "[b]ecause Governor Amalow is unavailable due to the government's delay," the Court should admit Ali Amalow's out-of-court statements under Rule 807." *Id.*

More specifically, Schulman seeks the admission of certain statements contained in an interview report from March 2017, consisting of the following:

(1)   Ali Amalow was the only individual with rightful authority to recover the assets for Somalia, as "[t]he banks that held the frozen assets would not recognize anyone else but him to unfreeze the assets because he was the representative of the last recognized Somali government."

(2)   Other individuals served as the governors of the Central Bank during Ali Amalow's supposed tenancy as the Director of Financial Asset Recovery and Banking Affairs.

(3)   Banks holding frozen Somali assets "required his physical presence or a signed letter from him" to unfreeze the assets.

(4)   Governor Bashir Isse "could not be trusted and would not have the best interest of the Somali people in mind."

(5)   Former Governor of the Central Bank Yussur Abrar "could not be trusted and would not have the best interest of the Somali people in mind."

(6)   Following Ali Amalow's resignation and establishment of the Permanent Federal Government in Somalia, the Somali official who had "sole authority" to direct the asset recovery project was the President of Somalia.

ECF No. 321-1 at 4.

Schulman rests his claim largely on the Court's September 28, 2023 Memorandum Opinion, in which the Court found that the Government engaged in pre-indictment delay sufficient to prejudice Schulman but did not do so to "'gain tactical advantage' or with 'reckless disregard' as to the consequences for Schulman's defense." ECF No. 308 at 51. Much of this Court's conclusions regarding pre-indictment delay were themselves based on hearsay presentations by defense counsel and uncorroborated assertions of exculpatory testimony that this Court accepted for the purposes of adjudicating the motion. Nevertheless, the Court has indicated that it "may ultimately need to relax certain rules of evidence at trial to right the scales. *See, e.g.*, Fed. R. Evid. 807." *Id.* Schulman now seeks to introduce statements that cannot survive Rule 807's constraints.

Rule 807 is "a narrow exception" to the rule against hearsay that "should be utilized only after much consideration and examination." *United States v. Dunford*, 148 F.3d 385, 394 (4th Cir. 1998) (internal quotation marks omitted). A court may admit hearsay under the residual exception only upon finding that (1) the statement is supported by sufficient guarantees of trustworthiness– after considering the totality of circumstances under which it was made and evidence, if any, corroborating the statement; and (2) it is more probative on the point for which it is offered than any other evidence that the proponent can obtain through reasonable efforts. Fed. R. Evid. 807(a).[10] Whether the statement enjoys sufficient guarantees of trustworthiness is the "most important element" in determining whether a statement falls within the exception. *Dunford*, 148 F.3d at 393. Thus, statements may not be admitted under Rule 807 if they lack the "sufficient guarantees of trustworthiness" required by the rule. *Tankesley v. Vidal*, 2023 WL 4273763, at *5 (E.D. Va. Jun. 29, 2023). As the Fourth Circuit has repeatedly explained, the residual exception is to "be used very rarely, and only in exceptional circumstances." *United States v. Gomez*, 774

---

[10] Schulman quotes and frames his argument pursuant to the 2011 version of Rule 807, rather than its current form as amended in December 2019.

F. App'x 136, 137 (4th Cir. 2019) (quoting *United States v. Heyward*, 729 F.2d 297, 299–300 (4th Cir. 1984)); *United States v. Cunningham*, 761 Fed. Appx. 203, 206 (4th Cir. 2019) (Rule 807 is "a narrow exception" to the rule against hearsay that "should be utilized only after much consideration and examination") (quoting *Dunford*, 148 F.3d at 394).

In support of his motion, Schulman cites several cases—chief among which are *United States v. Musaibli*, 647 F. Supp. 3d 571, 580 (E.D. Mich. 2022) and *United States v. Ruzicka*, 2018 WL 385422 (D. Minn. Jan. 11, 2018)—to argue that the Court should admit Ali Amalow's hearsay statements under the residual exception. In *Musaibli*, the court admitted "hearsay testimony made by several witnesses during interviews conducted by government agents abroad and memorialized in multiple FD 302 reports." ECF No. 321-1 at 8. Schulman also argues that in *Ruzicka*, the court admitted hearsay statements of a foreign witness—the defendant's supervisor during the time of the relevant conduct—that were memorialized during an interview with FBI agents. *Id.* But each court nevertheless examined the requirements for admission under Rule 807.

The *Musaibli* court noted that "[i]n similar circumstances, other federal courts have admitted evidence of statements memorialized in FBI 302 reports where the persons interviewed were exposed to the threat of criminal consequences of their behavior, notwithstanding whether their statements directly implicated their own guilt in the same crimes for which the defendant was charged." 647 F. Supp. 3d at 580. In *Musaibli,* the statements were taken by FBI agents from persons who already had been arrested, and apparently incarcerated, for various crimes involving their conduct under the ISIS regime, though it was "not clear whether any had the assistance of counsel during the interviews." *Id.* When admitting the statements, the court concluded that:

> the statements are material to the defense because they concern the defendant's state of mind while in service to ISIS and the duration of his active involvement with the conspiracy. The statements are more probative than any other available evidence before the Court, since nothing else so far offered tends to inform the jury

about the defendant's desire to escape or resist ISIS, or his desire to flee Syria during 2017 and 2018. Finally, the admission of the statements would serve the interests of justice by allowing the defendant to put before the jury the evidentiary record to support his defenses of duress and lack of intentional participation in ISIS's war campaign.

*Id.* at 581.

In *Ruzicka,* on the other hand, the witness was "formally interviewed by two FBI agents with the assistance of counsel" representing the witness. 2018 WL 385422 at *12. The *Ruzicka* court also concluded that the witness "had no incentive to lie" and that the statements were material because they "tend[ed] to refute the Government's assertion that the deal was based on [the defendant's] false claims." *Id.* Furthermore, "the statements were more probative than other evidence because the interviewed witness . . . was [the defendant's] supervisor at the relevant time," and the "admission serves the interests of justice because it tends to vindicate [defendant's] Sixth Amendment right to put on a defense." *Id.*

But the same equities that permitted hearsay admissions in *Musaibli* and *Ruzicka* do not exist here. The hearsay statements Schulman seeks to admit are far afield from satisfying the residual exception's criteria. Instead, the hearsay statements attributed to Ali Amalow in the interview report are lacking any guarantees of trustworthiness. A court should consider the "'totality of the circumstances that surround the making of the statement,'" in determining whether the statement has a "ring of reliability about it." *United States v. Clarke*, 2 F.3d 81, 84–85 (4th Cir. 1993) (citing *Idaho v. Wright*, 497 U.S. 805, 822 (1990)). Among the factors courts in this district consider are "whether the declarant: had an incentive to lie, had been subject to cross examination, voluntarily gave the statement, made a statement that was contemporaneously transcribed, and had personal knowledge about the incident to which he or she made the statement." *Goode v. United States*, 730 F. Supp. 2d 469, 476 (D. Md. 2010); *see also Clarke*, 2

F.3d at 85.  "This trustworthiness requirement [ ] serves as a surrogate for the declarant's in-court cross-examination."  *United States v. Shaw*, 69 F.3d 1249, 1253 (4th Cir. 1995) (citing *Wright*, 497 U.S. at 820).

Here, Ali Amalow was not under oath, subject to any cross examination about his statement, and, most critically, he had a great incentive to lie to the FBI due to his own personal exposure in the Somali asset recovery scheme.  Rather than a motive to tell the truth, Ali Amalow had an incentive to mislead the FBI about his role in the Somali asset recovery scheme and his authority to act on behalf of the Somali government in order to minimize his potential criminal liability.  This is especially true since, as discussed above, there is no evidence suggesting that the portion of Somali funds Amalo shared with Ali Amalow and his adult son were ever repatriated to the Somali government.  While Ali Amalow's statements were memorialized in the interview report, interview reports are not traditionally admissible as a witness's prior statement because they are a summary of an interview prepared by an FBI agent, not a verbatim transcript or recording.  *See United States v. Brook*, 145 F.3d 1326 (4th Cir. 1998).  The statements provide no visibility into whether Ali Amalow had any basis whatsoever to support his opinion that other former Central Bank governors did not have the best interest of the Somali people at heart.

Schulman's attempt to bolster the trustworthiness of Ali Amalow's statements is of no moment.  Schulman claimed that he "also had discussions with Presidential Advisor Dr. Ahmed Warfa, which further confirmed that President Ahmed intended for Governor Amalow to lead asset recovery efforts and that Governor Amalow had the authority to do so."  ECF No. 321-1 at 3.  Once again, these statements are rank hearsay and cannot provide the "circumstantial guarantees of trustworthiness" for Rule 807 admissibility, since trustworthiness cannot be assessed "from its

consistency with other evidence offered in the case." *Shaw*, 69 F.3d at 1253 n.5. This Court should reject those efforts.

Furthermore, at least one of the statements Schulman attributes to Ali Amalow appears to have been made by his son, Abdelhakim Abdi,[11] rather than by Ali Amalow. Citing to the March 2017 interview report, Schulman claims that Ali Amalow stated that "[o]ther individuals served as the governors of the Central Bank during his tenancy as the Director of Financial Asset Recovery and Banking Affairs." ECF No. 321-1 at 4. In fact, the interview report records Ali Amalow as stating: "The CBS [Central Bank of Somalia] had governor(s) during the time period from 2009 to 2013; there were many CBS Governors; Bashir ISSE, Abdusalam OMER, and ABRAR were CBS Governors during this time." Ex. 8 at 3. The interview report then states that Abdelhakim Abdi provided that "[h]is father had the title of Director of Recovery Assets for Somalia [or some variation]." *Id.* Nowhere does the interview report attribute Ali Amalow with stating that he was the Director of Financial Asset Recovery and Banking Affairs. *See id.* Schulman's attempt to merge Ali Amalow's and his son's statements into a supposedly exculpatory admission is plainly improper and further illustrates why these statements do not meet the residual exception's criteria and should not be admitted at trial.

**B.      Ali Amalow's Hearsay Statements Are Inadmissible Under Rule 403**

Even if Ali Amalow's statements passed the residual exception's test (and they do not), the Court should still exclude Ali Amalow's statements pursuant to Rule 403 due to the substantial risk that they will confuse the issues, mislead the jury, and waste time.

---

[11]   Abdelhakim Abdi is, of course, the individual who testified in person at the January 2023 motions hearing, and whom this Court found was "wholly unreliable on the most critical of evidence" in part because he testified inconsistently under oath as to whether his father was or was not the "Director of asset recovery" and was otherwise "evasive." ECF No. 308 at 41.

Rule 403 provides that "[t]he court may exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." Fed. R. Evid. 403. Courts routinely exclude evidence that would result in a confusing mini-trial, and the Court should do the same here with respect to Ali Amalow's statements. *See United States v. Rubio*, 87 F.3d 1309 (4th Cir. 1996) (affirming district court ruling preventing the defendant from questioning a witness "about specific details regarding the incidents in order to prevent a mini-trial about the issues and an undue waste of time under Rule 403"); *United States v. Myers*, 589 F.3d 117, 124 (4th Cir. 2009) (affirming trial court exclusion of reverse 404(b) evidence, in part because "further evidence on th[e] issue was not 'of high probative value,' and . . . it would result in a 'mini trial'"); *In re C.R. Bard, Inc., MDL. No. 2187, Pelvic Repair Sys. Prod. Liab. Litig.*, 810 F.3d 913, 922 (4th Cir. 2016) ("having a 'mini-trial' could easily inflate the perceived importance of compliance and distract the jury from the central question before it"); *Est. of Bryant v. Baltimore Police Dep't*, No. ELH-19-384, 2020 WL 6161708, at *7 (D. Md. Oct. 21, 2020) ("Among the hurdles that plaintiffs will face is the Fourth Circuit's disapproval of mini-trials within a trial, because of the time and expense involved and because the tangential allegations may cause juror confusion and unfair prejudice.").

Here, providing sufficient context for the jury to weigh the evidentiary value of Ali Amalow's statements would likely result in a needless mini-trial into various issues, including his health, the circumstances of the interview, and, most importantly, the other statements he made to the FBI during the same interview. For example, Schulman seeks to admit Ali Amalow's statements that Bashir Isse and Yussur Abrar "could not be trusted and would not have the best interest of the Somali people in mind." ECF No. 321-1 at 4. Tellingly, Schulman does not want

to introduce the remainder of Ali Amalow's statement identifying ███████████ among the Central Bank Governors whom Ali Amalow did not trust.  *See* Ex. 8 at 3.  Schulman's selective parsing of Ali Amalow's statement is likely due to the fact that in the course of the Somali asset recovery scheme, Schulman worked closely with ████████, who signed the July 2013 Contract and a related power of attorney, which provided that Law Firm A would receive a $25,000 per month fee, a percentage of Somali assets recovered, and reimbursement for costs and expenses.  *See* Ind. ¶ 46.  Thus, on the one hand, Schulman insists that he did not and could not credit Bashir Isse's disavowal of Schulman's purported work on behalf of the Central Bank due to Ali Amalow's statement that Bashir Isse "could not be trusted."  On the other hand, Schulman apparently has utter disregard for Ali Amalow's identical criticism of Schulman's partner, ████████.  Schulman thus seeks to cherry pick Ali Amalow's out-of-court statements—all of which are unreliable—to create a misleading presentation to the jury.  To provide the jury with the context and completeness that it is entitled to receive in order to evaluate Ali Amalow's hearsay statements, however, would require the very type of mini-trial routinely and sensibly excluded under Rule 403.

## C. If the Court Admits Ali Amalow's Hearsay Statements, They Should Be Admitted Through Agent Testimony

To the extent this Court determines that any of Ali Amalow's hearsay statements are admissible, the Government submits that these statements—including those that Schulman does not request be admitted—should be admitted through agent testimony, rather than the interview reports alone.  Admitting Ali Amalow's statements through agent testimony reduces the risks of misleading the jury and confusing the issues because the agent will be able to provide the necessary

34

context for the jury to evaluate Ali Amalow's statements.[12]  *See* Fed. R. Evid. 106 ("If a party introduces all or part of a writing or recorded statement, an adverse party may require the introduction, at that time, of any other part--or any other writing or recorded statement--that in fairness ought to be considered at the same time."); *United States v. Lutz*, 153 F.3d 723 (4th Cir. 1998) ("Rule 106 is a rule of completeness and is designed to ensure that 'when one party has made use of a portion of a document, such that misunderstanding or distortion can be averted only through presentation of another portion, the material required for completion is ipso facto relevant and therefore admissible . . . .'") (quoting *United States v. Ellis*, 121 F.3d 908, 921 (4th Cir. 1997)); *United States v. Jamar*, 561 F.2d 1103 (4th Cir. 1977). (Rule 106 "permits the contemporaneous introduction of recorded statements that place in context other writings admitted into evidence which, viewed alone, may be misleading.").

As such, the Government respectfully submits that to the extent the Court admits Ali Amalow's hearsay statements, this testimony should be presented through an agent who can provide the necessary context and completeness for the jury.

---

[12]  The defense, of course, will be free to cross-examine the agent with reference to the 302, which will have been the agent's own statement.

## **CONCLUSION**

Based on the foregoing, the United States respectfully submits that the Court should deny Defendant Jeremy Schulman's (1) Motion to Exclude Evidence, (2) Motion to Vacate the Crime Fraud Order, (3) Motion to Compel Witness Statements and Testimony, and (4) Motion to Admit Statements of Unavailable Witness.


Dated:  December 1, 2023                                Respectfully submitted,


       GLENN S. LEON                              EREK L. BARRON
       Chief                                                 United States Attorney
       Fraud Section                                  District of Maryland

       _____/s/_____        _____/s/_____
       Allison L. McGuire                            David I. Salem
       Jason M. Manning                             Assistant United States Attorney
       Trial Attorneys

**<u>Certificate of Service</u>**

I HEREBY CERTIFY that on December 1, 2023, a copy of the foregoing was delivered

via ECF to counsel of record.


_____/s/_____
Allison L. McGuire
Trial Attorney