## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| **UNITED STATES OF AMERICA,** | ) |
| | ) |
| **v.** | ) |
| | ) |
| | )   **Crim. No. PX-20-0434** |
| **JEREMY WYETH SCHULMAN** | ) |
| | ) |
| **Defendant.** | ) |
| _____ | ) |

### THE UNITED STATES' OPPOSITION TO DEFENDANT
### JEREMY SCHULMAN'S MOTIONS *IN LIMINE* (ECF 353)

The United States respectfully submits this response in opposition to defendant Jeremy Schulman's motions seeking: (1) adverse inference instructions for 14 "missing" witnesses; (2) an adverse inference instruction related to Amalo's Blackberry device; and (3) exclusion of certain trial testimony by Amalo on the grounds of lack of foundation and "prejudice." For the reasons outlined below, the Court should deny the motion to exclude testimony for lack of foundation as not ripe and deny the others on the merits.

### ARGUMENT

### I.    THE COURT SHOULD DENY SCHULMAN'S REQUESTS FOR MISSING WITNESS INSTRUCTIONS

A missing witness instruction is only available where the Government has the exclusive power to produce the witness at trial. Schulman has moved for missing witness instructions in relation to 14 deceased or overseas witnesses, none of whom the Government has the power to produce at trial, and the motion is thus fatally flawed. Schulman nevertheless urges the Court to invite the jury to draw adverse inferences against the Government to "level the playing field" on account of the alleged prejudice to Schulman caused by the passage of time during the investigation. In doing so, Schulman seeks to invite the jury to consider irrelevant and unfairly

1

prejudicial information related to the Government's investigation and charging decisions. Schulman's motion should be denied.

### A.      Legal Standard

As the Fourth Circuit has stated repeatedly, "[i]t is well settled that [t]he rule regarding missing witness instructions is that 'if a party has it peculiarly within his [or her] power to produce witnesses whose testimony would elucidate the transaction, the fact that he [or she] does not do it creates the presumption that the testimony, if produced, would be unfavorable." *United States v. Brooks*, 928 F. 2d 1403, 1412 (4th Cir. 1991); *see also United States v. Crawford*, 317 F. App'x. 303, 306 (4th Cir. 2008) (citing *Brooks*); *United States v. King*, 155 F.3d 562, *12 (4th Cir. 1998) (citing *Brooks*); *United States v. Green*, 103 F.3d 121, *1 (4th Cir. 1996) (citing *Brooks*). A missing instruction in not warranted, however, where the witness is not particularly under the Government's control, *Brooks* at 1412; the witness's testimony would be irrelevant or cumulative, *United States v. Graves*, 545 F. App'x 230, 241 (4th Cir. 2013); where the defendant cannot show that the witness's testimony would be "essential to shed light on any issue relevant to the case," *United States v. Bolan*, 1989 WL 152512, *2 (4th Cir. Nov. 30, 1989); or where the defendant's argument about the missing witness's likely testimony "is purely speculative," *United States v. Jackson*, 182 F.3d 910 (4th Cir. 1999).

### B.      Argument

Schulman seeks a novel contortion of the missing witness rule, contending that he is entitled to a "missing witness instruction" for 14 witnesses who are all deceased or overseas. Schulman's request for missing witness instructions here is squarely foreclosed by law: under Fourth Circuit precedent, missing witness instructions are not warranted in relation to witnesses—

such as deceased and overseas witnesses—who are not within the Government's power to produce at trial.

Schulman, however, apparently seeks an instruction that would invite the jury not to evaluate whether the witnesses at issue were solely in the Government's power to produce them (which they are not), but rather to evaluate whether the Government should be faulted for the timing of its indictment or its investigative choices. These issues, however, are outside the province of the jury. Moreover, Schulman would have the jury draw adverse inferences against the Government in relation to many witnesses who were never in the Government's power to bring to trial; who refused to sit for Court-ordered depositions overseas; and whose relevance to the charges is not sufficiently established. Schulman's motion should be denied.

> **i.    A Missing Witness Instruction Is Not Warranted Because the Missing Persons Are All Outside the Government's Power to Produce at Trial**

The 14 persons at issue are demonstrably *not* within the power of the Government to produce at trial. Many of these witnesses are foreign nationals residing overseas whom Schulman has not shown would *ever* have been within the power of the Government to produce at trial. Other purported "missing witnesses" have been deceased since before trial is scheduled to begin and, indeed, even before the grand jury indicted Schulman in December 2020. The reasons these 14 persons are not within the Government's power to produce at trial can be summarized as follows:

- Overseas foreign nationals for whom the Court ordered Rule 15 depositions, but they declined to be deposed (8): Former Governor Ali Amalow, Elmi Duale, Sheikh Sharif Ahmed, Hassan Sheikh Adan, Mohammed Omaar, Fawzia Adam, Hassan Mohamud, Thabit Abdi.
- Deceased former U.S. citizens or residents (3): Donald Bandler, Ahmed Warfa, and Brian Phipps.
- Deceased former Somali nationals (2): Nur Hassan and Abdirahman Omar Osman.
- Overseas U.S. citizen (1): Abdusalem Omer.

3

ECF 353 ("Def's Mot.") at 2; ECF 98; ECF 106. The sole living witness that the prosecution team has ever had any communication with is Former Governor Amalow, whose particular situation is addressed separately below. *See* Section II.B.ii, *infra*.

A missing witness instruction is not warranted where the Government does not have it within its power to produce the witness. *Brooks*, 928 F. 2d at 1412. In *United States v. Drozdowski*, the Third Circuit held that an absent witness instruction was not warranted where the witness had fled the country and was not available to either party. 313 F.3d 819, n.3 (3d Cir. 2002). As described above, eight of the 14 persons at issue apparently reside overseas, are not U.S. citizens, and are outside the subpoena power of the Court. The prosecution team has no power to bring them to trial.[1] Schulman points to the Court's general observation that the Government has "more arrows in [its] quiver" to produce witnesses. Def's Mot. at 7. None of these arrows, however, enables the Government to compel persons in Somalia to travel to the United States to testify in court, and Schulman has not shown otherwise.

Five of the 14 persons at issue are deceased. These witnesses too are outside the Government's power to bring to trial. Their absence from trial cannot give rise to a missing witness instruction. *United States v. Johnson*, No. 320CR00156010207, 2021 WL 5056438, at *1 (W.D. La. Nov. 1, 2021) (granting Government motion to preclude "missing witness instruction" where the witness at issue was deceased and thus "not within any party's power to produce at trial").

The fourteenth individual, Abdusalem Omer, is a U.S. citizen residing overseas who is within the subpoena power of the Court. 28 U.S.C. § 1793. Schulman apparently has not tried to serve a subpoena on him overseas, nor has he made any other effort to obtain Omer's testimony at

---

[1] As noted *supra,* the Government will address further below particular considerations related to Former Governor Amalow.

trial. Thus, the defense has failed to show that Omer is "peculiarly within the Government's power" as well. *Brooks*, 928 F. 2d at 1412.

In sum, none of the 14 witnesses are "peculiarly within the Government's power" to bring to trial, and the request for missing witness instructions should be denied on this ground alone.

### ii. The Court Has Already "Leveled the Playing Field" Related to Former Governor Amalow's Unavailability

With respect to Former Governor Amalow, Schulman seeks to be compensated for Former Governor Amalow's unavailability through a missing witness instruction that would invite the jury to draw an inference about Former Governor Amalow's likely testimony. Def's Mot. at 2–3. The Court has already ruled, however, that the defense can elicit testimony from an FBI agent who interviewed Former Governor Amalow about out-of-court statements Former Governor Amalow made to law enforcement about his involvement with Schulman. Ex. A, Transcript (01/05/24) ("Tr."), at 68:22–78:14. In issuing its ruling, the Court explained that it was admitting this evidence in part because of Former Governor Amalow's unavailability. *Id.* at 71:20–25. The Court has thereby already issued a remedy for any prejudice Schulman has incurred by Former Governor's Amalow move to Canada in the years before trial.

Further, it would cause confusion to instruct the jury to draw any inferences about Former Governor Amalow's likely trial testimony beyond the statements made during his FBI interview. The premise of the Court's ruling about those statements to the FBI is that they were admissible under Federal Rule of Evidence 807 because they contained guarantees of trustworthiness. *Id.* at 70:09–12. It would be contradictory to treat those statements as sufficiently reliable to admit into evidence, while also instructing the jury that Amalow might have provided additional material testimony at trial. After all, if the defense contends that Former Governor Amalow was anything

but fully forthcoming in his FBI interview, that undermines the rationale for admitting statements from that interview at trial in the first place.

Thus, the Court's previous ruling related to Former Governor Amalow renders a "missing witness" jury instruction about Former Governor Amalow both unnecessary and inappropriate.

### iii.    Schulman Has Not Shown that Any of the Deceased Persons Would Have Provided Material, Non-Cumulative, Favorable Testimony

Schulman's motion with respect to the deceased individuals also fails because he has not shown that any of them would have provided material, non-cumulative, and favorable testimony. *Graves* at 241 ("the witness's testimony must elucidate issues important to the trial, as opposed to being irrelevant or cumulative"). For example, Schulman contends that he is prejudiced by deceased former State Department official Brian Phipps's unavailability, but he does not provide any evidence showing that Phipps attended any meetings, or made any decisions, in which other, living State Department officials did not also participate. To the contrary, email correspondence shows Phipps deferred to State Department Attorney Advisor Gabriel Swiney, a likely Government witness, on the 25B Certification, which is the only issue in the case to which Phipps appears to have any connection. *See* Ex. B, DOJ-SCH-0000484083 (email from Phipps to State Department colleagues dated August 7, 2023, in which Phipps describes telling Schulman, "I said I would need direction from Gabriel [Swiney] before I could send anything.").

Moreover, Schulman has had the memorandum of Phipps's FBI interview since on or about December 3, 2023. The interview memo includes the following descriptions of statements made, in sum and substance, by Phipps:

> There were a lot of people scrounging around trying to gain access to the frozen assets . . . the President did not need to employ Jeremy SCHULMAN in order to get the funds. It was PHIPPS' view that the President could have obtained the frozen Somali assets from the Federal Reserve Bank in NY and

the Fed himself, and that there was no reason for SCHULMAN to be involved . . .

PHIPPS met in person with SCHULMAN on one occasion. PHIPPS recalls SCHULMAN as overconfident, abrasive, and bombastic and PHIPPS did his best to keep SCHULMAN at arm's length…

PHIPPS did not give SCHULMAN a "good housekeeping seal of approval"… It did not seem SCHULMAN was on the "up and up."

PHIPPS did not specifically recall the language on the 25B request, because it was drafted by SWINEY, and PHIPPS was not involved in the process of drafting it. PHIPPS did remember thinking it was good wording, because it did not mention SCHULMAN . . . PHIPPS was concerned that SCHULMAN was "pulling the wool over the President's eyes." PHIPPS did not have any evidence of that, only felt that way by personal judgment of character.

Ex. C., DOJ-SCH-000248678 (FBI interview memo of Briann Phipps) at 2–4. The interview memo also reflects that Phipps conveyed, in relation to an email he had written, that "PHIPPS was careful in his wording on purpose not to say that the funds be released to Jeremy SCHULMAN." *Id.* at 4. That is, Phipps recalled specifically taking actions to prevent funds being released to Schulman, not to authorize funds to be released to him. Based on this record, there is no reason to believe Phipps's trial testimony would have been helpful to Schulman; in fact, the opposite appears much more likely.

Schulman's motion with respect to other deceased persons is similarly unpersuasive. With respect to professor of botany-turned-political advisor Ahmed Warfa, Schulman alleges that he attended just a single relevant meeting. *See* ECF 156 at 22 (motion to dismiss for preindictment delay describing alleged prejudice caused by Warfa being unavailable). With respect to deceased Somali citizens Nur Hassan and Omar Osman, Schulman's contentions that they would provide critical testimony are based solely on counsel's assumptions and not supported by even a single document. *See id.* at 23 (motion to dismiss for preindictment delay describing alleged prejudice caused by Hassan and Osman being unavailable). Further, Schulman offers predictions as to what

7

these individuals would have testified to if they were alive and available, but both of them died before the case was indicted, and there is no indication that defense counsel ever spoke with either of them. *Id.* Schulman's "pure speculation" regarding their testimony does not support a missing witness instruction. *Jackson*, at 910.[2]

Regarding Ambassador Bandler, Schulman's motion fails for a separate reason. The premise of Schulman's motion is that a missing witness instruction is warranted because the Government's delay in charging the case rendered Ambassador Bandler unavailable for trial. The Court has already found, however, that until Amalo's arrest on January 24, 2017, the Government "reasonably focused on obtaining evidence by covert methods to avoid alerting the targets of the investigation and risking the destruction of evidence." ECF 308 at 17-18, 49. Ambassador Bandler died of early onset Alzheimer's disease the following month. *See* Ex. D, "Notable Deaths in the Washington Area," THE WASHINGTON POST (Mar. 27, 2017) (describing Ambassador Bandler's death on February 24, 2017). The idea that, under these circumstances, the Government should somehow be faulted for not preserving Ambassador Bandler's testimony in the final weeks of his life is absurd. There is no basis to hold the tragic cause of Ambassador Bandler's unavailability against the Government.

> ### iv. Schulman Has Not Shown that Any of the Living, Overseas Witnesses Were Ever in the Government's Control or Ever Willing to Testify for Schulman

With respect to seven individuals living overseas—former Deputy Chief of Staff to the Somali President Thabit Abdi; former Somali Foreign Minister and Deputy Prime Minister Fawzia Adam; former Somali Finance Minister and Deputy Prime Minister Sharif Hassan Sheikh Aden; former Somali President Sheikh Sharif Ahmed; former Somali President Hassan Sheikh

---

[2] Schulman also has not shown that either of these individuals ever resided in the United States or ever was in the power of the Government to produce at trial.

Mohamud; and former Somali Foreign Minister and Deputy Prime Minister Mohamed Abdullahi
Omaar—the Court granted Schulman's request to take depositions of these individuals pursuant
to Rule 15 in March 2022. ECF 129. None of the individuals were willing to sit for a deposition.
None of them are willing to testify at trial. Schulman now contends that had the Government
indicted the case earlier, these individuals would have had more enthusiasm for testifying on his
behalf and thus would be available to him. Def's Mot. 7–8. There is simply no reason to believe
that. It is true that some of these individuals now hold positions in the Somali government. It is
equally true that some of them do not. None of them have shown any willingness to testify in court
for Schulman.

These individuals' unwillingness to testify on Schulman's behalf is essential to their
unavailability because none of them resided in the United States or were otherwise within the
Government's power to bring to trial at any time since the Government's investigation became
overt in 2017. Although a witness told the Government in 2017 that he believed former Somali
President Sheikh Sharif Ahmed was living in Boston at the time, this information appears to have
been incorrect: the fellowship that brought Mr. Ahmed to Boston in 2013 was not expected to last
more than two years. *See* Ex. E, "Somali: Sheikh Sharif Wins Prestigious Boston fellowship,"
SOMALILAND SUN (Apr. 22, 2013) (describing fellowship awarded to Sharif in 2013 "invited [him]
to live and work at Boston University for up to two years."). Other information obtained by the
Government shows that Sharif left the United States in 2013 and has not returned.[3] Thus,
regardless of whether the Government indicted Schulman in 2017, in 2020, or any time in between,

---

[3] The Government is undertaking to obtain certified records related to Sharif's entries and exits
from the United States and will produce those records to defense upon receipt.

Schulman's ability to procure Mr. Ahmed's trial testimony would have depended on Mr. Ahmed's willingness to testify on Schulman's behalf—and he has shown himself unwilling to do so.

One of the seven individuals, Elmi Duale, lived in the United States for many years serving as Somalia's Ambassador to the United Nations.[4] Def's Mot. at 2–4. Diplomatic immunity, however, would have precluded the Government from compelling his appearance at trial. 22 U.S.C. § 245a *et seq.* Again, this individual's availability at trial would have been wholly dependent on his willingness to testify on Schulman's behalf regardless of when Schulman was indicted. And the other five living Somali individuals for whom Schulman seeks a "missing witness instruction" never resided in the United States and were never within the Government's power to bring to trial.

Schulman contends that the Government's approach to the Somali witnesses should be faulted because the Government failed to "preserve" their testimony when (or if) the witnesses happened to travel through the United States. Def's Mot. at 8. He states that "[t]he testimony of these important witnesses was not preserved because the government deliberately failed to utilize the resources at its disposal, such as promptly issuing border alerts, issuing material witness subpoenas, requiring the witnesses to testify before the grand jury when the government knew they were located in the United States, interviewing the witnesses, or otherwise securing these witness's testimony at trial." *Id.* Not surprisingly, Schulman does not cite a single case penalizing the

---

[4] Information obtained by the Government indicates that Duale left the United States in 2016 and has not returned. The Government is undertaking to obtain certified records related to Duale's entries and exits from the United States and will produce those records to defense upon receipt.

Government by issuing a missing witness instruction for not taking particular measures to "preserve" the testimony of foreigners traveling through the country during the investigation.[5]

Schulman's contention here is particularly hypocritical given his own choice not to preserve the testimony of one of these individuals, Fawzia Adam, even when she traveled to Virginia post-indictment and met with his counsel. The facts are as follows:

On January 19, 2022, Schulman moved to take a Rule 15 deposition of Adam, alleging that she is not a U.S. citizen and resides in Somalia.  ECF 103 at 13, n. 9.  On March 11, 2022, oral argument was held on the motion. Ex. F, Motions Hearing Transcript, 57:07–58:04 (03/11/22) ("March 2022 Tr."). The Court found that Adam was unavailable and "beyond the subpoena power of this court."  March 2022 Tr. at 58:01–04. The Court authorized her deposition. ECF 129.

Schulman never arranged for Adam's deposition. He then represented in his motion to dismiss for preindictment delay that she was "likely unavailable" to testify at trial because she had joined the Somali Government. ECF 156-1 at 18. During the subsequent motions hearing, however, Schulman's counsel Stanley Woodward (testifying as a defense witness) admitted that he had met with Adam at a hotel in Fairfax, Virginia in February 2022:

> Q: And so was your meeting with Ms. Adam in February of 2022 after you had requested a Rule 15 deposition from this Court?
>
> A.  I believe it was after we had filed the motion but . . .
> …
> Q. I have the dates. It was in January of 2022 that you all requested a Rule 15 deposition of Ms. Adam. It was not ruled on until March 11th of 2022.
>
> A. Yeah, that tracks.
>
> Q. And did you approach the Court or the government and ask to expedite your request for the Rule 15 deposition knowing that Ms. Adam was going to be in the United States, specifically in Virginia?

---

[5] Even if the Government had interviewed any of these individuals when or if they passed through the country, their statements would be inadmissible hearsay unless they were given at a trial or lawful deposition, and Schulman had an opportunity to cross-examine the witness.

A. I personally did not.

Q. Do you know if anybody on the team did?

A. I don't know of anyone on the team doing that.

Ex. G, Motions Hearing Transcript, Tr. 115:12–116:11 (01/19/23) ("January 2023 Tr.").

Thus, during the pendency of Schulman's motion to take a Rule 15 deposition of Adam predicated on his representation that she was overseas, Schulman knew that Adam was in the United States and willing to meet with him. There was nothing to prevent Schulman from obtaining and serving a trial subpoena on Adam. There was nothing to prevent Schulman from seeking to take Adam's deposition in the United States. But Schulman did not do any of that. Instead, Schulman's counsel interviewed Adam without informing the Court or the Government. And Schulman now faults the *Government* for failing to preserve Adam's testimony, even though his own lawyers secretly secured a closed-door meeting with her in February 2022 (14 months after the case was indicted).

Schulman's motion for a "missing witness" instruction for Adam is not just meritless; it is hypocritical. And it is emblematic of the defendant's desperate search for any possible litigation advantage that characterizes the entire motion.

### v.   Schulman's Motion Seeks to Introduce Irrelevant and Unfairly Prejudicial Evidence at Trial

Although cast as a motion for a missing witness instruction, Schulman's motion in fact seeks an entirely different instruction, which would invite the jury to pass judgment not on the defendant's conduct but on the Government's investigation. The text of the "Missing Witness" jury instruction proposed in *Modern Federal Jury Instructions* (2023) demonstrates the inapplicability of the instruction here. The proposed instruction is:

> You have heard evidence about (name of missing witness), who has not been called to testify. *The defense has argued that (name of missing*

*witness))'s testimony could have been important to this case and that (name of missing witness) was available as a witness only to the government and not to the defense.*

*If you find that the government could have called (name of missing witness) as a witness* and that (name of missing witness) would have given important new testimony, *and you also find that (name of missing witness) was available as a witness only to the government and not to the defense and that the government failed to call (name of missing witness)*, you are permitted, but you are not required, to infer that (name of missing witness)'s testimony would have been unfavorable to the government.

You must decide whether you believe that (name of missing witness) would have testified unfavorably to the government. You should not draw such a conclusion if the witness was equally available to both parties or if the witness' testimony would have merely repeated the testimony of other witnesses or evidence already presented in the case.

S1 Modern Federal Jury Instructions-Criminal 4.16 (2023) (emphasis added).  There will not, and cannot, be any evidence at trial that any of the purported witnesses "were available to the Government" because, undisputedly, none of them are currently or were ever available—and exclusively available—to the Government.

Thus, the instruction that Schulman seeks would have to be a different instruction that would instruct the jury that it could draw an adverse inference if it finds that at some time during the investigation the witness was available to the Government and only to the Government; and the Government chose not to charge the defendant during that time or "preserve" the witness's testimony at that time; and the witness is now unavailable to the defendant. Such an instruction would transform the jury's role at trial into finding facts about whether the Government should have indicted the case earlier or should have taken different investigative steps.

The Government, however, moved *in limine* to exclude that type of evidence from trial, which is legally improper. ECF 286. Specifically, the Government moved to:

1. Preclude the defendant from offering argument or evidence concerning alleged deficiencies in the government's investigation or disclosures,

> including the alleged corruption of electronic materials or other alleged problems with discovery[.]
>
> …
>
> 3. Preclude the defendant from offering argument or evidence concerning government charging decisions—in particular, preclude the defendant from offering argument or evidence concerning the timing by which the government chose to present the indictment to the grand jury[.]

ECF 286 at 3–6, 10–15. At the hearing on January 5, 2024, the Court stated:

> Am I going to allow the defense to try the government? No, no. I mean, they're going to have to try the case based on the evidence or lack thereof, demonstrating Mr. Schulman's guilt or, you know, whether the government's met its burden or not.

Tr. at 136:06-09.  Defense counsel stated:

> We don't intend to do what -- you know, to get up in our opening and say, you know, you should [acquit] because the government are bad people and they sat on this case for – that's not our intention; we intend to be much more thoughtful and within the bounds of trial practice to try to implement some of those ideas.

*Id.* at 139:10–15. Now, however, defense counsel seeks a jury instruction that would squarely put at issue the timing of the Government's charging decisions and whether the Government should be faulted for its investigative choices. For all the reasons stated in the Government's motion *in limine*, the defense request should be denied because it would impermissibly transform the jury's role from finding facts related to the defendant's guilt or innocence to finding facts related to the Government's exercises of prosecutorial discretion. *See* ECF 286 at 3–6, 10–15 (citing, among other authorities, *United States v. McVeigh*, 153 F.3d 1166, 1192 (10th Cir. 1998), cert. denied, 526 U.S. 1007 (1999) ("Under our system of criminal justice, the issue submitted to the jury is whether the accused is guilty or not guilty. The jury is not asked to render judgment about non-parties, nor is it normally asked to render a verdict on the government's investigation."); *United States v. Mosby*, 626 F. Supp. 3d 847, 859 (D. Md. 2022) ("Evidence and arguments about

the Government's investigation and prosecution of this matter are also improper at the trial stage

of this criminal proceeding")).

## II.     THE COURT SHOULD DENY SCHULMAN'S REQUEST FOR AN ADVERSE INSTRUCTION RELATED TO AMALO'S BLACKBERRY

Schulman moves for an adverse inference instruction based upon the Government's

purported "failure to preserve material evidence" from a Blackberry device seized from Amalo.

Def's Mot. at 9. Because Schulman has not made any showing that the Blackberry contained any

material evidence not already available to Schulman, and for the separate, independent reason that

Schulman cannot show that the Government willfully destroyed any evidence, the motion should

be denied.

### A.     The Government Acted Reasonably and in Good Faith and Schulman Has Not Shown that the Government Willfully Spoliated Evidence

The allegations related to the Blackberry arise in the following context: during the search

of Amalo's residence in January 2017, the Government seized 15 electronic devices, including

laptop computers, tablet computers, electronic storage devices, and six cellular phones. One of the

cellular phones was a Blackberry device that was broken at the time it was seized. The Government

imaged nine of the devices and produced the material in electronic form in discovery; it made the

other six devices available for physical inspection.

At the defense's request, the Government ultimately imaged or otherwise made

electronically available the data from five of the six cellular phone as well. Of the 15 seized

electronic devices, the only device that the Government could not access was the Blackberry

because Amalo could not recall his password.

The Government's successful undertakings to produce in discovery all the accessible

information from 14 of the 15 seized electronic devices show that the Government acted in good

faith. Further, the Government's decision not to try to repair and access the broken Blackberry earlier was reasonable: among other things, the Government obtained the Gmail account that Amalo used on the Blackberry from Google.  Further, at the time the device was seized it had already been at least seven years since Amalo used it.[6] This meant that even if the device could be repaired, it was not likely that Amalo would recall the password.

Schulman relies on a products liability and negligence case arising out of an explosion on a ship, *Vodusek v. Bayliner Marine Corp.,* 71 F.3d 148 (4th Cir. 1995), Def's Mot. 12–13, but the facts of that case are readily distinguishable. In *Vodusek*, the plaintiffs and their counsel physically destroyed key parts of the ship at issue, precluding the defendants from examining it effectively to determine the cause of the explosion. *Vodusek*, 71 F.3d at 155. The court found that the plaintiff "virtually attacked the boat with a chain saw and sledge hammer. The area which is critical to the theory eventually presented by [the defendant] was literally ripped apart." *Id.* The district court instructed the jury that if it found that defendants' access to potentially relevant evidence was substantially hindered by actions of plaintiffs and their counsel, the jury could infer that the evidence made unavailable to the defendants would have been unfavorable to the plaintiffs. *Id.*

The Fourth Circuit upheld the district court's instruction based on plaintiff's "intentional conduct" that contributed to the destruction of evidence. *Id.* at 156. The Court held that "[w]hile Vodusek may be correct in concluding that she and her expert did not act in bad faith in destroying portions of the boat, she does not dispute that those portions were permanently destroyed as part

---

[6] Schulman cites an email sent from Mr. Amalo's Gmail account from January 2010 containing an auto-signature, "Sent via Blackberry." Def's Mot. 12-13. The Government's own searches have not found any emails indicating that Mr. Amalo used the Blackberry at any time after January 2010.

of Halsey's *deliberate investigative efforts*." *Id.* (emphasis added).  Here, Amalo's Blackberry was broken at the time the Government seized it.

The spoliation of evidence rule establishes a duty "not to take action that will cause the destruction or loss of relevant evidence." *Id* .at 155. It does not impose an obligation to repair devices that are already broken when they are seized.  After the indictment, the Government nevertheless repaired the device at the defense's request. The device remained inaccessible, not because of any intentional conduct by the Government, but because Amalo did not recall his password. And it is pure speculation to contend that had the Government repaired the Blackberry earlier, Amalo would have recalled the password then: he had not used the Blackberry for approximately seven years at the time it was seized.

Schulman has not shown that the Government's deliberate conduct contributed to the unavailability of the information on the Blackberry. Under *Vodusek,* an adverse inference instruction is unwarranted. *See also United States v. Johnson,* 996 F.3d 200, 218 (4th Cir. 2020) (holding that "the mere negligent loss or destruction of evidence is an insufficient basis for an adverse inference.").

**B.    Schulman Has Not Shown the Blackberry Contained Material Evidence**

Schulman's motion *in limine* for a missing evidence instruction related to the Blackberry also fails because Schulman cannot show that it likely contains relevant information not otherwise available to Schulman. Schulman may contend that "key information contained on Amalo's Blackberry" has been "permanently lost," Def's Mot. at 12, but his contention is wholly unsubstantiated. To the contrary, the evidence produced in discovery indicates that the only

substantive communications on Amalo's Blackberry—emails from Amalo's Gmail account—were separately obtained by the Government and produced to Schulman.

The January 2010 email sent by Amalo on his Blackberry and cited by Schulman, Def's Mot. at 12, is from Amalo's Gmail account. The Government obtained this account through a search warrant served on Google and produced it in discovery. The Government has no reason to believe Amalo engaged in substantive written communications on his Blackberry device other than through Gmail. If he had done so, it stands to reason that Schulman would be able to identify some indicia of that: Schulman has received all the content available from 14 of the 15 seized Amalo devices. He has also received in discovery Amalo's Gmail account; the email accounts of other persons involved in the Somali asset recovery scheme; and Schulman's relevant emails from his former law firm, which include extensive emails between Schulman, Amalo, and others. From all this information, Schulman has not identified a single piece of information showing that Amalo ever sent substantive text messages, took relevant photographs, or otherwise maintained any unique information on the Blackberry. Nor has Schulman identified a single piece of information showing that Amalo ever used a different email address on the Blackberry.

In *Vodusek*, the missing evidence instruction was warranted because the plaintiff had shown that key parts of the vessel that would be at issue in the case were destroyed. *Vodusek*, 71 F.3d at 156 ("In this case, both the defendants and the district court concluded that the destroyed portions were significant to the effort to explain where and why the boat explosion occurred."). Similarly, in *United States v. Johnson,* 996 F.3d 200, 208-218 (4th Cir. 2020), the other Fourth Circuit precedent relied on by Schulman, Def's Mot. at 11, the defendants made a showing of the exculpatory value of the missing evidence at issue that Schulman cannot make.

In *Johnson*, the defendants were convicted of distributing heroin resulting in death. The Fourth Circuit reversed the defendants' conviction and urged the district court on remand to consider, *inter alia*, whether a missing evidence instruction should be given. The missing evidence at issue was the cellular phone of the decedent, which the Government's agent had returned to the decedent's family before trial. *Johnson* at 208–218. The defendants established that the missing evidence likely would have been exculpatory through independent evidence that the decedent's text messages showed purchases of narcotics from persons other than the defendants (which would undermine the Government's proof that the defendants' heroin caused the decedent's death). *Id.* at 209. This independent evidence included statements by the decedent's friends to law enforcement describing that decedent's text messages. *Id.* The court also found that "despite [the Government's agent's] knowledge of the cell phone's evidentiary value, [he] intentionally returned the cell phone to [the decedent's'] family after opting not to analyze it." *Id.* at 217.

Here, Schulman cannot show that the Blackberry, like the vessel at issue in *Vodusek* or the phone at issue in *Johnson*, contained unique, exculpatory information. Rather, the only evidence proffered by Schulman indicates that the primary communications on the Blackberry are emails from a Gmail account that Schulman has separately received. Schulman's motion for a missing evidence instruction should therefore be denied.

## III. SCHULMAN'S MOTION TO EXCLUDE WITNESS TESTIMONY LACKING PROPER FOUNDATION IS NOT RIPE

The Government agrees with the general evidentiary principle that witness testimony must be based on a proper foundation. *See* Fed. R. Evid. 602. The Government will not seek to elicit testimony from Amalo or any other witness that lacks proper foundation. However, Schulman's motion to exclude testimony by Amalo that lacks proper foundation, Def's Mot. at 12–16, is unripe. The Court cannot evaluate the foundation for any particular piece of Amalo's testimony

before hearing the testimony itself. In the event that Amalo—or an any other Government or defense witness—offers testimony for which the proponent's adversary believes there is an insufficient foundation, the party can and should interpose an objection at trial.

## IV.   THE COURT SHOULD DENY SCHULMAN'S MOTION TO EXCLUDE A WITNESS'S FIRST-HAND TESTIMONY DESCRIBING RELEVANT COMMUNICATIONS BETWEEN THE WITNESS AND THE DEFENDANT DURING THE CONSPIRACY

Schulman also seeks to exclude Amalo's testimony of statements that he made to Schulman during the course of the conspiracy. Def's Mot. at 16–19. This testimony would be based on Amalo's own first-hand knowledge, it would be probative of Schulman's knowledge and state of mind in connection with the charged crimes, and it would be subject to cross-examination. Accordingly, it would be highly probative, squarely admissible, and there would be nothing "unfair" about it. Schulman therefore falls far short of establishing that any *unfair* prejudice from this testimony *substantially outweighs* its probative value. Fed. R. Evid. 403.

### A.      Schulman Concedes the Hearsay Rule Does Not Apply

As a threshold matter, it bears emphasis that Schulman has conceded that this testimony by Amalo should not be excluded under the hearsay rule. In defendant's Reply Memorandum in support of his motion to exclude evidence, Schulman stated, "[t]he government's opposition waxes endlessly regarding the admissibility of in-court statements by Mr. Amalo. *The admissibility of these statements is not in dispute*. Rather, what is in dispute is whether Mr. Amalo should be permitted to testify to prior statements made to agents and statements made by other co-conspirators in the course of the alleged conspiracy."  ECF 321 at 6 (emphasis added).

Indeed, because a witness is subject to cross-examination, a witness's testimony regarding his own out-of-court statements should not be excluded by the hearsay rule. *See, e.g.*, *McCullers v. United States*, No. 07-CR-49, 2012 WL 1942068, at *8 (E.D. Va. May 29, 2012) ("Co-

conspirators . . . testified directly, at trial, to their and [defendant's] involvement in the conspiracy; Rule 801(d)(2)(E) is not applicable to their testimony because it was given at trial."); *see also* ECF 334 at 4–10. On the other hand, a witness's testimony regarding the out-of-court statements of declarants who are not subject to trial warrants greater scrutiny under the hearsay rule.

In *United States v. Jackson,* the Fourth Circuit explained the distinction as follows: "[a]lthough Rule 801(d)(2)(E) makes the co-conspirator's statements non-hearsay, the out of court statements nonetheless lack *the indicia of reliability that attaches to testimony given in the solemn atmosphere of a court by a witness subject to cross examination*." 757 F.2d 1486, 1491 (4th Cir. 1985) (emphasis added). Amalo's testimony regarding his own out-of-court statements will be "given in the solemn atmosphere of a court by a witness subject to cross examination" and thus should not be excluded under the hearsay rule, irrespective of whether the Court finds that the statements were made in furtherance of the conspiracy and admissible under Rule 801(d)(2)(E).[7]

Put another way, because Amalo will be testifying in court, he can testify directly to—and be cross-examined about—the truth of any out-of-court statement that he made.  Amalo's testimony that he made certain out-of-court statements to Schulman will be relevant not merely for the truth of the statement, which Amalo can testify to directly.  Rather, the testimony will be relevant because it is probative of Schulman's knowledge, intent, and state of mind—and  those issues are likely be the central issue in dispute at trial.  *See United States v. Santoro*, 302 F.3d 76, 82 (2d Cir. 2002) (holding, in a fraud and bribery case, that "[c]entral to the question of defendants' guilt at trial was not simply their conduct but also their knowledge of the fraud").

---

[7] The Government previously set forth some of the evidence that amply establishes the foundation under Rule 104 for the Court to admit statements made by Amalo as statements of Schulman's co-conspirator in furtherance of the conspiracy. ECF 334 at 11–16. But the Court need not revisit that issue to resolve this motion.

**B.      Rule 403 Does Not Preclude Highly Probative Testimony that Is Fairly—but Not Unfairly—Prejudicial**

To exclude evidence under Rule 403, the movant must show that the evidence's probative value is substantially outweighed by unfair prejudice. Fed. R. Evid. 403. The Court must first assess the likely probative value. Here, Amalo's testimony about his communications with Schulman during the course of the conspiracy will be highly probative of Schulman's knowledge and state of mind, and Schulman does not contend otherwise.

Courts have frequently held that the testimony of a co-conspirator is particularly probative of the defendant's knowledge and willing participation in the alleged conspiracy. In *United States v. Washington*, the Third Circuit held that the testimony of the defendant's former co-conspirator who testified for the Government about his relationship with the defendant was "highly probative of a key issue: whether Washington had continuous, trusting relationships with other alleged co-conspirators, and whether he worked in concert with them." 602 F. App'x 858, 864 (3d Cir. 2015) (upholding district court denial of motion to exclude testimony under Rules 403 and 404). Similarly, in *United States v. Cornell*, the Sixth Circuit held that that the co-conspirator's testimony was "highly probative" of the defendant's involvement with his co-conspirator and properly admitted. 162 F. App'x 404, 411 (6th Cir. 2006); *see also United States v. Dugue*, 763 F. App'x 93, 95 (2d Cir. 2019) (in a mail and wire fraud case, holding that "the conspirator's testimony was evidence of the conspiracy alleged in the indictment, and therefore was plainly probative"); *United States v. James*, 40 F.3d 850, 864 (7th Cir. 1994) (holding that co-conspirator's testimony was highly probative of whether the defendant knew the conspiracy existed).

In light of the highly probative nature of the testimony, the bar is high for exclusion under Rule 403 because Schulman must show the prejudice substantially outweighs the probative value. Moreover, Schulman must not merely show that the evidence is prejudicial but that it is *unfairly*

22

prejudicial. As the Fourth Circuit explained in *United States v. Wallace*, "Rule 403 only requires suppression of evidence that results in unfair prejudice—prejudice that damages an opponent for reasons other than its probative value, for instance, an appeal to emotion, and only when that unfair prejudice substantially outweighs the probative value of the evidence." 124 F. App'x 165, 167 (4th Cir. 2005). Under this rule, "damage to a defendant's case is not a basis for excluding probative evidence," because "[e]vidence that is highly probative invariably will be prejudicial to the defense." *United States v. Grimmond*, 137 F.3d 823, 831 (4th Cir. 1998); *see also Perry v. Ethan Allen, Inc.,* 115 F.3d 143, 151 (2d Cir. 1997) ("As the terms of the Rule indicate, for relevant evidence to be excluded on this basis, the imbalance must be substantial, and the prejudice must be unfair.").

Schulman has not shown that the evidence is unfairly prejudicial within the meaning of Rule 403. He has not shown that it would damage him "for reasons other than its probative value, for instance, an appeal to emotion." *Wallace* at 167. And without showing any unfair prejudice at all, Schulman certainly has not shown unfair prejudice that substantially outweighs the probative value of his alleged co-conspirator's testimony. Moreover, Schulman's brief tellingly does not cite a single case in which the testimony of a co-conspirator about communications with the defendant has been excluded under Rule 403 (or any other rule). The motion should be denied accordingly.

Schulman, however, contends that the testimony should be excluded for a different reason: he contends that he is prejudiced because "witnesses who would impeach or undermine Mr. Amalo's testimony are no longer available due to the government's delay." Def's Mot. at 17.

Schulman does not cite a single decision excluding witness testimony on this basis. The remedy he seeks is apparently unprecedented.

Punishing the Government by hamstringing its case in this way would be out of step with the Court's conclusion that the Government did not delay "to 'gain tactical advantage' or with 'reckless disregard' as to the consequences for Schulman's defense." ECF 308 at 51 (citing *United States v. Lovasco*, 431 U.S. 783, 788–89 (1977)). Moreover, the remedy sought is unnecessary to ensure a fair trial because Schulman will have ample ability to undermine Amalo's testimony. Most importantly, Amalo will be subject to cross-examination by defense counsel, who have received voluminous discovery (including 14 electronic devices) related to Amalo, and who have had more than three years to prepare for trial. *See California v. Green,* 399 U.S. 149, 158–59 (1970) (describing cross-examination as "the greatest legal engine ever invented for the discovery

of truth"). Accordingly, neither Rule 403 nor any other authority provide a basis to exclude Amalo's trial testimony of his communications with Schulman during the course of the conspiracy.

## **CONCLUSION**

Based on the foregoing, the United States respectfully submits that the Court should deny the defendant's motions *in limine*.


Dated: February 8, 2024                    Respectfully submitted,


    GLENN S. LEON                         EREK L. BARRON
    Chief                                 United States Attorney
    Fraud Section                         District of Maryland

    _____/s/_____                     _____/s/_____
    Jason M. Manning                      David I. Salem
    Allison L. McGuire                    Assistant United States Attorney
    Trial Attorneys

**<ins>Certificate of Service</ins>**

I HEREBY CERTIFY that on February 8, 2024, a copy of the foregoing was delivered via ECF to counsel of record.


_____/s/_____
Jason M. Manning
Trial Attorney