# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | * | |
| | * | |
| v. | * | **CRIMINAL NO. PX-20-0434** |
| | * | |
| **JEREMY WYETH SCHULMAN,** | * | |
| | * | |
| | * | |
| **Defendant** | * | |
| | * | |
| | ******* | |

## GOVERNMENT'S OPPOSITION TO DEFENDANT JEREMY SCHULMAN'S MOTION TO DISMISS THE INDICTMENT FOR PROSECUTORIAL MISCONDUCT [ECF 362]

**TABLE OF CONTENTS**

Background ........................................................................................................... 1

   A.   Grand Jury Service in the Southern Division - Greenbelt, Maryland ................................ 1

   B.   The Presentation to the Grand Jury in December 2020 ............................ 3

Legal Standard ................................................................................................... 6

   I.   The Supreme Court Squarely Held in Williams that There Is No Obligation to Present Exculpatory Information to the Grand Jury ............................................... 6

   II.   The Williams Rule that a Prosecutor Is Not Obligated to Present Even "Substantially Exculpatory Evidence" Is Not Limited to Any Specific Facts or Types of Allegedly Exculpatory Evidence ................................................................ 8

   III.   Following Bank of Nova Scotia and Williams, a Facially Valid Indictment Can Only Be Dismissed for Prosecutorial Conduct that Violates One of the "Few, Clear Rules" Established by Law ........................................................................ 10

   IV.   The Fourth Circuit Has Consistently Followed Bank of Nova Scotia and Williams ....... 11

   V.   Challenges to the Information Presented to the Grand Jury that Are Foreclosed by Williams Cannot Be Repackaged as Claims of Prosecutorial Misconduct ..................... 14

   VI.   Lawson and Other Pre-Williams Decision Are No Longer Good Law and Do Not Support Dismissal of the Indictment ................................................................ 15

Argument ........................................................................................................... 18

   I.   Schulman's Allegations Regarding the 2009 False Decree Translation Do Not Show False Let Alone Intentionally Misleading Testimony ..................................... 20

      A.   Abdelhakim Abdi's Testimony ................................................................ 20

      B.   Farah Abdi's Testimony ........................................................................ 22

      C.   Agent Schumaker's Testimony .............................................................. 23

      D.   Abdiaziz Amalo's Interview Memos ..................................................... 25

   II.   Schulman's Allegations about the Grand Jury Testimony Related to the 2010 Warning Letter Do Not Show False Let Alone Intentionally Misleading Testimony ................... 27

   III.   Schulman's Allegations about the Grand Jury Testimony Related to the Release of Funds by Various Institutions Do Not Show False Let Alone Intentionally Misleading Testimony ...................................................................................... 29

      A.   Citi Switzerland ................................................................................... 30

      B.   The New York Comptroller ................................................................... 33

      C.   Citibank .............................................................................................. 35

   IV.   Schulman's Allegations about the Other Supposedly Exculpatory Information Are Similarly Foreclosed by *Williams* ........................................................... 37

i

V.   Schulman's Allegations Regarding Xenia Espinoza Do Not Show Any Misconduct or Any Prejudice............................................................................................................. 38

VI.   Schulman's Allegations about the Proffer Letter Are Inconsistent with the Proffer Letter Itself and Meritless........................................................................................................... 43

VII.   The Government's Compliance with Its *Brady/Giglio* Obligations Does Not Show Prosecutorial Misconduct................................................................................................ 44

VIII.   There Has Been No Pattern of Misconduct that Has Pervaded This Case ...................... 46

IX.   No Evidentiary Hearing Is Warranted ............................................................................. 49

Conclusion .................................................................................................................................. 50

The United States of America, by and through its attorneys, submits this memorandum in opposition to Defendant Jeremy Schulman's Motion to Dismiss the Indictment Based on Newly Discovered Evidence of Prosecutorial Misconduct (ECF 362). Schulman alleges that the Government committed prejudicial misconduct by its selection and characterization of the evidence to present to the indicting grand jury. Under well-established Supreme Court precedent, however, allegations of misconduct before the grand jury only warrant dismissal of the indictment if the Government violates one of the "few, clear rules which were carefully drafted and approved by [the Supreme Court] and by Congress to ensure the integrity of the grand jury's functions," and "challenge[s] to the reliability or competence of the evidence" presented to the grand jury "will not be heard." *United States v. Williams*, 504 U.S. 36, 46, 54 (1992) (citation omitted). Because the Government comported with established rules governing grand jury practice, and Schulman's quarrels with how the Government presented the evidence to the grand jury have been foreclosed by *Williams* and its progeny, Schulman's motion to dismiss the indictment should be denied.

## BACKGROUND

### A.    Grand Jury Service in the Southern Division - Greenbelt, Maryland

During the relevant period, two federal grand juries were typically convened in the Southern Division of the District of Maryland for a period of 12 and 18 months, referred to as regular and special panels, respectively. Each panel typically met once a week during the period of their service. The District Court must issue an order each time a new grand jury is convened, *see* Fed. R. Crim. P. 6(a)(1), and it did so here.[1] Those orders authorize the term of service. By court order, a Greenbelt grand jury was convened in January 2017 and completed its service in

---

[1] *See Williams*, 504 U.S. at 47 ("Judges' direct involvement in the functioning of the grand jury has generally been confined to the constitutive one of calling the grand jurors together and administering their oaths of office.").

1

June 2018 ("the January 2017 Term"); another Greenbelt grand jury was convened in July 2018 and completed its service in December 2019 ("the July 2018 Term"); and another Greenbelt grand jury was convened in January 2020 and completed its service in December 2021, after its original 18 month term was extended for six months during the pandemic (the "January 2020 Term").[2] These grand juries were not convened for the purpose of any single investigation. Rather, they heard testimony and voted on indictments across the full range of cases that were presented by the U.S. Attorney's Office during their respective terms.

Apart from these grand juries, single-purpose (also called "special") grand juries are occasionally empaneled by the Justice Department for investigations of particular complexity or intensity. By statute, these single-purpose grand juries generally may not be empaneled longer than 36 months, even with extensions. *See* 18 U.S.C. § 3331. These single-purpose grand juries are relatively rare: to the best of the undersigned's knowledge, there has not been a single-purpose grand jury empaneled in Greenbelt for at least ten years.

From 2017 through 2019, six witnesses in this investigation testified before two different regular grand juries, as follows[3]:

---

[2]  Additional grand juries were convened in October 2017 and April 2019.

[3]  In its opposition to Schulman's motion to dismiss the indictment pursuant to the Fifth and Sixth Amendments of the U.S. Constitution, the Government used the definite article "the" when describing any testimony taken before "the grand jury" during the investigation, as it often does. By this word choice, the Government never intended to indicate that the same grand jurors who were empaneled in Greenbelt in April 2017 were still there when the Government sought the indictment three and half years later in December 2020. By statute, such a scenario would require special judicial authorization, *see* 18 U.S.C. §§ 3331, 3333(e), and in practice, it would be exceedingly rare (we do not believe it has ever occurred in Greenbelt). The Government regrets the imprecision of the language in its previous brief and that the Government did not seize on the misimpression it caused with the Court. For the reasons described *infra*, the Government submits that no legal obligations arise from the fact that there was testimony given in other grand juries before the January 2020 Term grand jury issued the indictment. Nor does the fact that different grand juries heard testimony in this investigation disturb the Court's finding that the Government was "earnestly and consistently investigating this highly complex transcontinental case through early 2020, and any further delay can reasonably be attributed to the court closures associated with the COVID-19 pandemic." ECF 308 at 51.

2

| January 2017 Term | | |
|---|---|---|
| | April 26, 2017 | ███████████ |
| | September 6, 2017 | ██████ |
| | May 9, 2018 | ███████ |
| | June 6, 2020 | ████████ |
| | June 20, 2018 | █████████ |
| July 2018 Term | | |
| | May 15, 2019 | ██████████ |

In September 2020, the Government informed Schulman that ████████████████

████████████████████████████████████████████████████████████

███████

### B.     The Presentation to the Grand Jury in December 2020

The Government presented the indictment to the January 2020 Term grand jury on December 2, 2020. At the time, there was no vaccine available for Covid-19, and the Government and grand jury had to take various precautions related to wearing of masks, spacing in the grand jury room, and other procedures. *See, e.g.*, Standing Order 2020-05 (Mar. 3, 2020).

Retired FBI Special Agent Nanette Schumaker ("Agent Schumaker") testified as a summary witness. Def's Ex. 9 Grand Jury Transcript of Nanette Schumaker ("Schumaker Tr."). She had been the lead FBI case agent on the investigation from its inception and continued to work with the prosecution team as a consultant following her retirement from the FBI. *Id.* At the outset, Agent Schumaker testified ████████████████████████████████████████



---

4 ████████████████████████████████████████ .

Schumaker Tr. at 4:17-5:01.



Agent Schumaker's testimony was not limited to incriminating facts.

████████████████████████████████████████████████████████

███████████████████████

Post-indictment, Schulman challenged the indictment's validity through four motions to dismiss. The Court held two hearings and received supplemented briefing on the motions. The Court determined that the indictment was facially valid and denied all the motions. *See* ECF 309.

## LEGAL STANDARD

Schulman's motion blatantly mischaracterizes the state of the relevant law. The leading Supreme Court decision on the Government's obligations regarding presentment of information to the grand jury, *United States v. Williams*, 504 U.S. 36 (1992), has been cited by the Circuit Courts of Appeal (including the Fourth Circuit) repeatedly for decades yet, through oversight or otherwise, it goes entirely unmentioned in Schulman's brief. Accordingly, the Government sets forth here the legal principles of grand jury practice that both provided the legal framework for the Government's choices in 2020 and should govern the adjudication of the motion.[6]

I.     **The Supreme Court Squarely Held in *Williams* that There Is No Obligation to Present Exculpatory Information to the Grand Jury**

In *United States v. Williams*, the Supreme Court addressed the question of "whether a district court may dismiss an otherwise valid indictment because the Government failed to disclose to the grand jury 'substantial exculpatory evidence' in its possession." 504 U.S. at 37-38. The Court began its analysis by addressing the scope of the federal courts' supervisory power to prescribe standards of prosecutorial conduct before the grand jury. The Court held that "[b]ecause the grand jury is an institution separate from the courts, over whose functioning the courts do not preside, we think it clear that, as a general matter at least, no such 'supervisory' judicial authority

---

[6] The Government also addresses Schulman's factual allegations further below.

exists." *Id*. at 47. The Court explained that the limited scope of the courts' supervisory power is grounded in the grand jury's "operational separateness from its constituting court." *Id*. at 49. The grand jury "is a constitutional fixture in its own right," that "belongs to no branch of the institutional Government," and operates "at arm's length" from the judicial branch. *Id.* at 47 (citations and quotation marks omitted).

Applying these principles, the Court held that prosecutors are not obligated to present exculpatory evidence to the grand jury. Doing so would be "incompatible" with the grand jury's unique function and independence. *Id.* at 52. Unlike a court, "the grand jury sits not to determine guilt or innocence, but to assess whether there is adequate basis for bringing a criminal charge." *Id.* at 51. To make that assessment, "it has always been thought sufficient to hear only the prosecutor's side." *Id.* The grand jury's function is not "to enquire upon what foundation the charge may be denied, or otherwise to try the suspect's defenses, *but only to examine upon what foundation the charge is made by the prosecutor*." *Id.* at 51-52 (alterations and quotation marks omitted and emphasis added).

As the Court explained, a "'balanced' assessment" of matters before the grand jury is not the objective. *Id.* at 52. "[N]either in this country nor in England has the suspect under investigation by the grand jury ever been thought to have a right to testify or to have exculpatory evidence presented." *Id.* The grand jury may choose "to hear no more evidence than that which suffices to convince it an indictment is proper," and "[i]f the grand jury has no obligation to consider all 'substantial exculpatory' evidence, we do not understand how the prosecutor can be said to have a binding obligation to present it." *Id.* at 53. The Court further explained that "requiring the prosecutor to present exculpatory as well as inculpatory evidence would alter the grand jury's historical role, transforming it from an accusatory to an adjudicatory body." *Id.* at 51. Such a rule

"would run counter to the whole history of the grand jury institution[,] [and] [n]either justice nor the concept of a fair trial requires [it]." *Id.* at 54-55 (quoting *Costello v. United States*, 350 U.S. 359, 364 (1956) (alterations in original)).[7]

**II.    The *Williams* Rule that a Prosecutor Is Not Obligated to Present Even "Substantially Exculpatory Evidence" Is Not Limited to Any Specific Facts or Types of Allegedly Exculpatory Evidence**

The Court's broad holding in *Williams* is not limited to facts of the case or the types of evidence at issue. Rather, the holding broadly applies to all allegedly exculpatory information without qualification. *Williams,* 504 U.S. at 53 ("If the grand jury has no obligation to consider all 'substantial exculpatory evidence', we do not understand how the prosecutor can be said to have a binding obligation to present it.").

The defendant in *Williams* was charged with making false statements to a financial institution. The district court dismissed the indictment because the government did not disclose to the grand jury Williams' general ledgers, tax returns, and testimony from a bankruptcy proceeding, all of which the defendant contended negated his criminal *mens rea*. The district court held that the evidence created a reasonable doubt about Williams' guilt, rendering the grand jury's decision to indict "gravely suspect." *Id.* at 39. On appeal, the Tenth Circuit agreed, and, using the language of the Supreme Court's earlier *Bank of Nova Scotia* decision, found that the government's withholding of "substantially exculpatory evidence" both "substantially influenced" the grand jury's decision to indict and "raised a 'grave doubt that the decision to indict was free from such

---

[7] *Williams* accords with holdings that other evidentiary rules necessary to ensure a fair trial do not apply in the grand jury context, where the objective is an accusatory assessment of probable cause. For example, the hearsay rule does not apply in grand jury proceedings, *Costello v. United States*, 350 U.S. 359 (1956), nor does the exclusionary rule for evidence obtained in violation of the Fourth Amendment, *United States v. Calandra*, 414 U.S. 338 (1974).

substantial influence.'" *Id.* at 39-40 (quoting *United States v. Williams*, 899 F.2d 898, 903 (10th Cir. 1990), *rev'd*, 504 U.S. 36 (1992)).

The Supreme Court reversed and held that the prosecutor has no obligation to disclose exculpatory evidence to the grand jury. In reaching its broad holding, the Court did not question the allegedly exculpatory quality of the evidence at issue. *Id., passim.* Rather, it accepted *arguendo* the finding of the district court that the evidence at issue was both "substantial" and "exculpatory"—and it nevertheless held that courts could not impose any requirement that prosecutors present exculpatory evidence to a grand jury. *Id.* at 51 (rejecting defendant's request to "impos[e] on the prosecutor a legal obligation to present exculpatory evidence in his possession"). The Court further held that federal courts have no supervisory power to prescribe additional standards of prosecutorial misconduct before the grand jury beyond those already provided in a clearly established rule of criminal procedure, statute, or constitutional guarantee. *Id.* at 46-47 (explaining that, contrary to the Tenth Circuit's holding, *Bank of Nova Scotia* did not permit dismissals based on judicially prescribed standards of prosecutorial conduct). Simply put, the Court's holding was not tethered in any way to either the type or the quality of the allegedly exculpatory evidence. Thus, any attempt to distinguish *Williams* on its facts must fail.

In *United States v. Witasick,* the defendant, like Schulman, alleged that the prosecution committed misconduct in the grand jury by not presenting exculpatory evidence. 443 F. App'x 838, 843 (4th Cir. 2011). The Fourth Circuit summarily rejected the defendant's appeal as follows:

> Witasick's argument that the prosecution must present exculpatory evidence to the grand jury is similar to that rejected by the Supreme Court in *United States v. Williams*, 504 U.S. 36, 44–46, 112 S. Ct. 1735, 118 L.Ed.2d 352 (1992). While Witasick seeks to distinguish *Williams*, we find his attempts unpersuasive. The Court was emphatic that "[i]mposing upon the prosecutor a legal obligation to present exculpatory evidence in his

possession would be incompatible with [the adversarial] system." *Id.* at 52,
112 S. Ct. 1735.

*Id.* at 843.

### III. Following *Bank of Nova Scotia* and *Williams*, a Facially Valid Indictment Can Only Be Dismissed for Prosecutorial Conduct that Violates One of the "Few, Clear Rules" Established by Law

In *Williams*, the Court held that while courts may "dismiss an indictment because of misconduct before the grand jury, at least where that misconduct amounts to a violation of one of those 'few, clear rules which were carefully drafted and approved by this Court and by Congress to ensure the integrity of the grand jury's functions,'" courts may not use their supervisory power "as a means of prescribing those standards of prosecutorial conduct in the first instance." *Id.* at 46-47 (citing *Bank of Nova Scotia v. United States*, 487 U.S. 250 (1988)). The Court specifically identified those "few, clear rules" whose violation would give rise to dismissal of indictment: Federal Rule of Criminal Procedure 6 and statutes establishing specific obligations for prosecutors in the grand jury, including 18 U.S.C. §§ 6002, 6003 (establishing procedures and obligations related to witness immunity), § 1623 (criminalizing false declarations before grand jury), § 2515 (prohibiting grand jury use of unlawfully intercepted wire or oral communications), and § 1622 (criminalizing subornation of perjury). *Williams,* 504 U.S. at 46 n.6.

Notably, in *Williams* the Court did not identify—and Schulman has not identified—any clear rule obliging the prosecutor to re-present to an indicting grand jury any information (exculpatory or otherwise) that was presented to a previous grand jury. To the contrary, Rule 6 expressly contemplates that a prosecutor "may" share information presented in one grand jury with another grand jury, but it does not require the prosecutor to do so. Fed. R. Crim. P. 6(e)(3)(C)

(providing that "[a]n attorney for the government may disclose any grand-jury matter to another federal grand jury.").[8]

In sum, indictments may only be dismissed for alleged misconduct where: (1) "misconduct amounts to a violation of one of those 'few, clear rules which were carefully drafted and approved by this Court and by Congress to ensure the integrity of the grand jury's functions,'" *Williams*, 504 U.S. at 46 (citation omitted), and (2) clear prejudice has been shown, *i.e.*, "'if it is established that the violation substantially influenced the grand jury's decision to indict,' or if there is 'grave doubt' that the decision to indict was free from the substantial influence of such violations," *Bank of Nova Scotia*, 487 U.S. at 256 (citations omitted). Further, under *Williams*, prosecutors are not required to disclose even substantially exculpatory information, and prosecutors are not required to re-present any testimony from a previous grand jury to an indicting grand jury (because no clear rule establishes that obligation).

## IV.    The Fourth Circuit Has Consistently Followed *Bank of Nova Scotia* and *Williams*

The Fourth Circuit has consistently adhered to the Supreme Court's ruling in *Williams* to reject challenges, like those raised by Schulman, to the government's presentation of evidence in the grand jury. In 1993, in *United States v. Burns*, a case involving conspiracy and Travel Act violations related to drug smuggling, the district court denied the defendant's motion to dismiss the Travel Act count under its "supervisory powers." The Fourth Circuit affirmed, citing to

---

[8] Accordingly, the Federal Grand Jury Practice Manual cited by Schulman, Def's Mot. at 30-31, describes practices the prosecutor "should" consider with respect to re-presenting information to an indicting grand jury; it does not identify any practices the prosecutor must adhere to. This language in the Federal Grand Jury Practice Manual stands in obvious contrast to other language describing mandatory obligations, *e.g.*, "[f]ederal crimes *must* be prosecuted in the judicial district in which they were committed"; "Rule 6(e) *prohibits* the disclosure of any information that would reveal matters occurring before the grand jury or grand jury matters." Schulman predicts that the Government will dismiss the practice manual as non-binding, and it is indeed non-binding. *See United States v. Jarrett,* 447 F.3d 520, 529 (7th Cir. 2006) ("Case law, not internal handbooks, provides the guidance for whether a prosecutor has crossed the line in pursuing an indictment."). But there is nothing to disavow: the Government's conduct here did not transgress any requirements set forth in the manual or the law.

*Williams* for the proposition that "the supervisory power of the federal courts of appeals may not be used to prescribe prosecutorial conduct 'in the first instance,' before a grand jury." 990 F.2d 1426, 1436 (4th Cir. 1993). As the court explained, "[i]t is the province of the Government to decide the terms on which it will bring criminal indictments, and to inscribe the charges it will post in them. So long as those charges are grounded upon solid legal predicates not contravened by the Constitution or other laws of the United States, we are unlikely to invoke transcendent powers of ambiguous scope to destroy them." *Id.*

That same year, in *United States v. Mills*, a drug conspiracy case, the defendant moved to dismiss the indictment, claiming that he was indicted for the conduct of another person because the case agent mistakenly referred to the defendant by another name in the grand jury. 996 F.2d 480, 483 (4th Cir. 1993). The district court denied the motion. The Fourth Circuit affirmed, stating that "the Supreme Court's holdings under the Fifth Amendment's Indictment Clause teach that *courts lack authority to review either the competency or sufficiency of evidence which forms the basis of an indictment* and may not quash indictments when the errors which produce them, such as prosecutorial misconduct or violation of a statute, do not affect substantial rights." *Id.* at 487 (emphasis added).

In 1995, in *United States v. McDonald*, a case involving gun and drug charges, the defendant contended that dismissal of the indictment was warranted because an agent testified to the grand jury that two witnesses had been given polygraph tests but failed to inform the grand jury that one test was inconclusive and the other indicated deception. 61 F.3d 248, 252 (4th Cir. 1995), *overruled on other grounds by United States v. Wilson*, 205 F.3d 720 (4th Cir. 2000). In the defendant's view, this misled the grand jury by implying the two had passed their tests. *Id.* The defendant also pointed to several additional misstatements by the testifying agent. The district

12

court denied the motion, and the Fourth Circuit affirmed. Citing *Bank of Nova Scotia*, the court held that it would "not hear a challenge to the reliability or competence of the evidence presented to the grand jury, and the mere fact that evidence itself is unreliable is not sufficient to require a dismissal of the indictment." *Id.* at 252 (cleaned up). The court further held that *Williams* "made clear that a failure by the government to disclose even substantial exculpatory evidence to the grand jury does not constitute such misconduct." *Id.* at 253 (citations and quotation marks omitted).

In *United States v. Witasick*, a case involving tax evasion, tax perjury, and health care fraud charges, the defendant alleged prosecutorial misconduct and argued that the prosecutor was required to present exculpatory evidence to the grand jury and did not do so. 443 F. App'x 838, 843 (4th Cir. 2011) (unpublished). Citing *Williams*, the Fourth Circuit rejected the defendant's argument, noting that in *Williams*, "[t]he Court was emphatic that '[i]mposing upon the prosecutor a legal obligation to present exculpatory evidence in his possession would be incompatible with [the adversarial] system.'" *Id.* (quoting *Williams,* 504 U.S. at 52).

In *United States v. Outlaw*, 464 F. App'x 165 (4th Cir. 2012) (unpublished), an inmate assault case, the defendant moved to dismiss the indictment based on allegations that the investigative agent had provided false testimony to the grand jury. *Id.* at 167. Outlaw disputed the agent's interpretation and representation of video surveillance footage to the grand jury and argued that the agent had "falsely exaggerated the strength of the Government's case." *Id.* The district court denied Outlaw's motion to dismiss, and the Fourth Circuit affirmed. The Fourth Circuit held that the defendant's "argument that dismissal of the superseding indictment was warranted because [the agent] provided false grand jury testimony amounts to nothing more than a disagreement with the witness's opinions of the facts of the case." *Id.* (internal quotation marks omitted). The court cited to *Williams* for the proposition that a court's ability to dismiss an indictment because of

misconduct before the grand jury is limited to situations in which "the misconduct 'amounts to a violation of one of those few, clear rules which were carefully drafted and approved by [the Supreme Court] and by Congress to ensure the integrity of the grand jury's functions.'" *Id.* at 167 (quoting *Williams,* 504 U.S. at 46).

As these cases (among many others) demonstrate, the law, for decades, has been well-established: allegations that the prosecutor failed to present substantial exculpatory evidence to the grand jury do not warrant dismissal of an indictment. *See United States v. Neely*, 966 F.2d 1445 (4th Cir. 1992) (unpublished) (reversing district court dismissal of indictment because, under *Williams,* "a district court may not dismiss an otherwise valid indictment because the government failed to disclose to the grand jury substantial exculpatory evidence in its possession."); *United States v. Slade*, 14 F.3d 598 (4th Cir. 1993) (unpublished) (denying new trial motion on grounds that prosecutor allegedly presented false testimony to obtain an indictment from the grand jury and relying on *Williams* for the proposition that "[t]he prosecutor need not present exculpatory evidence to the grand jury."); *United States v. Williams*, 70 F. App'x 141 (4th Cir. 2003) (unpublished) (same).

## V.     Challenges to the Information Presented to the Grand Jury that Are Foreclosed by *Williams* Cannot Be Repackaged as Claims of Prosecutorial Misconduct

Schulman accuses the government of presenting what he views as "false and misleading" testimony to the grand jury. Def's Mot. at 1-5. Yet these are the exact types of allegations that the Supreme Court has foreclosed. In *Williams*, the Supreme Court expressly stated that non-cognizable claims about which evidence was presented to the grand jury do not become cognizable simply because they have been repackaged as prosecutorial misconduct claims. The Court stated: "[a] complaint about the quality or adequacy of the evidence can always be recast as a complaint that the prosecutor's presentation was 'incomplete' or 'misleading.'" *Williams,* 504 U.S. at 54; *see*

14

*also Bank of Nova Scotia*, 487 U.S. at 260-61 (declining to consider whether prejudice would be shown where "IRS agents gave misleading and inaccurate summaries" of evidence to the grand jury).

**VI.   *Lawson* and Other Pre-*Williams* Decision Are No Longer Good Law and Do Not Support Dismissal of the Indictment**

Schulman principally relies on case law that pre-date the Supreme Court's controlling decisions in this area of the law, *Bank of Nova Scotia* (1988) and *Williams* (1992). *See* Def's Mot., *passim* (citing *United States v. Lawson*, 502 F. Supp. 158 (D. Md. 1980), *United States v. Samango*, 607 F.2d 877 (9th Cir. 1979), *United States v. Omni Int'l Corp.*, 634 F. Supp. 1414 (D. Md. 1986), *United States v. Gallo*, 394 F. Supp. 310 (D. Conn. 1975), *United States v. Hogan*, 712 F.2d 757 (2d Cir. 1983), and *United States v. DeMarco*, 407 F. Supp. 107 (C.D. Cal. 1975)). Schulman goes so far as to contend that *Lawson* is "most instructive." *Id.* at 10. Yet *Lawson* is readily distinguishable for at least two reasons.

First, it is doubtful *Lawson* remains good law post-*Bank of Nova Scotia* and post-*Williams*. After *Costello v. United States* (and before *Williams* and *Bank of Nova Scotia*), some courts (like the court in *Lawson*) seized upon "Justice Black's caveat in *Costello*, that an indictment must be returned by an 'unbiased grand jury'" as doctrinal justification for exercising supervisory control over prosecutorial misconduct before the grand jury. *Lawson*, 502 F. Supp. at 169; *see generally* LaFave, 4 Criminal Procedure § 15.5(b) ("The federal standard: the rise and demise of 'misconduct exception' to *Costello*"). As the court in *Lawson* explained, its decision in that case was based on what it called "the 'prosecutorial misconduct' doctrine" used by federal courts after *Costello* to "remedy perceived grand jury abuses, yet avoid *Costello*'s prohibition against examining directly the quality of the evidence presented to the grand jury." 502 F. Supp. at 169. The court in *Lawson* acknowledged that the decisions applying this doctrine "establish no consistent standard for

15

dismissal as they are based on discrete factual situations and employ diverse reasoning." *Id.* Surveying this inconsistent landscape, the *Lawson* court also observed that some courts had been inclined to dismiss indictments "even absent a showing of prejudice by the defendant." *Id.* at 170.

The court in *Lawson* nonetheless dismissed the indictment pursuant to the misconduct "exception" to *Costello*, holding that "[b]y intentionally and repeatedly asking misleading questions, while failing to disclose known, exculpatory evidence on the issue of Lawson's guilty knowledge, the prosecutor denied defendants their constitutional right to an 'unbiased' grand jury." *Id.* at 172 (citing *Costello*, 350 U.S. at 363). The court in *Lawson* made no finding of actual prejudice (as would be required under *Bank of Nova Scotia*), stating instead that "the court will not speculate that the grand jurors' decision might have been unaffected by the prosecutor's conduct," *Id.* at 172.

The doctrinal basis for the *Lawson* decision—the assumption that federal courts, using their supervisory powers, could define prohibited prosecutorial misconduct in the presentation of evidence before the grand jury apart from the "few, clear rules" governing such conduct—is exactly what the Supreme Court rejected in *Williams*. *See Williams*, 504 U.S. at 47 ("[W]e think it clear that, as a general matter at least, no such 'supervisory' judicial authority exists."). And both *Williams* and *Bank of Nova Scotia* clarified that for the limited set of cases in which an indictment could be dismissed for prosecutorial misconduct, a court must find actual prejudice to a defendant, which was a finding that the *Lawson* court expressly did not make. *See United States v. Derrick*, 163 F.3d 799, 808 (4th Cir. 1998) (vacating district court's dismissal of indictments for prosecutorial misconduct outside the grand jury context and calling called into question the district court's reliance on cases predating *Bank of Nova Scotia*, including *Lawson*, *Omni International*, *DeMarco*, and *Hogan*).

16

*Lawson*'s application of the "prosecutorial misconduct doctrine" as it existed in 1980 thus does not survive under today's precedents. Courts and commentators alike have recognized that "*Williams* . . . cast considerable doubt upon the continuing vitality of most, if not all, of the lower court rulings dismissing indictments based on prosecutorial misconduct in presenting evidence. Those rulings, in general, made no effort to tie the misconduct standards they recognized to a statutory prohibition, a court rule, or a constitutional command, but relied on precisely the authority to prescribe general standards of fairness that *Williams* rejected." LaFave, 4 Criminal Procedure § 15.5(b); *see also Burns*, 990 F.2d at 1436 (citing to *Williams* for the proposition that "the supervisory power of the federal courts of appeals may not be used to prescribe prosecutorial conduct 'in the first instance,' before a grand jury"); *United States v. Torres*, No. 93 CR. 673 (KMW), 1994 WL 48820, at *3 (S.D.N.Y. Feb. 16, 1994), *aff'd*, 48 F.3d 1214 (2d Cir. 1994) (stating that "the *Williams* decision calls into question the continuing validity" of cases holding that a court "may dismiss an indictment for prosecutorial misconduct if the grand jury was misled or misinformed"); *United States v. Orjuela*, 809 F. Supp. 193, 198 (E.D.N.Y. 1992) (in a case where defendant moved to dismiss the indictment based on prosecutor's failure to reconvene grand jury and correct inaccurate and misleading information, "the Supreme Court's latest pronouncement on the judiciary's supervisory power over the grand jury—*United States v. Williams*—sounds a death knell for [the defendant's] arguments").

Second, even if *Lawson* could fit the rubric of *Bank of Nova Scotia* and *Williams* (which it cannot), *Lawson* involved peculiar and egregious facts that are not present here. In *Lawson*, the prosecutor called a witness before the grand jury specifically to discredit the witness, who had previously testified about the defendant's efforts to verify the legitimacy of certain prescriptions for controlled substances. *Lawson* at 161-62. Although the prosecutor had obtained phone records

17

corroborating the witness's testimony, the prosecutor never gave the grand jury those records or revealed that those calls had been made. *Id.* at 162. Instead, the prosecutor cross-examined the witness before the grand jury to create the impression the defendant had never made such calls, in "an affirmative attempt both to discredit [the witness] and to turn exculpatory evidence into inculpatory evidence." *Id.* These extraordinary facts were not disputed by the government in *Lawson*—in fact, the government filed its own motion to dismiss the indictment without prejudice. *Id.* at 163 n.9. In the absence of any controversy over whether the egregious abuse by the prosecutor amounted to misconduct warranting dismissal, the court ruled that dismissal was proper. *Id.* At most, *Lawson* is limited to its facts.[9]

## ARGUMENT

When evaluated under the binding principles set forth above, Schulman's laundry list of complaints regarding which information was presented to the grand jury, and the manner in which it was presented, falls far short of invalidating the facially valid indictment.

*Willams* establishes that even *if* all of the information that Schulman contends should have been presented to the grand jury amounted to "substantial exculpatory evidence"—which, for the reasons set forth below, it does not—his claim would still fail. *Witasick,* 443 F. App'x at 843 (holding that in *Williams* "[t]he Court was emphatic that '[i]mposing upon the prosecutor a legal obligation to present exculpatory evidence in his possession would be incompatible with [the adversarial] system.'") (quoting *Williams* at 52); *see also United States v. Manchester Farming*

---

[9] Schulman's reliance on the 1986 decision *Omni* is similarly misplaced. In *Omni*, the district court dismissed the indictment without prejudice, but acknowledged that "recent pronouncements of the [Supreme] Court in *Payner* and *Hasting* imply a more limited use of supervisory power, possibly including a requirement of actual prejudice for dismissal." *Omni Int'l Corp.*, 634 F. Supp 1414 at 1437. Nonetheless, the court concluded that it retained the power to dismiss the indictment without prejudice because "the full significance of the *Payner* and *Hasting* rulings are not yet evaluated." *Id.* This conclusion cannot stand following the *Bank of Nova Scotia* and *Williams* decisions.

*P'ship*, 315 F.3d 1176, 1185 n.20 (9th Cir. 2003) ("Appellants also claim that the government wrongfully ignored exculpatory evidence when it presented its case to the grand jury. This argument is foreclosed by *United States v. Williams*.").

Schulman's motion should be denied accordingly. And it should be denied without requiring the Court to waste judicial resources on disputed evidentiary minutia that are legally irrelevant. After all, the Supreme Court did not say that motions like the instant motion should be resolved after a fact-intensive analysis; rather, the Court stated "*challenge[s] to the reliability or competence of the evidence will not be heard.*" *Williams,* 504 U.S. at 53 (emphasis added); *see also United States v. Syling,* 553 F. Supp. 2d 1187, 1190 (D. Haw. 2008) ("Syling claims that certain emails not presented to the grand jury demonstrate that she did not commit mail fraud. Syling may not seek dismissal of the Indictment on the ground that a factual basis for the charges does not exist. Whether the evidence is sufficient to prove that Syling committed mail fraud is a question for the jury, not this court.").

Nevertheless, the Government does believe it is important to correct the record in the face of Schulman's many meritless accusations that the Government solicited perjury and knowingly misled the grand jury. The Government thus will address seriatim Schulman's primary assertions that particular aspects of the grand jury testimony were false or misleading by placing both the actual grand jury testimony and the purportedly exculpatory information in their proper context. The Government submits that, in totality, this information shows that the Government acted in good faith and provided the grand jury with an evidentiary presentation that was faithful to the investigative findings. This presentation, of course, was not the presentation that Schulman's own counsel would have given. But, as the Supreme Court held in *Williams*, in the grand jury "it has always been thought sufficient to hear only the prosecutor's side." *Williams*, 504 U.S. at 51.

19

Schulman's opportunity to challenge the Government's presentation of evidence, hold the Government to its burden, and (if he chooses) present evidence in his own defense, will come at trial. *Syling* 553 F. Supp. 2d at 1190.

## I.   Schulman's Allegations Regarding the 2009 False Decree Translation Do Not Show False Let Alone Intentionally Misleading Testimony

Schulman contends that the Government failed to inform the grand jury of purportedly exculpatory information related to the 2009 Fraudulent Decree Translation. Def's Mot. 14. ██████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████ Regardless, under *Williams*, Schulman's contention that the Government was obligated to present any of this information to the grand jury (or, put another way, Schulman's contention that the Government engaged in misconduct by not presenting it) is squarely foreclosed. *Williams*, 504 U.S. at 52.

██   ██████████████████

████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

20



This testimony thereby supported, rather than undermined, the allegations in the indictment.

Moreover, regardless of whether the Court agrees (as we respectfully submit it should) that [ ] testimony was not substantially exculpatory, or even exculpatory at all, the Government's discretionary choice not to present this information to the grand jury would be permissible either way. *Williams*, 504 U.S. at 53 (holding that the prosecutor is not obligated to disclose "substantially exculpatory" information to the grand jury and citing *Bank of Nova Scotia*

for the proposition that "a challenge to the reliability or competence of the evidence will not be heard").

█        ████████████

████████ grand jury testimony, which Schulman also faults the Government for not presenting to the indicting grand jury in 2020, similarly corroborates the indictment's allegations

[REDACTED]

████████████████████████████████ [10]

Regardless, the Government had no obligation to present this evidence to the grand jury. *Williams*, 504 U.S. at 53; *Witasick*, 443 F. App'x at 843.

    *C.*    *Agent Schumaker's Testimony*

In connection with the same decree translation, Schulman accuses the Government of knowingly eliciting false testimony from Agent Schumaker when she testified ███████

████████████████████████████████████████████

███████████████████

███████████████████████████████████

███████████████████████████████████

███████████████████████████████████

████████████

███████████████████████████████

████

████████████

████████████████████████  It is unclear what Schulman believes was false about this

testimony. ██████████████████████████████████

████████████████████████████████████████████

---

[10] Schulman has argued vigorously that testimony that lacks proper foundation is unreliable and inadmissible: in his motion *in limine*, he seeks a court order "to exclude Mr. Amalo's testimony regarding the functions of the Somali government because the government cannot lay a foundation for this testimony, and Mr. Amalo lacks personal knowledge regarding the functions of the Somali government." ECF 356 at 13. In response to this motion *in limine*, the Government agreed with the evidentiary principle that witness testimony should not be admitted if it lacks proper foundation. ECF 368 at 13. The same principle would apply to ███████ opinion here.

█████████████████████████████████████████████████

█████████████████████████████████████████████████

████████████████████ Schulman thus has not shown that SA Schumaker gave any false

testimony at all—let alone that the Government knowingly solicited false testimony here.

████████████████████████████████████████████

█████████████████████████████████████████████████

█████████████████████████████████████████████████

█████████████████████████████████████████████████

█████████████████████████████████████████████████

█████████████████████████████████████████████████

██████████████████████████████

Schulman also distorts the record when he contends that "[t]he indictment's allegations

that Mr. Schulman falsely inserted a clause into the translation of the decree . . . rises and falls with

the Case Agent's testimony." Def's Mot. at 17-18. ██████████████████████████████

█████████████████████████████████████████████████

█████████████████████████████████████████████████

█████████████████████████████████████████████████

█████████████████████████████████████████████████

████████████████████████████████████████████

In sum, Schulman's effort to paint Agent Schumaker's testimony as knowingly false is

belied by the record and does not support any finding of misconduct.

24

█            ████████████████████████████

Schulman also contends that the Government committed misconduct in regard to the information it provided the grand jury about what ████████ has said about the fraudulent decree translation. This too amounts to nothing more than "a challenge to the reliability or competence of the evidence [that] will not be heard," and it should be dispensed with on that ground alone. *Williams*, 504 U.S. at 53. Nevertheless, the Government addresses the substance of the allegations as follows:



Schulman, however, points to a handful of statements from the interview memoranda of ████████████████ some of which he mischaracterizes, to contend that the Government withheld exculpatory information from the grand jury. For instance, Schulman contends that the Government should have informed the grand jury that ████████████████████████████ ████████████████████████████. That fact that is not in dispute, but it is also ancillary to the falsification of the decree itself and not exculpatory.

25

Schulman also contends that ███████████████████████████████████

████████████████████████████████████████████████████████████████

██████████████████████████████████ That statement, however, does not appear

in any of the 302s, and it is not clear what his source is for this purported statement. Regardless,

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

██████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

██████████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

████████████ Moreover, even if the Court were to disagree with the Government's choices, those choices fall far short of biasing the jury or committing any form of cognizable misconduct. *See United States v. Jefferson*, 546 F.3d 300, 312 (4th Cir. 2008) (holding that the "[b]ias of a grand jury may be manifested in several ways, but it has not been held to arise from the receipt of incompetent or constitutionally impermissible evidence.") (citation omitted).

II.    **Schulman's Allegations about the Grand Jury Testimony Related to the 2010 Warning Letter Do Not Show False Let Alone Intentionally Misleading Testimony**

Schulman also quibbles with Agent Schumaker's characterization of the evidence regarding the 2010 Warning Letter. Def's Mot. at 19-21. The facts are these: the 2010 Warning Letter is on the letterhead of the Central Bank of Somalia. Unlike the forged documents described in the indictment—for which the Government obtained evidence from multiple sources showing that the documents were forged using, among other things, signatures lifted from one document and placed onto another; notary stamps similarly lifted from one document onto another; and false letterheads created by Amalo—the Government had no reason to believe that the 2010 Warning Letter was not an authentic document. To the contrary, the evidence obtained by the Government indicated that the 2010 Warning Letter was actually sent by the Central Bank of Somalia, as reflected in the letterhead on the first page of the email and the official seal on the signature page. *See* Def's Ex. 16 at 1-2.

The letter was sent by mail to Shulman Rogers with a postmark from Kenya, *id.* at 3, and it was generally understood that officials in the Somali government at the time often operated out of Kenya. Further, key allegations in the letter included the following: (i) that the decree translation

27

used by Schulman was false; and (ii) the accusations that Schulman made against De La Rue were false. *Id.* The Government had independently corroborated these allegations by, among other things, ███████████████████████████████████████████████████

███ The Government's corroboration of the allegations in the letter lent additional credence to the letter's authenticity.

In September 2018, FBI agents based in Nairobi interviewed ██████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

███████████████████████████████████████████

██████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

This information further corroborates, rather than contradicts, the other information set forth above demonstrating the authenticity of the letter.

Lastly, Schulman contends that the Government should have informed the grand jury that

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████



Def's Ex. 18 at 3 (emphasis added). Schulman faults the Government for not providing the grand jury with information that ████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████ ██████████████████████████████████████████████████████████.

     In sum, when the Government's information about the 2010 Warning Letter is viewed in its totality, Agent Schumaker's testimony ███████████████████████████████████████ ████████████████████████████████████████ is undeniably accurate and consistent with the Government's reasonable, good-faith interpretation of the evidence. Schulman's allegation that the Government knowingly elicited false information fails accordingly.

     Moreover, even if the Court were to find that any of the snippets of cherry-picked information about the 2010 Warning Letter were "exculpatory," judicial second-guessing of the Government's decision to disclose that information to the grand jury is foreclosed by *Williams*.

## III.   Schulman's Allegations about the Grand Jury Testimony Related to the Release of Funds by Various Institutions Do Not Show False Let Alone Intentionally Misleading Testimony

     Shulman's flyspecking of Agent Shumaker's testimony about the release of funds by ██ ████████████████████ and the New York Comptroller fares no better than his complaints related

to the 2009 Fraudulent Decree Translation and the 2010 Warning Letter. Time and time again, Schulman takes statements in interview memos out of context, ignores the statements in those memos that contradict his argument, and yet accuses Agent Shumaker of knowingly giving false testimony. A fair reading of the record shows otherwise, and Schulman's allegations should be rejected.

█   ███████

Agent Schumaker testified that ███████████████████████████ ███████████████████████████████████████████ ██████████████████████. Def's Mot. at 22 (citing Schumaker Tr. at 23:25-24:07). Schulman contends that this constitutes "false testimony [by Agent Schumaker] that bank employees relied on allegedly forged documents provided by Mr. Schulman to the banks." Def's Mot. at 21. Schulman's accusation is based on a convoluted argument that ████████ relied entirely on Former Governor Amalow's matching signatures to release the funds and not the forged documents Schulman had provided. *Id.* at 22-23. ██████████████████████ █████████████████████████████████████████████ █████████████████████████████████████████ ███████████████████████████ █████████████████████████████████████████████ █████████████████████████████████████████████ ██████████████████████████. ███████████████████████████ ██████████████████████████████████████████████ ██████████████████████████████████████████████





In sum, Agent Schumaker accurately testified that a ██████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████ *See Outlaw,* 464 F. App'x at 167 (affirming

denial of motion to dismiss indictment where the defendant's "argument that dismissal of the

superseding indictment was warranted because [the agent] provided false grand jury testimony

amounts to nothing more than a disagreement with the witness's opinions of the facts of the case").

      *B.*    *The New York Comptroller*

Schulman similarly accuses Agent Schumaker of having "provided false testimony" in

connection with an affirmation provided by Schulman to the New York Comptroller in January

2013. Def's Mot. at 21, 23-24. In the affirmation, Schulman falsely asserted, among other things,

that the 2009 Fraudulent Decree Translation was in fact accurate, and that ██████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

███████████████

Agent Schumaker's testimony is consistent with the following information ██████████

████████████████████████████████



██████████████████████████████████████████████████████████████

████████████████████████████████████████████

C.   ████████

Schulman's allegations related to ████████ are similar to those related to ████████████

and the New York Comptroller, and they are similarly without merit. █████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

████████████████████ Schulman contends that the evidence shows that Citibank only relied on

the 25B Certification and a related power of attorney. Def's Mot. at 25-26.

The email correspondence gathered by the FBI before the indictment, however, reflects

that Nelson specifically requested these documents from Schulman in April 2013. She did so

because she believed the documents from 2009 that Schulman had provided (including the 2009

Fraudulent Decree Translation) were outdated. *Id.* █████████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

---

13 ████████████████████████████████████████████████████████████████.
At trial, he can cross-examine ████████ on this point and others. And he can argue that the 25B Certification negated
the relevance of any fraudulent documents Schulman provided the Comptroller. The jury, as the finders of fact, can
decide. That is the purpose of a criminal trial.



Agent Schumaker's testimony that ███████ relied, at least in part, on the 2013 Forged PM Letter and 2013 Forged POA Letter is thus consistent with the information obtained in the investigation. Schulman's allegations that the testimony was knowingly false and deliberately misleading are spurious. And Schulman's contention that the Government should have presented to the grand jury other emails or other information that Schulman believes are exculpatory is squarely foreclosed by *Williams* and its progeny.

## IV.    Schulman's Allegations about the Other Supposedly Exculpatory Information Are Similarly Foreclosed by *Williams*

Schulman's hodgepodge of other allegedly exculpatory information that should have been presented to the grand jury is largely comprised of extraneous and dubious information that has little bearing on the charges. For example, Schulman contends that the grand jury should have been told that ███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

████████████████████████████████████

███████████████████████████████



Defense counsel would surely be crying foul if any of these allegations of ████████████ had been presented to the grand jury. But they are no better, and no worse, than the information defense counsel insist *should* have been presented to the grand jury. Therein lies the folly of this exercise—and therein lies the wisdom of the Fourth Circuit case law foreclosing post-hoc flyspecking of a prosecutor's discretionary presentation of evidence to the grand jury. *Williams,* 504 U.S. at 54; *Burns*, 990 F.2d at 1426 (holding "[i]t is the province of the Government to decide the terms on which it will bring criminal indictments, and to inscribe the charges it will post in them. So long as those charges are grounded upon solid legal predicates not contravened by the Constitution or other laws of the United States, we are unlikely to invoke transcendent powers of ambiguous scope to destroy them."); *McDonald,* 61 F3d. at 252 (holding that the court would "not hear a challenge to the reliability or competence of the evidence presented to the grand jury").

## V.   Schulman's Allegations Regarding Xenia Espinoza Do Not Show Any Misconduct or Any Prejudice

In further support of his claim that the Government engaged in wrongdoing before the 2020 grand jury, Schulman contends that Agent Schumaker improperly instructed a witness, Xenia Espinoza, not to speak to defense counsel. Def's Mot. at 32-33. Schulman also contends that the Government should have re-presented Espinoza's testimony to the grand jury. *Id.* at 29.

Schulman's claims related to Espinoza fail because, *inter alia,* Schulman cannot demonstrate he incurred any prejudice from his purported lack of access to a witness who could not offer any credible, exculpatory testimony. *See United States v. Scott,* 518 F. 2d 261, 268 (6th Cir. 1975) (stating that "when claiming a denial of due process, a defendant must make a showing of more than just the witness' inaccessibility," and holding that because of, *inter alia*, "the absence of a showing of specific prejudice," the defendant's alleged inability to access a witness did not violate defendant's due process rights).

As a threshold matter, Schulman has not satisfied his burden to show that Agent Schumaker's guidance to Espinoza, as recounted by Espinoza, was improper. ███████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

Thus, Agent Schumaker made clear to Espinoza that the FBI was not advising Espinoza what to do or not do, which is what the law requires. *See United States v. Davis*, 154 F.3d 772, 785 (8th Cir. 1998) ("[T]he government does not interfere when it merely advises witnesses of their right to decide whether or not to submit to pre-trial interviews."); *United States v. Bittner*, 728 F.2d 1038, 1042 (8th Cir. 1984) (advising witness of her right to decline interviews with defense attorney "do[es] not constitute an impermissible interference with the defendant's right of access to witnesses").

Moreover, even accepting as true Espinoza's recollection of events, Agent Schumaker's ████████████████████████████████████████████████████████ was offered in the context of Espinoza telling Agent Schumaker that she was scared. This counsels against any finding of misconduct, let alone misconduct warranting dismissal of the indictment.

39

*Cf. United States v. Stein*, 435 F. Supp. 2d 330, 359 (S.D.N.Y. 2006), *aff'd*, 541 F.3d 130 (2d Cir. 2008) (the government "may not obstruct defendants' access to a potential witness unless that is necessary to protect the witness's safety"); *Scott*, 518 F.2d at 268 ("[T]he prosecution has no right to interfere with or prevent a defendant's access to a witness (absent any overriding interest in security).").

Schulman relies on a 1966 case, *Gregory v. United States*, that is readily distinguished: there, the prosecutor had "advised the witnesses not to talk to anyone unless he, the prosecutor, were present." 369 F.2d 185, 188-89 (D.C. Cir. 1966). Those facts are nearly the opposite of Agent Schumaker telling Espinoza that she could not advise her on what to do. Def's Mot. at 32.

The other case cited by Schulman, *United States v. Walton*, 602 F.2d 1176, 1179-80 (4th Cir. 1979), actually demonstrates why Schulman's motion fails. In *Walton*, the Fourth Circuit affirmed the defendant's conviction despite the defendant's lack of access to a witness because "we are not convinced that Walton has been prejudiced." *Walton* 602 F.2d at 1181. The *Walton* holding follows the rule that "when claiming a denial of due process, a defendant must make a showing of more than just the witness' inaccessibility"; the defendant must instead make a "showing of specific prejudice." *Scott*, 518 F.2d at 268. Schulman, like Walton, cannot do so.

Schulman contends that Espinoza provided exculpatory testimony and faults the Government for not re-presenting her testimony to the indicting grand jury. Yet the single supposedly exculpatory statement from Espinoza identified by Schulman ███████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████

██ It is blackletter law that Schulman could not admit this out-of-court statement of his own into evidence at trial through Espinoza. *United States v. Marin*, 669 F.2d 73, 84 (2d Cir. 1982) ("When

40

the defendant seeks to introduce his own prior statement for the truth of the matter asserted, it is hearsay, and it is not admissible.").[14] And even if the testimony were somehow admissible, the jury—whether grand jury or petit—would be highly unlikely to place any weight on the self-serving statements of the defendant to his mistress. *Cf. Miller v. Dretke,* 420 F.3d 356, 366 (5th Cir. 2005) ("As things stood, the jury was left only with the admittedly self-serving testimony of Miller and her ex-husband regarding her medical condition, and could easily have dismissed such testimony as not credible.").

The jury would be particularly unlikely to credit Schulman's out of court statement to Espinoza █████████████████████████████████████████████████████
███████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████
███████████

Moreover, Schulman's contention that he is prejudiced by Espinoza's passing ignores █
███████████████████████████████████████████████████████████
████████████████████████████████████
██ ███████████████████████████████████████████████████████
██████████████████
██ ███████████████████████████████████████████████████████
████████████████████████

---

[14] To be sure, the rule against hearsay would not have foreclosed presenting this evidence before the grand jury. But the Government was under no obligation to present it to the grand jury under *Williams* and its progeny. The inadmissibility of this evidence at trial, however, bears on Schulman's inability to show that he will be prejudiced at trial by the Government's purported interference with his access to Espinoza pre-trial.



In sum, Schulman has not shown, and cannot show, that he is prejudiced because the Government did not present Espinoza's testimony to the 2020 grand jury. Nor has he shown he is prejudiced because the Government allegedly hindered his counsel from contacting Espinoza pretrial. Schulman has put forward no evidence that, had Espinoza spoken to Schulman's attorney (and not just Schulman), he would have been able to procure admissible exculpatory evidence at

trial.[15] To the contrary, had Espinoza been available for trial, the Government likely would have sought to present evidence about ███████████████████████████████████████ ██████████████████████. Accordingly, Schulman has not met his burden to establish that dismissal of the indictment is warranted based on any of his allegations related to Espinoza.

## VI.   Schulman's Allegations about the Proffer Letter Are Inconsistent with the Proffer Letter Itself and Meritless

Schulman also accuses the Government of misconduct for introducing statements to the grand jury that were given during a proffer interview. Def's Mot. at 33-34. The Fourth Circuit has held that "a proffer agreement operates like a contract; accordingly, we examine its express terms to determine whether [a party] is in breach." *United States v. Anderson*, 628 F. App'x 872, 874 (4th Cir. 2015); *United States v. Gillion*, 704 F.3d 284, 292 (4th Cir. 2012).

While the proffer agreement provides that "[t]he Government will not introduce proffer information directly against your client *in any criminal trial*," Def's Ex. 28 at 1 (emphasis added), the agreement does not contain any promises that limit the Government's use of proffer information in the grand jury. *Id.* And the agreement expressly provides, "[t]he Government makes no representations or promises to your client beyond those in this letter." *Id.* at 2. The agreement thus did not preclude the Government from introducing proffer information in the grand jury.

In *United States v. Warren*, the Fifth Circuit rejected the defendant's contention that a proffer agreement that provided that the government would not use proffer information "during the government's case-in-chief" precluded the government from using proffer information in grand jury proceedings. 728 F. App'x 249, 258 (5th Cir. 2018). Here, the proffer agreement similarly limited the Government's promise to use during a criminal trial, and Schulman's claim that his

---

[15] Of course, regardless of whether Espinoza spoke to counsel, Espinoza would not be available to testify at trial as she passed away in 2021.

proffer agreement provided protections before the grand jury fails accordingly. *Id.* at 258; *see also,* *United States v. Cobblah*, 118 F.3d 549, 551 (7th Cir. 1997) (denying defense argument that government breached the terms of the proffer agreement by using proffer information at sentencing and stating "[A]s a contract, a proffer agreement must be enforced according to its terms. It is the language of the contract that binds the parties."); *United States v. Chiu*, 109 F.3d 624, 625 (9th Cir. 1997) (denying defense argument that government breached the terms of the proffer agreement by using proffer information to prepare witnesses for trial and stating "we [ ] apply contract principles to the interpretation of a proffer agreement").

Moreover, even if the proffer agreement by its terms did apply to grand jury proceedings— which it does not—Schulman cannot point to any one of the "few, clear" rules governing grand jury practice that precludes the Government from using proffer information before the grand jury. Schulman's allegation about the proffer agreement thus would fail regardless.[16] *Williams,* 504 U.S. at 46 (citing *Bank of Nova Scotia*).

## VII.   The Government's Compliance with Its *Brady/Giglio* Obligations Does Not Show Prosecutorial Misconduct

In his latest misconduct allegation, Schulman faults the Government for providing a disclosure pursuant to its obligations under *Brady v. Maryland*, 373 U.S. 83 (1963), *Giglio v. United States*, 405 U.S. 150 (1972), and their progeny. ECF 372. Specifically, on February 5, 2024, the FBI finalized an interview report memorializing a January 30, 2024 meeting with Abdi Amalo. The FBI provided this report and the underlying notes to the Government on February 7, 2024, and the Government produced them to defense counsel the next day. As the report details, on

---

[16] The Government disagrees with Schulman's argument that in order to vitiate the agreement's protection, there must be an independent finding (as opposed to a finding by the Government) that Schulman was completely truthful in the proffer agreement. Def's Mot. 33-34. Regardless, Schulman's contention here fails because the proffer agreement does not contain any promises related to the grand jury.

January 30, 2024, Amalo told the Government ████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████ Given the discrepancy between these statements, and the Government's disclosure obligations under *Giglio* and other authorities, the Government provided the report about which Schulman now complains.

The Government's recent disclosure merely reflects that a witness's memory of a particular event that occurred in 2010 may have faded in the last decade. Schulman has not set forth any reason to believe that Amalo deliberately misled the Government with his previous statements about the 2010 Attorney General letter, and the Government is not aware of any such reason. The evidence that Schulman knew the 2010 Attorney General letter was a forgery ████████████ ████████████████; it includes all the indicia from Schulman and Amalo's email exchanges that the letter was a forgery.[17] Thus, the recent disclosure does not cast doubt on Government's 2020 presentation to the grand jury, which was accurate when made, let alone provide any reason to dismiss the indictment.

Moreover, Schulman should appreciate ████████████████████████████ ████████████████████████████████████████████. Instead of "turning a blind eye" to the inconsistencies in Amalo's accounts over time, the Government disclosed them to Schulman. In doing so, the Government furthered defense counsels' ability to

---

[17] The 2010 Attorney General letter is described in the indictment as one of many overt acts in connection with the conspiracy charged in Count One, but it is not the basis of any of the individual substantive charges. ECF 1 ¶ 40.

cross examine Amalo at trial by providing the FBI's statements showing any changes over time to information provided by Amalo about the alleged conspiracy with Schulman.

It is unclear how the Government's compliance with its *Brady* and *Giglio* obligations could form the basis of prosecutorial misconduct. What has become clear, however, is that Schulman will find fault in every action the Government takes in this matter and will continue to manufacture reasons to try to avoid trial. Nevertheless, the Government has and will continue to comply with its discovery obligations, regardless of any allegations Schulman may level.

**VIII.   There Has Been No Pattern of Misconduct that Has Pervaded This Case**

The Government staunchly disagrees with Schulman's contention that the Government has "engaged in a pattern [] of misconduct that has pervaded this case." Def's Mot. 34-35. The Court does not need the parties to relitigate here all of their previous disputes, of which the Court is all too well familiar, and the Government will abstain from doing so. To balance the record, however, the Government notes that the Court's ruling denying the defendant's motion to dismiss found that "[g]iven the sheer magnitude and complexity of the transcontinental investigation, the Court cannot conclude that the Government delay somehow lacked sufficient justification." ECF 308 at 50. The Court concluded that the Government acted "earnestly and consistently investigating this highly complex transcontinental case through early 2020, and any further delay can reasonably be attributed to the court closures associated with the COVID-19 pandemic."[18] *Id.* at. 51.

The information obtained in the investigation includes material from "150 grand jury subpoenas, executing 8 search warrants, reviewing over 1.5 million documents, and conducting 60 voluntary witness interviews, six grand jury interviews, and five foreign evidence requests." *Id.* at

---

[18] To be sure, the Government takes seriously the Court's statements in its previous ruling faulting the Government for what it viewed to be investigative lapses. Defendant's allegation that the Government has engaged in a pattern of misconduct, however, including repeatedly suborning perjury, far exceeds those issues.

48. All of that material, including all of the witness interview memoranda and all of the grand jury transcripts, has been produced to the defense in discovery, well in advance of trial, and well in advance of the Court's deadline to produce *Jencks* material. Schulman's contention that the Government has committed an unspecified pre-trial *Brady* violation here has no basis in fact or the law: it is axiomatic that the requirement of *Brady*, which the Government has amply satisfied, is pre-trial disclosure. *United States v. Smith Grading & Paving, Inc.*, 760 F.2d 527, 532 (4th Cir. 1985) (holding that "[n]o due process violation occurs as long as *Brady* material is disclosed to a defendant in time for its effective use at trial"); *see also United States v. Jeffers*, 570 F.3d 557, 573 (4th Cir. 2009) (same); *United States v. Gagliardi*, 285 F. App'x 11, 15 (3d Cir. 2008) ("We conclude that no *Brady* violation occurred here because, contrary to Gagliardi's contention, the government disclosed Carmean's testimony in pretrial discovery.").

In addition, the Government notes that before the Government produced the 302s of Amalo in their entirety, the Government provided excerpts of them to the defense as part of its compliance with its *Brady* obligations, and the Court then reviewed them *in camera*. The Court subsequently ordered that the Government disclose additional material following its *in camera* review. In doing so, the Court stated, "And I'll say for the record I don't consider any of the areas that I have highlighted to indicate bad faith or any --you know, it's not as if I'm dinging the government for this, in part, because the subject may very well have been covered somewhere else. So, obviously, the government intended to produce it; it's just that there may be detail or context in another 302 that ought, for completeness and fairness, be produced." Ex. E, Transcript of Proceedings, at 5:04-11 (Dec. 1, 2021).

The disclosures that Government made more than two years ago related to Amalo included many disclosures that Amalo forged the signatures on fraudulent documents, including:

47



…

Despite these disclosures, at a hearing on January 5, 2024, when the Government referenced the

likely evidence at trial that Amalo used forged signatures, defense counsel protested:

> [T]he 302s do not describe Mr. Amalo telling the FBI or the government
> that he added signatures to these documents, so I don't know how they know
> that. And if they do know that, *I don't know why we're learning about it
> today and how we're supposed to defend a case that is about [] forgery . . .
> I'm just learning now for the first time* that [Amalo is] going to sit there and
> say that he added a signature to a document .

Ex. G, Transcript of Proceedings, 111:15-25 (Jan. 5, 2024) (emphasis added). The Government

pointed out that this information is in the 302s. *Id.* at 112:07-11. The Court then stated to defense

counsel, "either it's in the 302 or it's not. And if it's not, you'll be able to cross-examine on that, and if it is, I don't know, maybe you'll buy Mr. Salem a cup of tea." *Id.* at 113:21-23.

Lo and behold, it is in the 302s, and it was in the disclosures produced years before the 302s, as shown above. This episode captures well, in the Government's view, defense counsel's consistent practice of raising meritless misconduct allegations throughout this case.

## IX.    No Evidentiary Hearing Is Warranted

The Court should not hold an evidentiary hearing on this motion because Schulman has not identified any disputed facts that, if resolved in his favor, would lead to dismissal of the indictment.[19] His motion must fail regardless of whether an evidentiary hearing would show that the information Schulman believes should have been presented to the grand jury is substantially inculpatory, substantially exculpatory, or anywhere in between. His motion must also fail regardless of whether the Court concludes that it agrees with Schulman's characterization of the evidence, Agent Schumaker's characterization of the evidence in her testimony, or anything in between.[20] And even if the Court were inclined to examine the purported mischaracterizations, it may compare Agent Schumaker's testimony with the interview reports of the various witnesses and the other documentary evidence, none of which requires additional testimony. Courts have routinely held that disputes about the evidence are appropriately left for the jury to resolve at trial. *See, e.g.*, *United States v. Rogers*, 960 F.2d 1501, 1512 (10th Cir. 1992) (affirming district court's dismissal of motion to dismiss indictment based on alleged prosecutorial misconduct in the grand jury without an evidentiary hearing); *United States v. Wasserman*, No. 8:20-CR-207-CEH-MRM,

---

[19] To be clear, the Government does not oppose oral argument on the motion at the scheduled date of March 4, 2024; the Government opposes the calling of witnesses for an evidentiary hearing.

[20] As set forth above, even accepting as true Espinoza's recollection of her conversation with Agent Schumaker, that does not constitute misconduct, let alone misconduct requiring dismissal.

2022 WL 18034513, at *4 (M.D. Fla. Nov. 17, 2022), report and recommendation adopted, No. 8:20-CR-207-CEH-MRM, 2022 WL 17844364 (M.D. Fla. Dec. 22, 2022) (denying motion to dismiss indictment based on allegations of prosecutorial misconduct before the grand jury and holding that "because the Undersigned finds that Defendant's allegations of misconduct, even if true, do not warrant dismissal, the Undersigned finds that an evidentiary hearing on this motion is unnecessary."); *United States v. Syling*, 553 F. Supp. 2d 1187, 1189 (D. Haw. 2008) ("Because Syling does not raise a persuasive argument for dismissing the Indictment or disclosing grand jury transcripts, her motions are denied without a hearing.").

Further, an evidentiary hearing held without justification would prejudice the Government by requiring potential trial witnesses to have to testify twice. This Court already denied Schulman's meritless request for a pre-trial "crack" at cross-examining Amalo; it should do the same with respect to whatever witnesses Schulman contends should testify here.

## **CONCLUSION**

For the foregoing reasons, Schulman's fifth motion to dismiss should be denied.

Respectfully submitted,

GLENN LEON                          EREK L. BARON
Chief                                        United States Attorney
Fraud Section                          District of Maryland


_____/s_____                    _____/s_____
Jason M. Manning                      David I. Salem
Allison L. McGuire                     Assistant U.S. Attorney
Trial Attorneys

50