

**U.S. Department of Justice**

*United States Attorney*
*District of Maryland*
*Southern Division*

---

| | | | |
|---|---|---|---|
| *David I. Salem* | *Mailing Address:* | *Office Location:* | DIRECT: 301-344-4237 |
| *Assistant United States Attorney* | 6500 Cherrywood Lane, Suite 200 | 6406 Ivy Lane, 8th Floor | MAIN: 301-344-4433 |
| *David.Salem@usdoj.gov* | Greenbelt, MD 20770-1249 | Greenbelt, MD 20770-1249 | FAX: 301-344-4516 |

April 29, 2024

The Honorable Paula Xinis
United States District Court
District of Maryland
6500 Cherrywood Lane
Greenbelt, MD 20770

   Re: **Foreign Deposition Testimony of Mr. Douglas Denham (ECF 359)**
     *United States v. Jeremy Schulman*
     Criminal No.: PX-20-0434

Dear Judge Xinis:

  As agreed by the Court during the pretrial conference held on April 11, 2024, and in connection with the joint motion *in limine* regarding the admission of foreign deposition testimony (ECF 359), the Government respectfully submits this letter pleading to address the admissibility of certain portions of the deposition testimony of Douglas Denham.

  Mr. Denham is a former attorney of De La Rue, a UK-based currency printer that held Somali notes. In 2009 and 2010, the defendant Jeremy Schulman asserted claims regarding this Somali currency as part of the charged conspiracy, and Mr. Denham was the point person at De La Rue in responding to those claims. Mr. Denham testified that during his dealings with Schulman he evaluated certain documents submitted to him by Schulman and concluded that the documents appeared to be falsified. Mr. Denham's impression that the documents were likely falsified—which he reached as part of performing his job to evaluate Schulman's claims—informed the actions he took in response to those claims.

  This testimony relates to an essential aspect of Mr. Denham's interactions with Schulman. It will be helpful to the jury in determining whether Schulman knowingly made false representations and provided forged and fraudulent documents in asserting claims against De La Rue—which are charged acts in furtherance of Count 1, Conspiracy to Commit Mail, Wire, and Bank Fraud.  Mr. Denham's testimony follows from his own perception and experience, will be helpful to the jury, and is not expert testimony within the meaning of Rule 702. For the reasons set forth below, the testimony should be admitted pursuant to Rule 701.

### I.     The Relevance of Mr. Denham's Testimony to the Proposed Charges

At trial, the Government will have the burden to prove that Schulman engaged in a scheme to defraud in which he attempted to take control of Frozen Somali Assets based on fraudulent, material misrepresentations about his authority and the authority of others. ECF 1 ("Ind.") ¶ 21. Schulman's attempt to take control of Somali currency held by De La Rue on the basis of Former Governor Amalow's purported authority is among the overt acts in furtherance of the conspiracy charged in Count 1. *Id.* at ¶¶ 14, 30. Further, Mr. Denham questioned the legitimacy of Schulman's claims and provided him with information that contradicted his claims. Mr. Denham's responses to Schulman therefore are relevant to Schulman's *mens rea* in his dealings with entities other than De La Rue, which includes Schulman's conduct charged in Counts 1, 2, 5, and 6.

### II.    Mr. Denham's Deposition Testimony

Mr. Denham's testimony established the following: in October 2009, Schulman asserted to De La Rue that he was acting on behalf of Former Governor Amalow, and that Former Governor Amalow was then the Governor of the Central Bank. Ex. A, Transcript of Douglas Denham ("Tr.") at 248:20-251:09. De La Rue, and more specifically, Mr. Denham, the company's Legal Director for the Currency Division, evaluated Schulman's claim. *Id.* at 10:20-11:04; 20:11-15; 38:06-08.

By 2009, Mr. Denham had worked at De La Rue for 15 years. *Id.* at 10:02-06. Mr. Denham's responsibilities included protecting De La Rue from attempts at fraud, which he testified arose at least once or twice a year. *Id.* at 11:15-12:03. He received training at De La Rue specifically related to fraud prevention. *Id.* at 12:05-14:03 ("It was drummed into us regularly that we had to be ultra-careful with any approaches . . . We were the custodians of the currencies of countries around the world, and we had to behave properly and take proper precautions."). De La Rue had customers, which were mostly central banks, in approximately 150 countries. *Id.* at 9:07-19. Mr. Denham's responsibilities included supporting central banks in dealing with counterfeit documents. *Id.* at 14:04-15:16. Performing "due diligence . . . checking out the warts, as [far as] how much is true is true" was part of what he did every day. *Id.* at 15:17-16:05.

On October 5, 2009, Mr. Denham told Schulman that he was scrutinizing Schulman's claim related to Former Governor Amalow. Mr. Denham wrote, "[y]ou will appreciate that [in] matters of national currency, we must be very certain that an individual has been properly appointed before we can deal with them." *Id.* at 44:01-06 (quoting Ex. 17). Mr. Denham assessed Schulman's claim by, among other things, evaluating, based on Mr. Denham's prior experience, whether Schulman could provide the type of information Mr. Denham would expect from someone who represented the Central Bank Governor (*id.* at 54:02-54:18); whether Schulman's claims were consistent over time (*id.* at 92:11-93:01; 100:03-101:01); whether the documents furnished by Schulman appeared to be legitimate (*id.* at 47:05-48:08); whether Schulman could muster support from U.S. officials, U.K. officials, or U.N. officials to verify Former Governor Amalow's authority (*id.* at 23:14-24:04; 25:02-16; 42:05-43:02); and whether Schulman could arrange meetings with high-level Somali officials to verify Former Governor Amalow's authority (*id.* at 43:03-05).

Mr. Denham assessed that Schulman's representations about Former Governor Amalow fell short in every respect, as follows:

- Schulman was unable to set up meetings with any Somali officials who Mr. Denham viewed as having appropriate authority to validate Former Governor Amalow's alleged current position in the government. *Id.* at 51:02-52:10; 55:08-15; 76:09-22; 85:09-12.

- Schulman was unable to set up meetings with any U.S. officials to validate Former Governor Amalow's alleged current position in the government. *Id.* at 98:02-08.

- Schulman could not answer Mr. Denham's question regarding what the Central Bank planned to do with the Somali currency, indicating that Former Governor Amalow was not actually in touch with the Central Bank. *Id.* at 59:07-18.

- A certification provided by Schulman, which was allegedly signed by Somali Prime Minister Sharmarke and which purported to formally recognize Former Governor Amalow as the Central Bank Governor, did not pass muster.[1] Mr. Denham observed that "the body of the text looked as though it had been cut and pasted onto a letterhead document." *Id.* at 47:05-48:08 (referring to Ex. 17, page 7). He explained that the text of the document cut off the signature and the text and header were misaligned. *Id.* at 246:21-247:18. He also observed that the document was missing things that, based on his experience, he would expect to see in a legitimate government document, including a date and a stamp. *Id.* at 48:09-49:05.

- A Somali-language Presidential decree provided by Schulman, about which Mr. Denham consulted a Somali speaker, also proved to be insufficient.[2] *Id.* at 64:02-67:18 (referring to Ex. 21). Mr. Deham concluded that based on this decree, Former Governor Amalow was not a "properly empowered representative of the Central Bank." *Id.* at 72:04-07; 74:13-22. He wrote to Schulman "[c]learly, you are acting for the adviser to the President rather than the Governor of the Central Bank." *Id.* at 70:19-21.

- Schulman's representations were inconsistent and contradictory: In October 2009, Mr. Denham observed that Schulman represented that Former Governor Amalow was the Central Bank Governor, but then in December 2009, Schulman represented that Former Governor Amalow had a different position. *Id.* at 92:11-93:01 (referencing Ex. 27); 100:03-101:01 (referencing Ex. 29); *id.* at 187:12-17.

- Once Schulman began asserting that Former Governor Amalow was not the Central Bank Governor but rather had a different title, Schulman could not identify the actual Central Bank Governor. *Id.* at 105:04-106:05 (referencing Ex. 29).

Accordingly, Mr. Denham did not accept Schulman's original claim that Former Governor Amalow was the current Central Bank Governor. *Id.* at 30:07-09. He also did not accept Schulman's later claim that Former Governor Amalow had some other position that authorized him to direct De La Rue. *Id.* at 62:-01-05; 93:11-93:22.

In an email to Schulman on March 19, 2010, Mr. Denham described the documents that Schulman had provided—which included the 2009 Forged PM Letter and the 2009 Fraudulent

---

[1] This document is described in the indictment as the "2009 Forged TFG PM Letter."

[2] An English-language translation of this document used by Schulman is described in the indictment as the "2009 Fraudulent Decree Translation."

Decree Translation—as "poor quality documentation," and he wrote, "we will not deal through you or whoever your clients are until we are entirely satisfied as to the positions they hold." *Id.* at 93:02-94:03 (discussing Ex. 27). In his testimony, Mr. Denham explained that he chose to use the phrase "poor quality documentation" because he was being "a little bit kind" in that he did not "want to accuse anybody of falsifying documents." *Id.* at 93:02-94:03.

On May 24, 2010, Denham also provided Schulman with documents indicating that another individual, Bashir Issa, was the Central Bank Governor and that Former Governor Amalow had been removed from his advisor position. *Id* at 106:09-108:02 (referencing Ex. 29). Through these communications, De La Rue put Schulman on notice of the false nature of his claims. Schulman never contested the documents that Mr. Denham provided him. *Id.* at 109:06-17. Nevertheless—as will be shown at trial by other evidence—Schulman continued to press these claims, including by using these same documents, with other entities (but no longer with De La Rue) in his ongoing attempts to take control of Frozen Somali Assets.

Mr. Denham's testimony was scrutinized over nearly three hours of cross-examination. *Id.* at 112:06-236:15. Defense counsel was not prevented from asking a single question. *Id., passim*. Defense counsel did not challenge on cross-examination Mr. Denham's testimony that he reviewed the documents at issue at the time he received them and that he believed them to be falsified.

In sum, Mr. Denham's testimony is highly probative of: (i) whether Former Governor Amalow had the *actual* authority that Schulman was asserting with De La Rue and other entities (including Citibank, Citibank Switzerland, and the NY Comptroller, all of which ultimately released Frozen Somali Assets to Schulman); and (ii) Schulman's *knowledge* of whether he made false and fraudulent representations as charged in Count One, particularly after Mr. Denham told him that Former Governor Amalow did not have the asserted authority.[3]

### III. Mr. Denham's Specific Testimony at Issue

Schulman objects to portions of testimony that he contends constitute improper opinion testimony outside the parameters of Rule 701. ECF 359 at 10-11. Although Schulman has not specified which of his objections fall into this category, these objections appear to related to the following portions of testimony, which are referred to here as Portions 1, 2, and 3 respectively:

**Portion 1**
Q: And we'll get into those documents specifically in a bit. But generally, can you describe your impression of those documents?
A: My impression was not favorable. The document looked falsified.

*Id.* at 26:07-12 (objection omitted).

---

[3] This testimony is directly relevant to Counts 1, 2, 5, and 6. It is also relevant to the money laundering charges in Counts 7 through 11, which involve transactions with criminal proceeds from the scheme to defraud.

**Portion 2**

Q: And did you review this document at -- at the time or shortly after you received it?

A: I did.

Q: What was your impression of this document?

A: It looks falsified.

Q: Why do you say that?

A: The text of the letter is misaligned from the header and the footer. And the text overlays the signature at the top of the signature.

Q: Keep -- if you could keep holding that up. Could you explain what you mean, that the -- that the text -- before we get to the signature, can you explain what you mean by the text being misaligned, in your view?

A: The body of the text looked as though it had been cut and pasted onto a letterheaded document.

Q: And why do you say that?

A: Because if you look -- if you look closely at the main body of the text, it is misaligned with the -- with the header. And it overlays the top of the signature.

Q: Is there a date on this document?

A: No. It's undated.

Q: Did that have any impression on you?

A: Yes.

Q: Can you explain that?

A: Normally, I would expect this document to be dated and numbered and have contact details; address, telephone number, email. All of that is missing from the document.

Q: Were there other -- are there other features of a formal government documents that you expected to see but didn't see here?

A: I would have also [ ] expected to see a stamp of the Prime Minister's office. That's very typical from Middle Eastern states. And I would have expected to see either notarized or validated by a country's signature from one of the secretaries to the office.

*Id.* at 47:05-49:05. And:

**Portion 3**

Q: And do you recall testifying that the formatting of the text and the header caught your attention when you originally reviewed this document?

A: Yes. I believe that document has been fabricated or falsified.

Q: And with respect to the formatting of the text and the header, can you just explain the issue as you believe it to be?

> A: The issue -- I mean, I have more training in the area than some, but I would believe, even to an ordinary individual ---- you can see that the alignment of the text is not parallel to the alignment of the central line and header. The headed paper. And that the bottom of this text overlays the top of the signature, which indicates to me that it's been fabricated and falsified.
>
> Q: Now, if you could --
>
> Q: If you could bring up, back to Government's Exhibit 29, that page you're at that ends in 1549. Directing your attention back to this Confirmation of Appointment of Bashir Issa Ali.
>
> A: 1549. Yeah. Got it.
>
> Q: Hold that up so we can see it?
>
> A: Yeah.
>
> Q: How does the alignment of the text and the header compare in this document?
>
> A: To my eye, the alignment is perfect. So you can see the top of the text is parallel to the lines here, and to the alignment of the other lines of text, all the way down. And there's no overlay of the signature.

*Id.* at 246:21-248:13.

The Government's submission addresses the admissibility of these statements. If there is any other testimony that Schulman seeks to exclude on this ground, the Government respectfully requests the opportunity to address it at the hearing currently scheduled for June 7, 2024.

### IV.     Legal Standard

Federal Rule of Evidence 701 authorizes the admission of lay opinion testimony if it is: "(a) rationally based on the perception of the witness, and (b) helpful to a clear understanding of the witness' testimony or the determination of a fact in issue, and (c) not based on scientific, technical, or other specialized knowledge within the scope of Rule 702." Fed. R. Evid. 701; *United States v. Offill*, 666 F.3d 168, 177 (4th Cir. 2011). The Fourth Circuit has explained the parameters of the rule as follows:

> Rejecting the impractical notion that lay persons be required to testify only to pure facts when relating their knowledge of an incident, the rule allows testimony based on the person's reasoning and opinions about witnessed events, such as are familiar in every day life. Thus, on entering a room, a witness might say that she saw the victim on the floor with what looked like blood on his shirt, even though she was not an expert and had not tested the substance to confirm that it was blood. The important limitations are (1) that the opinion testimony be based on the witness' actual perception of events and (2) that it be helpful to the jury in understanding those events.

*Id.*

The "prototypical example[s] of the type of evidence contemplated by the adoption of Rule 701 relat[e] to *the appearance of persons or things*, identity, the manner of conduct, competency of a person, degrees of light or darkness, sound, size, weight, distance, *and an endless number of items that cannot be described factually in words apart from inferences*." *Asplundh Mfg. Div. v. Benton Harbor Eng'g*, 57 F.3d 1190, 1196 (3d Cir. 1995) (emphasis added); *United States v. Colwell*, 7 Fed. App'x 555, 557 (9th Cir. 2001) (unpublished) (affirming admission of lay witness testimony that defendant appeared to have acted as a "lookout" because "[a] lay witness may testify based on visual observations of conduct and may make reasonable inferences regarding that conduct.").

Further, the provision in Rule 701(c) precluding lay opinion testimony based on "scientific, technical, or other specialized knowledge within the scope of Rule 702" does not prohibit lay witnesses "from testifying based on particularized knowledge *gained from their own personal experiences*." *United States v. Hill*, 643 F.3d 807, 841 (11th Cir. 2011) (emphasis added). Specifically, the Advisory Committee Notes cite with approval the admission of testimony based on "the particularized knowledge that the witness has by virtue of his or her position in the business." Fed. R. Evid. 701 Advisory Comm. Notes (2000 Amendments); *see also United States v. Variste*, 625 Fed. App'x 458, 459-460 (11th Cir. 2015) (affirming admission of lay opinion testimony by IRS investigator describing indicia of fraud observed in the defendant's tax returns); *Hill,* 643 F.3d at 841 (citing with approval the admission of lay witnesses' testimony that was "based upon their particularized knowledge garnered from years of experience within the field.").

A witness's lay opinion must also be based on a proper foundation: "a witness who testifies to a fact which can be perceived by the senses must have had an opportunity to observe, and must have actually observed the fact." Fed. R. Evid. 602 Advisory Comm. Notes.

### V. Mr. Denham's Testimony at Issue Relates to His Perceptions of Schulman's Documents

In Portion 1, 2, and 3, Mr. Denham testified about the perception he had of the documents provided by Schulman *at the time he received and reviewed them.* A key distinction between Mr. Denham's lay opinion testimony and expert opinion testimony is that Mr. Denham was not offering his opinion, in the present moment, of documents he had reviewed in preparation for testimony. Rather, Mr. Denham, as a fact witness, testified to the perception he had of the documents at the time he received them from Schulman—a perception that informed his dealings with Schulman and his subsequent communications to Schulman. Accordingly, Mr. Denham's testimony was always clearly in the past tense, to wit:

Portion 1 (excerpt):
A: My impression *was* not favorable. The document *looked* falsified.
*Id.* at 26:07-12 (emphasis added).

Portion 2 (excerpt):

Q: *And did you review this document at -- at the time or shortly after you received it?*

A: *I did.*

Q: What *was* your impression of this document?

A: *It looks falsified.*

*Id.* at 47:05-11 (emphasis added).

Portion 3 (excerpt):

Q: And do you recall testifying that the formatting of the text and the header *caught your attention when you originally reviewed this document*?

A: *Yes. I believe that document has been fabricated or falsified.*

*Id.* at 246:21-247:04 (emphasis added).

In *United States v. Baraloto*, a criminal prosecution for trafficking in stolen goods, lay witnesses who worked with the defendant testified that they understood the goods at issue to be stolen based on, among other things, the witnesses' observations that the goods often were presented to them with retail labels still on them; the goods, which included large quantities of over-the-counter medications, were not the types of goods that individuals typically possess in bulk; and the persons bringing them the goods appeared to be, and described themselves as, drug addicts.  535 Fed App'x 263, 265-267, 270-271 (4th Cir. 2013) (unpublished).  The Fourth Circuit affirmed the admission of the lay witness testimony because it satisfied the requirement that the witnesses' opinions was based on their sensory perception and comprehension of the items at issue. *Id.* at 271 (citing *United States v. Mendiola*, 707 F.3d 735, 741 (7th Cir. 2013)).  Here, Mr. Denham's opinions were similarly based on his observations of the documents at issue at the time that he received them from Schulman and assessed them. Like the witnesses who could testify to their perception that the goods in *Baraloto* were stolen, Mr. Denham should be permitted to testify to his perceptions of Schulman's documents.

### VI.     Mr. Denham's Testimony Is Based on His Professional Experience

Mr. Denham's lay opinion that the documents appeared to be falsified or fraudulent was based on his professional experience and came to him while performing his job to evaluate Schulman's claims. Mr. Denham testified that performing due diligence and looking out for potential fraud was part of his regular responsibilities. *Id.* at 11:15-14:03; 15:05-16:05. Accordingly, he reviewed the documents submitted by Schulman while evaluating Schulman's claims. *See, e.g., id.* at 46:15-19; 47:05-08; at 67:06-13. Mr. Denham's impression of the documents informed his response to Schulman: he referred to Schulman's "poor quality documentation" when he wrote to Schulman that "we will not deal through you or whoever your clients are until we are entirely satisfied as to the positions they hold."  *Id.* at 93:02-94:03 (discussing Ex. 27).

A professional testifying about the performance of his or her duties as it related to the defendant is the type of lay opinion testimony routinely held to be admissible. *See, e.g., Hill*, 643 F.3d at 841 (lay witness testimony that was "based upon their particularized knowledge garnered

from years of experience within the field" does not constitute scientific, technical, or other specialized knowledge within the scope of Rule 702). In *United States v. Holavacko,* a criminal prosecution arising from the investment advisor defendant's misappropriation of his client's money, an investigator at the defendant's advisory firm testified to his investigation of the defendant's conduct. 781 Fed. App'x 100, 102-104 (3rd Cir. 2019) (unpublished). The court admitted the witness's "*informed inference* that the patterns [he] observed demonstrated a likely misappropriation of assets." *Id* at 103-104 (emphasis added). The Third Circuit affirmed the district court's admission of the lay opinion testimony because the witness's testimony "concerned his own actions and perceptions" and the witness "confined his testimony to what he personally perceived and concluded." *Id*. at 103.

Here, Mr. Denham's testimony concerns what he perceived about the documents at issue at the time of his dealings with Schulman. Those perceptions informed the actions that Mr. Denham took with respect to Schulman. Just as in *Holavacko,* Mr. Denham's testimony that he believed a document he received from Schulman was "fabricated or falsified" constitutes an informed inference, based on his perceptions, that he made while carrying out his professional duties. The testimony should be admitted.

## VII. Mr. Denham's Testimony Will Be Helpful to the Jury

The testimony at issue also satisfies Rule 701's requirement that it be helpful to the jury. Fed. R. Evid. 701(b). The legitimacy of Schulman's claims, and the legitimacy of the documents Schulman furnished in support of those claims, are key factual issues that the jury must resolve. Simply put, the Government alleges that Schulman, during the period of the charged conspiracy, attempted to defraud De La Rue, and that Mr. Denham sniffed out the potential fraud and rejected the claims. The testimony is integral to how and why Mr. Denham did what he did and told Mr. Schulman what he told him. It is also integral to showing Schulman's knowing submission of false and fraudulent statements to the victims of the charged offenses, particularly after Mr. Denham reported his conclusions to Schulman. It is difficult to imagine more probative testimony.

*United States v. Kalume*, 684 Fed App'x 80, 83 (2d Cir. 2017), a criminal prosecution alleging that the defendant committed visa fraud by falsely asserting that she was married to an individual named Jaiteh, is squarely on point. There, the Second Circuit affirmed the district court's admission of lay opinion testimony from the immigration official who had reviewed the visa petition. *Kalume*, 684 Fed App'x at 83. The court explained:

> [Th]e immigration officer's testimony was based on direct knowledge acquired in the course of conducting a review of and making a recommendation on the petition of Kalume and Jaiteh to secure unconditional resident status for Jaiteh based on the couple's marriage. With the petition and supporting documents in evidence, the officer identified the parts she considered most significant to her review, specifically her review of the *bona fides* of the couple's marriage, and she explained [ ] how she reached her adverse recommendation… *there was no error, much less clear and obvious error, in deeming this testimony helpful to the jury's understanding of why the evidence of marriage that Kalume*

9

  *and Jaiteh presented in support of Jaiteh's immigration petition was suspect.*

*Id.* (emphasis added). Here, Mr. Denham's testimony would be helpful to the jury's evaluation of whether the documents Schulman presented to De La Rue in support of his claims were "suspect," which goes directly to an issue that the Government has the burden to prove at trial. The testimony should be admitted accordingly.

                 Respectfully submitted,

| | |
|---|---|
| GLENN LEON | EREK L. BARRON |
| Chief | United States Attorney |
| Fraud Section | District of Maryland |
| | |
|      /s      |      /s      |
| Jason M. Manning | David I. Salem |
| Allison L. McGuire | Assistant United States Attorney |
| Trial Attorneys | |