Akin Gump Strauss Hauer & Feld LLP
Robert S. Strauss Tower
2001 K Street, N.W.
Washington, DC 20006

T  +1 202.887.4000
F  +1 202.887.4288
akingump.com



**Paul W. Butler**
+1 202.887.4069 /fax: +1 202.887.4288
pbutler@akingump.com

July 17, 2024

The Honorable Paula Xinis
United States District Court
District of Maryland
6500 Cherrywood Lane
Greenbelt, MD 20770-1249

      Re:     Supplemental Briefing on Admissibility of Abdiaziz Amalo's Testimony
              *United States v. Jeremy Schulman* (Cr. No. PX-20-434) **[REDACTED]**

Dear Judge Xinis:

      Mr. Schulman, by and through counsel, respectfully submits this correspondence regarding the admissibility of Abdiaziz Amalo's ("Amalo") trial testimony.

### I.    Timeline of Relevant Events.

      Amalo contacted Schulman in June 2009. Amalo and Schulman first met on June 29, 2009 at Starbucks. *See* GX 1000. At this time, Schulman and Amalo had spoken by phone approximately four times. *See* Ex. A,[1] GX 300 at 4, 5, 9 (Schulman phone records showing calls with Amalo on June 10, 16, and 28); Ex. B, GX 105 (Joint Stipulation of phone numbers). *See also* June 7, 2024 Hr'g Tr. ("Tr.") at 85:11-88:22.

      On July 16, 2009, Amalo met with Schulman at Shulman Rogers's office. *See* Ex. C, GX 1004; Tr. 88:13-22. Ali Abdi Amalow ("Amalow") and Abdelhakim Abdi ("Liban") also attended this meeting. The government intends to offer Amalo's hearsay testimony that Schulman was told at this meeting that Amalow did not currently serve as the Central Bank Governor. *See* Tr. 89:6-25; 230:10-15.

      However, two weeks later, on July 29, 2009, Amalow executed an engagement letter with Shulman Rogers on behalf of the Central Bank of Somalia. *See* DX 102. Amalow stamped the engagement letter with an official Central Bank of Somalia stamp expressly listing Amalow as "THE GOVERNOR." *See id.* at 3; Tr. 168:8-170:11. Years later, both Amalow and Liban told investigators that Amalow was involved in the asset recovery project because the banks only recognized Amalow's authority as the former and last governor of the last recognized Somali Government. *See* Ex. D at 4 (March 23, 2017 FD-302 of Liban).

      That same day, on July 29, 2009, Schulman sent to Amalo draft appointment letters to be executed by the President and Prime Minister of Somalia. The first set of draft appointment letters

---

[1] Hearing exhibits are not enclosed with this letter and are identified as "GX" and "DX."



The Honorable Paula Xinis
July 17, 2024
Page 2

appointed Amalow as the Governor of the Central Bank of Somalia. *See* GX 1001, 1001A, 1002, 1002A. Two and a half hours later, Schulman sent a second set of draft appointment letters providing that "AMALOW *has validly served* as the Governor of the Central Bank of Somalia continuously since his original appointment to that post in 1989 [and] such appointment is hereby re-affirmed." *See* GX 1003, 1003A, 1003B (emphasis added). Amalo did not assist in drafting these letters. Instead, the letters reflected Schulman's understanding of Amalow's authority based on his discussions with Amalo, Amalow, and Liban. Tr. 91:10-16, 95:19-96-7, 181:10-16, 191:2-5. At the time these letters were drafted, Schulman and Amalo had met twice in person and spoken on the phone for approximately two hours. *See* Ex. A.

Unbeknownst to Schulman, Amalo inserted the language provided by Schulman into a letter that appeared to be executed by Prime Minister Sharmarke but was actually forged by Amalo. *See* GX 1003A, GX 1008, 1008A. On August 3, 2009, Amalo's father sent him a letterhead for the Office of the Prime Minister of Somalia that included Prime Minister Sharmarke's signature. *See* GX 1005, 1005A. Amalo pasted the draft language into the letterhead. *See* Ex. E, GX 1006 (August 3, 2009 email from Amalo to himself regarding "Letter"); Ex. F, GX 1006A (attachment to August 3, 2009 email); GX 1007, 1007A. On August 4, 2009, Amalo sent the forged letter to Schulman, writing, "Good News!! [J]us[t] got it." GX 1008, 1008A. To further deceive Schulman, Amalo created a fake email account of "somalirepublic@gmail.com" in the name of "Osman" to make it appear as though he received the letter from the Prime Minister's office. *See id.*; Tr. 155:4-23. Amalo did not tell Schulman that he created the forged letter from Prime Minister Sharmarke, and Schulman relied on the authenticity of the Sharmarke letter in the following months. Tr. 99:1-6, 102:7-10, 104:4-12, 159:15-18, 185:18-186:5. The Sharmarke letter was sent to Credit Suisse on or about September 18, 2009. *See* GX 1010A.

Around September 26, 2009, Schulman, Amalow, and Amalo met with Somali President Sheikh Sharif Ahmed, Finance Minister Sharif Hassan, and Presidential Advisor Ahmed Warfa in New York. *See* Tr. 108:6-110:23. Amalow's authority was discussed in these meetings. Tr. 109:18-20, 110:16-23; *see also* Ex. G, DX 105 at 3 (March 30, 2017 FD-302 of Amalo). Contemporaneous communications show that, beginning in November 2009, Amalo and Schulman sought to secure a new title for Amalow, consistent with President Sheikh Sharif's direction at the New York meetings. *See, e.g.*, GX 1015, 1015A, 1016, 1016A, 1017B; Tr. 114:9-117:24.

On December 13, 2009, Finance Minister Hassan emailed Amalo a Somali-language decree executed by President Sheikh Sharif. *See* GX 1018, 1018A. The authenticity of the decree is not in dispute. *See* Tr. 119:10-23, 206:4-6. The government maintains that the decree appointed Amalow as an "Advisor of the President for Banking Affairs and Recovery of National Assets." *See* Ex. H, GX 1018C (certificate of translation signed by A. Elmi).



The Honorable Paula Xinis
July 17, 2024
Page 3

Finance Minister Hassan's email transmitting the Presidential Decree, written in Somali, reads, "Attached herewith to this email is the Decree that designates the Presidential Advisor." *See* Ex. I, DX 111 (December 13, 2009 email); Tr. 118:23-119:9. In forwarding the email to Schulman, Liban, and Amalo's father with an English document, Amalo intended to deceive Schulman by altering the Somali text in Finance Minister Hassan's email to indicate that the decree appointed Amalow as the "***Commissioner and*** the Presidential Advisor." *See* Ex. J, DX 110 (certified translation of December 13, 2009 email from Amalo to H. Amalo, Liban, and J. Schulman regarding "Updates") (emphasis added); Tr. 121:16-122:21, 123:9-25, 206:21-207:4. That same day, Schulman asked Amalo to confirm that the English document attached to Amalo's email was an accurate translation. *See* GX 1020; Tr. 207:14-208:18. Schulman also drafted a separate document detailing Amalow's authority as the Commissioner of Economic Recovery and Banking Affairs. *See* GX 1021A. This document was never ratified by the Somali government.

Two days later, on December 15, 2009, Amalo asked his brother, Farah Abdi ("Farah"), to translate the decree. *See* GX 1022. On December 16, 2009 at 7:17 PM, Farah emailed Amalo an initial translation, which identified Amalow as the "Special Advisor to the President on matters of all banking institutions and the reestablishment and recovery of all national assets of the country." *See* GX 1023, 1023A. Two hours later, at 9:18 PM, Farah emailed Amalo a revised translation, which identified Amalow as the "advisor to the president of the Somali Republic on matters concerning the Banks and Banking with the authority and power to recover the national assets of the country." *See* GX 1024, 1024A. Amalo testified that he told Farah to revise the first translation. Tr. 135:15-23. Schulman was not provided with either of Farah's translations and was not included on the emails with Farah. Instead, at 11:44 PM, Amalo emailed Schulman a translation that identified Amalow as "Sr advisor to the president of the Somali Republic on matters concerning the Banks and head of recovery financial assets and Banking affairs with the authority and power to recover all the national assets of the country." *See* GX 1025, 1025A.

The next day, on December 17, 2009, Schulman proposed edits to the translation, and asked Amalo to "review this revised letter with the translator to ***ensure that it is accurate***." GX 1026 (emphasis added). Schulman's edits are detailed in DX 126. Schulman's most substantive change modified the language of "***head*** of ***recovery financial assets*** and Banking affairs with the authority and power to recover all the national assets of the country" to "***Director*** of ***Financial Asset Recovery*** and Banking Affairs with the authority and power to recover all the national assets of the country." *See* DX 126 (emphases added). Schulman's translation left unchanged the language providing Amalow with "the authority and power to recover all of the national assets of the country."

In February 2010, Amalow executed a second engagement letter with Shulman Rogers as the Director of Financial Asset Recovery and Banking Affairs. *See* DX 107; Tr. 226:5-17.



The Honorable Paula Xinis
July 17, 2024
Page 4

**II.  Amalo's Testimony Is Inadmissible Hearsay.**

Rule 801(d)(2)(E) excludes from the hearsay rule statements offered against an opposing party that "was made by the party's coconspirator ***during and in furtherance of*** the conspiracy." Fed. R. Evid. 801(d)(2)(E) (emphasis added). The plain language of the rule makes clear that Rule 801(d)(2)(E) applies to out-of-court statements made ***during*** the conspiracy that the government seeks to elicit from the co-conspirator at trial. *See also* Fed. R. Evid. 801(c) (defining hearsay as "a statement that . . . the declarant does not make while testifying at the current trial or hearing").

The government has not established by a preponderance of the evidence that Schulman agreed with Amalo to commit some unlawful objective. Rather, the evidence shows that (i) Amalow's authority was affirmed by senior Somali officials and (ii) Schulman did not engage in any conduct inconsistent with that authority. None of Schulman's conduct evinces an agreement to accomplish an unlawful act. Instead, the evidence shows that Amalo repeatedly deceived Schulman by creating fake email accounts, failing inform Schulman that he falsified certain documents, and forging emails from Somali officials. Amalo's hearsay statements are inadmissible pursuant to Rule 801(d)(2)(E).[2]

The government seemingly concedes in its post-hearing pleading that no conspiracy existed prior to October 1, 2009. *See* ECF No. 501 at 4. As such, the Court should exclude all hearsay testimony and exhibits that pre-date October 1, 2009. Additionally, hearsay statements post-dating October 1, 2009 should be excluded because the government has not established the existence of a conspiracy by a preponderance of the evidence.

No conspiracy existed at the time that Amalo forged the Sharmarke letter. Amalo testified at the hearing that he did not tell Schulman that the letter was forged prior to creating the letter. *See* Tr. 102:2-10; 159:5-9, 159:24-160:6, 162:7-11. This testimony contradicts Amalo's prior statements to federal agents that he provided Schulman with the blank letterhead prior to forging the letter. *See* See Ex. G at 2. The Court cannot credit Amalo's testimony that he told Schulman

---

[2] Ample authority exists to exclude a co-conspirator's statement when it is not supported by independent evidence of a conspiracy. *See, e.g., United States v. Gresko*, 632 F.2d 1128, 1131-32 (4th Cir. 1980) (trial court should have entered judgment of acquittal where no independent evidence of a conspiracy, and co-conspirator hearsay statements should have been excluded); *Campbell v. Lyon*, 26 F. App'x 183 (4th Cir. 2001) (excluding co-conspirator affidavits in absence of independent evidence of conspiracy); *United States v. Stroupe*, 538 F.2d 1063, 1065 (4th Cir. 1976) (insufficient proof of conspiracy to warrant application of Rule 801(d)(2)(E)). *See also United States v. Grassi*, 616 F.2d 1295, 1302 (5th Cir. 1980) (upholding trial court's exclusion of co-conspirators' statements where no independent evidence of conspiracy).



The Honorable Paula Xinis
July 17, 2024
Page 5

that the Sharmarke letter was forged.[3]

No conspiracy existed at the time Shulman met with President Sheikh Sharif and other Somali officials in New York. Amalo previously told federal agents that "President Sheikh Sharif and Finance Minister Hassan liked the idea of having the Shulman Rogers law firm recover the frozen assets and agreed to give Amalow some type of title upon their return to Mogadishu." *See* Ex. G, DX 105 at 3. No independent evidence supports the government's theory that a conspiracy existed at this point in time. Rather, the evidence shows that Schulman sought to discuss the asset recovery project with President Sheikh Sharif. Tr. 109:21-110:13. Schulman's conduct following the meetings in New York was consistent with the authority given to Amalow by President Sheikh Sharif—as evinced by the issuance of the presidential decree ten weeks later.

No conspiracy existed at the time the presidential decree was translated. The government did not present any evidence—outside of Amalo's hearsay statements—that (1) Schulman knew that Farah's translation of the decree was inaccurate or (2) Schulman's edits to the translation were in furtherance of a criminal conspiracy. Amalo's hearsay statements regarding the translation are unsupported by the contemporaneous emails and contradicted by his prior statements to government agents. For instance, Amalo repeatedly told investigators that Schulman spoke separately to Farah about the translation. *See* Ex. G at 5 (stating "AMALO was aware that SCHULMAN was also talking to Farah separately during the same time," "SCHULMAN and Farah were fighting over the translation," and "AMALO could not say for certain, but said it was possible that SCHULMAN convinced Farah that his (SCHULMAN's) version of the translation was suitable"); Tr. 130:11-14 (testifying that both Amalo and Schulman discussed the translation with Farah). However, Farah testified ▓▓▓▓▓▓▓▓▓▓▓▓▓ (and in previous interviews with the government) that he did not speak to Schulman while he translated the decree and that he did not meet Schulman until five days after he notarized the translation. *See* Ex. K at 26:5-7 (September

---

[3] Similarly, in January 2024, Amalo told the government's attorneys that "***Amalo never told Schulman*** that he fabricated the version of the [August 2010 letter from the Somali Attorney General] that titled Kitaabi as the Attorney General." *See* ECF No. 372, Ex. 1 (emphasis added). Amalo told government agents in March 2017: "AMALO recalled that he ***confessed to SCHULMAN*** when he produced the second forged Attorney General letter with Nur's signature and notary on each page. After being told about the forgery, SCHULMAN asked AMALO, "What am I supposed to do now?" SCHULMAN was angry and told AMALO that he (SCHULMAN) was going to lose credibility with the banks…." *See* Ex. G, DX 105 at 10 (emphasis added). Amalo's willingness to inculpate Schulman and fabricate inculpatory statements purportedly made by Schulman should bear significantly on the Court's determination of whether the government has met its burden.



The Honorable Paula Xinis
July 17, 2024
Page 6

6, 2017 ███████████████████████████████████
██████████████████████████████████████████).

The government's briefing conflates the admissibility of (i) direct testimony by a witness as to what he observed and events that occurred, which are admissible even if no hearsay exception applies, and (ii) out-of-court statements renewed by a testifying witness, which are admissible only if a hearsay exception applies.

The cases cited by the government stand solely for the proposition that direct testimony by a co-conspirator, as to his and others' participation in a conspiracy and what he observed, is not subject to the hearsay rule. Out-of-court statements that are renewed at trial are hearsay unless a hearsay exception applies. *See Dutton v. Evans*, 400 U.S. 74, 88 (1970) ("The hearsay rule does not prevent a witness from testifying as to what he has heard; it is rather a restriction on the proof of fact through extrajudicial statements."); *Chestnut v. Ford Motor Co.*, 445 F.2d 967, 972, n.5 (4th Cir. 1971) (distinguishing between hearsay and direct testimony); *United States v. Williams*, 14 F. App'x 469, 474 (6th Cir. 2001) (distinguishing between out-of-court admissions retold on the stand—which are "non-hearsay" pursuant to Rule 801(d)(2)(E)—and "*direct testimony* of co-conspirators") (emphasis in original); *United States v. Mobile Materials, Inc.*, 881 F.2d 866, 871-73 (10th Cir. 1989) (direct testimony by a co-conspirator "describing his participation in the conspiracy and the actions of others is not hearsay" but out-of-court statements offered by the co-conspirator are subject to Rule 801(d)(2)); *United States v. Smith*, 692 F.2d 693, 697-98 (10th Cir. 1982) (hearsay rule does not apply to direct testimony of a co-conspirator); *Laughlin v. United States*, 385 F.2d 287, 292 (D.C. Cir. 1967) (Rule 801(d)(2)(E) "applies only to out-of-court (i.e., hearsay) statements of a coconspirator" and "does not exclude proof of a conspiracy by the direct testimony under oath of a party to it.").

**III.   Amalo's Hearsay Testimony Is Not Admissible for Any Non-Hearsay Purpose.**

Following the Fourth Circuit's recent decision in *United States v. Gallagher*, 90 F.4th 182 (4th Cir. 2024), this Court should conclude that Amalo's hearsay statements are not admissible for any other purpose other than the truth of the matter asserted. As the Fourth Circuit explained in *Gallagher*, "statements offered for the[] effect of the listener . . . are not hearsay ***because their relevance does not depend on whether the declarant spoke the truth***." *Id.* at 195 (emphasis added). Amalo's statements that Schulman was told certain facts are relevant only if the underlying facts purportedly conveyed to Schulman are also true. Amalo's testimony is thus inadmissible for any non-hearsay purpose.

**IV.   Amalo's Testimony Is Unfairly Prejudicial.**

Evidence should be excluded if its "probative value is substantially outweighed" by a risk of unfair prejudice. Fed. R. Evid. 403. At the June 7 hearing, Amalo disavowed prior statements



The Honorable Paula Xinis
July 17, 2024
Page 7

he made to federal agents,[4] contradicted prior statements made to federal agents,[5] claimed not to remember pertinent facts,[6] and manufactured additional statements unsupported by his *eight* interviews with federal agents.[7] The unreliability of Amalo's testimony affirms that the probative value of Amalo's testimony is substantially outweighed by the unfair prejudice of his uncorroborated and contradicting self-serving statements.

Further, Amalo's testimony is unfairly prejudicial because Amalo's proffered testimony purports to recount events from 15 years ago involving numerous witnesses who are presently unavailable to testify due to the government's delay in prosecuting this case. *See Vodusek v. Bayliner Marine Corp.*, 71 F.3d 148, 156 (4th Cir. 1998) (court has wide discretion "for the purpose of leveling the evidentiary playing field and for the purpose of sanctioning the improper conduct"). Schulman will be deprived of his right to a fair trial and to confront the witnesses against him if Amalo testifies to statements purportedly made by Amalow, President Sheikh Sharif,

---

[4] During Amalo's March 30, 2017 interview with federal agents, Amalo explained that he provided the blank letterhead he received from his father to Schulman at a Starbucks on Rockville Pike. *See* Ex. G at 2. At the hearing, Amalo repeatedly disavowed this version of events, stating "that's not true" and that this version of events was impossible "because he wasn't even hired at the time" they met at Starbucks. *See* Tr. 159:5-9, 159:24-160:6, 162:7-11.

[5] During Amalo's March 30, 2017 interview with federal agents, Amalo stated that "in Somalia when someone leaves a position in the government, that person does not keep the title" and he was "confused as to why SCHULMAN kept referring to his uncle as 'Governor Amalow' even though he made it clear that his uncle was no longer the governor of the CBS." Ex. G at 3-4. At the hearing, Amalo testified that he referred to Amalow as the Governor "because when you have somebody general, or governor, still the name, they hold it" and "it was custom" to refer to Amalow as Governor. Tr. 171:8-14, 187:5-11.

[6] Amalo claimed to not have any recollection of his March 30, 2017 statements to agents that he was "confused as to why SCHULMAN kept referring to his uncle as 'Governor Amalow.'" *See* Tr. 172:1-174:23.

[7] Amalo testified at the hearing that his cousin sent him the blank letterhead that included Prime Minister Sharmarke's signature from his father's email account. Tr. 96:20-97:6. Amalo previously told federal agents that his father sent him this letterhead. Ex. G at 2. Additionally, Amalo testified at the hearing that Amalow contacted Farah to convince Farah to notarize Schulman's translation of the Presidential Decree. Tr. 139:17-141:9. This testimony is unsupported by Amalo's eight interviews with government agents, and contradicted by ███ ████████████████ that it took him five days to send the translation back because he was busy at work and with his father's cancer diagnosis. *See* Ex. K at 25:10-16. Farah's prior statements make no mention of Amalow contacting him regarding the translation.



The Honorable Paula Xinis
July 17, 2024
Page 8

Finance Minister Hassan, and others, and Schulman cannot cross-examine these witnesses as to statements attributed to them.

**V.    Amalo's Testimony Lacks a Predicate Foundation.**

"A witness may testify to a matter only if evidence is introduced sufficient to support a finding that the witness has personal knowledge of the matter." Fed. R. Evid. 602. Evidence is inadmissible under Rule 602 "only if in the proper exercise of the trial court's discretion it finds that the witness could not have actually perceived or observed that which he testifies to." *M.B.A.F.B. Fed. Credit Union v. Cumis Ins. Soc., Inc.*, 681 F.2d 930, 932 (4th Cir. 1982).[8]

Amalo testified that he moved to the United States in 1989, Amalow moved to the United States in 2000, and he did not observe Amalow complete work on behalf of the Central Bank once he moved to the United States. Tr. 72:21-25, 75:25-76:3, 77:15-78:6. Amalo further testified that his testimony was based upon information provided to him by his father and other individuals, watching the news, and his Somali heritage. Tr. 165:12-167:6, 198:13-201:5, 203:3-204:7. As to the existence of the Office of Financial Asset Recovery and Banking Affairs, the foundation for this testimony is Amalo's hearsay and uncorroborated statements that he asked Somali officials whether this office existed and conducted an internet search. *See* Tr. 149:15-20; 150:15-23.

This proffer is not a sufficient foundation for Amalo's unsubstantiated testimony regarding the organization and workings of the Somali government, particularly because this uncorroborated testimony is the factual underpinning of the government's allegation that Schulman agreed to participate in a conspiracy.

Respectfully,

*[signature]*

---

[8] *See also United States v. Crews*, 443 F. App'x 834, 837 (4th Cir. 2011) (no abuse of discretion to allow a bank teller testify that she thought defendant may have possessed a concealed weapon after testifying to what she observed); *Shamblin's Ready Mix, Inc. v. Eaton Corp*, 873 F.2d 736, 739 (4th Cir. 1989) (setting aside verdict when it was based on "false, misleading, and prejudicial evidence," including testimony for which a witness had no personal knowledge), *overruled on other grounds, Defender Indus., Inc. v. Nw. Mut. Life Ins. Co.*, 938 F.2d 502 (4th Cir. 1991); *United States v. Ebert*, 178 F.3d 1287, 1999 WL 261590, at *14 (4th Cir. 1999) (testimony regarding non-existence of fact would have been inadmissible since the government did not lay a foundation to show that witnesses would have known of the absence of the fact).



The Honorable Paula Xinis
July 17, 2024
Page 9

                                                Paul W. Butler
                                                Allison T. Coffin
                                                Madeline M. Bardi
                                                *Counsel for Jeremy Wyeth Schulman*

cc:    Stanley E. Woodward Jr., Esq., Brand Woodward Law